**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL BELL and MICHELLE KIDD, individually and on behalf of themselves and all others similarly situated; SOUTHWEST ORGANIZING PROJECT and PALENQUE LSNA, individually,<br><br>          Plaintiffs,<br><br>v.<br><br>MARIA PAPPAS, in her capacity as Treasurer of Cook County, Illinois, and Trustee of the Indemnity Fund; and COOK COUNTY, ILLINOIS,<br><br>          Defendants. | Case No.:<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

## INTRODUCTION

1.     Plaintiffs Michael Bell and Michelle Kidd ("Individual Plaintiffs") are Cook County homeowners who seek compensation, on their own behalf and on behalf of classes of similarly situated persons, for the loss of the value of their homes due to the actions of Defendant Maria Pappas, as the Cook County Treasurer, and Defendant Cook County, through their administration of property tax sales. Plaintiffs Southwest Organizing Project ("SWOP") and Palenque LSNA ("PLSNA") ("Organizational Plaintiffs") are non-profit community-based organizations whose members and missions are threatened and undermined by the same failure to compensate homeowners of which the Individual Plaintiffs complain and whose members are impacted and whose resources have been diverted from other purposes to address Defendants'

unlawful actions.

2.     Under the Cook County property tax sale system, which implements the Illinois Property Tax Code, 35 ILCS 200/1-1 *et seq*., a homeowner who fails to pay overdue property taxes can be divested of not just their home, but suffer loss of all of the market value of the home over and above what the homeowner owes in overdue taxes, penalties, interest, costs, and any other liens and encumbrances on the property (hereafter "equity").[1] Defendants sell the delinquent taxes to an investor—called a "tax buyer"—who pays the past due taxes and, in exchange, secures the right to take ownership of the home if the homeowner does not pay the tax buyer the amount of the taxes, plus substantial penalties and a high rate of interest by a fixed deadline.  If the homeowner does not "redeem" the taxes and related charges by the deadline, a deed to the property to the tax buyer may issue, who then owns the property free and clear, no matter how much it was worth in excess of the unredeemed taxes and related charges.

3.     Neither the tax buyer nor the County has any statutory obligation to reimburse the homeowner for their lost equity. Therefore, unlike a bank mortgage foreclosure sale, where amounts realized in excess of the debt owed on the property are returned to the owner, a property tax sale can ultimately result in a total loss to the homeowner of not just the home *but also the entire value of the home over and above the taxes and related charges.*

4.     Recognizing homeowners' property right in their equity, State law creates a avenue to potentially seek indemnity for the loss via a lawsuit against the Treasurer in her capacity as Trustee of what is called the Indemnity Fund.  35 ILCS 200/21-305. This is the

---

[1] *See also Crane v. Comm'r*, 331 U.S. 1, 7 (1947) (equity is the value of property that exceeds encumbering liens); *Hall v. Meisner*, ___ F. 4th ___, No. 21-1700 (6th Cir. October 13, 2022) ("equity," also referred to historically as "equitable title").

County's sole method for a homeowner to even try to recover lost equity, and unfortunately it is effectively hidden from public view and inherently inadequate and in practice fails to provide homeowners with a fair chance to vindicate their rights. There is no notice of the fund and process to the homeowners; there must be a formal court filing and ultimately a trial; even blameless homeowners can be denied compensation; there are eligibility requirements that rule out some homeowners; the indemnity fund is never is adequately or sufficiently funded; and even successful homeowners must wait many years to be paid. In the end, vanishingly few homeowners ever receive indemnity in an amount close to the true and reasonable value of the homeowner's lost equity. The indemnity fund does nothing to help homeowners access their home equity soon enough to help them secure new housing.

5.     Cook County's tax buyer program has especially pernicious and disproportionate effects on communities of color. Last year, 75% of the Cook County parcels on the tax sale list were in Latino and Black neighborhoods, even though only 52% of County residents identify as Latino, Black, or as being of two or more races.[2]

6.     Communities of color in Cook County have long endured housing discrimination, and the disproportionately low rates of homeownership in these communities have exacerbated the racial wealth gap in Cook County and around the country. Defendants' actions aggravate these racial inequities by driving Black and Latino homeowners out of their homes while

---

[2] Samantha Chatman, "Cook Co. Treasurer Wants to Help Black Homeowners Who Could Lose Houses to Unpaid Property Taxes," ABC7 (Oct. 9, 2020), https://abc7chicago.com/cook-county-property-taxes-tax-illinois-treasurer/6878804/ (last visited Dec. 7, 2022); U.S. Census Bureau, QuickFacts: Cook County, Illinois, https://www.census.gov/quickfacts/fact/table/cookcountyillinois/PST045221 (last visited Dec. 7, 2022).

depriving them of the value of this key financial asset – the home's equity in excess of unredeemed taxes and related charges – impairing their ability to continue to be adequately housed.

7.     Plaintiffs claim that depriving homeowners of the equity in their homes is an unconstitutional taking of private property without just compensation and an unconstitutional excessive fine. Plaintiffs claim that Defendants' inadequate indemnity fund policy and process effectively deprives them of property rights recognized and established under the common law and by the Illinois General Assembly. Finally, Plaintiffs and a subclass of homeowners who are Black or Latino claim that by depriving them of the equity in their homes disproportionately more than other homeowners, Defendants have violated their civil rights.

8.     The Individual Plaintiffs bring this action on behalf of themselves and a class and a subclass of similarly situated individuals pursuant to 42 U.S.C. §1983, the United States Constitution directly, the federal Fair Housing Act, 42 U.S.C. §3601, *et seq.*, and the Illinois Civil Rights Act of 2003, 740 ILCS 23/1 *et seq*. ("ICRA"). Jurisdiction is proper under 28 U.S.C. § 1331, 1343, and 1367, and 42 U.S.C. § 3613.  Plaintiffs and putative class members, and the Organizational Plaintiffs, seek all available remedies, including damages, and declaratory and injunctive relief.

## PARTIES

### Plaintiff Michael Bell

9.     Plaintiff Michael Bell is a natural person and citizen and resident of Illinois.

10.     Mr. Bell owned the residential property located at 2203 East 100th Street, Chicago, Illinois. As of December 7, 2022, the property has, on information and belief, an estimated market value of approximately $115,000.

11.     He acquired sole ownership of this property, which had been in his family for more than 40 years, after his mother, Helen McKinnon, died in March 2017, and he used $25,000 of his inheritance to buy out his brothers' interests in the property.

