**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MICHAEL BELL and MICHELLE KIDD,
individually and on behalf of themselves and
all others similarly situated; SOUTHWEST
ORGANIZING PROJECT and PALENQUE
LSNA, individually,

                Plaintiffs,

v.

MARIA PAPPAS, in her capacity as
Treasurer of Cook County, Illinois, and
Trustee of the Indemnity Fund; and COOK
COUNTY, ILLINOIS,

                Defendants.

Case No. 22 CV 7061

Judge Matthew F. Kennelly

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

ARGUMENT ....................................................................................................... 6

I.     The FAC Plausibly Alleges Every Element of a Disparate Impact Claim. ........................ 7

     A.     Plaintiffs Allege a Statistically Disparate Impact. ................................... 7

     B.     Plaintiffs' FHA and ICRA Claims are Based on Defendants' Policy of Not Providing Prompt and Just Compensation. ............................................. 10

     C.     The FAC Alleges that Defendants' Policy Choices Have Caused a Disparate Impact on Black and Latino Cook County Residents.......................... 12

II.     Plaintiffs Properly Allege a Disparate Treatment Claim Based on Defendants' Ongoing Knowledge and Acknowledgement of Their Conduct's Racialized Harms. ................................................................................................. 13

III.     Mr. Bell and His Proposed Class B and Subclass Have Standing to Seek Declaratory and Injunctive Relief. ................................................................. 16

IV.     Defendants' Tort Immunity Act Argument Lacks Merit. ................................. 21

CONCLUSION.................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Living of Metro. Chi. v. Prewitt*,
111 F. Supp. 3d 890 (N.D. Ill. 2015) .....................................................................................14

*Access Living of Metro. Chi. v. Uber Techs.*,
351 F. Supp. 3d 1141 (N.D. Ill. 2018) ...................................................................................18

*Alvarado v. Litscher*,
267 F.3d 648 (7th Cir. 2001) .................................................................................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................................6

*Bank of Am. Corp. v. City of Miami, Fla.*,
581 U.S. 189 (2017)................................................................................................................12

*Bankhead v. Wintrust Fin. Corp.*,
2023 U.S. Dist. LEXIS 173291 (N.D. of Ill., Sept. 27,2023) .................................................8

*Cabrini-Green Local Advisory Council v. City of Chicago*,
2008 U.S. Dist. LEXIS 88355 (N.D. Ill. May 30, 2008) .........................................................9

*Chi. Teachers Union v. Bd. of Educ. of Chicago*,
14 F.4th 650 (7th Cir. 2021) ..................................................................................................16

*Clinton v. New York*,
524 U.S. 417 (1998)................................................................................................................19

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
478 F. Supp. 3d 259 (D. Conn. 2020) .................................................................................9, 10

*Cook County v. Bank of Am. Corp.*,
584 F.Supp. 3d 562 (N.D. Ill. 2022) ......................................................................................10

*Cook v. Wells Fargo & Co.*,
314 F.Supp.3d 975 (N.D. Ill. 2018) ......................................................................................7, 9

*County of Cook v. Wells Fargo & Co.*,
115 F. Supp. 3d 909 (N.D. Ill. 2015) ......................................................................................9

*de Reyes v. Waples Mobile Home Park L.P.*,
903 F.3d 415 (4th Cir. 2018) ...................................................................................................9

*Dinerstein v. Google, LLC*,
  73 F.4th 502 (7th Cir. 2023) ...................................................................................19

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
  528 U.S. 167 (2000)................................................................................................18

*Howard v. Cook Cnty. Sheriff's Off.*,
  2022 U.S. Dist. LEXIS 80848 (N.D. of Ill, May 4, 2022)...................................22

*Huskey v. State Farm Fire & Cas. Co.*,
  2023 U.S. Dist. LEXIS 160629 (N.D. Ill. Sept. 11, 2023) ...........................7, 9, 12

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007)....................................17

*Nat'l Fair Hous. All. v. Deutsche Bank*,
  2019 U.S. Dist. LEXIS 196481 (N.D. Ill. Nov. 13, 2019)....................................12

*Parents Protecting Our Child, UA v. Eau Claire Area Sch. Dist.*,
  2023 U.S. Dist. LEXIS 28836 (W.D. Wis., Feb. 21, 2023)..................................20

*Penland v. Chi. Park Dist.*,
  2023 U.S. Dist. LEXIS 107973 ......................................................................21, 22

*Pennell v. City of San Jose*,
  485 U.S. 1 (1988)...................................................................................................18

*Powell v. Illinois*,
  2019 U.S. Dist. LEXIS 168209 (N.D. Ill. Sept. 30, 2019) .........................16, 19, 20

*Raintree Homes, Inc. v. Village of Long Grove*,
  209 Ill. 2d 248, 807 N.E.2d 439 (Ill. 2004) .........................................................21

*In re Recalled Abbott Infant Formula Prods. Liab. Litig.*,
  2023 U.S. Dist. LEXIS 88878 (N.D. Ill. May 22, 2023) .....................................7, 16

*Remijas v. Neiman Marcus Group, LLC*,
  794 F.3d 688 (7th Cir. 2015) ................................................................................20

*Rogers v. Lodge*,
  458 U.S. 613 (1982)..........................................................................................13, 15

*Santiago v. City of Chicago*,
  446 F. Supp. 348 (N.D. Ill. 2020) ...................................................................17, 20

*Signify N. Am. Corp. v. Menard, Inc.*,
  2023 U.S. Dist. LEXIS 155422 (W.D. Wis. Aug. 31, 2023)..................................8

*Simic v. City of Chicago,*
851 F.3d 734 (7th Cir. 2017) ..................................................................................7

*TBS Grp., LLC v. City of Zion,*
2017 U.S. Dist. LEXIS 183060 (N.D. Ill. Nov. 6, 2017)...................................13, 15

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,*
576 U.S. 519 (2015) ..................................................................................7

*Tyler v. Hennepin County.*
143 S. Ct. 1369..................................................................................6, 17

*Van Meter v. Darien Park Dist.,*
207 Ill. 2d 359 (2003) ..................................................................................22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977)..................................................................................14

*Williams v. Dart,*
967 F.3d 625 (7th Cir. 2020) ..................................................................................9

