**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL BELL, MICHELLE KIDD, DOLLY JANIS, and GOYCE H. RATES, Individually and on behalf of all others similarly situated; SOUTHWEST ORGANIZING PROJECT and PALENQUE LSNA, individually,** | ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 22 C 7061** |
| **MARIA PAPPAS, in her capacity as Treasurer of Cook County, Illinois, and Trustee of the Indemnity Fund; KAREN A. YARBROUGH, in her capacity as Cook County Clerk; and COOK COUNTY, ILLINOIS,** | ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Michael Bell, Michelle Kidd, Dolly Janis, Goyce H. Rates, Southwest Organizing

Project (SWOP), and Palenque LSNA (PLSNA) have filed suit against Cook County, its

treasurer, Maria Pappas, and its clerk, Karen Yarbrough. The plaintiffs claim that the

defendants violated the Fair Housing Act (FHA), 42 U.S.C. § 3604; the Illinois Civil

Rights Act (ICRA), 740 ILCS 23/5, and the United States Constitution through the

operation of the County's property tax sale system. Cook County and Pappas have

moved to dismiss Count 4 and 5 of the plaintiffs' second amended complaint.

Yarbrough has moved to dismiss all of the claims asserted against her. For the reasons

stated below, the Court grants both motions.

## Background

The Court takes the facts in the light most favorable to the plaintiffs, the non-moving parties.

### I.      Cook County property tax sale

In Illinois, property taxes may be levied on all real property except for property exempted by the state.  Ill. Const. art. IX, § 6.  Cook County's property tax sale system is governed by the Illinois Property Tax Code, 35 ILCS 200, *et seq*.  Under the Illinois Property Tax Code, if a homeowner fails to timely pay their property taxes, that property is considered delinquent.  The County treasurer creates a list of all delinquent properties on an annual basis.  If a judgment for nonpayment is rendered against a delinquent property, then the treasurer is required to offer the value of the unpaid taxes at the County's annual tax sale.  At the tax sale, third party investors called tax buyers can bid on delinquent properties.  Tax buyers bid on the interest rate collected on payments made by the homeowner to redeem the property, and the lowest bid wins.  After submitting a winning bid, the tax buyer pays the outstanding balance of the unpaid taxes to the County in exchange for a lien on the homeowner's property and the right to collect from the homeowner.

The Illinois Constitution provides that for all tax sales, homeowners and interested parties "shall be given reasonable notice of the sale and the date of expiration of the period of redemption."  Ill. Const. art. IX, § 8(e).  Generally, homeowners have thirty months from the time of the tax sale to redeem their property by repaying the tax buyer.  If the homeowner does not pay off the taxes during this

redemption period, the tax buyer can petition a court to take ownership of the property and evict the current residents.  If the court grants the tax buyer's petition, the County clerk issues and certifies a tax deed that transfers ownership of the property to the tax buyer.

Illinois law requires counties to maintain "indemnity funds" to indemnify eligible parties for losses or damages incurred due to the tax sale.  The country treasurer serves as the trustee of the indemnity fund.  A homeowner seeking indemnity must "petition the Court which ordered the tax deed to issue" and "ask that judgment be entered against the County Treasurer, as Trustee, in the amount of the indemnity sought."  35 ILCS 200/21-305.  The plaintiffs allege that the indemnity fund is an inadequate remedy for homeowners because "many owners are not eligible" and the indemnification process is "expensive and time-consuming."  Pls.' Second Am. Compl. ¶ 89.

## II.     Plaintiffs

Bell, Kidd, Janis and Rates are individuals who owe property taxes to the county and/or have had tax deeds issued for their homes.  SWOP and PLSNA are community organizations that assist local members who have property-tax related issues.

Bell took ownership of a residential property located on East 100th Street after the death of his mother in 2017.  In 2018, Bell lost his job and was unable to pay his property taxes for 2017 and 2018. On May 17, 2019, Cook County sold his unpaid property taxes to Lien Group LLC for $1,649.67.  Lien Group LLC petitioned for a tax deed to Bell's property in 2021 but later moved for a "sale in error" to vacate the original purchase.  Bell's tax bill for 2017-2020 amounts to approximately $6,945.00.  Bell

believes that the market value for his home is approximately $115,000.

Kidd purchased her home in Maywood, Illinois in 2011. On April 4, 2017, Cook County sold Kidd's unpaid 2015 property taxes to High 5 Group, LLC. Kidd was unable to pay her outstanding tax debt before the redemption period expired on October 10, 2019. On November 2, 2021, High 5 Group received a tax deed for Kidd's home. After an eviction order was entered in January 2022, Kidd vacated her home along with her husband and four children. Kidd alleges that as of December 7, 2022, the home had an estimated market value of $230,000.