12.     Mr. Bell lives in the home and until recently worked part-time at Buddy Bear Car Wash, where he earned the minimum wage.

13.     Mr. Bell was unemployed from 2018-19 and failed to pay his property taxes for 2018 due to his personal challenges and economic circumstances. He wanted to pay the taxes but could not do so. He did not abandon or intend to abandon his property and did not do so.

14.     On May 17, 2019, Cook County sold the 2018 taxes on Mr. Bell's property to Lien Group LLC. The total amount of the sale was $1,649.67.

15.     Mr. Bell was not able to redeem due to his ongoing hardships, and the redemption period expired on April 18, 2022.

16.     The redemption amount was $11,089 (including subsequent or "sub year" taxes of $6,226.19, penalties of $1,495.12, and costs and fees of $1,705.45).

17.     As a direct, proximate and foreseeable result of Defendants' actions, Mr. Bell will soon lose all rights in his property, including the right to use, live in and dispose of it.

18.     Mr. Bell's home is and was at all relevant times worth a large multiple of the sum of all taxes, interest, penalties and other associated charges against the property.

19.     Mr. Bell received no compensation for his equity, the difference between the unpaid taxes and related charges and the value of the home. Defendants' failure to fairly and promptly compensate Mr. Bell upon the loss of the equity in his home has impeded his ability to secure new, future housing.

20.     Mr. Bell is Black and his neighborhood is predominantly Black.

5

**Plaintiff Michelle Kidd**

21.     Plaintiff Michelle Kidd is a natural person and citizen and resident of Illinois.

22.     Ms. Kidd owned the residential property located at 1922 South 12th Avenue, Maywood, Illinois. As of December 7, 2022, the property has, on information and belief, an estimated market value of approximately $230,000.

23.     At the time she purchased the property in August 2011, Ms. Kidd was employed full-time as a bus driver.

24.     Ms. Kidd paid the full purchase price for the property. She did not have a mortgage.

25.     In the mid-2010s, Ms. Kidd became disabled—she suffers from chronic obstructive pulmonary disease and asthma—and fell behind on her property taxes.

26.     On April 4, 2017, Cook County sold the 2015 taxes on Ms. Kidd's property to an entity known as "High Five Group, LLC". Due to Ms. Kidd's disability, she was unable to earn sufficient income to redeem the taxes.

27.     Ms. Kidd did not redeem and the redemption period expired on October 10, 2019.

28.     She did not abandon or intend to abandon her home and legal interest in the property and did not do so. She wanted to pay the taxes but could not do so. On November 2, 2021, the Circuit Court of Cook County issued a tax deed on Ms. Kidd's property to High Five Group.

29.     On January 3, 2022, High Five Group moved for an order of possession.

30.     On January 26, 2022, the Circuit Court of Cook County entered an eviction order awarding High Five Group possession of the premises.

31.     Ms. Kidd started paying rent to High Five Group but vacated the premises in May

6

2022, moving with her husband and four children to an apartment located at 1014 South 11th
Avenue, Maywood, Illinois.

32. As a direct, proximate and foreseeable result of Defendants' actions, Ms. Kidd
lost all rights in her property, including the right to use, live in and dispose of it.

33. Ms. Kidd's home is and was at all relevant times worth a large multiple of the
sum of all taxes, interest, penalties and other associated charges against the property.

34. Ms. Kidd received no compensation for her equity, the difference between the
unpaid taxes and related charges and the value of the home. Defendants' failure to fairly and
promptly compensate Ms. Kidd for the loss of her rights in her home and the equity in it has
impeded her ability to secure new, future housing.

35. Ms. Kidd is Black and her neighborhood is predominantly Black.

**Plaintiff Southwest Organizing Project**

36. Southwest Organizing Project (SWOP) is a community-based nonprofit
corporation incorporated in Illinois that has its principal place of business in Chicago. It is a
citizen of Illinois.

37. SWOP formed in 1996 as a response to the legacy of structural racism that has
severely damaged the quality of life for many Chicago residents. SWOP's offices are located on
the Southwest side of Chicago, where it serves forty-five member institutions including churches
and representing approximately 40,000 people in Chicago Lawn, Gage Park, West Lawn, West
Elsdon, and Ashburn—some of the communities most impacted by Defendants' unlawful
conduct.

38. The population SWOP serves is almost entirely Black and Latino. The
communities it serves include low- and moderate-income neighborhoods where over half of

households—and in some areas nearly 70% of households, such as in Chicago Lawn—have annual incomes below $50,000.

39.     SWOP's mission is to build multi-racial, multi-religious, intergenerational coalitions and to improve the lives of those living in the neighborhoods it serves. Ensuring that its community members have and maintain housing they can afford is part of and critical to this mission—as is helping people transition to new housing when they can no longer remain in their current residence.

40.     For example, SWOP works with partner organizations that provide certified housing counseling as part of its day to day activities, and trains its staff members to direct community members to these counselors when they have housing issues, including property taxes and potential sales. SWOP's housing-related work accounts for approximately one-third of SWOP's overall budget, as well as approximately one third of its personnel costs.

41.     Community members come to SWOP for assistance with concerns about missed property taxes and SWOP provides it. They also seek SWOP's assistance—and SWOP will provide or direct them to proper resources—prior to or after losing a home to a tax sale.

42.     SWOP also collects information about property tax sales as part of its research to support ongoing advocacy efforts around housing and housing discrimination. This includes regularly reviewing the published lists of those subject to the tax sale to identify community members who may lose their homes without compensation and are in need of assistance. If a person on the list is living in the listed property, SWOP will try to help them stay in the home. If they cannot stay, because they cannot afford to pay the taxes (plus fees and interest), SWOP will try to connect them to resources to locate new housing.

43.     Tax sales can affect SWOP's member organizations and in turn their members in

other ways also. For example, several of SWOP's members are schools, who are affected by property tax sales whenever they require a student to move out of a neighborhood and change schools. Thus, the inability to quickly obtain compensation for lost equity can immediately impact local school enrollment by limiting a family's ability to stay in their chosen home community.

44. Because of Defendants' unlawful conduct, SWOP is forced to do work it otherwise would not have to do and expend resources that could be put towards other efforts. Every dollar and minute that SWOP expends assisting individuals who have suffered or risk uncompensated loss of their homes is money and time that SWOP would spend on its other projects and efforts. This includes efforts to fill vacant buildings, prevent non-tax-related foreclosures, improve parent involvement in their children's education, and more.