**Statutes**

35 ILCS 200/21-215 ..................................................................................2

35 ILCS 200/21-240 ..................................................................................2

35 ILCS 200/21-250 ..................................................................................2

35 ILCS 200/21-295 ..................................................................................3

35 ILCS 200/21-350(b) ..................................................................................2

35 ILCS 200/22-40 ..................................................................................2

740 ILCS 23/5 ..................................................................................5

745 ILCS 10/2-103 ..................................................................................2

28 U.S.C. § 2201 ..................................................................................6

42 U.S.C. § 3604..................................................................................5

**Regulations**

24 C.F.R. § 100.500(c)(1)..................................................................................8

**Other Authorities**

Aditya Aladangady and Akila Forde, "Wealth Inequality and the Racial Wealth Gap", Board of Governors of the Federal Reserve System (October 22, 2021).........................1

https://www.federalreserve.gov/econres/notes/feds-notes/wealth-inequality-and-the-racial-wealth-gap-20211022.html (last visited October 12, 2023)......................................1

Plaintiffs Michael Bell, Michelle Kidd, Southwest Organizing Project, and Palenque LSNA (collectively "Plaintiffs"), through counsel, hereby respond to the Motion to Dismiss filed by Maria Pappas ("the Treasurer" or "Pappas") and Cook County ("the County," and collectively with the Treasurer, "Defendants") as follows:

## INTRODUCTION

When Defendants take a person's home for failing to pay property taxes, they do not provide just compensation for the value of the home over and above what was owed for the taxes and related charges, nor do they provide the former homeowner a definite, prompt, or complete right to receive just compensation. Defendants' failure to provide just compensation violates the Fifth, Eighth and Fourteenth Amendments to the U. S. Constitution. It also has a disparate impact on Black and Latino homeowners and widens the already vast racial wealth gap by preventing them from passing on to future generations their most significant financial asset: the equity in their homes.[1]

Defendant Pappas has herself stated that "[t]he majority of the taxes offered [at the tax sale] are for properties in minority communities[,]" and "[y]ear after year, a disproportionate number of properties on the [tax sale] list are in majority Black and Latino communities." "Ultimately," she has concluded, "there's nothing about this system that works." (First Amended Complaint ("FAC"), ¶ 79.) Nevertheless, Defendants have moved to dismiss all of Plaintiffs' race-based claims under the federal Fair Housing Act (FHA) and the Illinois Civil Rights Act (ICRA). Defendants have also moved to dismiss Plaintiffs' ICRA claims based on the Tort Immunity Act, and move to dismiss the claims of Plaintiff Michael Bell entirely, *i.e.,* not only his race-based

---

[1] Aditya Aladangady and Akila Forde, "Wealth Inequality and the Racial Wealth Gap", Board of Governors of the Federal Reserve System (October 22, 2021). https://www.federalreserve.gov/econres/notes/feds-notes/wealth-inequality-and-the-racial-wealth-gap-20211022.html (last visited October 12, 2023) (noting that Black families have 15-20% of the net wealth of white families). The Court may take judicial notice of this report.

claims but his constitutional claims —and the Class and Subclass he seeks to represent[2]—based on a purported lack of standing to assert any claims. (Defendants do not challenge the standing of Plaintiffs Palenque, SWOP or Kidd, and Defendants' request to "dismiss" the Class and Subclass is premature in that no class or subclass has yet been certified.)

Plaintiffs have sufficiently alleged that Defendants' policy of using the tax sale system to take homeowners' residential properties without just compensation has had a statistically significant disparate impact on protected classes. Defendants' other arguments fail on the merits. Mr. Bell has clear standing to seek both declaratory and injunctive relief for himself, Class B and the race discrimination subclass of Class B (seeking declaratory and injunctive relief) because of the current threat and future likelihood that he and they will lose their homes, and thus their home equity in excess of the tax debt, following a tax sale. Further, the Tort Immunity Act simply does not bar Plaintiffs' claims for damages or other relief under ICRA.

## BACKGROUND

***The Legal Framework.*** Under the Illinois Property Tax Code, Cook County sells delinquent property taxes to a third-party investor known as a "tax buyer." (FAC ¶ 59.) The County also grants to the tax buyer a lien on the property and the right to collect the taxes and interest from the homeowner. *See* 35 ILCS 200/21-215; 35 ILCS 200/21-240. If the owner fails to pay the taxes (plus penalties and interest) owed before the expiration of a 30-month redemption period, the tax buyer may obtain a "tax deed" from the court entitling it to take complete ownership of the property and all of its value, even if the property is worth far more than what is owed. (FAC ¶¶ 60-61, 63 (citing 35 ILCS 200/21-250; 35 ILCS 200/21-350(b); 35 ILCS 200/22-40).) (Defendants have

---

[2] That is, Class B and the associated subclass for the discrimination claims.

2

admitted that this may be the case. (*See* Dkt. 37, at ¶ 3 ("Defendant admits a homeowner may []
be divested of property and risk the loss of equity exceeding the delinquent taxes[.]"))

A homeowner divested of their property may, under limited circumstances, petition for
financial compensation from an "Indemnity Fund" each county is required to maintain under state
law, 35 ILCS 200/21-295. Cook County's fund is administered and supervised by Defendant
Pappas. (FAC ¶ 56.)  Cook County's Indemnity Fund fails to provide prompt, adequate – that is,
"just" – compensation to any former homeowner. Not all homeowners are eligible; claims to the
fund require a court petition and involve complex issues effectively requiring counsel; Defendants
do not provide any written, oral or online notice of the existence of the fund or how to access it to
people who may be eligible; Defendants contest the petitions; and Defendants fail to direct
sufficient assets to cover claims to the Fund, so even the relatively few homeowners who lost their
equity but then prevail on their indemnity fund petitions have had to wait at least eight years to
receive any money. (FAC ¶¶ 5, 64, 88-92; *see also* dkt. 37 ¶¶ 3-5, 90-91) Only two to three dozen
claims are paid out annually, according to the FAC and based on Defendant Pappas's response to
public records requests. (FAC ¶ 92; *see also* dkt. 37 ¶¶ 90-91.)

There is nothing in state law that forbids or prevents Defendants from providing prompt
and adequate just compensation when taking property from homeowners in the tax sale system,
whether through a vastly improved and expanded Indemnity Fund program or otherwise.