Janis acquired her childhood home located in Chicago, Illinois from her parents. On May 3, 2018, Cook County sold Janis's tax debt for the property to Sabre Investments, LLC. Janis was unable to pay off the property taxes before the redemption period ended on April 16, 2021. Sabre Investments, LLC obtained a tax deed for Janis's home on September 7, 2022. Janis continues to reside in the home and believes that at the time the tax deed was issued the home was worth approximately $260,000.

Rates become the sole owner of her Evanston home in 2014 upon the death of her mother. Rates was unable to pay property taxes for the two parcels of land on which the home sits, and tax deeds for the parcels were issued in 2023. At the time the tax deeds were issued Rates owed $9,025.45 in taxes and related charges, and she alleges that her home was worth over $200,000. Eviction orders have been issued for Rates's home.

SWOP is a nonprofit organization based in Chicago. It was founded in 1996 "as a response to the legacy of structural racism that has severely damaged the quality of

4

life for many Chicago residents." *Id.* ¶ 64. About one-third of SWOP's overall budget and personnel costs are dedicated to housing-related work, which includes outreach to homeowners on the property tax sale list, providing resources to owners of delinquent properties, and supporting ongoing housing advocacy efforts. PLSNA is a non-profit organization that promotes community improvement and hosts programming in the Logan Square neighborhood of Chicago. The organization has "dedicated significant resources to assisting residents with property tax-related issues, including those related to the tax sale." *Id.* ¶ 73. The organization maintains an outreach team that assists individuals with property tax issues.

## Discussion

To survive a motion to dismiss under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A claim is facially plausible when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Ashcroft*, 556 U.S. at 678). A court "construe[s] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

## I. FHA and ICRA claims

Section 3604 of the FHA provides that it is unlawful to "make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). ICRA prohibits governmental bodies in Illinois from "utiliz[ing] criteria or methods of administration that have the effect of subjecting

individuals to discrimination because of their race." 740 ILCS 23/5(a)(2). Both the FHA and ICRA allow recovery under both disparate impact and disparate treatment theories of discrimination. *County of Cook v. HSBC N. Am. Holdings Inc.*, 136 F. Supp. 3d 952, 966 (N.D. Ill. 2015) (FHA); *Adams v. Cook Cnty. Sheriff's Off.*, No. 23 C 1390, 2024 WL 263035, at *8 (N.D. Ill. Jan. 24, 2024) (ICRA).

Cook County and Pappas argue that the plaintiffs have failed to state a claim for disparate impact or disparate treatment under the FHA or ICRA.[1] "To state a disparate treatment claim under the FHA requires allegations of intentional discrimination, provable via either direct or circumstantial evidence." *HSBC N. Am. Holdings Inc.*, 314 F. Supp. 3d at 966 (internal quotation omitted).[2] "In contrast to a disparate-treatment case, where a plaintiff must establish that the defendant had a discriminatory intent or

---

[1] Neither party cites, nor has this Court found, a federal case in which a court applied to an ICRA claim the pleading standards for alleging a disparate treatment or disparate impact claim under the FHA. However, courts "look to cases concerning alleged violations of federal civil rights statutes to guide our interpretation of the [Illinois Civil Rights] Act." *Weiler v. Village of Oak Lawn*, 86 F. Supp. 3d 874, 889 (N.D. Ill. 2015) (Kennelly, J.); *see also Jackson v. Cerpa*, 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010) ("[T]he Act was expressly intended to provide a state law remedy that was *identical* to the federal disparate impact canon . . . ."). And the plaintiffs do not dispute that the pleading standards for FHA claims also apply to their ICRA claims. This Court therefore considers the plaintiffs' FHA and ICRA claims under the same pleading standards.

[2] The plaintiffs acknowledge that sufficiently pleading a disparate treatment claim requires an allegation of discriminatory intent. Pls. Resp. to Defs.' Mot. to Dismiss at 15. But the plaintiffs also contend that to adequately plead a disparate treatment claim, they only need "identify the type of discrimination and the person who engaged in the discriminatory activity, describe the discriminatory conduct, and state where and when the discriminatory conduct occurred." *Id.* (citing *Access Living of Metro. Chi. v. Prewitt*, 111 F. Supp. 3d 890, 897 (N.D. Ill. 2015). Post-*Access Living of Metropolitan Chicago*, however, judges in this district have repeatedly affirmed that a plaintiff must allege intentional discrimination to withstand a motion to dismiss on an FHA disparate treatment claim. *HSBC N. Am. Holdings Inc.*, 314 F. Supp. 3d at 966 (Lee, J.); *Williams v. Village of Hazel Crest,* No. 22 C 6069, 2023 WL 3981302, at *3 (N.D. Ill. June 13, 2023) (Kocoras, J.).

6

motive, a plaintiff bringing a disparate-impact claim challenges practices that have a disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale." *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 524 (2015) (internal quotation omitted).