### Plaintiff PLSNA

45. Plaintiff PLSNA (formerly known as the Logan Square Neighborhood Association, or LSNA) is a community-based non-profit corporation that is incorporated in Illinois and has its principal place of business in Chicago. It is a citizen of Illinois.

46. PLSA was founded in 1962 as an organization dedicating to improving economic conditions in the Logan Square neighborhood of Chicago, eventually combining economic, political, social, cultural, and educational programming into a broad strategy for positively impacting the neighborhood. Today, PLSNA continues pursuing its goal of community improvement and has an expanded footprint, now serving more than 6,500 residents annually across the Logan Square and its adjacent neighborhoods. Most of these residents are non-white.

47. While PLSNA's work touches on many issues key to maintaining a healthy, prosperous community, housing is one of the most significant. PLSNA's work is focused on an

area of Chicago that is primarily Latino and, in the past two decades, has undergone a significant increase in property values. As property taxes have continued to increase in turn, PLSNA has worked to avoid some of the negative effects of these increases—including through litigation. *See* Grotto, *An Unfair Burden*, *infra*, ¶ 82.

48.     Because of its community members' high property tax burdens and support for homeownership and economic opportunity on the Northwest Side, PLSNA has dedicated significant resources to assisting residents with property tax-related issues, including those related to the tax sale.

49.     PLSNA maintains an outreach team of three individuals who spend 45-50 hours per month, each, on assisting individuals with property tax issues. Each year, when the tax sale list is published, PLSNA works to locate property owners in their area and provide them with information—in English and Spanish—about their options, and to offer assistance before the home is lost to a tax sale.

50.     In providing this outreach and support, PLSNA focuses its limited resources on owner-occupied properties because of its highly hands-on approach, which includes visiting the homes and trying to talk to the owners directly. While this is more time consuming than just sending a letter, PLSNA believes it to be more effective. PLSNA also focuses on the owner-occupied properties because, in its experience, many of these homes are owned by senior citizens, or mom-and-pop property owners, whose only source of income or other wealth building is their property.

51.     If PLSNA did not have to worry about families losing their homes and livelihood, and did not have to worry about homeowners not receiving fair, speedy compensation for the lost equity in their homes, PLSNA would divert time, energy, and resources towards other efforts,

such as strengthening the Here to Stay Community Land Trust, doing more outreach about obtaining weatherization through the Chicago Bungalow Association, or connecting more senior residents to resources at the Center for Elder and Disability Law.

**Defendants**

52.    Defendant Maria Pappas is sued in her official capacity. She is and has been the duly elected and acting Treasurer of Cook County, Illinois from 1998 to the present, in charge of the Office of Treasurer for Cook County. Acting with the discretion vested in her in that position, she supervises and administers Cook County's tax sales and forfeitures at issue herein, as did her predecessors and as will her successors. Defendant Pappas also serves as Trustee of the indemnity fund. In these official capacities, Defendant Pappas is a "person" within the meaning of 42 U.S.C. § 1983, a unit of state, county, or local government within the meaning of the Illinois Civil Rights Act and subject to the provisions of the Fair Housing Act.

53.    Defendant Cook County, Illinois, is a political entity and includes its agents, one of whom is Defendant Pappas. Cook County is a unit of county government subject to ICRA. Cook County is a party defendant, including for purposes of indemnification of Defendant Pappas as to any monetary amounts recovered by Plaintiffs through this action. *See Carver v. Sheriff of LaSalle County*, 203 Ill.2d 497 (2003), and *Carver v. Sheriff of LaSalle County*, 324 F.3d 947 (7th Cir. 2003).

54.    Acting under color of state law and through their policies and customs, Defendants have violated, and continue to violate, Plaintiffs' and the putative Class's rights by, among other things, seizing without adequate just compensation the equity in their homes.

## FACTUAL ALLEGATIONS

### Overview of Equity Seizure in Cook County

55.     Under Illinois's Property Tax Code, Cook County may sell delinquent property taxes to a third party investor—a tax buyer. On information and belief, Defendants exercise discretion pursuant to a supposedly unwritten internal policy over what properties are sold for taxes. The tax buyer pays the county for the delinquent taxes, and in return receives, among other things, the right to collect those back taxes from the homeowner, plus interest.[3] 35 ILCS 200/21-215; 21-240.

56.     Upon paying the back taxes, the tax buyer receives a lien on the homeowner's property. If the owner does not timely reimburse the tax buyer for the taxes paid, plus penalties and interest, the tax buyer may take ownership of the property and retain all value of the property, even if this amount exceeds the debt for taxes and applicable penalties and interest. 35 ILCS 200/21-250, 22-40.

57.     Most residential property owners have 30 months from the date of the tax sale to redeem their property by paying off the taxes and related charges. 35 ILCS 200/21-350(b).

58.     Unlike many taxing authorities, Cook County offers no payment plans for redemption. As a recent study by Defendant Pappas's office explains, "To redeem their taxes, property owners must pay the entire tab — all unpaid taxes, interest penalties and fees — with no option for a payment plan." Cook County Treasurer, Maps of Inequality: From Redlining to

---

[3] The tax sale involves a "reverse bidding" process. Investors bid a percentage representing the penalty the buyer will charge the taxpayer above the taxes and interest they owe, with penalties ranging from 9% to 0% every six months. The lowest bid wins. 35 ILCS 200/21-215; 35 ILCS 200/21-355(b).

Urban Decay and the Black Exodus at 46 (July 2022),

https://www.cookcountytreasurer.com/pdfs/scavengersalestudy/2022scavengersalestudy.pdf (last

visited Dec. 7, 2022); *see also* Cook County Clerk's Office, A Guide to the Tax Redemption

Process, https://www.cookcountyclerkil.gov/sites/default/files/pdfs/Brochure%20-

%20Tax%20Redemption%20Process%20-%202021.pdf (last visited Dec. 7, 2022).

59.     If the property owner does not redeem in full and on time, the tax buyer may

petition the court to become the legal owner of the property and evict the owner and any family

members or other residents. 35 ILCS 200/22-40.