***The Plaintiffs.*** Plaintiffs are two individuals, Michael Bell and Michelle Kidd ("Individual
Plaintiffs"), and two Chicago-based community organizations, Palenque LSNA ("Palenque")—
formerly known as Logan Square Neighborhood Association—and Southwest Organizing Project
("SWOP") ("Organizational Plaintiffs").  (FAC ¶¶ 10-55.)

Mr. Bell is a Black man who lives on the South Side of Chicago in a home he owns outright, with a market value of $115,000. (FAC ¶¶ 10-12.) Mr. Bell is unemployed with no prospects for obtaining consistent employment due to ongoing health issues, and previously was earning only the minimum wage working part-time at a car wash. (FAC ¶¶ 14-15, 17, 19, 24.) As a result of his poverty, Mr. Bell has failed to pay his property taxes for the years 2017, 2018, 2019, and 2020, which makes him eligible for the tax sale. (FAC ¶ 18.) In fact, his 2017 taxes were sold at the 2019 tax sale to Lien Group LLC, which—after Mr. Bell failed to redeem before the 30-month deadline expired—petitioned the court to issue a tax deed. Lien Group later moved to vacate the tax sale as a "sale in error" and a deed never issued. Nevertheless, Mr. Bell's taxes remain subject to sale. (FAC ¶¶ 16-18.) Given his ongoing financial and health problems, Mr. Bell "cannot and will not earn enough to pay off his past-due taxes." (FAC ¶ 18.)

Ms. Kidd is a is a Black woman who lived in Maywood, Illinois, in a home that she owned outright with a market value of $230,000. (FAC ¶¶ 25-26.) After becoming disabled in the mid-2010s, Ms. Kidd became impoverished and failed to pay her property taxes. (FAC ¶¶ 27-29.) Her 2017 taxes were sold to High 5 Group, LLC in 2019, and due to her low income she could not redeem the taxes in a timely manner. (FAC ¶¶ 30-31.) As a result, High 5 Group obtained a tax deed to her property on November 2, 2021. An eviction order was entered and she later vacated the premises. (FAC ¶¶ 32-35.) At no point have Defendants compensated her for this loss, nor tried to, despite the fact that her home was worth "a large multiple of the sum of all taxes, interest, penalties, and other [] charges" owed. (FAC ¶¶ 36-38.)

SWOP is a community-based non-profit based in Chicago that serves approximately 40,000 residents of almost entirely Black and Latino neighborhoods on the Southwest Side. (FAC ¶¶ 40-42.) SWOP works on property tax sale issues as a part of its mission, including by working

to identify community members subject to the tax sale and helping those who cannot locate new housing, in large part, because such individuals are not provided just compensation for the equity in their homes. (FAC ¶¶ 44-46.) In the latter case, such tax sales can affect SWOP's members and member organizations, especially when they require families to move out of SWOP's service area. (FAC ¶¶ 47-48.) SWOP seeks only declaratory and injunctive relief.

Palenque, which also seeks declaratory and injunctive relief, is a community-based non-profit in Logan Square which serves the primarily Latino residents of Logan Square, Hermosa, and Avondale. (FAC ¶¶ 49-51.) Housing issues are a core focus for Palenque. (FAC ¶ 51.) In part because of its community members' high property tax burdens, Palenque has dedicated significant resources to helping local residents with their taxes, including issues related to the tax sale. (FAC ¶ 52.) For example, Palenque maintains an outreach team that works to identify and offer assistance to property owners affected by the tax sale. A major reason it does this is because of the extraordinarily punitive consequences of the tax sale system resulting from the County's failure to compensate homeowners for the equity in their homes when their taxes are sold. (FAC ¶¶ 53-55.)

*__Procedural Background.__* Plaintiffs filed their FAC on July 29, 2023. (Dkt. 34.) The FAC contains five claims, and Defendants in this motion challenge two: (i) claims of disparate impact and disparate treatment under the FHA, 42 U.S.C. § 3604, and (ii) similar claims under the ICRA, 740 ILCS 23/5. (FAC ¶¶ 129-44.)[3] Both claims are brought by the Organizational Plaintiffs individually and by the Individual Plaintiffs on behalf of themselves and two Classes and Subclasses. (FAC ¶¶ 129, 138.) Mr. Bell, who has not yet lost his home, seeks to represent a class requesting only injunctive and declaratory relief under Rule 23(b)(2) on behalf of homeowners who have unpaid property taxes and who therefore face the prospect of having their taxes sold and

---

[3] The other claims rely on the Due Process and Takings clauses of the Fifth Amendment to the U.S. Constitution, as well as the Excessive Fines Clause of the Eighth Amendment. (FAC ¶¶ 107-21.)

their equity taken, plus a subclass of Black and Latino homeowners in the same position. Ms. Kidd, who has lost her home, seeks to represent a class requesting injunctive and declaratory relief, as well as damages, under Rule 23(b)(3) on behalf of homeowners whose homes already have been taken, and similarly including a subclass of Latino and Black homeowners. (FAC ¶¶ 94-97.)[4]

After Plaintiffs filed their initial complaint, the U.S. Supreme Court issued a unanimous decision in favor of a Minnesota homeowner who lost her home for failing to pay delinquent taxes, and held that the Minnesota County's failure to provide her with just compensation constituted a Taking under the Fifth Amendment. *Tyler v. Hennepin County*, 143 S. Ct. 1369 (2023) (government action leading to loss of entire home to satisfy unpaid property tax bill amounting to less than value of the home constituted a Taking under the Fifth Amendment and required just compensation). *Id.* at 1380. "The taxpayer," stated the Court, "must render unto Caesar what is Caesar's, but no more." *Id.* This case seeks a declaration that the Supreme Court's holding in *Tyler* applies equally to Cook County's deprivation of homeowners' equity through its tax sale system, and that such deprivations discriminate against Black and Latino homeowners, along with appropriate injunctive and monetary relief.