### A. Disparate impact

A plaintiff may establish a prima facie disparate impact claim under the FHA by alleging (1) a statistical disparity; (2) a specific policy; and (3) a causal connection between the disparity and the policy. *County of Cook v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 990 (N.D. Ill. 2018). The defendants argue that the plaintiffs have not adequately alleged any of the three elements of a prima facie disparate impact claim.

### 1. Statistical disparity

The plaintiffs allege that "the individuals who are entitled to indemnity for their losses are disproportionately Black and Latino." Pls.' Resp. to Defs.' Mot. to Dismiss at 8. But many of the statistics to which the plaintiffs point show the existence of racial disparities *prior* to tax sale proceedings. For example, the plaintiffs allege that "in 2021 more than 75 percent of the parcels set for sale at the annual tax sale were located in Black and Latino neighborhoods," despite only thirty-eight percent and forty-six percent of Cook County homeowners identifying as Black or Latino, respectively. *Id.* at 9. These statistics indicate that homes owned by Black and Latino residents are overrepresented in the annual tax sale but provide no information about the extent to which Black and Latino homeowners are disproportionately impacted by the County's operation of the indemnification fund. Similarly, the plaintiffs provide statistics regarding homeownership rates in Cook County, but because not all homeowners are eligible for

indemnification, these numbers do not tend to show a compensation- or indemnification-related statistical disparity.

The plaintiffs allege "upon information and belief" that the "vast majority of homeowners" who "fail[] to redeem their taxes" and "suffer a loss of the equity owned in their property after a tax deed is issued" are Black and Latino. *See* Pls.' Second Am. Compl. ¶¶ 107-08. "[P]leading a fact on 'on information and belief' does not necessarily disqualify the allegation for consideration." *TBS Grp., LLC v. City of Zion*, No. 16 C 5855, 2017 WL 5129008, at *5 (N.D. Ill. Nov. 6, 2017). But the sources the plaintiffs cite in their complaint do not support these allegations. The tax sale eviction study the plaintiffs cite provides data only on Black communities, and their reference to a study indicating that tax sale properties are more likely to be owned by Black or Hispanic residents provides no information about the racial demographics of homeowners who are unable to redeem their taxes or who file a petition for indemnification. *See* Pls.' Second Am. Compl. ¶ 107 n.12; Housing Action Illinois, *Racial Disparities and Cook County Tax Sale Evictions*, https://perma.cc/AS8S-SC9F ("During this period, tax sale evictions in Cook County most disportionately occurred in majority-Black communities.").

In their response to the motion to dismiss, the plaintiffs make clear that their claims are focused on the defendants' failure to "provid[e] just compensation to people who lose their homes for failing to pay property taxes," not the defendants' operation of the tax sale itself. Pls.' Resp. to Defs.' Mot to Dismiss at 7. But the plaintiffs have provided no statistics tending to show any disparities in the distribution of compensation, such as the demographics of homeowners who are eligible for, petition

for, and ultimately receive compensation through the indemnity fund. The plaintiffs assert that tax sale statistics as well as Cook County's "long and well-documented history of intentional residential housing segregation" raise the reasonable inference that a "disproportionate number of homeowners who lose their residential properties through the tax sale system are Black and Latino." Pls.' Resp. to Defs.' Mot. to Dismiss at 9. But this is too big an inferential leap. Without statistics or other facts that tend to show the claimed disparity, the plaintiffs' disparate impact claim is deficient from a pleading standpoint. *See TBS Grp., LLC*, 2017 WL 5129008, at *11 (explaining that plaintiffs' statistics failed to show the racial disparity alleged in the complaint); *see McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) ("[L]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to [a] presumption of truth."). Even if the Court accepts as adequate the plaintiffs' general allegations of disproportionality, the plaintiffs have not identified a specific policy that is causing this disparity.

### 2. Specific policy and causal connection

To adequately plead disparate impact liability, "after identifying a statistical disparity, the plaintiff must 'point to a defendant's policy or policies causing that disparity.'" *Wells Fargo & Co.*, 314 F. Supp. 3d at 990 (quoting *Tex. Dep't of Hous. & Cmty. Affs.*, 576 U.S. at 542). The plaintiffs argue that they are challenging the defendants' "policy choices" that lead to the lack of "prompt and just compensation for the value seized in excess of the tax debt." Pls.' Resp. to Defs.' Mot. to Dismiss at 11. But the plaintiffs provide no information about what these policy choices are, or how they are causing any disparities. The plaintiffs repeatedly assert that the defendants'

tax sale and indemnification policies have a disproportionate impact on Black and Latino communities. But an allegation that a defendant displayed a "lack of concern that their actions had a disproportionate negative impact on members of protected classes" is insufficient to state a claim for disparate impact unless the plaintiffs "point to a specific policy or policies causing the discriminatory effect." *Mabry v. City of E. Chicago*, No. 2:16-CV-402-JVB, 2021 WL 5141371, at *3 (N.D. Ind. Oct. 20, 2021). Here, without any factual allegations on these points, the plaintiffs have not adequately alleged a specific County policy causing the alleged discriminatory effect.