60.     Recognizing the loss of property rights established under both state law and

federal common law suffered by homeowners whose homes are seized without compensation,

state law requires counties to maintain "indemnity funds" for some property owners who suffer

losses as a result of a tax sale and subsequent deed issuance. 35 ILCS 200/21-295. But this is an

inadequate remedy for lost equity as many owners are not eligible, and all others must petition

for this relief in court.  The indemnity fund process is expensive and time-consuming.  Even if

the owner prevails, they may wait years to be paid, and is not guaranteed to receive the full value

of their lost equity, or indeed any of the value of the equity lost, in part due to extreme and

chronic failure and refusal to fund the indemnity fund which at present has an eight-year delay in

payment, which delay has steadily grown over the years and is still growing. 35 ILCS 200/21-

305.

**Cook County Deprives Homeowners of the Property Right in Equity
in their Homes and Does Not Compensate Them**

61.     In 1976, an Illinois Legislative-Investigative Commission deemed Illinois'

practice of "total forfeiture" to be needlessly harsh and recommended replacing it with  a "sale-

surplus system" that would preserve home equity:

> The Commission's main conclusion was that there is no relation
> between the threat of total forfeiture and the rate of tax collection,
> and we recommend that this severe penalty be stricken from the
> statutes. We recommend that the current tax deed sale be
> eliminated and replaced by a sale-surplus system, whereby
> delinquent property is sold at a public auction. The proceeds of the
> sale would be first applied to the costs of the proceedings and the
> fees incurred; the tax buyer would collect the monies due him, and
> the surplus would be turned over to the original owner. Under this
> system, a property owner who fails to redeem is penalized
> sufficiently; the State receives its taxes; and the tax buyer realizes
> a profit. Our recommendations simply eliminate the possibility of a
> tax buyer reaping an unearned windfall at the expense of those
> who can least afford it.

Illinois-Legislative Investigating Commission, Annual Report of 1976: Delinquent Tax Sales: A
Report to the Illinois General Assembly 24 (1976).

62.     Despite this recognition that a fairer system was needed, one not involving
"unearned windfalls at the expense of those [homeowners] who can least afford it", nothing was
ever done and Cook County continues to strip homeowners of their equity.

63.     Each annual tax sale involves thousands of properties. At the annual tax sale held
in 2019 (for tax year 2017), Cook County auctioned nearly 57,000 properties with delinquent
property taxes.[4] The tax sale held in 2022 (for tax year 2019; delayed by COVID) involved
delinquent property taxes due on 37,176 properties.[5] The November 15-18, 2022 sale of 2020
taxes involved more than 55,000 properties, almost half of which owed less than $1,000.[6]

---

[4] Cook County Treasurer's Office, Pappas: 57,000 Property Owners Are Running Out of
Time to Pay Nearly $190 Million in Delinquent Taxes to Avoid Sale, (Mar. 13, 2019),
https://www.cookcountytreasurer.com/newsarticle.aspx?articleid=759 (last visited Dec. 7, 2022).
[5] ABC7, Cook County Treasurer Begins Holding Delinquent Property Tax Sale, (May 12,
2022), https://abc7chicago.com/cook-county-property-tax-sale-bill/11840970/ (last visited Dec.
7, 2022).
[6] Pappas: More than 55,000 Properties are in Cook County's Tax Sale and 21,000 Owe

64.     As noted, the delinquent property taxes are often relatively low. For tax year

2017, nearly 4,000 of the roughly 14,000 Chicago residential properties listed for the tax sale

owed $1,000 or less in unpaid taxes. The median unpaid tax amount was $1,696.89, and the

smallest tax amount due was $100.56. Odette Yousef, "Cook County Makes Millions By Selling

Property Tax Debt — But At What Cost?," WBEZ Chicago (May 3, 2019),

https://www.npr.org/local/309/2019/05/03/719971654/cook-county-makes-millions-by-selling-

property-tax-debt-but-at-what-cost  ("Cook County Makes Millions") (last visited Dec. 7, 2022).

The median sales price of a Cook County home is approximately $300,000.  Realtor.com, "Cook

County, IL Real Estate Market," https://www.realtor.com/realestateandhomes-search/Cook-

County_IL/overview (last visited Dec. 7, 2022). The average tax rate in Cook County is

approximately 2.09 % of the home's value.[7]

65.     According to a report from Housing Action Illinois, "When a tax deed is issued,

the investor typically acquires the property at a fraction of the value, creating very large profits

for the investor and a huge loss of equity for the property owner." Housing Action Illinois,

*Racial Disparities and Cook County Tax Sale Evictions* (hereafter "Housing Action IL Report")

at 5 (Nov. 2021), https://housingactionil.org/downloads/Policy/Racial-Disparities-and-Cook-

County-Tax-Sale-Evictions.pdf; *see also* Yousef, Cook County Makes Millions, *supra* ¶ 64

(citing advocates for the proposition that "it's elderly African American or Latino homeowners

living on fixed incomes who fall behind and who lose their only source of wealth for a fraction

---

Under $1,000; https://www.prnewswire.com/news-releases/pappas-more-than-55-000-
properties-are-in-cook-countys-tax-sale-and-21-000-owe-under-1-000--301641108.html (last
visited Dec. 7, 2022).
        [7] SmartAsset, Overview of Cook County, IL Taxes, https://smartasset.com/taxes/cook-
county-illinois-property-tax-calculator (last visited Dec. 7, 2022)

of its true value" and describing a Chicago resident who nearly lost his $400,000 home over $20,000 in property taxes and costs); Michael Sallah, Debra Cenziper, Steven Rich, "Left With Nothing," Wash. Post (Sept. 8, 2013), https://www.washingtonpost.com/sf/investigative/2013/09/08/left-with-nothing/ (last visited Dec. 7, 2022) (of close to 200 Washington, D.C. residents who lost their properties, one in three had liens worth less than $1,000).

66.     Nearly all properties listed for sale are, like Mr. Bell's and Ms. Kidd's were, mortgage-free, because when properties have mortgages there is typically an interested third-party (*e.g.*, the mortgage lender) who will step in to pay delinquent property taxes and protect the property from sale. *See generally* 35 ILCS 200/20-10 (describing process when copies of tax bill are mailed to mortgage lender). Properties most affected by the tax sale are thus those in which the owners have accumulated significant equity.

67.     Once a homeowner's taxes are sold, the tax buyer gets the right to collect high rates of penalty interest on the back taxes—historically, up to 18% every six months, or 36% per year, though the General Assembly capped the penalty interest rates at a still-high rate of 9% per six months, or 18% per year, beginning in 2022. *See* Housing Action IL Report, *supra* ¶ 65 at 5; 35 ILCS 200/21-215.