## ARGUMENT

In resolving a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court assumes the truth of the facts alleged in Plaintiffs' FAC, and draws all reasonable inferences from those allegations in Plaintiffs' favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009). Dismissal is proper only if the FAC lacks "sufficient factual matter … to state a claim to relief that is plausible on its

---

[4] The FAC defines the Class and subclass proposed to be represented by Mr. Bell as Class B of persons with unpaid taxes and a subclass of Black and Latino homeowners with unpaid taxes. (FAC ¶¶ 96–97.) Implicitly excluded from such definitions are persons against whom a tax deed has issued; these persons are included in Class A and its subclass, which Plaintiffs propose Ms. Kidd represent. To the extent confirmatory clarification of the class definitions is required, Plaintiffs will incorporate same in connection with their motion(s) for class certification.

face." *Id.* at 678. Further, a request to dismiss for lack of standing such as Defendants make is properly considered under Rule 12(b)(1), not cited by Defendants. Courts' treatment of such motions varies depending on whether the challenge is "facial" (based on the pleadings) or "factual" (based on matters outside the pleadings). *See In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 2023 U.S. Dist. LEXIS 88878, at *15 (N.D. Ill. May 22, 2023) (Kennelly, J.). Defendants fail to identify which type of challenge they make, but since they do not refer to facts outside the FAC, it appears to be a facial challenge subject to the same standard as a Rule 12(b)(6) motion. *Id.*

**I.      The FAC Plausibly Alleges Every Element of a Disparate Impact Claim.**

Plaintiffs' FAC alleges that Cook County's policy of not providing just compensation to people who lose their homes for failing to pay property taxes has a disparate impact on Black and Latino communities, and this allegation is supported by Defendant Pappas' own public admissions denouncing the racialized effects of the tax sale system. (FAC ¶ 79.) The parties agree that Plaintiffs may state a *prima facie* disparate impact claim (under either ICRA or the FHA) by alleging (1) a statistical disparity, (2) a policy of Defendants, and (3) that Defendants' policy caused the disparity. *Cook v. Wells Fargo & Co.*, 314 F.Supp.3d 975, 990 (N.D. Ill. 2018) (citing *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 538 (2015)). The parties disagree, however, about the relevant legal standards and evidentiary burdens Plaintiffs must meet at the pleading stage. That disagreement should be resolved in Plaintiffs' favor. *See Huskey v. State Farm Fire & Cas. Co.*, 2023 U.S. Dist. LEXIS 160629, at *22 (N.D. Ill. Sept. 11, 2023) ("As other courts in this District have noted, *Inclusive Communities* did not displace the pleading standard for discrimination claims.")

**A.      Plaintiffs Allege a Statistically Disparate Impact.**

Defendants first argue that the FAC does not allege a "plausible disparate impact," (dkt. 39, at 5). This argument ignores the FAC's actual allegations, as well as the admissions of Defendant Pappas herself, who, as alleged, has said publicly that "[y]ear after year, a disproportionate number of properties on the [tax sale] list are in majority Black and Latino communities." (FAC ¶ 79.) The FAC thus fits squarely into the model of a disparate impact claim by raising a plausible inference that Defendants' acts and omissions "caused or predictably will cause a discriminatory effect" against a protected class. 24 C.F.R. § 100.500(c)(1).

Plaintiffs allege that "the individuals who are entitled to indemnity for their losses are disproportionately Black and Latino" and that these individuals are not being compensated at all, or in a reasonable amount of time, and therefore lack the funds to secure new housing. (FAC ¶¶ 88-90). This is the definition of a disparate impact. Plaintiffs' allegation of disproportionate impact is also supported by statistics (even though they are not required at this stage). *See Bankhead v. Wintrust Fin. Corp.*, 2023 U.S. Dist. LEXIS 173291, at *12-13 (N.D. Ill. Sept. 27, 2023) (collecting cases for proposition that "[d]etails about the policy at issue may be sufficient to render a disparate impact claim plausible" without statistics, at the pleading stage). For example, Black and Latino families comprise about half of the population of Cook County, but in terms of homeownership rates, Black (38%) or Latino (46%) individuals lag far behind their White counterparts (70%). (FAC ¶ 80.) Nevertheless, in 2021 more than 75 percent of the parcels set for sale at the annual tax sale were located in Black and Latino neighborhoods, and this is typical at each tax sale. (FAC ¶¶ 7, 80 n.9, 81.) These groups are significantly overrepresented relative to their rates of residency in Cook County and rates of homeownership.

Given Cook County's long and well-documented history of intentional residential housing segregation, (FAC ¶ 87), it is reasonable to infer--and plaintiffs allege--that a disproportionate

number of homeowners who lose their residential properties through the tax sale system are Black and Latino.[5] "[T]ax sale evictions in the County are concentrated on the south and west sides of Chicago." (FAC ¶ 87.) This is the heart of the city's Black and Latino communities, and "the individuals who are entitled to indemnity for their losses are disproportionately Black and Latino." (*Id.*) This inference is further supported by research as recent as 2023 showing that nationwide "tax sale properties are more likely to be owned by [B]lack or Hispanic taxpayers than the general population[.]" (FAC ¶ 21, n.10.) *See also Huskey v. State Farm Fire & Cas. Co.,* 2013 U.S. Dist. LEXIS 160629, at *24 n.2 (N.D. Ill. Sept. 11, 2023) (denying motion to dismiss disparate impact claim based on quibbles with a racial impact survey's methodology because, this would run "counter to this Court's obligations to draw inferences in Plaintiffs' favor); *de Reyes v. Waples Mobile Home Park L.P.*, 903 F.3d 415, 428-29 (4th Cir. 2018) (denial of motion to dismiss based in part on pleaded "statistical evidence that Latinos constitute 64.6% of the total undocumented immigrant population in Virginia, and that Latinos are ten times more likely than non-Latinos to be adversely affected by" a mobile home park policy requiring residents to provide proof of legal status or face eviction); *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 478 F. Supp. 3d 259, 292 (D. Conn. 2020) (summarizing situations and citing cases where higher-level population data may be used to support a disparate impact claim).

Defendants ask the Court to draw an implausible inference unsupported by any evidence —that the affected homeowners are likely White, *i.e.*, not members of protected classes—despite

---

[5] *See also Williams v. Dart*, 967 F.3d 625, 638 (7th Cir. 2020) ("We may take judicial notice that Chicago is consistently ranked among the most racially segregated cities in the country."); *Cabrini-Green Local Advisory Council v. City of Chicago*, 2008 U.S. Dist. LEXIS 88355, at *4-6 (N.D. Ill. May 30, 2008) (describing history of residential segregation in Chicago through the 1990s); *County of Cook v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 990 (N.D. Ill. 2018 ("The racial character of Cook County neighborhoods depends on numerous variables— including individual preferences for diversity in housing, the history of both governmental and private efforts to maintain (and then to dismantle) residential segregation, and continuing racial disparities in income and wealth."); *County of Cook v. Wells Fargo & Co.*, 115 F. Supp. 3d 909, 918 (N.D. Ill. 2015) (noting allegations by Cook County that it was suffering from "urban blight and re-entrenchment of existing segregation patterns[]").