The plaintiffs also argue that Pappas has "refused" to operate the indemnification fund "in a way that addresses property seizures' demonstrably disparate impact on Black and Latino homeowners." Pls.' Resp. to Defs.' Mot. to Dismiss at 11. Specifically, the plaintiffs contend that Pappas has "chosen not to inform the public . . . about the Indemnity Fund's existence," "does not help potentially eligible homeowners complete and submit a petition for indemnity," and "refuses to direct sufficient funds to the Indemnity Fund." *Id.* But these allegations do not describe any specific policies plausibly linked to the alleged disparity; instead, they appear to identify various strategies that the plaintiffs suggest Pappas could utilize to mitigate existing disparities. Furthermore, the plaintiffs have not alleged that Black and Latino homeowners are more likely to need assistance submitting a petition for indemnity or receive less compensation than their counterparts, so it is unclear how any alleged racial disparities can be attributed to Pappas's alleged refusal to implement these changes. Absent a description of how Pappas's conduct resulted in the statistical disparities the plaintiffs cite, the plaintiffs have not plausibly alleged a causal link between these disparities and

the defendants' policies.  *TBS Grp., LLC*, 2017 WL 5129008, at *11 (granting motion to dismiss due to plaintiffs' failure to plausibly allege that the defendant caused the racially disproportionate impact).

The Court finds that the plaintiffs have failed to state a viable disparate impact claim.

### 4.    Other evidence

To state an FHA disparate impact claim, a plaintiff is not required to provide statistics.  *Nat'l Fair Hous. All.*, 2019 WL 5963633, at *13 (citing *Tex. Dep't of Hous. & Cmty. Affs.*, 576 U.S. at 543).  But aside from statistics, the only other claimed evidence of disparate impact the plaintiffs identify are statements made Pappas, the County treasurer.  In 2022, Pappas stated that the "majority" of the homes subject to the tax sale in May of that year were "properties in minority communities."  Pls.' Second Am. Compl. ¶ 104.  Similarly, in 2021, Pappas stated that "a disproportionate number of properties on the [tax sale] list are in majority Black and Latino communities."  *Id.*  Both of Pappas's statements acknowledge disparities among the racial makeup of the communities where homes are subject to the tax sale.  But again, the plaintiffs make clear that their claims are directed towards the County's indemnification procedures, not the entire tax sale system.  Pls.' Resp. to Defs.' Mot. to Dismiss at 11 ("Plaintiffs are not seeking to enjoin the tax sale but rather, when homes are seized, to require payment of just compensation for value seized in excess of the tax debt.").  Pappas's statements do not address the operation of the indemnification fund or the payment of compensation following the issuance of a tax deed.  Furthermore, "[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact."  *Tex. Dep't of Hous. &*

*Cmty. Affs.*, 576 U.S. at 542.  The plaintiffs' allegation that the defendant was aware of the existence of disparities does not permit a plausible inference that the defendants' conduct *caused* those disparities.  The Court therefore finds that the plaintiffs have failed to state a disparate impact claim against Cook County and Pappas.

**B.    Disparate treatment**

In support of their disparate treatment claim, the plaintiffs point to their allegations that the defendants "knew and admitted that the County's tax buyer system had a disproportionate impact on protected classes but did nothing to rectify the problem."  Pls.' Resp. to Defs.' Mot. to Dismiss at 15.  The plaintiffs assert that "knowledge and inaction is sufficient to allege discriminatory intent," but they provide no legal authority to support that assertion.  *Id.*  Additionally, the plaintiffs allege that Pappas has made statements indicating that Black and Latino homeowners are disproportionately impacted by tax sales.  *See* Pls.' Second Am. Compl. ¶ 104.  But the plaintiffs do not explain why Pappas's acknowledgement of racial disparities within the tax system suggests that the County's tax sale policies or procedures are *motivated* by racism.  *See Cabrini-Green Loc. Advisory Council v. Chicago Hous. Auth.*, No. 04 C 3792, 2005 WL 61467, at *7 (N.D. Ill. Jan. 10, 2005) (concluding plaintiffs' allegations regarding defendants' awareness of potentially discriminatory effects of relocation plan were insufficient to state a claim for intentional discrimination).  A general acknowledgement of the existence of a disparity does not rise to the level of the "stark" statistical disparities that have been found to be sufficient to raise an inference of intentional discrimination.  *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (noting that statistics alone are rarely sufficient to show

discriminatory purpose).