68.     Partly as a result of these high interest rates, property owners face unreasonable and sometimes insurmountable obstacles when trying to meet the redemption deadline. A 2019 WBEZ analysis found that property owners who were able to redeem after their properties were sold at the tax sale paid, on average, nearly three times what *tax buyers* had paid for the property owners' unpaid taxes. Yousef, Cook County Makes Millions, *supra* ¶ 65.

69.     Every year, many homeowners are unable to redeem their properties. These

individuals lose all the equity they have built up in their homes.

70.     Homeowners fail to redeem their properties for reasons including lack of notice, mental illness, hospitalization, or confusion about the redemption process. *See Apex Tax Invs., Inc. v. Lowe (In re Cty. Collector)*, 225 Ill. 2d 208, 217 (2007) (property owner hospitalized with mental illness); *Giordano v. Trzaska*, 2014 IL App (2d) 130778-U, ¶ 8 (lack of notice and confusion about instructions from Treasurer's office in Boone County); *see also* Andrew W. Kahrl, *Investing in Distress: Tax Delinquency and Predatory Tax Buying in Urban America*, 43(2) Critical Socio. 199 (2017) ("Investing in Distress") (citing reporting from Washington, D.C. that most residents who lost homes to tax buyers "were black, elderly, sick or suffering some form of mental illness, and living in neighborhoods where real estate values were appreciating rapidly").

71.     Defendant Pappas has herself acknowledged that the annual tax sale "usually affects those who are most vulnerable—senior citizens." Marc Vitali, Delinquent Tax Deadline Looms for 45K Property Owners in Cook County, WTTW (May 2, 2019), https://news.wttw.com/2019/05/02/delinquent-tax-deadline-looms-45k-property-owners-cook-county (last visited Dec. 7, 2022).

72.     Homeowners also fail to redeem due to inadequate funds and inability to secure a loan against the equity in their home. *See* Robyn A. Friedman, *Why Home Equity Loans Are Still So Hard to Come By*, Wall Street Journal (Apr. 29, 2021), www.wsj.com/articles/why-home-equity-loans-are-still-so-hard-to-come-by-11619699464 (last visited Dec. 7, 2022). Lenders generally do not make mortgage or home equity loans on home equity alone.  Key eligibility determinants also include income, credit history or score, liquid assets such as bank deposits, payment history and other factors. Lenders typically do not loan money to persons in default on

17

taxes.

73.     The net result, for example, is that if a homeowner's failure to pay taxes results in $10,000 in tax-related debt on a property worth $100,000, and the homeowner is unable to pay the full past due amount during the redemption period, the tax buyer can get title to the home. The  owner receives nothing and loses as much as $90,000 in equity, while the tax buyer receives the windfall of a property worth $100,000 for which they paid $10,000. One recent report suggests homeowners often lose more than $135,000 in equity. See Sidnee King, *Tax Sale Process Hits Black Homeowners Hardest*, Illinois Answers Project (Nov. 17, 2022), https://illinoisanswers.org/2022/11/17/tax-sale-process-hits-black-homeowners-hardest/ (last visited Dec. 7, 2022) ("the average home equity lost after eviction [for non-payment of taxes] was at least $135,000, while the median cost for tax purchasers to get a lien on their properties was just over $2,000.").

## Cook County Disproportionately Harms Homeowners of Color

74.     Plaintiffs are not challenging Defendants' assessment or collection of taxes. Instead, they are challenging Defendants' failure to compensate homeowners, thus depriving homeowners of the value of the difference between the market value of their residential properties and the amounts they owe in delinquent taxes, penalties and interest, which we have referred to, and which is commonly referred to, as equity. This significant harm disproportionately affects communities of color, a fact that Defendant Pappas has repeatedly acknowledged.

75.     Just this year, for instance, she stated that the "majority of the taxes offered" at the tax sale held in May of 2022 "are for properties in minority communities."  ABC7, *Cook County Treasurer Begins Holding Delinquent Property Tax Sale*, https://abc7chicago.com/cook-

18

county-property-tax-sale-bill/11840970/ (last visited Dec. 7, 2022). According to Treasurer

Pappas, "Year after year, a disproportionate number of properties on the list are in majority

Black and Latino communities," Pappas said. "Ultimately, there's nothing about this system that

works." Sidnee King, *Tax Sale Process Hits Black Homeowners Hardest* (Nov. 17, 2022),

https://illinoisanswers.org/2022/11/17/tax-sale-process-hits-black-homeowners-hardest/ (last

visited Dec. 7, 2022).

76.     In 2021, Pappas reported that 75% of the parcels set for sale at the annual tax sale

were in Latino and Black neighborhoods. Samantha Chatman, Cook County Treasurer, *ABC7*

*Chicago Team Up to Connect Taxpayers with Unclaimed Property Tax Refunds* (Sept. 20, 2021),

https://abc7chicago.com/cook-county-property-tax-illinois-treasurer-maria-pappas/11033141/

(last visited Dec. 7, 2022).

77.     Fewer than 24% of Cook County residents identify as Black. Only 26% identify

as Latino. U.S. Census Bureau, QuickFacts: Cook County, Illinois,

https://www.census.gov/quickfacts/fact/table/cookcountyillinois/PST045221 (last visited Dec. 7,

2022).

78.     The racially disparate effect of the tax sale system is even more pronounced than

these figures suggest because Black and Latino homeownership rates (35% and 43%

respectively) lag far behind the White homeownership rate of 54%. Institute for Housing Studies

at DePaul University, *Data and Research to Facilitate Equitable Homeownership in Chicago*

(Sept. 20, 2021), https://www.housingstudies.org/releases/equitable-homeownership (last visited

Dec. 7, 2022).

79.     Depriving homeowners, especially minority homeowners, of the market value of

their residential properties in excess of the amounts they owe in delinquent taxes, penalties and

interest prevents them from passing on their most valuable asset to future generations, thereby widening the racial wealth gap.