Defendant Pappas's statements, the County's history of racial discrimination in residential housing, the fact that most properties lost through the tax sale process are in majority Black and Latino neighborhoods on the South and West Sides of Chicago, the fact that a disproportionate number of tax sale evictions take place in these same neighborhoods, and the fact that rates of tax sales in these communities far outstrip countywide rates of Black and Latino homeownership.

At this stage, Plaintiffs have sufficiently pleaded that Defendants' conduct—specifically, failing to compensate homeowners who lose their residential properties though the tax sale process for the value of their equity in excess of the tax debt—has caused a statistically significant disparate racial impact.

## B. Plaintiffs' FHA and ICRA Claims are Based on Defendants' Policy of Not Providing Prompt and Just Compensation.

Defendants argue that the FAC fails to allege any specific policy that creates an "artificial, arbitrary, and unnecessary" barrier to equality by causing a racially disparate impact. (Dkt. 39, at 7 (quoting *Cook County v. Bank of Am. Corp.*, 584 F.Supp.3d 562, 566 (N.D. Ill. 2022).) Once again, Defendants misread the FAC.

Defendants assert that their role in the tax sale process is largely defined by state law, but this is irrelevant. (Dkt. 39, at 7) Plaintiffs' claims focus on policy choices Defendants have made within the discretion left to them by state law. The tax sale statutes do not preclude Defendants from providing prompt and just compensation when they take Plaintiffs' property. Defendants have chosen not to provide such compensation, and this choice has a harmful and disparate impact on protected classes.

Defendants' administration of the Indemnity Fund also has a disparate impact. State law does not preclude Defendants from maintaining a sufficient Indemnity Fund or supplementing it in order to promptly pay out qualifying claims. In addition, state law allows Pappas—and the FAC

alleges that Pappas has refused —to administer the Indemnity Fund in a way that addresses tax evictions' demonstrably disparate impact on Black and Latino homeowners. For example:

- Pappas has chosen not to inform the public, in writing or online or by telephone, about the Indemnity Fund's very existence, let alone the process for filing and prevailing on a petition for indemnity;

- Pappas does not help potentially eligible homeowners complete and submit a petition for indemnity; and

- Pappas refuses to direct sufficient funds to the Indemnity Fund so the lucky few who *do* prevail on their petitions receive prompt and certain compensation, rather than uncertain compensation eight years or more later. (That is, Defendant Pappas could direct funds to the Indemnity Fund from other sources to ensure it always has funds sufficient to pay out all successful claims.)

(FAC ¶¶ 5, 88-92.)

Plaintiffs acknowledge that Defendants may "collect[ ] lawfully levied taxes," (dkt. 39, at 8), and this lawsuit does not challenge Defendants' right to collect such taxes. Instead, Plaintiffs are challenging Defendants' failure to compensate those homeowners who lose their residential properties through the tax sale process for the difference between the taxes due and the home's value—a failure that has a disparate impact on protected classes. Without such adequate and timely compensation, the homeowners who lose their properties cannot rent or buy new homes or pass on to future generations the value of the equity they had in their old homes. (FAC ¶¶ 5, 85-86, 90, 134.) (Black and Latino homeowners tend to rely more on home equity to build wealth relative to their white counterparts. (FAC ¶ 85.))

**The FAC Alleges that Defendants' Policy Choices Have Caused a Disparate Impact on Black and Latino Cook County Residents.**

Defendants argue that the FAC does not demonstrate a sufficiently close connection between the policy choices set forth above and the statistical disparity that is harming Plaintiffs and the putative classes. (dkt. 39, at 9). At this stage, however, Plaintiffs need only establish a "plausible inference" of causation. *Inclusive Communities*, 576 U.S. at 542; *Huskey*, 2023 U.S. Dist. LEXIS 160629, at *23. Plaintiffs have met that standard by demonstrating that Defendant Pappas' policy choices are "sufficiently close" to the harm suffered by dispossessed Black and Latino homeowners who do not receive adequate and timely compensation that could be used to secure new housing. *Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 190 (2017); *Nat'l Fair Hous. All. v. Deutsche Bank*, 2019 U.S. Dist. LEXIS 196481, at *12-13 (N.D. Ill. Nov. 13, 2019) ("Several factors are relevant to the proximate cause inquiry, [including] foreseeability, directness, whether the defendant's actions were a substantial factor in the sequence of events leading to the plaintiff's injuries[.]") In fact, Defendants' policy choices that deny Black and Latino homeowners constitutionally sufficient compensation for the equity in their homes are the *only* thing that causes the harm.

Defendants argue that the FAC fails to "account for the fact that Defendants do not control which property owners are delinquent in their taxes." (Dkt. 39, at 9). The FAC alleges otherwise, (FAC ¶¶ 55, 58), but Defendants' argument misses the point. Plaintiffs' claim is not that they have been injured by losing their homes for failing to pay delinquent taxes (although they have been). Instead, they allege that they have been harmed by Defendants' failure to provide them with just and timely compensation equal to the difference between each home's value and the taxes due (plus fees and interest) which could be used to secure new housing for them. (FAC ¶¶ 5, 85-86, 90, 134.) Only Defendants can provide this compensation. Plaintiffs

12

have therefore alleged a causal connection between the policy (failure to take actions to provide constitutionally sufficient compensation) and the harm (lack of funds to secure new housing after a tax deed is issued). This harm is especially problematic because of Black and Latino homeowners' particular reliance on home equity to build and sustain wealth. (FAC ¶ 85.)