The plaintiffs also direct the Court's attention to evidence of the "long-and well-documented history of residential segregation" in Cook County, and they assert that the defendants "cannot escape liability by arguing that they were just trying to maintain [the status quo]." Pls.' Resp. to Defs.' Mot. to Dismiss at 16. Another judge of this court has noted that "[e]ven if a law or ordinance is just maintaining the status quo, it can run afoul of the Fair Housing Act if that status quo was based on a history of discriminatory practices." *TBS Grp., LLC*, 2017 WL 5129008, at *6 (Chang, J.) (citing *Rogers v. Lodge*, 458 U.S. 613, 625 (1982)). But in *TBS Group, LLC*, the court also made it clear that the plaintiff must "plausibly connect[]" the provided historical data to the "actions and motivations" of the defendants or the allegedly discriminatory policy in order to plausibly allege that the defendant had a discriminatory intent or motive. *TBS Grp., LLC*, 2017 WL 5129008, at *7.

In this case, the plaintiffs have not plead any factual allegations that link the County's history of housing discrimination to any current policies regarding compensation for homeowners subject to a tax deed. The plaintiffs allege that the defendants "have for years failed to provide compensation for equity value in excess of the tax debt when the home is transferred to a tax buyer." Pls.' Resp. to Defs.' Mot. to Dismiss at 15. But they allege no statements or actions by the defendants tending to suggest that this failure is the result of a desire to maintain or exacerbate existing patterns of residential segregation within the County. These allegations do not indicate that any part of the tax sale system, specifically the indemnification fund, was developed or is operated with a discriminatory motive. The plaintiffs have therefore failed to plead

a plausible claim of disparate treatment. The Court grants the defendants' motion to dismiss the plaintiffs' disparate treatment claims.

## II.    Standing

Cook County and Pappas argue that Bell and the members of the proposed class he seeks to represent lack standing. To establish Article III standing, a plaintiff must show "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014)). Bell seeks both declaratory and injunctive relief, which are "forward looking remed[ies.]" *Santiago v. City of Chicago*, 446 F. Supp. 3d 348, 364 (N.D. Ill. 2020) (Kennelly, J.). A plaintiff seeking these forms of relief "has standing to sue for an alleged future injury only if 'the threatened injury is "certainly impending," or there is a "substantial risk" that the harm will occur.'" *Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018) (quoting *Susan B. Anthony List*, 573 U.S. at 158.

Before turning to the merits of the defendants' argument, the Court must first determine whether they are advancing a facial or a factual challenge to Bell's standing. In a facial challenge, the defendant contends that the plaintiff has not sufficiently alleged a basis for subject matter jurisdiction. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). When considering a facial challenge, the court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). In a factual challenge, the defendant argues that "the complaint is formally sufficient but . . . there is

*in fact* no subject matter jurisdiction." *Apex Digital, Inc.,* 572 F.3d at 444. When weighing a factual challenge, the court may "look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue." *Id.*

The defendants do not clarify whether they are mounting a facial or a factual challenge to Bell's standing. But because they did not attach any standing-related exhibits to their motion to dismiss and argue that Bell has failed to allege a proper injury, the Court will treat the defendants' argument as a facial challenge.[3]

The defendants contend that Bell has not suffered an injury in fact because he "did not lose ownership of his property or any of the equity in the property." Defs.' Mot. to Dismiss at 13. A tax buyer bought the delinquent taxes on Bell's property in 2018, but after petitioning for the issuance of a tax deed, the tax buyer later moved to vacate the sale. Pls.' Second Am. Compl. ¶¶ 17-19. Bell currently retains ownership over his property, but because he has not paid his taxes for 2017-2020, his property remains delinquent. *Id.* Bell argues that he has standing because he remains subject to the County's tax sale system and there is a continuing threat that he will be subject to injury through the seizure of his home and the subsequent allegedly unconstitutional indemnification process. Although these allegations may be sufficient to show that Bell has pleaded *an* impending injury, Bell has not shown that there is a substantial or impending risk that he will be subject to the relevant injury that the plaintiffs identified in

---

[3] In their reply brief, the defendants seem to assert a factual challenge to Bell's standing, and they include an exhibit that indicates that Bell paid his property taxes for tax year 2021. Defs.' Reply at 10 & Ex. A. Because the defendants did not include this argument in their opening brief, and therefore left no chance for the plaintiff to respond, they have forfeited the argument for the purposes of this motion to dismiss. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021).

their second amended complaint: the defendants' failure to provide just compensation. *See* Compl. ¶¶ 137, 148, 151.