80.     Furthermore, it compromises and interferes with their ability to find new housing. A person's home equity is typically the key asset they rely on to secure new housing when they move away from a home that they own. This is especially true for Black and Latino homeowners: at the end of 2019, about 28% of Latino families' wealth and 20% of Black families' wealth came from home equity, compared to about 16% for white families.[8]

81.     Thus, when a person loses their home to foreclosure after a tax sale and does not receive immediate, fair compensation for their equity, that prevents them–as it prevents the Individual Plaintiffs—from obtaining new housing and further harms the local community. In a 2016 paper for *Regional Science and Urban Economics*, several economists found that property tax delinquency sales have a significant effect on the sales of the surrounding properties.

82.     Depriving minority homeowners of the equity in their homes is yet another example of a long-running pattern in Cook County. From the enforcement of racially restrictive covenants and Federal Housing Administration redlining policies, to unfairly high property tax assessments in Black neighborhoods, the discriminatory impacts of local officials' decisions have undermined Black and Latino families' wealth and stability. *See, e.g.,* "How the 'Black Tax' Destroyed African-American Homeownership in Chicago," Bloomberg (June 11, 2015) ("For decades, racist property assessments and predatory tax-debt sales went hand-in-hand in

---

[8] Federal Reserve Bank of St. Louis, "Housing Wealth Climbs for Latinos and Blacks, Yet Racial Wealth Gaps Persist," On the Economy Blog (Apr. 1, 2020), https://www.stlouisfed.org/on-the-economy/2020/april/housing-wealth-climbs-hispanics-blacks-racial-wealth-gaps-persist (last visited Dec. 7, 2022).

Chicago. The system came to be known as the 'Black Tax.'"); Jason Grotto, *An Unfair Burden*, CHI. TRIB. (June 10, 2017), https://apps.chicagotribune.com/news/watchdog/cook-county-property-tax-divide/assessments.html (last visited Dec. 7, 2022). It is no surprise that tax sale evictions in the County are concentrated on the south and west sides of Chicago, and that the individuals who are entitled to indemnity for their losses are disproportionately Black and Latino. Housing Action IL Report, *supra* ¶ 65 at 1–2.

83.     However, as shown in the following allegations, Cook County's indemnity fund is ineffectual and extremely slow in a way that completely undermines its purpose. It provides relief to only a small handful of the homeowners every year who fail to redeem, and then only after substantial expense, effort, and years of delay. It has not remedied the widespread problem of homeowners being evicted from homes and losing all of the equity in them, and thus the key asset needed to secure new housing.

84.     And the backlog is growing, meaning persons who receive an award now will likely have to wait more than eight years.

85.      As a result, even homeowners who receive a judgment entitling them to payment from the fund must wait an unreasonable and arbitrary amount of time to receive any money. According to the Cook County Treasurer's response to Plaintiffs' counsel's FOIA request, as of March 29, 2022, Cook County had 270 outstanding indemnity fund judgments waiting to be paid. These judgments totaled over $25 million and are due on judgments stretching back to 2014. Twenty-five unpaid judgments date back to 2015.

86.     The net result is that only a few dozen homeowners receive payouts from the Cook County Indemnity fund per year—a fraction of those who have lost the equity in their homes. According to Cook County's responses to Plaintiffs' FOIA requests, from 2009 to 2014,

the County averaged only 27.5 payouts per year to property owners through the indemnity fund, as shown in this chart:

| YEAR | NUMBER OF PAYOUTS THROUGH INDEMNITY FUND | TOTAL AMOUNT PAID OUT OF INDEMNITY FUND |
|------|------|------|
| 2009 | 39 | $5,298,758 |
| 2010 | 23 | $2,812,100 |
| 2011 | 43 | $3,760,487 |
| 2012 | 46 | $3,120,471 |
| 2013 | 33 | $2,224,500 |
| 2014 | 35 | $2,532,650 |
| 2015 | 15 | $1,222,361 |
| 2016 | 36 | $4,795,998 |
| 2017 | 8 | $714,500 |
| 2018 | 20 | $1,499,000 |
| 2019 | 29 | $1,726,550 |
| 2020 | 4 | $300,000 |
| 2021 | 26 | $1,093,700 |

## CLASS ALLEGATIONS

87. The Individual Plaintiffs bring this action individually and on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23, including Rule 23(b)(2) and 23(b)(3), in the following class and subclass (collectively, "the Classes").

88.     Plaintiffs Bell and Kidd sue individually and as representatives of a Class defined as follows:

>   All persons who meet the following criteria: (1) they owned or were the beneficial owners of residential real property in Cook County, Illinois; (2) the taxes on such property were sold by Defendants; and (3) a tax deed was issued to the purchaser of such taxes.

89.     Plaintiffs Bell and Kidd also seek to represent a subclass of the Class, referred to hereafter as the FHA/ICRA Subclass, and defined as follows: All persons who are members of the Class and who are Black or Latino.

90.     Excluded from all Classes are (i) any judge or magistrate presiding over this case and their family members; (ii) Defendants and their subsidiaries, successors, predecessors, and any entity in which Defendants have a controlling interest; (iii) anyone who properly executes and files a timely request to be excluded from any Class from which exclusion is permitted; (iv) anyone whose claims have been finally adjudicated on the merits or otherwise released; (v) Defendants' counsel and Plaintiffs' counsel; and (vi) legal representatives, successors, and assigns of any such excluded persons.

91.     **Numerosity.** Upon information and belief and based on the data cited elsewhere in this Complaint, well over forty persons are members of the Class and Subclass. Between 2018 and spring of 2022, more than 200 people were evicted by the Sheriff for taxes, and this does not count owners who left voluntarily before being evicted, and there was a moratorium on evictions during COVID. Joining them all would be impracticable, but the individuals in question can be identified through Defendants' data. On information and belief based on FOIA requests, approximately 4,000 properties were not redeemed from the 2015 tax sale.

92.     **Commonality / Predominance**. Common questions of law and fact exist as to the

members of the Class and Subclass that predominate over any questions affecting individual

Class members. These questions include, without limitation:

(1) Whether the involuntary transfer of Plaintiffs' and the Class's properties to tax buyers

or others without promptly remitting to Plaintiffs or compensating them for the equity in

their home constitutes an uncompensated taking of private property, a violation of due

process of law, and/or an excessive fine under the United States Constitution;

(2) Whether Defendants "make unavailable or deny[] a dwelling" to individuals "because

of race, color,…or national origin" in violation of the Fair Housing Act;

(3) Whether Defendants' conduct violates the Illinois Civil Rights Act by causing a

disparate impact on Black and Latino homeowners;

(4)  Whether class members whose homes are taken through the property tax sale process

were entitled to receive adequate, prompt, and just compensation for their equity;

(5) Whether, in addition to just compensation and other damages, declaratory and

injunctive relief is appropriate.