Chicago's lamentable history of racial disparities in housing and housing-based wealth, originally based on intentional and *de jure* government actions, is now also a story of public officials continuing to implement facially neutral policies that they the know perpetuate those disparities, as Defendant Pappas has repeatedly admitted in public. (FAC ¶ 79; *TBS Grp., LLC v. City of Zion*, 2017 U.S. Dist. LEXIS 183060, at *15 (N.D. Ill. Nov. 6, 2017) (citing *Rogers v. Lodge*, 458 U.S. 613, 625 (1982) for proposition that "just maintaining the status quo [] can run afoul of the [FHA] if that status quo was based on a history of discriminatory practices.")) There are ways to provide just compensation when taking property away from people, but Defendants have decided not to use them (or otherwise conceal them from the public), and the result is to maintain and exacerbate historic racial disparities. The disparate impact provisions of federal and state law were meant for this case.

## II.    Plaintiffs Properly Allege a Disparate Treatment Claim Based on Defendants' Ongoing Knowledge and Acknowledgement of Their Conduct's Racialized Harms.

Defendants urge this Court to dismiss Plaintiffs' claims under the FHA and ICRA that rely on a disparate treatment theory of liability because the FAC does not allege that "Defendants implement[e]d the tax sale with the intention of discriminating against Black and Latino [home]owners." (Dkt. 39, at 12.)[6] Defendants maintain that their knowledge that the tax sale has a

---

[6] Defendants also argue a lack of proximate cause between their alleged intentionally discriminatory actions and Plaintiffs' injuries, a point addressed in the preceding section.

disparate impact on Black and Latino homeowners in Cook County is "not sufficient to support a" disparate treatment claim. (*Id.* at 10). They are wrong.

The Supreme Court has held that circumstantial evidence of the following types is relevant to proof of discriminatory intent: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Pleading a disparate treatment claim, therefore, requires allegations that identify the type of discrimination and the person who engaged in the discriminatory activity, describe the discriminatory conduct, and state where and when the discriminatory conduct occurred. *See Access Living of Metro. Chi. v. Prewitt*, 111 F. Supp. 3d 890, 897 (N.D. Ill. 2015).

The FAC satisfies these requirements. It identifies the type of discrimination (racial), the responsible entities (Defendants), when it occurred (over a period of years) and where (Cook County), (FAC ¶¶ 65-86). Most important, it specifically alleges that Defendants have for years implemented a tax buyer collection system that does not provide compensation for equity value in excess of the tax debt when the home is transferred to a tax buyer. The FAC also alleges that Defendants knew and admit that the County's tax buyer system had a disproportionate impact on protected classes but did nothing to rectify the problem. (FAC ¶¶ 78-92.) For pleading purposes— and prior to discovery, where evidence of animus and intent is most commonly found—such knowledge and inaction is sufficient to allege discriminatory intent.

Defendants' argument also ignores the fact that "just maintaining the status quo [] can run afoul of the [FHA] if that status quo was based on a history of discriminatory practices." *TBS Grp., LLC v. City of Zion*, 2017 U.S. Dist. LEXIS 183060, at *15 (N.D. Ill. Nov. 6, 2017) (citing *Rogers v. Lodge*, 458 U.S. 613, 625 (1982)). The FAC notes that Defendants' unconstitutional conduct does not exist in a historical vacuum. The "total forfeiture" of property tax evictions have long been understood to be needless and harsh, and this unnecessary harshness must be considered alongside Black and Latino homeowners' long-acknowledged disproportionate representation among those whose taxes are sold and eventually face eviction. (FAC ¶¶ 69, 78-92.). It must also be viewed in the context of the County's "long and well-documented history of residential housing segregation[,]" the history of disproportionately high property tax assessments in Black neighborhoods, the recognition that "property tax" evictions are needlessly harsh, and the fact that Black and Latino homeowners have been disproportionately harmed by these harsh procedures. (FAC ¶¶ 6-7, 82, 87.) The status quo in Cook County is discriminatory, and Defendants cannot escape liability by arguing that they were just trying to maintain it. (FAC ¶¶ 6-7, 87.)

Defendants rely on *Chi. Teachers Union v. Bd. of Educ. of Chicago* to suggest that knowledge of a discriminatory impact is never sufficient to allege disparate treatment, but the case does not support their position. 14 F.4th 650, 657-68 (7th Cir. 2021). On appeal of a motion granting summary judgment against a disparate treatment claim—not a 12(b)(6) motion—the Seventh Circuit held that there was no record evidence that the Chicago Board of Education knew a decision would adversely impact Black students, and that the Chicago Teachers Union did not explain how such knowledge would demonstrate an intent to discriminate. *Id.* This summary judgment decision based on the lack of evidence in the record does not support the assertion that

as a matter of law ongoing knowledge of and failure to address a disparate impact cannot constitute disparate treatment.

### III. Mr. Bell and His Proposed Class B and Subclass Have Standing to Seek Declaratory and Injunctive Relief.

Defendants argue that Mr. Bell lacks standing to bring any claim in this case, either on his own behalf, on behalf of a proposed Class B and on behalf of the FHA/ICRA Subclass B[7], because the tax buyer who previously bought his taxes vacated the sale in 2022, his taxes have not yet been resold, and if they are, a tax deed will not issue until 2027. (Dkt. 39, at 12-13.) Defendants argue that the proposed Class B and Subclass Mr. Bell seeks to represent lack standing to bring their claims for the same reason. (*Id.* at 13-14.) As noted above, although they do not cite it, Defendants appear to be making a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, a facial challenge to standing subject to the same standard as a 12(b)(6) motion. *See In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 2023 U.S. Dist. LEXIS 88878, at *15.

Mr. Bell and the proposed Class and Subclass B only seek declaratory and injunctive relief. To have standing to seek declaratory relief, an actual controversy is required. 28 U.S. C 2201. Another court in this District explained what that means in *Powell v. Illinois*, 2019 U.S. Dist. LEXIS 168209, at *1-3 (N.D. Ill. Sept. 30, 2019). There, the court said that when a plaintiff seeks a declaratory judgment, "'[b]asically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

---

[7] Class B is defined in the FAC as:
      All persons who meet the following criteria: (1) they own or are or were the beneficial owners of residential real property in Cook County, Illinois: and (2) the taxes on such property were not timely paid.
Additionally Mr. Bell seeks to represent a subclass of Class B, the "FHA/ICRA Subclass B," defined as "[a]ll persons who are members of Class B who are Black or Latino."

declaratory judgment.'" *Id.* at *17-18 (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).