Bell cites *Powell v. Illinois*, No. 18 C 6675, 2019 WL 4750265 (N.D. Ill. Sept. 30, 2019) (Gottschall, J.), in support of his argument, but that case is distinguishable. In *Powell*, a group of plaintiffs sued on behalf of a group of African-American children that resided in Chicago's Austin neighborhood. *Id.* at *3. Each child had been diagnosed with post-traumatic stress disorder and alleged that "exposure to gun violence on a daily basis contributed substantially to the diagnosis as well as related problems." *Id.* Based on the information the plaintiffs provided regarding the prevalence and concentration of gun violence in Chicago as well as the effects of gun violence on children, the judge in *Powell* found that the fact the plaintiffs face "the threat of continuing exposure to incidents of gun violence" constituted an injury in fact. *Id.* at *7. Specifically, because the plaintiffs sought "injunctive relief to stem a harm within a geographic locus," the judge concluded that "residing in Chicago neighborhoods in which gun violence is concentrated" was sufficient to confer Article III standing on the plaintiffs given the nature of their claims. *Id.* at *7-8. In this case, however, Bell does not allege that his injury is rooted in his *exposure* to a particular harm, or that the threat of injury is compounded based on his geographical location. And although Bell has adequately alleged that a tax deed was issued for his home in the past, he provides no factual allegations that indicate a substantial or imminent risk that his home will be seized *and* the County will fail to provide just compensation following a sale.

Bell asserts that he has established standing by alleging that he must "plan for his financial future" and "ascertain[] his rights and liabilities in relation to the equity in his

16

home." Pls.' Resp. to Def.'s Mot. to Dismiss at 18. But none of the cases that Bell cites

in support of this assertion involve an individual plaintiff establishing Article III standing

based solely on a desire to receive clarity about the financial impact of the defendant's

actions. *See id.* at 18-19; *Santiago*, 446 F.Supp.3d at 365-55 (finding plaintiff had

standing to challenge car abandonment ordinance given allegations that her car would

be towed pursuant to municipality's official policy); *Clinton v. City of New York*, 524 U.S.

417, 430-31 (1998) (holding City of New York had standing to challenge the legality of

President's line item veto action because of the City's potential financial liability due to

loss of federal funding); *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988) (concluding

organization had standing to challenge rent ordinance on behalf of members); *Signify N.*

*Am. Corp. v. Menard, Inc.*, No. 22-CV-706-JDP, 2023 WL 5647789, at *6 (W.D. Wis.

Aug. 31, 2023) (describing standard for third party to seek declaration for

noninfringement or invalidity of a patent). The Court concludes that Bell has not alleged

an injury in fact sufficient to establish Article III standing.

The defendants also argue that the members of the proposed class and subclass

that Bell seeks to represent lack standing because they have suffered no injury. This

argument is premature. The plaintiffs have not filed a motion for class certification, and

at this stage the Court cannot determine whether any proposed class is proper.

### III. Tort Immunity Act

Cook County and Pappas argue that the Illinois Tort Immunity Act (TIA) bars the

plaintiffs' ICRA claims. The Illinois legislature enacted the TIA to "protect local public

entities and public employees from liability arising from the operation of government."

745 ILCS 10/1-101.1(a). Section 2-103 of the TIA provides that "[a] local public entity is

not liable for an injury caused by adopting or failing to adopt an enactment or by failing to enforce any law." 745 ILCS 10/2-103. The defendants contend that because the plaintiffs "seek to hold Defendants liable for adopting and enforcing the tax code as prescribed by state law," they are immune from liability for the plaintiffs' ICRA claims. Defs.' Mot. to Dismiss at 15.

The defendants cite *Howard v. Cook County Sheriff's Office*, No. 17 C 8146, 2022 WL 1404833 (N.D. Ill. May 4, 2022) (Kennelly, J.), in support of their argument, but that case weighs against ruling in their favor. In *Howard*, the defendants argued that various sections of the TIA immunized them from the plaintiffs' ICRA claims. *Id.* at 15. This Court rejected the defendants' argument, noting that although the Illinois Supreme Court had not yet ruled on the issue, "the general consensus among state appellate courts is that the TIA applies only to tort claims." *Id.* at *16. And because "claims under the ICRA are not tort claims under Illinois law," this Court concluded that the TIA did not bar the plaintiffs' ICRA claims. *Id.*; *see Blount v. Stroud*, 232 Ill. 2d 302, 313, 904 N.E.2d 1, 9 (2009) ("[A]n action to redress a civil rights violation has a purpose distinct from a common law tort action.").

Similarly, here, the plaintiffs bring claims under civil rights statutes, not tort claims. The TIA does not grant the defendants immunity against the plaintiffs' ICRA claims. *See Penland v. Chicago Park Dist.*, No. 21 C 5581, 2023 WL 4134692, at *8 (N.D. Ill. June 22, 2023) (concluding TIA did not extend to the plaintiffs' ICRA claims). The Court therefore overrules the defendants' defense of TIA immunity.