93.    **Typicality.** The named Plaintiffs' claims are typical of those of the Class and the

Subclass. All of the named Plaintiffs' claims arise from the same challenged policies and

practices. The proposed representatives of the Subclass assert claims that are typical of Subclass

members. No Plaintiff presents claims that are unique to themselves.

94.    **Adequacy.** Individual Plaintiffs will fairly and adequately protect the interests of

the Class and Subclass. Plaintiffs have no interests adverse to the interests of the Class or

Subclass. Individual Plaintiffs are committed to prosecuting this action and have retained

competent, experienced counsel who have had substantial success prosecuting complex class

action cases and claims based on constitutional law.

24

95.     **Superiority.** A class action is an appropriate method for the fair and efficient adjudication of this controversy and superior to other methods. Pursuing individual litigation would be unduly burdensome to class members, especially given that many of those class members are impoverished and in no position to hire hourly counsel to sue Defendants. Class treatment is also preferable because of the time and expense required for courts to address each individual case and the risks of having inconsistent adjudications on the important issues raised herein. Overall, a class action would present far fewer management difficulties than a slew of individual lawsuits, as well as the benefits of a single adjudication and comprehensive supervision by a single court.

96.     The Defendants have acted or refused to act on grounds that apply generally to the class.

## CAUSES OF ACTION

97.     All causes of action herein are pleaded in the alternative.

98.     Individual Plaintiffs bring Counts I, II, III, IV and V in their individual capacities and also as class representatives, and seek compensatory monetary relief, and all other available relief relating to the Defendants' failure to provide compensation to persons who lose their equity as alleged herein.

99.     Organizational Plaintiffs bring Counts I, II, III, IV and V in their individual capacities, and not as class representatives, and seek injunctive and declaratory relief relating to Defendants' failure to provide compensation to persons who lose their equity.

**COUNT I**
**TAKING OF PRIVATE PROPERTY WITHOUT JUST COMPENSATION**
**U.S. CONST. AM. V, XIV and 42 U.S.C. § 1983**

100.     The allegations contained in paragraphs 1-99 hereof are incorporated and repeated

in this paragraph and this Count is brought individually by Individual Plaintiffs and on behalf of the Class, and by the Organizational Plaintiffs individually.

101.    The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." The Fourteenth Amendment prohibits state and local governments from violating the right to just compensation.

102.    Defendants' uniform policies and practices of failing to adequately and promptly compensate Plaintiffs for the equity in properties which Defendants have confiscated or caused homeowners to cease to own is an actionable taking of private property for public use without just compensation, and a deprivation of Plaintiffs' rights secured under, *inter alia,* the Fifth and Fourteenth Amendments to the United States Constitution.

103.    Defendants' actions in failing to pay just compensation are *ultra vires*, as takings of property are only permitted when just compensation promptly follows.

104.    Defendants' violations of rights secured by the Fifth and Fourteenth Amendments are actionable pursuant to 42 U.S.C. §1983, *and* as direct claims brought under those Amendments. Plaintiffs' claims are brought directly and under §1983.

105.    As a direct, proximate and foreseeable result of Defendants' unconstitutional failure to compensate Plaintiffs and the Class as alleged, Plaintiffs and Class members whose property value has been taken from them have been injured and damaged and are entitled to just compensation and appropriate post-foreclosure injunctive relief.

106.    Organizational Plaintiffs and their members have personally suffered and now suffer injury, and continue to be threatened with and are in immediate danger of future injury likely to be redressed by a favorable decision. No adequate remedy at law is available and violations of Constitutional rights *per se* cause and threaten irreparable harm. They are entitled to

an injunction requiring Defendants to, among other things, cease and refrain from future seizures of equity without prompt, just compensation.

## COUNT II
## DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS
## U.S. CONST. AM. XIV and 42 U.S.C. § 1983

107.    The allegations contained in paragraphs 1-99 hereof are incorporated and repeated in this paragraph and this Count is brought individually by Individual Plaintiffs and on behalf of the Class and by Organizational Plaintiffs individually.

108.    The Due Process Clause of the Fourteenth Amendment prohibits the government from depriving "any person of life, liberty, or property, without due process of law …." U.S. Const. amend. XIV, § 1.

109.    Defendants' actions as alleged herein deprive Plaintiffs of due process and of a fundamental property interest without due process of law.

110.    Plaintiffs and Class members have a protected property interest in the equity in their home.

111.    Plaintiffs and Class members have a protected property interest existing by reason of federal and state common law, as well as an interest created by the Illinois General Assembly in creating the indemnity fund.

112.    Defendants have created, implemented and administered procedures for administering the program for indemnifying homeowners' losses in a way that fails to provide Plaintiffs and Class members with a fair, timely, and adequate means of securing compensation for taking the entire value of a property over and above any liability for taxes, interest and fees.

113.    As a direct, proximate and foreseeable result of Defendants' unconstitutional failure to indemnify Plaintiffs and the Class and failure to provide fair, timely and adequate

redress as alleged, Plaintiffs and Class members have been injured and damaged and are entitled to compensation and appropriate post-foreclosure injunctive relief.

114.    Organizational Plaintiffs and their members have personally suffered and now suffer injury, and continue to be threatened with and are in immediate danger of future injury likely to be redressed by a favorable decision. No adequate remedy at law is available and violations of Constitutional rights *per se* cause and threaten irreparable harm. They are entitled to an injunction requiring Defendants to, among other things, cease and refrain from future seizures of equity without prompt, just compensation.

**COUNT III**
**EXCESSIVE FINES**
**U.S. CONST. AM. VIII, XIV and 42 U.S.C. § 1983**

115.    The allegations contained in the foregoing paragraphs 1-99 hereof are incorporated and repeated in this paragraph and this Count is brought by Individual Plaintiffs individually and on behalf of the Class and by Organizational Plaintiffs individually.

116.    The Eighth Amendment to the United States Constitution prohibits the imposition of excessive fines. The Eighth Amendment is applicable to the State of Illinois and its governmental entities within it by operation of the Fourteenth Amendment to the United States Constitution.

117.    Taking the entire value of a property over and above any liability for taxes, interest and fees without providing just compensation is purely punitive and an excessive fine under the Eighth Amendment to the United States Constitution.