A pleading seeking injunctive relief is sufficient to resist a standing challenge if it alleges "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017). Here, Bell makes sufficient allegations to seek both declarative and injunctive relief.

***Declaratory Relief.*** With respect to declaratory relief, Plaintiff Bell and the Class and Subclass he seeks to represent are experiencing injury right now. Because they are unable to pay their property taxes, they are exposed to the tax sale system, a system that includes the loss of the value of the homes above the taxes. (FAC ¶¶ 5, 17-21.) They are making decisions right now about how to deal with this dilemma -- whether they can somehow redeem or else secure new housing. (FAC ¶¶ 23-24, 85.) They need to know right now whether they will be compensated, as *Tyler v. Hennepin County* provides they must. 143 S. Ct. 1369. This open question about their resources and future choices, caused by Defendants' challenged policies, is a current injury that they have a right to ask the Court to clarify by means of a declaration so that their rights, liabilities, and resources are settled and their options are clarified.

Mr. Bell alleges he has to "plan for his personal and financial future" and thus needs to "ascertain[] his rights and liabilities in relation to the equity in his home." (FAC ¶ 24; *see Santiago v. City of Chicago*, 446 F. Supp. 348, 364-67 (N.D. Ill. 2020) (Kennelly, J.) (plaintiff had standing to seek declaratory and injunctive relief from potential takings violation based on likelihood city would someday tow a car it improperly deemed abandoned); *Clinton v. New York*, 524 U.S. 417, 422-24, 429-31 (1998) (after New York was disqualified from obtaining certain federal funds, the

Court held that even though the state could request a "waiver" to potentially get the funding, the state still had standing because it needed certainty in making decisions involving the money); *Pennell v. City of San Jose*, 485 U.S. 1, 9-10 (1988) (landlords had standing to challenge ordinance's constitutionality where there was a likelihood of enforcement and a probability that the landlords' rent would be reduced); *Signify N. Am. Corp. v. Menard, Inc.*, 2023 U.S. Dist. LEXIS 155422, at *17 (W.D. Wis. Aug. 31, 2023) (third-party had standing to seek declaratory relief in patent infringement lawsuit where they had not been sued nor been required to indemnify the defendant, but both were hypothetically eventually possible).)

    ***Injunctive Relief.*** With respect to injunctive relief, Defendants dispute that Bell and his proposed Class and Subclass have alleged an injury-in-fact, which is an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Access Living of Metro. Chi. v. Uber Techs.*, 351 F. Supp. 3d 1141, 1149 (N.D. Ill. 2018) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000)).

    Mr. Bell has done so. The Seventh Circuit recently explained:

> Starting with the qualitative aspect, a concrete injury must be de facto; that is, it must actually exist. Endorsing the term's usual meaning, the Supreme Court has described a concrete injury as one that is real and not abstract. … As the Court has explained, our task—especially when the plaintiff asserts an intangible harm—is to assess whether the alleged injury has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts. The inquiry asks whether the plaintiff has identified a close historical or common-law analogue for his asserted injury. Put another way, when reviewing a plaintiff's alleged injury for concreteness, history and tradition remain our ever-present guides.
>
> Imminence is more of an elastic concept. While it lacks a precise framework, the basic function of the imminence requirement is to ensure that the alleged injury is not too speculative for Article III purposes. Accordingly, a plaintiff who has not suffered a past harm cannot simply rest on allegations that he may suffer some possible

> future injury at some indefinite future time. His threatened injury instead must be certainly impending to satisfy Article III. Id. And importantly, while an imminent risk of future harm may suffice to support standing to sue for prospective relief … a claim for damages requires a concrete harm that has in fact occurred.

*Dinerstein v. Google, LLC*, 73 F.4th 502, 511-12 (7th Cir. 2023) (internal quotations, citations, and modifications omitted).

The FAC alleges an injury that is real and imminent. It alleges that Mr. Bell will lose his property for failing to pay his property taxes and not be compensated. (FAC ¶¶ 10-23.) His past-due taxes were bought by a tax buyer once before, who then petitioned for issuance of a tax deed after Mr. Bell's redemption period ended. Mr. Bell has still not paid his 2017, 2018, 2019, or 2020 taxes, and Defendant admits that these taxes will be subject to sale as soon as 2024. (FAC ¶ 17.) Further, Mr. Bell "cannot and will not earn enough to pay off his past-due taxes … because his income remains precariously low and he has no realistic home of increasing it[.]" (FAC ¶ 18.) This is due not only to long periods of unemployment—and he is once again currently unemployed—but also to an "ongoing health condition" that has made permanent employment and earning enough to live virtually impossible. (FAC ¶¶ 14, 15, 18.) Mr. Bell is seeking an injunction because he will not realistically recover from his health condition or start earning enough money to pay his taxes.

This case is comparable to *Powell v. Illinois*, an opinion denying a Rule 12(b)(1) (and 12(b)(6)) motion to dismiss a lawsuit brought under ICRA and the Americans with Disabilities Act over the state's failure to implement sufficient gun regulations. 2019 U.S. Dist. LEXIS 168209, at *1-3 (N.D. Ill. Sept. 30, 2019). There, the court found that a child who grew up and was still living on the west side of Chicago had standing to seek to enjoin the State to implement appropriate gun regulations that would reduce the level of gun violence there. *Id.* at *1-3, 23.

The court stated that the "complaint adequately alleges the three essential ingredients of standing as to D.P. [the plaintiff] —an *ongoing* threatened injury that is concrete and particularized, that is fairly traceable to defendants' failure to regulate, and that is redressable through injunctive and declaratory relief." *Id.* at *31; *see also Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 693-94 (7th Cir. 2015) (injury-in-fact where plaintiffs alleged a "substantial risk" of identity theft following a data breach).