## IV. Yarbrough

Yarbrough argues that Counts 1, 2, and 3 should be dismissed against her

18

because the plaintiffs "fail to allege any facts to establish that the Clerk caused the constitutional deprivation they claim." Def.'s Mot. to Dismiss at 5. She further argues that Counts 4 and 5 should be dismissed because the plaintiffs do not allege any facts upon which they can establish municipal liability for their disparate treatment and disparate impact claims.

### A. Constitutional violations

Section 1983 creates a private right of action for plaintiffs to bring suit against any "person" who violates their federal rights while acting under color of state law. 42 U.S.C. § 1983. A suit against a county employee in their official capacity is treated as a suit against the county itself, and courts apply the standard for municipal liability claims to suits against municipal actors. *Snyder v. King*, 745 F.3d 242, 246 (7th Cir. 2014). To state a section 1983 claim against a municipality, the plaintiff must plausibly allege facts that satisfy the requirements for municipal liability established in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). To satisfy *Monell*, the plaintiffs must allege that they suffered a constitutional deprivation that was caused by "an official policy, custom or usage of the municipality." *Castro v. Dart*, 483 F. Supp. 3d 564, 573 (N.D. Ill. 2020) (citation omitted). An official policy or custom may consist of (1) an express policy, (2) a widespread custom or practice, or (3) a decision by a municipal actor with final policymaking authority. *Spiegel v. McClintic*, 916 F.3d 611, 618 (7th Cir. 2019). Additionally, the plaintiffs must allege that the municipal policy or custom was "the moving force" behind the constitutional violation. *Est. of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). "Whether or not a plaintiff has stated a Section 1983

claim against a municipal entity typically hinges on the extent to which that municipal entity was independently responsible for the allegedly unconstitutional act." *Snyder*, 745 F.3d at 247.

The plaintiffs allege that the issuance of tax deeds is a "widespread practice in Cook County." Pls.' Resp. to Def.'s Mot. to Dismiss at 7. But the Illinois Property Tax Code, rather than Cook County policy, provides that the county clerk is responsible for issuing tax deeds to tax buyers. *See* 35 ILCS 200/22-40. And the Seventh Circuit has held that a municipality's enforcement of a state statute cannot be used to meet *Monell*'s policy-or-custom requirement. In *Bethesda Lutheran Homes & Services, Inc. v. Leean*, 154 F.3d 716 (7th Cir. 1998), the plaintiffs argued that various defendants, including a municipality, violated their federal constitutional right to travel by enforcing certain Wisconsin state laws. *Id.* at 717. The Seventh Circuit noted that "when the municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury." *Id.* at 718. Because establishing municipality liability requires the plaintiff to "trace the action of the employees who actually injured him to a policy or other action of the municipality itself," the Seventh Circuit concluded that a county "cannot be held liable under section 1983 for acts that it did under the command of state or federal law." *Id.*

Here, as the plaintiffs acknowledge, every aspect of Yarbrough's involvement in the tax sale process that the plaintiffs challenge is mandated by *state*, not County, policy. *See* Pls.' Resp. to Def.'s Mot. to Dismiss at 4. And the plaintiffs have not identified an independent County policy or practice that governs the issuance of tax

deeds or any other county clerk actions in the tax sale process. Furthermore, the plaintiffs have not alleged that Yarbrough made any discretionary choices that render her, or by extension the County, responsible for any constitutional violation that allegedly occurred. Because Yarbrough's actions were taken under compulsion of state law, the plaintiffs have failed to state a claim against her upon which relief can be granted. *See, e.g., Ellis v. City of Chicago*, No. 13 C 2382, 2016 WL 212489, at *9 (N.D. Ill. Jan. 19, 2016) (granting the defendants' motion to dismiss due to the plaintiff's failure to trace the defendants' actions to a municipal policy).

Even if Yarbrough's actions were not performed pursuant to state law, the plaintiffs have not stated a claim against her because they have not alleged that the policies she enforced were the "moving force" behind any alleged constitutional violations. The plaintiffs argue that their injuries based on violations of the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution were directly caused by Yarbrough because she is "responsible for deprivation of the property" that serves as the basis for their takings clause, excessive fines, and due process claims. *See* Pls.' Resp. to Def.'s Mot. to Dismiss at 8-10. But this argument inappropriately broadens the scope of the constitutional injury at issue in this case. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011) (citation omitted) ("[A] plaintiff may not amend his complaint in his response brief."). In Count 1 of their second amended complaint, the plaintiffs allege that the defendants' failure to "adequately and promptly compensate Plaintiffs for the equity in properties which Defendants have confiscated or caused homeowners to cease to own" is what constitutes a violation of their Fifth and Fourteenth Amendment Rights. Pls.' Second

Am. Compl. ¶ 136.   Counts 2 and 3 of the plaintiffs' second amended complaint similarly identify the defendants' "unconstitutional failure to compensate Plaintiffs," as well as the defendants' "procedures for administering the program for indemnity homeowners' losses," as the conduct that caused the plaintiffs' injuries.  *Id.* at ¶¶ 146, 153.