118.    Defendants are engaged in assessing and collecting prohibited excessive fines.

119.    As a direct, proximate and foreseeable result of Defendants' unconstitutional failure to compensate Plaintiffs and the Class as alleged, Plaintiffs and Class members whose

property value has been taken from them have been injured and damaged and are entitled to compensation and appropriate post-foreclosure injunctive relief .

120.    Organizational Plaintiffs and their members have personally suffered and now suffer injury, and continue to be threatened with and are in immediate danger of future injury likely to be redressed by a favorable decision. No adequate remedy at law is available and violations of Constitutional rights *per se* cause and threaten irreparable harm. They are entitled to an injunction requiring Defendants to, among other things, cease and refrain from future seizures of equity without prompt, just compensation.

## COUNT IV
## VIOLATION OF THE FAIR HOUSING ACT, 42 U.S.C. § 3604

121.    The allegations contained in the paragraphs 1-99 hereof are incorporated and repeated in this paragraph and this Count is brought on behalf of Individual Plaintiffs individually and on behalf of the FHA/ICRA Subclass and by Organizational Plaintiffs individually.

122.    The federal Fair Housing Act makes it unlawful "[t]o … make unavailable or deny a dwelling to any person because of race, color, or national origin." 42 U.S.C. § 3604(a).

123.    Disparate impact claims are cognizable under the Fair Housing Act. *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 546–57 (2015).

124.    Plaintiffs and members of the FHA/ICRA Subclass are "aggrieved persons" within the meaning of 42 U.S.C. § 3613(a).

125.    Black and Latino property owners are disproportionately represented in the tax sale population and disproportionately victimized by uncompensated loss of equity.

126.     The uncompensated confiscation of these homeowners' equity over and above liability for taxes, interest and fees through the tax sale process thus especially burdens Black and Latino property owners in Cook County, making housing unavailable or significantly less available to these property owners because of their race or color, in violation of the Fair Housing Act. Defendants' failure to adequately and promptly compensate these homeowners for their lost equity deprives Plaintiff and the Subclass of the primary asset they would otherwise rely on to secure new housing.

127.     As a direct, proximate and foreseeable result of Defendants' unconstitutional failure to fully and promptly compensate Plaintiffs and the Subclass as alleged herein, Plaintiffs and Subclass members whose property value has been taken from them have been injured and damaged and are entitled to compensation, attorneys' fees and costs and appropriate post-foreclosure injunctive relief. See 42 U.S.C. § 3613(c).

128.     Organizational Plaintiffs and their members have personally suffered and now suffer injury, and continue to be threatened with and are in immediate danger of future injury likely to be redressed by a favorable decision. No adequate remedy at law is available and violations of Constitutional rights *per se* cause and threaten irreparable harm. They are entitled to an injunction requiring Defendants to, among other things, cease and refrain from future seizures of equity without prompt, just compensation.

**COUNT V**
**VIOLATION OF THE ILLINOIS CIVIL RIGHTS ACT, 740 ILCS 23/5**

129.     The allegations contained in paragraphs 1-99 hereof are incorporated and repeated in this paragraph and this Count is brought by Individual Plaintiffs individually and on behalf of the FHA/ICRA Subclass and by Organizational Plaintiffs individually.

130. The Illinois Civil Rights Act provides that "[n]o unit of State, county, or local government in Illinois shall … utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." 740 Ill. Comp. Stat. Ann. 23/5.

131. Disparate impact claims are cognizable under ICRA. *See Cent. Austin Neighborhood Ass'n v. City of Chicago*, 2013 IL App (1st) 123041, ¶ 28.

132. Defendants are a unit of state, county, or local government in Illinois.

133. Defendants' failure to compensate persons whose equity was seized subjects persons to discrimination under a program or activity and Defendants' method of failing to compensate taxpayers whose equity or surplus value is seized has the effect of subjecting individuals to discrimination because of their race or color.

134. As a direct, proximate and foreseeable result of Defendants' unconstitutional failure to compensate Plaintiffs and the Subclass as alleged, Plaintiffs and Subclass members whose property value has been taken from them have been injured and damaged and are entitled to compensation, attorneys' fees and costs and appropriate post-foreclosure injunctive relief. See 740 Ill. Comp. Stat. Ann. 23/5(a).

135. Organizational Plaintiffs and their members have personally suffered and now suffer injury, and continue to be threatened with and are in immediate danger of future injury likely to be redressed by a favorable decision. No adequate remedy at law is available and violations of Constitutional rights *per se* cause and threaten irreparable harm. They are entitled to an injunction requiring Defendants to, among other things, cease and refrain from future seizures of equity without prompt, just compensation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.     Certify this action as a class action pursuant to Fed. R. Civ. P. 23, with Plaintiffs designated, as appropriate, as representatives of the Class and Subclass described herein and Plaintiffs' undersigned counsel designated as Class/Subclass Counsel;

b.     Award Plaintiffs and the Class and/or Subclass just compensation and/or damages, including prejudgment interest, in an amount determined at trial;

c.     Award Plaintiffs and the Class and/or Subclass reasonable attorney's fees and costs, as provided by law;

d.     Declare that the inadequately or non-compensated seizure of equity as alleged herein is unlawful and discriminatory under the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution, the Fair Housing Act, and the Illinois Civil Rights Act;

e.     Enjoin Defendants from seizing or causing to be seized the equity in homes without promptly and adequately providing compensation as described herein; and

f.     Grant the Plaintiffs and the Class and/or Subclass such further relief as may be deemed just and proper to secure and protect their right to just compensation or similar awards.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.

Date: December 15, 2022           By: /s/ Brian D. Roche

Brian D. Roche
REED SMITH LLP
10 South Wacker Drive
40th Floor
Chicago, IL 60606
(312) 207-6400
broche@reedsmith.com

Charles R. Watkins
GUIN, STOKES & EVANS, LLC
805 Lake Street, #226
Oak Park, IL 60301
(312) 878-8391
charlesw@gseattorneys.com

John Bouman
Lawrence Wood
Daniel Schneider
LEGAL ACTION CHICAGO
120 South LaSalle Street, 10th Floor
Chicago, IL 60603
(312) 341-1070
jbouman@legalactionchicago.org
lwood@legalactionchicago.org
dschneider@legalactionchicago.org

*Counsel for Plaintiffs and the Putative Class and Subclass*