Defendants argue that the "Seventh Circuit has found a potential injury that is contingent []on the [a party's] future unlawful activities does not constitute a real and immediate future threat" because courts must "assume litigants will act lawfully" even if they have acted unlawfully in the past and continue to do so. (Dkt. 39, at 12.) This argument lacks merit for two reasons. First, this Court is governed by the standard of Rule 12(b)(6) and must assume that Defendants will continue to act unlawfully in the future when presented with sufficient allegations that Defendants' actions are pursuant to an unlawful policy and practice that they have continuously followed for years. (FAC ¶¶ 56, 59, 65-66.) Defendant's position is tantamount to saying that this Court may not declare unlawful or enjoin Defendants because they may eventually change their policy and obey the law. No binding federal case on standing has held that, and if one has, it is contrary to a raft of authority—including some cited above—allowing plaintiffs to seek injunctions to enjoin likely future government misconduct. *Santiago v. City of Chicago*, 446 F. Supp. at 364-67 (Kennelly, J.); *Powell*, 2019 U.S. Dist. LEXIS 168209, at *31; *Parents Protecting Our Child, UA v. Eau Claire Area Sch. Dist.*, 2023 U.S. Dist. LEXIS 28836, at *17 (W.D. Wis. Feb. 21, 2023) (collecting cases holding that allegation of a future injury may confer standing).

Second, Defendants *admit* in their Answers that tax sales can lead to a loss of home equity beyond what it is owed, and that Cook County's Indemnity Fund pays out, at most, only a few

dozen claims per year. (Dkt. 37, at ¶ 3 ("Defendant admits a homeowner may [] be divested of property and risk the loss of equity exceeding the delinquent taxes[.]"); *id.* at ¶ 91 ("Defendants admit the chart in this paragraph accurately reflects the number of payouts … from 2009-2021.") Combined with his allegations about the end-result of the tax sale process, which this Court should also accept as true, Mr. Bell has alleged that Defendants' intent is to ultimately divest him and the Proposed Class B and Subclass B of their homes' value without providing a realistic path to prompt and just compensation required by law. *Tyler,* 143 S. Ct. 1369. Mr. Bell does not ask the Court to enjoin his taxes from inevitably being *sold* at the tax sale (as they were before, (FAC ¶ 16)) or to stop a tax buyer from *seeking* a tax deed (as one did before, (FAC ¶ 17)), but asks only that Defendants be required to—when the tax deed is eventually issued—provide "prompt[] and adequate[] … compensation, and access to compensation," (FAC, Prayer for Relief ¶ e.)

## IV.     Defendants' Tort Immunity Act Argument Lacks Merit.

Finally, Defendants argue that they are "immune from liability for the alleged violations of the ICRA under the Illinois Local Governmental and Governmental Employees Immunity Act, 745 ILCS 10/2-100, *et seq.* ("the Tort Immunity Act"). (Dkt. 39, at 14.) As an initial matter, governmental immunity is an affirmative defense "inappropriate" for resolution on a motion to dismiss given the fact-intensive inquiry required. *Penland v. Chi. Park Dist.*, 2023 U.S. Dist. LEXIS 107973, *23, 26 (N.D. Ill. June 22, 2023) (quoting *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001)). Further, the Act is "strictly construed against the public entities involved." *Id.* at *23 (internal citation and quotations omitted). And in any event, the Tort Immunity Act does not even apply to Plaintiffs' claims for declaratory and injunctive relief. *See Penland v. Chi. Park Dist.*, *supra,* at *22 (citing *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 807 N.E.2d 439 (Ill. 2004) for the proposition that the "Act only affects a plaintiff's right to request

damages; it does not restrict the right to obtain injunctive or declaratory relief against a local public entity or public employee.")

The Act also does not bar Plaintiff Kidd's claim for ICRA damages. While the Tort Immunity Act may immunize public officials for "adopting or failing to adopt an enactment or by failing to enforce any law," 745 ILCS 10/2-103, this in no way limits Defendants' potential liability. Plaintiffs do not allege Defendants adopted or failed to adopt a law or failed to enforce one. They allege Defendants violated an existing laws—the ICRA. The Tort Immunity Act applies only to actions that sound in tort and does not apply to any of Plaintiffs' ICRA claims. *Van Meter v. Darien Park Dist.*, 207 Ill. 2d 359, 368 (2003) (TIA's purpose was to "prevent the dissipation of public funds on damage awards in tort cases") Plaintiffs' ICRA claims are about governmental discrimination, not the types of physical or emotional injuries at issue in a typical tort case. Case law noted by Defendants supports Plaintiffs' position. *See Howard v. Cook Cnty. Sheriff's Off.*, 2022 U.S. Dist. LEXIS 80848, at *51 (N.D. Ill. May 4, 2022) (Kennelly, J.) (collecting "numerous Illinois state court opinions suggesting that TIA immunity extends only to tort claims"); *Penland*, 2023 U.S. Dist. LEXIS 107973, at *23 (collecting cases). ICRA's fundamental purpose is to rectify civil rights violations perpetrated by government actors like and including Defendants—it would be absurd if such violations were exempt from liability by the Tort Immunity Act. *Howard*, 2022 U.S. Dist. LEXIS 80848, at *51 ("Reading the TIA to immunize the defendants from liability under the ICRA thus would effectively write it out of existence.")

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs ask that the Court deny Defendants' Motion.

Respectfully submitted,

MICHAEL BELL and MICHELLE KIDD, individually and on behalf of themselves and all others similarly situated; SOUTHWEST ORGANIZING PROJECT and PALENQUE LSNA, individually,

Dated: October 23, 2023

By: /s/ Brian D. Roche
*An Attorney for Plaintiffs*

Brian D. Roche
REED SMITH LLP
10 South Wacker Drive
40th Floor
Chicago, IL 60606
(312) 207-6400
broche@reedsmith.com

Charles R. Watkins
GUIN, STOKES & EVANS, LLC
805 Lake Street, #226
Oak Park, IL 60301
(312) 878-8391
charlesw@gseattorneys.com

David J. Guin (admitted *pro hac vice*)
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd. N.
Suite 600
Birmingham, AL 35203
(205) 503-4505
davidg@gseattorneys.com

John Bouman
Lawrence Wood
Daniel Schneider
LEGAL ACTION CHICAGO
120 South LaSalle Street, 10th Floor
Chicago, IL 60603
(312) 341-1070
jbouman@legalactionchicago.org
lwood@legalactionchicago.org
dschneider@legalactionchicago.org

## CERTIFICATE OF SERVICE

I, Brian D. Roche, an attorney, hereby certify that on, October 23, 2023, I caused to be served the above and forgoing document by causing a true and accurate copy of the same to be served on counsel of record via electronic mail and the Court's filing system in the above-noted matter.

/s/ Brian D. Roche