A homeowner's entitlement to compensation for the seizure of their home is assessed not at the time that a tax deed is issued, but after the homeowner has submitted a petition for indemnity.  Pls.' Second Am. Comp. ¶¶ 5, 89.  The processes and policies that govern the issuance of a tax deed are separate from those that govern the payment of compensation to homeowners, and Yarbrough asserts that she has no "involvement in determining whether a property owner receives compensation from the indemnity fund."  Def.'s Mot. to Dismiss at 5.  The plaintiffs question the accuracy of Yarbough's assertion, Pls.' Resp. to Def.'s Mot. to Dismiss at 5, yet they have not alleged any facts to the contrary.

The only allegation the plaintiffs provide regarding Yarbrough's involvement with the indemnity fund is that she failed to "involve herself" in the operation of the indemnity fund or otherwise "implement a properly functioning method of compensating homeowners."  *Id.* at 8.  But to state a cause of action against a municipal actor in their official capacity, the plaintiffs cannot simply allege that the defendant engaged in individual wrongdoing; they must attribute that wrongdoing to a municipal policy.  *Est. of Sims ex rel. Sims*, 506 F.3d at 515 (collecting cases); *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (citation omitted) ("[U]nits of local government are responsible only for their policies rather than misconduct by their workers.").  The

plaintiffs have not attributed Yarbrough's alleged inaction to a governmental policy, nor have they alleged that this inaction had a "direct causal link" to the alleged deprivation of their federal rights. *Orozco v. Dart*, 64 F.4th 806, 824 (7th Cir. 2023). And the plaintiffs' unsupported speculation that Yarbrough could have potentially intervened to improve the operation of the indemnification fund does not provide factual allegations that plausibly support a claim of municipal liability.

The plaintiffs advance two additional arguments with respect to their Fifth Amendment Takings Clause claim. First, the plaintiffs assert that their "constitutional right to sue for compensation arises instantaneously from the actions of the Clerk in issuing the tax deed that 'takes' away their property without compensation." Pls.' Reply to Def.'s Mot. to Dismiss at 5. But in the case the plaintiffs cite in support of their argument, *Knick v. Township of Scott, Pennsylvania*, 588 U.S. 180 (2019), the Supreme Court addressed whether a plaintiff must seek just compensation in state court before bringing a federal takings claim. *Id.* at 192-96. Yarbrough is not disputing the plaintiffs' right to bring a federal takings claim. Her argument is that, as the party responsible for issuing tax deeds rather than assessing compensation, she is not the proper defendant for the plaintiffs' suit. *Knick* does not address the issue of liability on a federal Takings Clause claim.

Second, the plaintiffs contend that in addition to bringing a Takings Clause claim under Section 1983, they can also assert a claim against Yarbrough "directly under the Fifth Amendment." Pls.' Resp. to Def.'s Mot. to Dismiss at 6. Again, the plaintiffs cite *Knick* in support of their argument. But in *Knick*, the Supreme Court stated that "someone whose property has been taken by a local government has a claim *under §*

23

*1983* for a 'deprivation of [a] right[ ] ... secured by the Constitution.'" 588 U.S. 180, 194 (quoting 42 U.S.C. § 1983) (emphasis added). The Supreme Court's decision in *Knick* provides no support for the proposition that a plaintiff may bring a Takings Clause claim directly under the Fifth Amendment rather than via Section 1983. And neither the Seventh Circuit, nor the Supreme Court, has ever ruled that the Takings Clause creates a direct cause of action. *Gerlach v. Rokita*, 95 F.4th 493, 498 (7th Cir. 2024).[4]

### B. Disparate impact and disparate treatment

As noted above, "[c]laims against municipal officials in their official capacities are really claims against the municipality." *Castro*, 483 F. Supp. 3d at 577. The plaintiffs' disparate treatment and disparate impact claims against Yarbrough fail for the same reasons as their claims against Cook County. *See Harrison v. County of Cook*, No. 08 C 3202, 2011 WL 4036115, at *8 (N.D. Ill. Sept. 12, 2011) (Kennelly, J.) (granting summary judgment in favor of official-capacity defendant that was sued alongside Cook County).

The Court therefore grants Yarbrough's motion to dismiss all of the claims against her.

### Conclusion

For the foregoing reasons, the Court grants Pappas and Cook County's motion to dismiss [dkt. no. 64] Counts 4 and 5, and grants Yarbrough's motion to dismiss all of the

---

[4] The Supreme Court recently considered a case where the plaintiff argued that the Takings Clause provides a direct cause of action for just compensation claims, but the Court did not resolve the question. *DeVillier v. Texas*, No. 22-913, 2024 WL 1624576, at *3 (U.S. Apr. 16, 2024).

claims against her [dkt. no. 61].

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  April 19, 2024