## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE KIDD and GOYCE H. RATES, individually and on behalf of all others similarly situated; SOUTHWEST ORGANIZING PROJECT and PALENQUE LSNA, individually, | ) ) ) ) ) | Case No. 1:22-cv-7061 |
| Plaintiffs, | ) ) | Hon. Matthew F. Kennelly |
| v. | ) ) | |
| MARIA PAPPAS, in her capacity as Treasurer of Cook County, Illinois, and Trustee of the Indemnity Fund, and COOK COUNTY, ILLINOIS, | ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
## FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ............................................................................................. 1

II.   STATEMENT OF FACTS .............................................................................. 3

      A.    How Defendants Collect Unpaid Property Taxes in Cook County ........................ 3

            1.    *In Personam* Tax Collection, the "Statutory" Option ................................. 4

            2.    The *In Rem* Tax Sale/Tax Buyer Foreclosure Option................................. 4

      B.    Plaintiffs................................................................................................... 6

            1.    Michelle Kidd and Goyce Rates ......................................................... 6

            2.    Organizational Plaintiffs SWOP and Palenque LSNA ............................... 7

III.  ARGUMENT .................................................................................................... 7

      A.    Plaintiffs Are Entitled to Partial Summary Judgment on Liability for the
            Takings Claim. ........................................................................................... 7

            1.    Plaintiffs Have Established Their Takings Claim....................................... 8

                  a.    Defendants Took Plaintiffs' Property Within the Meaning
                        of the Fifth Amendment................................................................. 9

                  b.    Plaintiffs' Equity was Confiscated Because of Choices
                        Defendants Made That Were Not Mandated by the Property
                        Tax Code. .................................................................................... 13

                        (1)   *Monell* Choice One: Defendants Used the Equity-
                              Confiscating Tax Sale Instead of Equity-Preserving
                              Suits Against Individual Homeowners. ............................ 13

                        (2)   *Monell* Choice Two: Upon Choosing to Put
                              Plaintiffs' Properties in the Tax Sale, Defendants
                              Had the Authority to Conduct the Tax Sale in a
                              Manner that Preserved Surplus Equity. ............................ 14

                        (3)   *Monell* Choice Three: Defendants Chose Not to
                              Exercise Their Home Rule Authority to Compensate
                              Owners for Lost Equity Following the Issuance of
                              Tax Deeds. ...................................................................... 17

2.      Defendants' *Monell* Custom and Practices Caused and Were the Moving Force Behind Plaintiffs' Injury. ...................................................... 19

3.      The Injury Resulting from Defendants' Monell Choices Occurs When the Tax Deeds Issue, Not Years Later If and When an Indemnity Fund Lawsuit Reaches Final Judgment. .................................. 20

4.      Defendants' "Inaction" Authorities Do Not Apply. .................................. 24

B.      The Indemnity Fund Is Not the Sort of Immediate, No-Fault Process to Provide Contemporaneous Just Compensation that was Available to the Property Owner in *Nelson* ...................................................................... 25

C.      Defendants' Eleventh Amendment Arguments Fail. .............................................. 29

D.      Plaintiffs Are Entitled to Partial Summary Judgment on Liability for the Excessive Fines Claim. ........................................................................ 30

1.      The Elements of an Excessive Fines Claim ........................................... 30

2.      The Confiscation of Plaintiffs' Equity is a Fine. ...................................... 30

3.      The Fine is in All Cases Excessive. ........................................................ 31

E.      The Court Should Deny Defendants Request for Summary Judgment on Plaintiffs' Due Process Claim. ................................................................ 33

F.      Organizational Plaintiffs Are Entitled to Summary Judgment on Their Claims for Equitable Relief. .................................................................... 35

1.      The Organizational Plaintiffs Have Standing. ........................................ 35

2.      Declaratory Relief Is Appropriate. ......................................................... 37

3.      Injunctive Relief Is Appropriate. ............................................................ 38

        a.      Irreparable Injury and Inadequate Remedy at Law...................... 38

        b.      Balance of Hardships. ................................................................. 39

        c.      Public Interest. ............................................................................ 39

IV.     CONCLUSION.................................................................................................... 39

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*257-261 20th Avenue Realty, LLC v. Roberto*,
    477 N.J. Super. 339, 307 A.3d 19 (App. Div. 2023), *affirmed as modified,*
    2025 N.J. LEXIS 2 (Jan. 9, 2025) .......................................................................................10, 32

*Access Living of Metro. Chicago v. Uber Techs., Inc.*,
    958 F.3d 604 (7th Cir. 2020) ..............................................................................................35, 36

*Allen v. County of Cook*,
    65 Ill. 2d 281 (1976) ...................................................................................................................18

*Ancata v. Prison Health Services, Inc.*,
    769 F.2d 700 (11th Cir. 1985) ....................................................................................................12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ....................................................................................................................39

*In re Application of the County Collector*,
    295 Ill. App. 3d 703, 692 N.E. 2d 1211 (1998) .........................................................................31

*Austin v. United States*,
    509 U.S. 602 (1993)....................................................................................................................31

*Balthazar v. Mari Limited*,
    301 F. Supp. 103 (N.D. Ill. 1969), *aff'd without opinion*, 396 U.S. 114 (1969)................31, 32

*Blanchard v. Berrios*,
    410 Ill. Dec. 923, 72 N.E. 3d 309 (2016) ..................................................................................18

*Bonaparte v. Camden & AR Co*,
    3 F. Cas. 821 (Cir. Ct. D. N.J. 1830) .........................................................................................27

*Boston Chamber of Commerce v. Boston*,
    217 U.S. 189 (1910).....................................................................................................................10

*Bowles v. Sabree*,
    No. 22-1912, 2024 WL 1550833 (6th Cir. Apr. 10, 2024).........................................................29

*Cassell v. Snyders*,
    990 F.3d 539 (7th Cir. 2021) ......................................................................................................29

*Castro v. Dart*,
    483 F. Supp. 3d 564 (N.D. Ill. 2020) ..........................................................................................9

*Cherokee Nation v. Southern Kansas Ry. Co.*,
135 U.S. 641 (1890)................................................................................27

*City of Canton v. Harris*,
489 U.S. 378 (1989*)*.................................................................................19

*Common Cause Ind. v. Lawson*,
937 F.3d 944 (7th Cir. 2019) ................................................................35

*Cont'l. Res. v. Fair*,
317 Neb. 391 (2024). Dkt. 133 ...........................................................11, 12

*Conyers v. City of Chicago*,
10 F.4th 704 (7th Cir. 2021) ..................................................................8

*Crawford v. Love*,
243 Ill. App 3d 977 (1993) ...................................................................20

*Crooks v. Nix*,
872 F.2d 800 (8th Cir. 1989) ...............................................................12

*Demas v. Pappas*,
2011 IL App (1st) 100829.........................................................................4

*DePiero v. City of Macedonia*,
180 F.3d 770 (6th Cir. 1999) ...............................................................19

*DeVillier v. Texas*,
601 U.S. 285 (2024)...................................................................................9

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006)................................................................................38

*Edmond v. City of Chicago*,
2024 U.S. Dist. LEXIS 67237 (N.D. Ill. Apr. 11, 2024) (Kennelly, J.) ................25

*Excalibur Energy Co. v. Rochman*,
2014 IL App (5th) 130524, 22 N.E.3d 322 (2014) ................................31

*First English Evangelical Church v. County of Los Angeles*,
482 U.S 304 (1987)...................................................................................9

*Freed v. Thomas*,
81 F. 4th 655 (6th Cir. 2023) .............................................................14, 19

*Garner v. Memphis Police Dep't*,
8 F.3d 358 (6th Cir. 1993) ...................................................................19

*Goudy v. Cummings*,
922 F.3d 834 (7th Cir. 2019) ...............................................................12

*Grady v. Wood Cnty.*,
    2025 U.S. Dist. LEXIS 5293 (S.D. W.Va. Jan. 12. 2025).........................................................11

*Greater Pleasant Valley Church in Christ v. Pappas*,
    2012 IL App. (1st) 111853, 975 N.E.2d 713 (2012) ............................................................28

*Hall v. Meisner*,
    51 F.4th 185 (6th Cir. 2022) ...............................................................................................23

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)...........................................................................................................35

*Hedrick v. Bathon*,
    747 N.E.2d 917 (Ill. App. Ct. 5th Dist. 2001).....................................................................26

*Hope v. Comm'r of the Ind. Dep't of Corr.*,
    No. 1:16-cv-02865, 2017 U.S. Dist. LEXIS 52850 (S. D. Ind. Apr. 6, 2017).........................39

*Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund.*,
    778 F.3d 593 (7th Cir. 2015) ..............................................................................................39

*J.K.J. v. Polk Cnty.*,
    960 F.3d 367 (7th Cir. 2020) ..............................................................................................24

*Jacobs v. United States*,
    290 U.S. 13 (1933)............................................................................................................27

*Joelner v. Vill. of Wash. Park*,
    378 F.3d 613 (7th Cir. 2004) ..............................................................................................39

*Johnson v. Cook County*,
    526 Fed. Appx 692 (7th Cir. 2013)......................................................................................14

*Joslin Mfg. Co. v. Providence*,
    262 U.S. 668 (1923)...........................................................................................................28

*Kakos v. Butler*,
    2016 IL 120377 (Ill. 2016)..................................................................................................18

*Kaskaskia Land Co., LLC v. Vandalia Levee & Drainage Dist.*,
    2019 IL App (5th) 180403 ...................................................................................................10

*Kelo v. City of New London*,
    545 U.S. 469 (2005)........................................................................................................1, 10

*Killinger v. Johnson*,
    389 F.3d 765 (7th Cir. 2004) ..............................................................................................14

*King v. Kramer*,
    680 F.3d 1013 (7th Cir. 2012) ..........................................................................................3, 12

*Kirby Forest Indus., Inc. v. United States,*
    467 U.S. 1 (1984) .........................................................................................27

*Knick v. Twp. of Scott, Pennsylvania,*
    588 U.S. 180 (2019) ............................................................................ *passim*

*Kruse v. Village of Chagrin Falls,*
    74 F3d 694 (6th Cir. 1996) .........................................................................27

*Lake County Board of Review v. Property Tax Appeal Board,*
    119 Ill. 2d 419 (1988) ...........................................................................15, 16

*Lily Lake Road Defenders v. County of McHenry,*
    156 Ill. 2d 1 (1993) .....................................................................................19

*Lintzeris v. City of Chicago,*
    276 F. Supp. 3d 845 (N.D. Ill. 2017) .........................................................34

*Lucas v. South Carolina Coastal Council,*
    505 U.S. 1003 (1992) ..................................................................................10

*Lynch v. Multnomah Cnty.,*
    2024 U.S. Dist. LEXIS 233277 (D. Ore. Dec. 27, 2024) ...........................20

*MacNeil Auto. Prods. v. Cannon Auto. Ltd.,*
    No. 08 CV 0139 2014 U.S. Dist. LEXIS 94243 (N. D. Ill. July 11, 2014) ...........39

*Miller v. O'Malley,*
    No. 20 C 2118, 2024 U.S. Dist. LEXIS 168746 (N. D. Il. Sept. 19, 2024) ...........39

*Miller v. Vohne Liche Kennels, Inc.,*
    600 Fed. Appx. 475 (7th Cir. 2015) ............................................................12

*Monell v. Department of Social Services of City of New York,*
    436 U.S. 658 (1976) .............................................................................. *passim*

*Murdock v. City of Chicago,*
    2022 U.S. Dist. LEXIS 216624 (N.D. Ill. Dec. 1, 2022) .............................14

*Murr v. Wisconsin,*
    582 U.S. 383 (2017) ....................................................................................10

*Nelson v. City of New York,*
    352 U.S. 103 (1956) ..........................................................................25, 26, 28

*Olson v. United States,*
    292 U.S. 246 (1934) ....................................................................................27

*Orozco v. Dart,*
    64 F.4th 806 (7th Cir. 2023) .......................................................................24

*People v. Bohenek,*
202 IL App. (2d) 170545 ...................................................................................18

*People v. Hollins,*
971 N.E. 2d 504 (Ill. 2012) ..............................................................................18

*Phoenix Bond and Indemnity Co. v. Pappas,*
194 Ill. 2d 99 (2000) ................................................................................. *passim*

*Pimentel v. City of Los Angeles,*
115 F.4th 1062 (9th Cir. 2024) .........................................................................33

*Preston v. Thompson,*
589 F.2d 300 (7th Cir. 1978) ............................................................................39

*Relf v. Shatayeva,*
2013 IL 114925 (Ill. 2013)................................................................................19

*Richman v. Sheahan,*
270 F.3d 430 (7th Cir. 2001) ............................................................................29

*Ruehman v. Sheahan,*
34 F.3d 525 (7th Cir. 1994) ..............................................................................29

*San Diego Gas & Elec. Co. v. San Diego,*
450 U. S. 621 (1981)........................................................................................23

*Scott v. O'Grady,*
975 F.2d 366 (7th Cir. 1992) ............................................................................29

*Sharritt v. Henry,*
2024 U.S. Dist. LEXIS 189825 (N.D. Ill. Oct. 18, 2024)................................ *passim*

*Simpson v. Brown Cty.*
860 F.3d 1001 (7th Cir. 2017) ..........................................................................34

*Smith v. Babbitt,*
96 F. Supp. 2d 907 (D. Minn. 2000) .................................................................10

*Spiegel v. McClintic,*
916 F.3d 611 (7th Cir. 2019) ..............................................................................9

*Stensrud v. Rochester Genesee Reg'l Transp. Auth.,*
507 F. Supp. 3d 444 (W.D. N.Y. 2020)..............................................................20

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,*
560 U.S. 702 (2010)..........................................................................................10

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,*
535 U.S. 302 (2002)............................................................................................8

vii

*Town of Tyngsborough v. Recco*,
No. 18-TL-001223, 2024 Mass. LCR LEXIS 71, 2024 WL 2331197 (Mass.
Land Ct. May 21, 2024)............................................................................................17

*Tyler v. Hennepin County*,
598 U.S. 631 (2023)........................................................................................ *passim*

*United States v. 564.54 Acres of Monroe and Pike County Land*,
441 U.S. 506 (1979)............................................................................................27

*United States v. Bajakajian*,
524 U.S. 321 (1998)................................................................................30, 31, 32

*United States v. Cherokee Nation of Okla.*,
480 U.S. 700 (1987)............................................................................................10

*United States v. Miller*,
317 U.S. 369 (1943)............................................................................................27

*United States v. Noel*,
581 F.3d 490 (7th Cir. 2009) ............................................................................20

*Vargo v. Casey*,
No. 20-cv-1109, 2024 U.S. Dist. LEXIS 207319 (W.D. Wis. Nov. 14, 2024) ......................38

*Vives v. City of New York*,
524 F.3d 346 (2d Cir. 2008)..............................................................................14

*Watts v. Laurent*,
774 F.2d 168 (7th Cir. 1985) ............................................................................12

*Williams v. Reed*,
2025 U.S. LEXIS 550 (Feb. 21, 2025) ..............................................................21

*Williamson County Reg'l Planning Comm'n v. Hamilton Bank*,
473 U.S. 172 (1985)............................................................................................22

*Woodbridge v. City of Greenfield*,
No. 23-30093, 2024 U.S. Dist. LEXIS 96015 (D. Mass. May 29, 2024).........................17, 28

**Statutes**

35 ILCS 200/9-175 ..............................................................................................4

35 ILCS 200/21-75 ..............................................................................................3

35 ILCS 200/21-150 ............................................................................................3

35 ILCS 200/21-160 ............................................................................................3

35 ILCS 200/21-180 ...................................................................................... *passim*

35 ILCS 200/21-190 .................................................................................................5

35 ILCS 200/21-250 .................................................................................................5

35 ILCS 200/21-305(a) ....................................................................................21, 23

35 ILCS 200/21-305(a)(1) ....................................................................................26

35 ILCS 200/21-305(a)(2) ....................................................................................26

35 ILCS 200/21-305(a)(3) ....................................................................................26

35 ILCS 200/21-440 ........................................................................................13, 18

35 ILCS 200/22-40 .......................................................................................... 6, 20

35 ILCS 200/22-45 ......................................................................................6, 9, 20

35 ILCS 200/22-65 ...............................................................................................20

35 ILCS 200/22-75 ......................................................................................6, 9, 20

35 ILCS 200/32-10 ...............................................................................................18

55 ILCS 5/5-1014 .................................................................................................18

735 ILCS 5/2-1402 .................................................................................................4

735 ILCS 5/12-101 .................................................................................................4

735 ILCS 5/15-1504.5(5) .....................................................................................4

735 ILCS 5/15-1512(d) .........................................................................................4

735 ILCS 30/10-5-5(a) ........................................................................................19

42 U.S.C. § 1983 ...................................................................................... *passim*

Iowa Code Ann. § 446.16 ....................................................................................17

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................39

L.R. 56.1(b)(2) ......................................................................................................20

**Regulations**

Colo. Atty' Gen. Op. No. 23-01 (July 27, 2023) (available at
    https://coag.gov/app/uploads/2023/07/AG-Formal-Opinion-No-23-01.pdf) ..........................11

**Other Authorities**

Charles Dickens, *Bleak House 2* (Oxford University Press ed. 1989) (London 1853) .................27

IL Const., Art. VII, §6 (m)...........................................................................................................18

Ill. Const. 1970, art. IX, § 8 .......................................................................................................16

Ill. Const., Art. VII, § 6(a) ....................................................................................................17, 18

U.S. Const. amend. V. A...............................................................................................................8

Individual Plaintiffs Michelle Kidd and Goyce H. Rates, on behalf of themselves and the putative class ("Plaintiffs"), move for partial summary judgment on liability on Count I (Fifth Amendment Taking) and Count III (Eighth Amendment Excessive Fine). Second Amended Complaint ("SAC") Dkt. 53. Plaintiffs Southwest Organizing Project ("SWOP") and Palenque LSNA ("Organizational Plaintiffs") move for summary judgment and prospective equitable relief on these same claims. Plaintiffs submit this memorandum in support of their Motion for Partial Summary Judgment and in opposition to Defendants' Motion for Summary Judgment (Dkt. 132).[1]

## I.      INTRODUCTION

Plaintiff homeowners Michelle Kidd and Goyce Rates owed property taxes. The taxes were not paid, and County Treasurer Pappas collected them for Cook County by selling tax liens on Plaintiffs' homes to third-party investors, commonly known as tax buyers. When Plaintiffs did not redeem, the tax buyers were granted tax deeds that deprived Plaintiffs of all property rights in their homes, including the value in excess of what was owed for taxes. Defendants did not pay or require payment of just compensation to Plaintiffs for their surplus equity. In this manner, Defendants took Plaintiffs' property (their surplus equity) without compensation in violation of the Fifth Amendment. *Tyler v. Hennepin* County, 598 U.S. 631, 639 (2023). That taking also constituted an excessive fine in violation of the Eighth Amendment. *See id.* at 648-49 (Gorsuch, J. concurring).

It does not matter that the tax buyers ended up with the properties. Governments often take private property to give it to another private party. *See, e.g., Kelo v. City of New London*, 545 U.S. 469 (2005). That is what Defendants did here—they took Plaintiffs' properties and granted them to tax buyers without compensation. But Defendants still have to pay for what they take. As Judge

---

[1] Plaintiffs previously filed their Motion for Class Certification. Dkt. 130. To avoid any concerns with one-way intervention, Plaintiffs suggest that the Court rule on their motion for class certification before ruling on the Parties' cross-motions for summary judgment.

Ellis recently explained in a similar case, when government "render[s] *the entire value* of their properties unto Caesar" and Caesar then "'renders it unto Antony [the tax buyers]," "[t]his still constitutes a taking." *Sharritt v. Henry*, 2024 U.S. Dist. LEXIS 189825 at *35-36 (N.D. Ill. Oct. 18, 2024) (emphasis in original).

The former owner's ability to petition for compensation from the indemnity fund is no more relevant to whether a taking occurred than is the existence of *other* post-taking causes of action such as inverse condemnation. Plaintiffs had a right to reasonable and certain just compensation for the value of their surplus equity *immediately* upon its deprivation. Under *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 190 (2019), Plaintiffs were not required to pursue a risky indemnity fund lawsuit, and then wait seven years for payment if they won. The Plaintiffs had and have the right to sue upon issuance of the tax deeds that deprive them of their property. The constitutional injury was complete on issuance of the tax deed, when compensation was due and not paid. *Id.* at 189, 192 ("once there is a 'taking,' compensation *must* be awarded because '[a]s soon as private property has been taken, whether through formal condemnation proceedings, occupancy, physical invasion, or regulation, the landowner has *already* suffered a constitutional violation'") (emphasis in original). In addition, the indemnity fund is no defense because it comes nowhere close to constituting a means of providing certain, contemporaneous just compensation. *See Sharritt*, 2024 U.S. Dist. LEXIS 189825, at *36-41.

It didn't have to be this way. Defendants were not compelled to take Plaintiffs' property without compensation in violation of the Constitution they swore to uphold. They had options under the Illinois Property Tax Code to collect the delinquent property taxes while *preserving* Plaintiffs' surplus equity, but they chose as their regular custom and practice to take and sell Plaintiffs' properties to tax buyers, without exercising their power to implement equity-protecting safeguards. *See Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1976).

2

Defendants try to shield themselves by blaming the tax buyers for what happened. But the tax buyers' role in taking Plaintiffs' surplus value was only a consequence of the *Monell* choices Defendants made to use the tax sale without also implementing available safeguards. *See King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) ("The County cannot shield itself from § 1983 liability by contracting out its [constitutional duties]."). Defendants' choice to give the tax buyers the right and opportunity to foreclose does not absolve Defendants of their constitutional obligation to pay just compensation for the equity they took and transferred to tax buyers. *Id.*

Defendants should be required to pay just compensation and enjoined to preserve homeowners' surplus equity in future takings.

## II. STATEMENT OF FACTS

### A. How Defendants Collect Unpaid Property Taxes in Cook County

When Cook County homeowners do not timely pay their property taxes, a first lien arises on the property limited to the amount of the taxes plus penalties, interests and costs. 35 ILCS 200/21-75. As Treasurer of Cook County, Defendant Pappas ("Treasurer") is in charge of collecting those taxes. In each year relevant to this lawsuit, she did so by petitioning for and obtaining a judgment and order of sale against the Plaintiffs' and class members' properties. 35 ILCS 200/21-150; 35 ILCS 200/21-160; Statement of Facts ("SOF") ¶ 2 (example of petition and order). Like the tax liens against the properties, the judgments were limited to "the amount of taxes … interest, penalties and costs due thereon." 35 ILCS 200/21-180. The orders of sale the Treasurer requested and obtained were in each instance similarly limited, authorizing only that "the properties, *or so much of each of them as shall be sufficient to satisfy the amount of taxes* (and special assessments, if any), interest, penalties and costs due thereon, be sold as the law directs." *Id.* (emphasis added).

1.    *In Personam* Tax Collection, the "Statutory" Option

The Property Tax Code explicitly gives Defendants at least two options for collecting taxes after obtaining the judgment and order of sale. One option authorizes the County to sue the homeowner personally for the tax debt. 35 ILCS 200/9-175; 35 ILCS 200/21-180; 35 ILSC 200/21-440. Under Section 21-440, "[t]he county board may, at any time after final judgment and order of sale against delinquent property … institute a civil action … in the circuit court for the whole amount due for taxes and special assessments on the … property." If the action is successful, the County may garnish and use other normal collection methods authorized by Illinois law, including selling the property, to obtain payment of the tax debt. 735 ILCS 5/2-1402; 735 ILCS 5/12-101, *et seq.* Defendants have a name for this option – the "statutory method," as opposed to the tax sale method. SOF ¶¶ 30-31, 32-35.

Section 21-440 limits the amount that can be recovered under the statutory method to the amount of the tax debt. Thus, even if the County does have to resort to selling Plaintiffs' homes to collect their tax debts, the Plaintiffs would not be divested of the surplus equity. Any surplus of the sale price over the debt is remitted to the owner, as in a traditional mortgage foreclosure. *See, e.g.,* 735 ILCS 5/12-101 (judgment lien foreclosed in same manner as mortgage); 735 ILCS 5/15-1512(d); 735 ILCS 5/15-1504.5(5).

2.    The *In Rem* Tax Sale/Tax Buyer Foreclosure Option

Instead of filing personal collection lawsuits and preserving Plaintiffs' surplus equity, Defendants uniformly chose to use another option available to them — sell the Plaintiffs' properties at the annual tax sale. *Demas v. Pappas,* 2011 IL App (1st) 100829, ¶ 16 ("county collector may offer property for sale when a judgment has been rendered against the property for the nonpayment of real estate taxes. 35 ILSC 200/21-190."); SOF ¶ 28, 30-37.

Defendant Pappas is in charge of conducting the tax sales (35 ILSC 200/21-190). She has authority to set the rules and to take such additional actions as are appropriate to further the purpose of the tax sale and conform the collection process to the law, including not only the Property Tax Code, but also the Illinois and U.S. Constitutions. *See Phoenix Bond and Indemnity Co. v. Pappas*, 194 Ill. 2d 99 (2000); SOF ¶ 27.

At that sale, third-party tax buyers bid against each other for the right to collect the taxes plus interest. The price paid to the Treasurer is not based on the property's value but on the amount of the taxes owed and the rate of interest to be charged the owner should they redeem their property by paying the delinquent taxes. The tax buyers "bid down" the interest rate and whoever agrees to accept the lowest rate of interest from an owner who "redeems" (pays) their taxes before the deadline wins the bid and pays Defendant Cook County the amount of the taxes due. (Dkt. 97 at 2; "Clerk Order").

Each winning tax sale buyer receives a Certificate of Purchase signed by the Treasurer, describing the property, and stating the amount of taxes, interest and costs paid for it. 35 ILCS 200/21-250; SOF ¶ 4 (Certificate of Purchase on Kidd's property). These Certificates give tax buyers the ability to petition for and obtain "a deed of conveyance" of the property if the homeowner does not pay the tax debt, plus taxes for subsequent years, before the period to redeem expires. SOF ¶ 4; 35 ILCS 200/21-190 (Treasurer offers the property for sale at annual tax sale); 35 ILCS 200/21-180 (property is sold at annual tax sale).

The individual Plaintiffs did not redeem their taxes before the deadline. SOF ¶¶ 4-6, 16-18. Accordingly, the tax buyers enforced their right under the Certificates of Purchase and petitioned for and obtained tax deeds to the Plaintiffs' properties. SOF ¶¶ 7-8, 19-20. The tax deeds conferred on the tax buyers all the incidents of ownership, including the right to evict the prior owners, thus

5

confiscating Plaintiffs' properties. Clerk Order at 2; 35 ILCS 200/22-40; SOF ¶ 29 (citing Defendants Answers, Dkt. 65 at 24-25 and Dkt. 66 at 22-23).

The tax deeds issued under Section 22-40 were not interim or conditional; they were incontestable, except on grounds not relevant here. 35 ILCS 200/22-45. As a matter of law, their issuance marked the end of the owner's equity in the property and their right to occupy, convey, possess, exclude others from and control it. 35 ILCS 200/22-45, -55; 35 ILCS 200/22-75.

Defendants know that tax buyers routinely obtain title to properties worth far more than the taxpayers' debts. SOF ¶ 52 (citing in part Defendants' Answers, Dkt. 65 at 3 and Dkt. 66 at 3). Every year from 2015 through 2022, an average of 769 tax deeds was issued to tax buyers, and a subset of these homeowners who lost their properties comprises the proposed class. SOF ¶ 43.

## B.  Plaintiffs

### 1.  Michelle Kidd and Goyce Rates

Ms. Kidd's house was in Maywood and she had no mortgage on it. SOF ¶ 3. She lived there with her family, and worked as a bus driver until becoming disabled and falling behind on her property taxes. SOF ¶ 4. Defendant Pappas sold her home for taxes worth a fraction of her home's value to a tax buyer, and Ms. Kidd did not redeem. SOF ¶¶ 4-5. The tax buyer then obtained a tax deed to Ms. Kidd's home and an order for possession. SOF ¶¶ 7-8. Ms. Kidd paid rent to the tax buyer and stayed in her home for a time before moving to a smaller, poorly maintained rental unit. SOF ¶ 9. She and her family lived there for about a year before relocating again to a rental in Lombard. *Id.* She received no compensation for the confiscated surplus equity. SOF ¶¶ 10-12.

Ms. Rates' home, which sat on two parcels, was in Evanston, where she lived with two adult nieces and a nephew. SOF ¶¶ 13-14. One niece has a disability and Ms. Rates is her legal guardian. *Id.* Ms. Rates inherited the home from her mother, and she also had no mortgage. *Id.* Ms. Rates fell behind on her property taxes and Defendant Pappas sold the property to tax buyers. SOF

6

¶¶ 16-17. Ms. Rates did not redeem, so the tax buyers obtained deeds to the parcels as well as orders for possession. SOF ¶ 19-21. The Sheriff evicted Ms. Rates and her family three days before Thanksgiving and the family had to split up. SOF ¶ 22. Ms. Rates moved to a hotel and then she and her disabled niece moved to an apartment where they now live. *Id.* Ms. Rates received no compensation for the confiscated surplus equity. SOF ¶¶ 24-26.

### 2.    Organizational Plaintiffs SWOP and Palenque LSNA

SWOP is a southwest Chicago-based non-profit with over 40 members, serving approximately 40,000 people on the southwest side of Chicago, and it focuses on housing and tax sale-related issues in its advocacy to help improve community stability. SOF ¶¶ 53-60. Palenque LSNA is a northwest Chicago-based non-profit that works to improve housing security, economic opportunity, and equity in its community. SOF ¶¶ 82-84. Palenque's work on tax sale issues is critical to its mission to prevent displacement and ensure community stability, especially in recent years as its neighborhoods have seen significant property tax increases, which means more residents risk losing their properties. SOF ¶¶ 85-87, 102. Palenque and SWOP both work to prevent the injuries low-income homeowners suffer when they lose homes and equity for failing to pay taxes. SOF ¶¶ 61-81, 86-107. Defendants do not challenge their standing.

### III.    ARGUMENT

**A.    Plaintiffs Are Entitled to Partial Summary Judgment on Liability for the Takings Claim.**

Plaintiffs' Takings claim is governed by the Supreme Court's unanimous decision in *Tyler v. Hennepin County*, 598 U.S. 631 (2023). In *Tyler*, homeowner Geraldine Tyler did not timely pay or redeem her property taxes. Hennepin County confiscated her home and sold it without compensating Ms. Tyler for the difference between the home's value and her tax debt. 598 U.S. at 635, 647.

7

The Supreme Court found that, despite having followed Minnesota law, Hennepin County violated the Fifth Amendment's Takings Clause by depriving Ms. Tyler of the value of her home in excess of her tax obligations without compensating her. *Id*. The Court held that a homeowner's surplus equity is protected property within the meaning of the Fifth Amendment, *Id*. at 638-39, and that while "[t]he County had the power to sell Tyler's home to recover the unpaid property taxes, … it could not use the toehold of the tax debt to confiscate more property than was due. By doing so, it effected a 'classic taking in which the government directly appropriates private property for its own use.'" *Id*. at 639 (quoting *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 324 (2002)). The Court held that depriving homeowners of more than is owed is unconstitutional unless compensation is paid: "The taxpayer must render unto Caesar what is Caesar's, but no more." *Id*. at 647. The Court ruled Ms. Tyler was therefore "entitled to just compensation." *Id*. at 639.

In Cook County, as in Hennepin County, homeowners suffer the same unconstitutional injury: their failure to pay small amounts of property taxes routinely leads to the uncompensated and involuntary confiscation of their surplus home equity. *See Sharritt v. Henry*, 2024 U.S. Dist. LEXIS 189825 (N.D. Ill. Oct. 18, 2024); SOF ¶ 29. This court should therefore deny Defendants' motion for summary judgment and grant Plaintiffs' cross-motion.

### 1.     Plaintiffs Have Established Their Takings Claim.

The Takings Clause of the Fifth Amendment provides that the government may not take private property "for public use, without just compensation." U.S. Const. amend. V. A plaintiff establishes a Takings claim under 42 U.S.C. § 1983 by demonstrating: (i) a governmental entity "took" property physically or through onerous regulations, (ii) the taking was for a public use, and (iii) the government did not pay just compensation. *Conyers v. City of Chicago*, 10 F.4th 704, 710–

11 (7th Cir. 2021); *Sharritt v. Henry*, 2024 U.S. Dist. LEXIS 189825, *31 (N. D. Ill. Oct. 18, 2024).

This case involves a classic "physical taking" of real property. *Tyler*, 598 U.S. at 639 (2023).[2]

To be actionable against counties or local officials, the taking must be caused by their

policy, practice or custom. *Monell v. Department of Social Services of City of New York,* 436 U.S.

658 (1978). As this Court explained when ruling on the County Clerk's motion to dismiss:

> To satisfy *Monell*, the plaintiffs must allege that they suffered a constitutional
> deprivation that was caused by 'an official policy, custom or usage of the
> municipality.' *Castro v. Dart,* 483 F. Supp. 3d 564, 573 (N.D. Ill. 2020) (citation
> omitted). An official policy or custom may consist of (1) an express policy, (2) a
> widespread custom or practice, or (3) a decision by a municipal actor with final
> policymaking authority. *Spiegel v. McClintic*, 916 F.3d 611, 618 (7th Cir. 2019).
> Additionally, the plaintiffs must allege that the municipal policy or custom was
> 'the moving force' behind the constitutional violation.

Dkt. 97 at 19.

### a.    Defendants Took Plaintiffs' Property Within the Meaning of the Fifth Amendment.

When they sold tax liens on Plaintiffs' properties, Defendants conferred on tax buyers the

ability to obtain tax deeds to the properties if Plaintiffs failed to redeem. The tax deed conveyed

merchantable title, terminating Plaintiffs' rights in the property and depriving each Plaintiff of the

surplus equity in her home. 35 ILCS 200/22-45, -55; 35 ILCS 200/22-75; SOF ¶ 29.

It is undisputed that Plaintiffs' surplus equity is constitutionally protected property. It is

also uncontested that Plaintiffs ceased to own their surplus equity after the tax deed issued.

Defendants, however, deny *taking* the property, arguing it is the tax buyers who received the surplus

---

[2] As an alternative to their § 1983 claim, Plaintiffs assert their Takings claim directly under the Constitution.
Dkt. 53 ¶ 138; *See First English Evangelical Church v. County of Los Angeles*, 482 U.S 304, 314-315 (1987)
("[C]laims for just compensation are grounded in the Constitution itself. … Statutory recognition was not
necessary."). As this Court noted in its Clerk opinion, the Seventh Circuit has not yet determined whether
the Takings Clause creates a direct cause of action, and although the Supreme Court granted certiorari to
address this issue last year in *DeVillier v. Texas,* 601 U.S. 285, 292 (2024) it ultimately did not reach the
issue. *See* Dkt. 97 at 24.

equity. Dkt. 133 at 19. Judge Ellis ruled that this argument "defies the Fifth Amendment's text and established Supreme Court precedent." *Sharritt*, 2024 U.S. Dist. LEXIS 189825, *33. The Takings Clause is not limited to transfers of property to the government. It encompasses any actions that *deprive* owners of their property. *See, e.g., Boston Chamber of Commerce v. Boston*, 217 U.S. 189, 195 (1910) ("the question is what has the owner lost, not what has the taker gained."); *Smith v. Babbitt*, 96 F. Supp. 2d 907, 915-916 (D. Minn. 2000) ("[T]he United States may not 'give the tribal lands to others … without rendering, or assuming an obligation to render, just compensation for them.'"), quoting *United States v. Cherokee Nation of Okla.,* 480 U.S. 700, 707 (1987) (alteration in the original). Thus, condemning private property to transfer it to another private party is a taking that requires compensation even if the government gets nothing. *Kelo v. City of New London*, 545 U.S. 469 (2005) (private property transferred to another private party); *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,* 560 U.S. 702, 713 (2010) ("classic taking is a transfer of property to the State *or to another private party* by eminent domain") (emphasis added).

The same principle applies to "regulatory takings" cases, where the government so heavily regulates property as to deprive it of value. In such cases, the government receives no property but still owes just compensation. *See, e.g., Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992); *Murr v. Wisconsin*, 582 U.S. 383, 392-93 (2017); *Kaskaskia Land Co., LLC v. Vandalia Levee & Drainage Dist*., 2019 IL App (5th) 180403, at 22.

Defendants' sale of surplus equity to a tax buyer does not protect them; it merely proves the government *took it*, for how else could they sell it? Defendants can convey only what they own. *See 257-261 20th Avenue Realty, LLC v. Roberto*, 477 N.J. Super. 339, 350, 307 A.3d 19, 25 (App. Div. 2023), *affirmed as modified,* 2025 N.J. LEXIS 2 (Jan. 9, 2025) ("The government cannot

10

confer to a third-party [tax buyer] a greater entitlement to property than that to which the public entity is entitled…") (internal citations omitted).

As Judge Ellis explained, "'confiscating' and 'retaining' are separate acts, and *Tyler* did not apply only to the latter. Defendants 'confiscate' all of a delinquent property owner's property when they transfer title to a tax buyer pursuant to the Illinois Tax Code." *Sharritt*, 2025 U.S. Dist. 18925 at *35*. The county defendants therefore are not excused where the "Plaintiffs ultimately render *the entire value* of their properties unto Caesar [the Defendants]" just because Caesar "in turn renders it unto Antony [the tax buyers]. This still constitutes a taking." *Id.* at *35-36 (emphasis in original). *See also Grady v. Wood Cnty.*, 2025 U.S. Dist. LEXIS 5293 *11 (S.D. W.Va. Jan. 12. 2025) (county took surplus via tax lien sale).[3]

Defendants rely on a single, non-binding case from a Nebraska state court, *Cont'l. Res. v. Fair*, 317 Neb. 391, 393-94 (2024). Dkt. 133 at 20. That decision, however, is predicated on the fact that the Nebraska government defendants only "perform[ed] a ministerial action." *Id.* at 414. But whatever may have been the process in Nebraska, Cook County and the Treasurer both made non-ministerial choices (further explained in the next section below) that led to the uncompensated deprivation of Plaintiffs' property.

Moreover, Defendants' reliance on *Fair* ignores settled Seventh Circuit law applicable to joint and several liability under section 1983. In Cook County, even if one assumes the tax buyers

---

[3] The Colorado Attorney General similarly opined in a formal opinion that use of lien sales to tax buyers is not immunized from the holding of *Tyler*: "In *Tyler*, the U.S. Supreme Court held that a government may take property to pay a tax debt, but not without compensating the property owner for the difference between the value of the property and the debt. 143 S. Ct. at 1379. […] There does not appear to be a reasonable basis to conclude that the *Tyler* Court would have ruled differently where the government gives the property to a third party who has paid the tax debt with no opportunity for the taxpayer to recover the excess." Colo. Atty' Gen. Op. No. 23-01 (July 27, 2023) (available at https://coag.gov/app/uploads/2023/07/AG-Formal-Opinion-No-23-01.pdf) (last accessed Feb. 27, 2025).

are participants in the taking process, they do not act alone. To the extent they act at all, they act *with* Defendants pursuant to authority Defendants *chose* to confer on them. Binding precedent in the Seventh Circuit provides that where

> independent actors [such as tax buyers and governments] concurrently *or consecutively* produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury. In such a [Section 1983] case the injured party may proceed to judgment against any or all of the responsible actors in a single or in several different actions.

*Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985) (emphasis added; citations omitted); *see Goudy v. Cummings*, 922 F.3d 834, 843 (7th Cir. 2019) ("Section 1983 liability must be understood against the background of the ordinary principles of tort law, where joint and several liability is the norm.").

*Fair* also ignores the fact that, even assuming tax buyers may be liable as state actors, if a private actor implements a county's policy choices (as, for instance, by purchasing tax certificates), or the county's policy choices and customs "play a role" in a constitutional deprivation at the hands of the private actor, or even if the county allows decision-making by the private actor, *both the county and the private actors* are liable. *King v. Kramer,* 680 F.3d 1013, 1020 (7th Cir. 2012) ("County cannot shield itself from §1983 liability by contracting out its duty to provide medical services. … The underlying rationale is not based on *respondeat superior,* but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it.") (citing *Ancata v. Prison Health Services, Inc*., 769 F.2d 700, 705-06 (11th Cir. 1985) (County remains liable where county policy "played a role" in the private actor's misconduct)); *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989) (government officials remain responsible for constitutional violations by a contractor where the officials' policies "contributed to" the violations); *Miller v. Vohne Liche Kennels, Inc*., 600 Fed. Appx. 475, 477 (7th Cir. 2015) ("delegating an exclusive public function to a private entity does not absolve a state of its constitutional obligations").

12

### b. Plaintiffs' Equity was Confiscated Because of Choices Defendants Made That Were Not Mandated by the Property Tax Code.

"Every person who … subjects, *or causes to be subjected*, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983 (emphasis added). Here, just as surely as opening floodgates upstream causes destruction downstream, Defendants' decision to sell Plaintiffs' homes through the tax sale, combined with their decisions to implement none of the *other* steps to protect equity that were available to them and which are described below, foreseeably led to and proximately caused the confiscation of Plaintiffs' equity without compensation.

### (1) *Monell* Choice One: Defendants Used the Equity-Confiscating Tax Sale Instead of Equity-Preserving Suits Against Individual Homeowners.

The Property Tax Code gave Defendants a choice: collect delinquent property taxes by selling them through the tax sale to tax buyers (leading to takings without just compensation, as with Plaintiffs' property), or file individual collection lawsuits against the homeowners (resulting in no uncompensated takings). 35 ILCS 200/21-440. As summarized in D. Karlen & R. Slutzky, Tax Collection and Methods of Enforcement, in Real Estate Taxation (Ill. Inst. for Cont. Legal Educ. 1997):

> **[5.48] In Personam Liability — The Suit To Recover Unpaid Taxes**
>
> In addition to the above methods of tax enforcement through *in rem* tax sale proceedings, the Property Tax Code establishes personal liability for the payment of real estate taxes. Section 9-175 of the Property Tax Code declares that the "owner of property on January 1 in any year shall be liable for the taxes of that year." … The liability may be enforced by means of a money judgment obtained in a civil action brought under §21-440 of the Code.

Ex. A, hereto, at 5-54; *see also* SOF ¶¶ 30-31, 34-35. The Treasurer admitted that this option was available but not used in Cook County for residential properties, thereby rendering the decision to use the tax sale method in its stead a *Monell* custom and practice. SOF ¶¶ 26, 29, 30.

Defendants' choice to use the tax sale was a choice that caused unconstitutional takings. This is a classic *Monell* policy choice. SOF ¶¶ 30-31, 34-35 (admitting County elected to use tax sale over direct lawsuits to collect taxes). *See, e.g., Freed v. Thomas,* 81 F. 4th 655 (6th Cir. 2023) (statute *prohibited* refunding surplus, but because county did not have to foreclose, their choice to do so satisfied *Monell*); *Vives v. City of New York*, 524 F.3d 346, 351 (2d Cir. 2008) (collecting authorities concluding "that a municipality engages in policy making when it determines to enforce a state law that authorizes it to perform certain actions but does not mandate that it do so.").

Defendants rely on cases that are inapposite, *e.g., Killinger v. Johnson*, 389 F.3d 765, 771-72 (7th Cir. 2004) (government actor lacked discretion to not enforce underage liquor sale laws and plaintiffs identified no policy choice) and *Johnson v. Cook County*, 526 Fed. Appx 692, 696 (7th Cir. 2013) (*respondeat superior* case; isolated incident did not establish a county policy). This case is more like *Murdock v. City of Chicago*, 2022 U.S. Dist. LEXIS 216624, at *5-7 (N.D. Ill. Dec. 1, 2022), where state law may have "authorized" the Chicago Police Department to implement a policy of holding people without bail during weekends, but did not "command[]" it, thereby permitting the department to make a *Monell* choice.

> **(2)** *Monell* **Choice Two: Upon Choosing to Put Plaintiffs' Properties in the Tax Sale, Defendants Had the Authority to Conduct the Tax Sale in a Manner that Preserved Surplus Equity.**

Defendants admit the Treasurer supervises and administers the annual tax sale, Dkt. 133 at 5; *see also* SOF ¶ 27, but contend the Treasurer's role is merely "ministerial," and thus there is "no evidence of an actionable policy or custom of the Defendants related to the tax sale process." Dkt. 133 at 10. Defendants' characterization, however, conceals the Treasurer's wide-ranging authority and indeed obligation to collect taxes within *constitutional* bounds. While aspects of the Treasurer's

tax collection activities, such as certain nuts-and-bolts mechanics of the tax sale, are prescribed by statute, these specific provisions do not define the full extent of her authority.

The non-ministerial, discretionary aspects of the Treasurer's power and role in tax collection were described in *Phoenix Bond and Indemnity Co. v. Pappas*, 194 Ill. 2d 99 (2000). *Phoenix Bond* confirms that the Treasurer had the discretion to — but chose not to — sell properties with delinquent taxes in a manner that would have avoided the confiscation of surplus equity. In *Phoenix Bond*, the taxpayers' right under the Illinois Constitution to redeem their property at the lowest possible penalty rate of interest, or cost, was being thwarted by simultaneous, identical bids at the maximum interest rate. *Id.* at 107. This practice inflated the interest rate a taxpayer would have to pay to redeem. To protect the taxpayers, Treasurer Pappas implemented a rule of her own invention that removed from the tax sale properties that drew no competitive bids. Taxes on the removed properties could then be collected in other ways, such as a direct action for the tax debt under Section 21-440 as described above and referenced by the court in *Phoenix Bond*. *Id.* at 103 n.2. Once the rule was implemented, "competitive bidding was returned to the sale." *Id.*

Tax buyers sued, insisting the Treasurer strictly comply with the Property Tax Code and arguing that she had no authority to create the new bidding rule. The Illinois Supreme Court, after acknowledging that "[t]he Property Tax Code contains no express provisions for dealing with this situation," *id.* at 105, nonetheless *upheld* the Treasurer's discretion to implement her new rule. Had the Treasurer not implemented the rule, the Court stated, "owners would be deprived of the opportunity to redeem at the lowest possible rate. The reason for the law would be thwarted." *Id.* at 107. The Court stated:

> [T]he collector is not confined to those actions specifically detailed in the Property Tax Code. When the General Assembly conferred on county collectors the power to conduct tax sales, it also conferred, by implication, the authority to do all that is reasonably necessary to execute that power. *Lake County Board of Review v. Property Tax Appeal Board,* 119 Ill. 2d 419, 427 (1988) . . . County collectors are

permitted to 'exercise discretion to accomplish in detail what is legislatively authorized in general terms.' *Lake County Board of Review*, 119 Ill. 2d at 428.

194 Ill. 2d at 105, 741 N.E.2d at 251 (emphasis added).

The policy question about how to conduct the annual tax sale that the Treasurer faced in *Phoenix Bond* is similar to the question she faced in this case. Taxpayers there had rights under the Property Tax Code *and Illinois constitution* that were being subverted. The question was how to protect them. The Treasurer decided a new rule was required, and the Supreme Court agreed, recognizing that "[t]he public sale provisions of the Property Tax Code were designed to foster competition in bidding in order to enable owners to exercise their right of redemption, *as guaranteed by our constitution* (see Ill. Const. 1970, art. IX, § 8), at the lowest possible cost." *Id.* at 107 (citation omitted) (emphasis added).

Similarly here, the Treasurer faced a problem: taxpayers were losing their property without compensation in violation of their constitutional rights. Just as she did in *Phoenix Bond*, the Treasurer could have used her power to prevent that injury and implement appropriate protections, but here she chose *not* to do so. The Treasurer had the option to ensure compliance with the Illinois and U.S. Constitutions by imposing rules for the conduct of the tax sale that would have enforced the Property Tax Code's express provisions limiting a taxpayer's obligation to the amount of tax debt. The Treasurer could have done this in any number of ways. She could have required that, as a condition of the Treasurer accepting a tax buyer's bid on a property, the tax buyer would have to commit to paying to the homeowner the value of the property in excess of the tax debt at the time the deed issued in the event the property was taken by a tax deed. SOF ¶ 27.

She could also have offered for sale only so much of each property (a fractional share) as was sufficient to satisfy the amount of the debt. 35 ILCS 200/21-180. If no tax buyer wanted to purchase that share, the Treasurer could collect the delinquent tax as she did in *Phoenix Bond* (*i.e.*,

16

using the other modes of collection available under the Property Tax Code). 194 Ill. at 103 n.2. The

option to sell fractional interests and thereby preserve surplus equity is enshrined in the Property

Tax Code. The delinquency judgment the Treasurer obtains against the property is limited to the

tax debt and provides that "the properties, *or so much of each of them as shall be sufficient to satisfy*

*the amount of taxes* (and special assessments, if any), interest, penalties and costs due thereon, be

sold as the law directs." 35 ILCS 200/21-180 (emphasis added).[4] The Treasurer claims she is

shielded from liability by the Property Tax Code, when in fact she chose a path not compelled by

the Code while disregarding equity-preserving options available to her.

Defendants also had the discretion under *Phoenix Bond* to *themselves* provide prompt and

fair just compensation. That option is not specifically authorized by the Property Tax Code, but

neither is it forbidden. *See, e.g., Woodbridge v. City of Greenfield*, No. 23-30093, 2024 U.S. Dist.

LEXIS 96015 (D. Mass. May 29, 2024) (government can take, but must pay compensation); *Town*

*of Tyngsborough v. Recco*, No. 18-TL-001223, 2024 Mass. LCR LEXIS 71, 2024 WL 2331197

(Mass. Land Ct. May 21, 2024) (constitutional just compensation and statutory tax collections are

not mutually exclusive).

The decision to employ none of these available options to protect confiscation of equity

was an actionable *Monell* policy, custom and practice that caused the constitutional injury.

> **(3)** ***Monell* Choice Three: Defendants Chose Not to Exercise Their
> Home Rule Authority to Compensate Owners for Lost Equity
> Following the Issuance of Tax Deeds.**

In addition to the authority under *Phoenix Bond*, Cook County has "Home Rule" power to

appropriate funds to compensate homeowners deprived of surplus equity. Ill. Const., Art. VII, §

---

[4] Selling fractional interests is an option in other states as well. *See, e.g.,* Iowa Code Ann. § 446.16 (Bids
are for the "smallest percentage of the parcel"); R.I. Gen. L. § 44-9-8 ("sale of fractional interests with
partition sale if necessary).

6(a)). *See Allen v. County of Cook*, 65 Ill. 2d 281, 288 (1976) ("the manner in which the defendant county appropriates funds … is a matter 'pertaining to its government and affairs'" within county's home rule powers) (quoting Ill. Const. 1970, art. VII, § 6(a)).

Home rule units in Illinois have authority to direct their own affairs, by themselves or concurrently with the state, except where the General Assembly explicitly gives the state sole authority in a particular subject matter. Home rule power is construed liberally in favor of local powers. IL Const., Art. VII, §6 (m); *see also* 55 ILCS 5/5-1014 (home rule statute). Home rule powers are broad, and judicial pre-emption in the absence of a legislative limitation is disfavored. *Blanchard v. Berrios,* 410 Ill. Dec. 923, 932, 72 N.E. 3d 309 (2016).

The General Assembly pre-empted home rule in just four sections of the Property Tax Code, none of which applies here. As to all applicable portions of the Property Tax Code, the General Assembly made it clear that "Nothing in this Code … is a denial or limitation on home rule powers where no denial or limitation extended under prior law." 35 ILCS 200/32-10. Defendants' home rule powers therefore empowered them to abide by their constitutional duty to provide just compensation.

Defendants claim that the Property Tax Code prevents Cook County from using its Home Rule powers to avoid violating the Constitution (Dkt. 133 at 17-18), but that argument ignores express provisions authorizing collection methods other than the tax sale, as well as provisions limiting the homeowner's liability to Cook County to the amount of the debt. 35 ILCS 200/21-440; 35 ILCS 200/21-180. It also contravenes a fundamental canon of statutory construction. Courts must construe statutes "in a manner that upholds [their] … constitutionality if it is reasonably possible to do so." *Kakos v. Butler*, 2016 IL 120377 ¶ 9 (Ill. 2016); *People v. Bohenek,* 202 IL App. (2d) 170545, ¶ 28 (2nd Dist. Cit. App. 2020); *People v. Hollins*, 971 N.E. 2d 504, 508 (Ill. 2012). Illinois courts similarly read separate statutes to harmonize them with each other and the

18

Constitution. *Lily Lake Road Defenders v. County of McHenry*, 156 Ill. 2d 1, 9 (1993); *Relf v. Shatayeva*, 2013 IL 114925, ¶ 39 (Ill. 2013). The Property Tax Code must therefore be read to require or at least permit use of Home Rule power and *Phoenix Bond* rule-making power to ensure the Tax Code is implemented consistently with both the Illinois and U.S. Constitutions and Illinois' Eminent Domain statute. 735 ILCS 30/10-5-5(a) ("Private property shall not be taken or damaged for public use without just compensation.") Defendants have instead chosen to interpret the Tax Code in a way that makes their policy choices *unconstitutional*.

### 2. Defendants' *Monell* Custom and Practices Caused and Were the Moving Force Behind Plaintiffs' Injury.

Defendants' challenged choices and conduct were the "direct causal link" to the constitutional violation here. *City of Canton v. Harris,* 489 U.S. 378, 385 (1989*)*. The Sixth Circuit's decision in *Freed v. Thomas,* 81 F. 4th 655 (6th Cir. 2023) demonstrates how the causation requirement under *Monell* and *City of Canton* is satisfied. In *Freed*, the county argued that it was merely following a state statute that prohibited refunding surplus to owners when it foreclosed on Freed's home, and that it therefore had no custom or policy that led to the unconstitutional taking. The court disagreed because the county did not have to foreclose: "The county's decision to voluntarily and repeatedly serve as the foreclosing governmental unit and retain the proceeds was a policy decision with a 'direct causal link' to the constitutional violation in this case." *Id.* at 661; *see also DePiero v. City of Macedonia*, 180 F.3d 770, 787 (6th Cir. 1999) (finding municipal liability where a state statute authorized but did not require a city to take a certain action); *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (municipality may be subject to *Monell* liability where it makes a deliberate choice beyond what a statute requires).

Plaintiffs are not seeking recovery based on actions mandated by state law, but on actions *in violation of* state law, *i.e.*, the requirement in both the Illinois Constitution and the Eminent Domain Act to pay just compensation for taken properties.[5]

### 3. The Injury Resulting from Defendants' Monell Choices Occurs When the Tax Deeds Issue, Not Years Later If and When an Indemnity Fund Lawsuit Reaches Final Judgment.

Though Defendants imply otherwise, the Clerk's issuance of tax deeds is not some interim "step" on a winding road to equity deprivation: ***it constitutes*** the equity deprivation itself. It is the taking. Before the tax deed issues, Plaintiffs own property with power to occupy, sell, bequeath, and otherwise enjoy it. Afterwards, Plaintiffs have nothing. The tax deeds conveying merchantable title to the tax buyer mark the end of Plaintiffs' ownership and equity in the property. 35 ILCS 200/22-45, -55; 35 ILCS 200/22-65; 35 ILCS 200/22-75; *Crawford v. Love,* 243 Ill. App 3d 977, 979 (1993) ("tax deed issued pursuant to a judicial process grants to the purchaser a new and independent title, free and clear from all previous titles and claims of every kind and character"); Clerk Order at 2; 35 ILCS 200/22-40; SOF ¶ 29 (citing to Answers, Dkt. 65 at 24-25, and Dkt. 66 at 22-23). *See also Lynch v. Multnomah Cnty.*, 2024 U.S. Dist. LEXIS 233277, *26 (D. Ore. Dec. 27, 2024) (Section 1983 claim for taking of surplus home value accrued "when the properties [were] deeded to the county"); *Stensrud v. Rochester Genesee Reg'l Transp. Auth.*, 507 F. Supp. 3d 444, 452 (W.D. N.Y. 2020) (Claim for surplus value became ripe upon transfer of deed).

---

[5] Defendants assert that Organizational Plaintiffs—but not the Individuals —"acknowledge" the Property Tax Code governs the tax sale. Dkt. 133 at 10. But as shown above, nothing in the Code says the tax sale is the only way to collect delinquent taxes, or that it has to be conducted as the Treasurer did, leading to the confiscation of Plaintiffs' equity. Further, laymen 30(b)(6) representatives' statements of law are not binding admissions. Laymen are not competent to testify about the law. Moreover, counsel for Plaintiffs properly objected to such questions; accordingly, the testimony is inadmissible. Plaintiffs' L.R. 56.1(b)(2) Response to Defendants' Statement of Material Facts ¶¶ 11,29.; *United States v. Noel*, 581 F.3d 490, 496 (7th Cir. 2009) ("[L]ay testimony offering a legal conclusion is inadmissible.")

After the tax deed issues, some owners have ten years to file an indemnity fund lawsuit in circuit court seeking compensation. They can do so, however, only *after* they have been injured by the issuance of a tax deed, a limitation that confirms it is the tax deed's issuance, not some later development, that inflicts the harm. 35 ILCS 200/21-305(a) ("Any owner of property sold under any provision of this Code who sustains loss or damage by reason of the issuance of a tax deed" and who has no other means to recover the property, can assert a claim subject to other limitations on ability to recover).

The indemnity fund is thus by definition a *post*-taking state court remedy. Such remedies are irrelevant to the government's liability for the taking in federal court. When government action that qualifies as a taking under the Fifth Amendment has occurred (by, for example, the issuance of a tax deed), this confiscation, by operation of law—law that states are powerless to interfere with, *Williams v. Reed*, 2025 U.S. LEXIS 550, *11-12 (Feb. 21, 2025)—creates an immediate right to sue. *Knick* v. *Twp. of Scott, Pennsylvania*, 588 U.S. 180, 190 (2019). *Knick* holds that no matter what sort of procedures the local government puts in place to remedy a taking, a property owner has a federal Fifth Amendment entitlement to compensation as soon as the government takes his property without paying for it. *Id.* at 190. The injury is not dependent on the outcome of the post-taking state procedure. The deprivation of ownership without advance or contemporaneous compensation *is* the injury. State court remedies like the indemnity fund lawsuit (or an inverse condemnation lawsuit for that matter), good, bad or indifferent, just do not matter.

> [A] property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it. The Clause provides: '[N]or shall private property be taken for public use, without just compensation.' It does not say: 'Nor shall private property be taken for public use, without an available procedure that will result in compensation.' [….] A later payment of compensation may remedy the constitutional violation that occurred at the time of the taking, but that does not mean the violation never took place.

(*Id.* at 189, 193).

With this reasoning, the Supreme Court in *Knick* overruled *Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172 (1985), which had held that "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the [Takings] Clause until it has used the procedure and been denied just compensation." Dkt. 133 at 21. After *Knick,* violation of the Takings Clause is complete when the property is taken and compensation is not *then* paid. *Knick.* at 189. Defendants' contention that "there is no Fifth Amendment unlawful taking because divested property owners can file petitions for relief from the indemnity fund to recover the equity they lose in property acquired by tax buyers," Dkt. 133 at 21, flies in the face of *Knick*.[6] Defendants' effort to blame the indemnity fund's shortcomings on "state law" and their claim that "the County's hands are tied by the Illinois legislature" (Dkt. 133 at 11, 16) are beside the point; as a post-taking remedy, the indemnity fund is not relevant to Plaintiffs' claims.[7]

Defendants argue that Plaintiffs cannot establish that their harm was caused by any *Monell* policy, Dkt. 133 at 10-12, because what Plaintiffs are really complaining about is what might be called "the indemnity fund mess," *i.e.*, the complications, delays and funding shortfalls that plague the indemnity fund. Defendants argue that these shortcomings are imposed on them by the state statute creating the indemnity fund. Whoever fault the "indemnity fund mess" may be is irrelevant because Plaintiffs make no claim based on the indemnity fund's innumerable flaws. Plaintiffs identify the defects in the indemnity fund in their complaint merely to explain *why it is not a defense*

---

[6] The Court in *Knick* explained further that the *reason why* exhaustion is not required is that post-taking state remedies occur too late to affect the existence of the violation. *Id.* at 193 ("A bank robber might give the loot back, but he still robbed the bank.").

[7] Defendants' effort to blame the tax buyers' lobby for the indemnity fund's shortcomings (Dkt. 133 at 7) is similarly unavailing. It doesn't matter who is responsible for the shortcomings of an irrelevant state court remedy.

to the takings claim.[8] Dkt. 53 ¶¶ 5, 8. But Plaintiffs base no *takings* claim on the indemnity fund's defects. Plaintiffs' takings claim is based on the fact that when the tax deed issues without compensation, the injury caused by the confiscation of their property is complete, notwithstanding the existence of the indemnity fund.

Defendants' citation to this Court's Clerk Opinion does not change the result. Dkt. 133 at 10-11. That Opinion states that "the processes and policies that govern the issuance of a tax deed are separate from those that govern payment of compensation to homeowners." *Id.* at 10. That statement supports Plaintiffs. It confirms that the indemnity fund, which "govern[s] payment of compensation" is "separate from" *and not part of,* the tax deed issuance process. It is a post-taking remedy not relevant to the injury-causing confiscation of equity accomplished through Defendants' *Monell* policies. The indemnity fund, as defective as it is, does not injure Plaintiffs; the tax deed does, as the Property Tax Code itself confirms in providing that an indemnity fund suit can be brought as soon as, but not sooner than, there has been harm *caused by issuance of the tax deed*. 35 ILCS 200/21-305(a). *See Hall v. Meisner*, 51 F.4th 185, 196 (6th Cir. 2022) (taking of "absolute title" is the relevant source of liability for Fifth Amendment purposes).

In sum, Defendants' arguments contradict *Knick*, which provides that a taking injury happens the moment "private property has been taken, whether through formal condemnation proceedings, occupancy, physical invasion, or regulation, the landowner has *already* suffered a constitutional violation.'" *Id.* at 193 (quoting *San Diego Gas & Elec. Co. v. San Diego*, 450 U. S. 621, 654, 657 (1981)) (emphasis in original). The taking here consists of the tax deed, which is the equivalent of the "formal condemnation proceedings, occupancy, physical invasion, or regulation" referred to in *Knick.*

---

[8] Plaintiffs also argue in the alternative that if the indemnity fund were their exclusive remedy – which they believe it is not – its failings would amount to a due process violation. *See* Section E. below.

### 4.     Defendants' "Inaction" Authorities Do Not Apply.

Defendants contend Plaintiffs' claims fail under *Monell* because the constitutional injury is based on "purported inaction, as opposed to affirmative action." Dkt. 133 at 12. But, if that were the case, *every* takings case would be analyzed as an "inaction" case because every takings case is premised upon the defendant's failure to pay just compensation. But that is not the law.

The cases on which Defendants rely are cases where the plaintiff seeks to hold the municipality liable under § 1983 for a failure to train or supervise an employee, such as prison guards, who caused the harm. *J.K.J. v. Polk Cnty.,* 960 F.3d 367, 378 (7th Cir. 2020) (sexual assault of prisoners); *Orozco v. Dart,* 64 F.4th 806 (7th Cir. 2023) (confiscation of reading materials). In such cases, to distinguish the claim from *respondeat superior,* proof is required that the supervising defendant had some reason to anticipate the employee's action. That line of inaction cases does not apply here because the Constitution specifically prohibits Defendants from taking property without the payment of just compensation.

Moreover, the purpose of the *Monell* requirement is to ensure that the suit is based on action *of the government* and not simply the actions of an unauthorized employee. Plaintiffs are clearly seeking to impose liability based only on government action, not respondeat superior. Plaintiffs have demonstrated that Defendants chose to take "affirmative municipal action that is itself unconstitutional." *J.K.J.,* 960 F.3d at 377-78 (comparing this type of "straightforward *Monell* claim" to a failure to supervise inaction claim). Plaintiffs challenge nothing that is the result of a single employee's actions or a failure to supervise or train. Plaintiffs claim not that Defendants "allowed" or failed to prevent tax sales, but that Defendants chose to take actions that resulted in the confiscation of equity without just compensation. Choosing to use the tax sale method rather

than the individual suit method or fractional sales, or using Home Rule or *Phoenix Bond* authority to require payment, was a choice to *act*.[9]

**B.**      **The Indemnity Fund Is Not the Sort of Immediate, No-Fault Process to Provide Contemporaneous Just Compensation that was Available to the Property Owner in *Nelson*.**

Defendants contend that by its mere existence, the indemnity fund *provides* the just compensation that Plaintiffs were denied. According to Defendants, the process for obtaining money from indemnity fund "operates in much the same way" as the process for obtaining just compensation that the Supreme Court approved in *Nelson v. City of New York*, 352 U.S. 103 (1956). (Dkt. 133, at 21.) That is simply not true.

In *Nelson*, New York City foreclosed on property owners who were delinquent in paying utility bills, but the owners could avoid an equity loss by requesting that the property be sold by the city, whereupon the surplus sale proceeds would promptly be paid to the owner. Trying to fit within *Nelson,* Defendants say that in order to recover under the indemnity fund, all a divested owner has to do is "assert[] the property is worth more than the taxes due, and upon proof of this allegation, receive[] an amount equal to the surplus." Dkt 133, at 21. What Defendants don't say is that once the owner in *Nelson* demonstrated that there was surplus, that surplus was paid to the owner simultaneously with the taking, just as *Tyler* requires. Here, in contrast, there is no process permitting surplus to be provided to owners contemporaneously with the taking. All they can do is

---

[9] In any event, even if an "inaction" analysis applied, Defendants understood the consequences of their action. Defendants had ample notice that the issuance of tax deeds resulted in the uncompensated loss of home values above the Plaintiffs' tax debts. Defendants also understood that there was no meaningful means available for those who suffered a loss to obtain just compensation (see next section). There is no excuse for Defendants' choices here in the presence of obvious and foreseeable constitutional harms. *See, e.g., Edmond v. City of Chicago*, 2024 U.S. Dist. LEXIS 67237, at *72-73 (N.D. Ill. Apr. 11, 2024) (Kennelly, J.) (summary judgment denied on *Monell* grounds where evidence existed that city disregarded an "obvious risk" employees could be subject to discrimination).

file an after-the-fact lawsuit that *Knick* says is not an impediment to filing a section 1983 claim in federal court.

Furthermore, recovery from the indemnity fund contains many conditions and limitations that were not present in *Nelson*. For example, an owner seeking less than $99,000 may receive compensation *only* if a Court decides they are "equitably entitled" to compensation. 35 ILCS 200/21-305(a)(1); Dkt. 133 at 6. In considering whether the equities warrant an award, the court may consider, among other things, the limited funds available in the indemnity fund. *Hedrick v. Bathon*, 747 N.E.2d 917, 925 (Ill. App. Ct. 5th Dist. 2001).[10] A homeowner seeking more than $99,000 "must prove that the loss of his or her property was not attributable to his or her own fault or negligence." Dkt. 133 at 6; 35 ILCS 200/21-305(a)(2). And "[i]n determining the existence of fault or negligence, the court shall consider whether the owner exercised ordinary reasonable diligence under all of the relevant circumstances." 35 ILCS 200/21-305(a)(2) and (3). Thus, on its face, the indemnity fund is no automatic remedy and is inherently deficient: *all* petitioners must file a lawsuit – in the Circuit Court of Cook County and governed by the Illinois Code of Civil Procedure – and prove they are "equitably" entitled to relief, even if there is no dispute that they suffered a loss via issuance of a tax deed. And owners requesting more than $99,000 must show they were not negligent.

Defendants' argument is that, as long as the state statute doesn't absolutely preclude compensation, the mere possibility to recover from an after-the-fact state court claim "*is*" just compensation. Dkt. 133 at 21. *Knick* put that argument to rest. In Justice Kagan's dissent, she pointed out that it *used to be* the rule that some form of state court remedy was "enough" to satisfy

---

[10] Defendants admit that in Illinois, the indemnity fund "shall not be greater than" $2,000,000, that there is currently a six to seven-year backlog in paying awards due to insufficient funds being available. Dkt. 133 at 5, 6, 11; Dkt 134 at ¶ ¶ 17, 20.

the just compensation requirement. But that rule – the one Defendants ask this Court to re-adopt in defiance of *Knick* –was smashed to "smithereens" by the majority holding in *Knick*. 588 U.S. at 212-213 (2019) (Kagan, J., dissenting).

Even without considering *Knick*, the indemnity fund comes nowhere close to satisfying the Fifth Amendment. Just compensation is not some money, maybe, in a few years, if you win your lawsuit, with no interest for the delay. "Just compensation" has been repeatedly and consistently defined as "the full and perfect equivalent in money" for what was taken. *United States v. Miller*, 317 U.S. 369, 373 (1943). It is make-whole relief that restores the takings victim to the same position they would have been in had there been no taking. *United States v. 564.54 Acres of Monroe and Pike County Land,* 441 U.S. 506, 510 (1979) (quoting *Olson v. United States,* 292 U.S. 246, 255 (1934)).

Included in such "make whole" relief is the *requirement* of prejudgment interest, *i.e.*, compensation for delay between the taking and the time money is actually received, *see, e.g., Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984)*; Jacobs v. United States*, 290 U.S. 13, 16-17 (1933) (Prejudgment interest required). But the indemnity award statute does not allow for pre-judgment interest, the time period between the taking and the granting of the indemnity award.

Just compensation must also be paid in a reasonably accessible and trouble-free way. In *Cherokee Nation v. Southern Kansas Ry. Co*., 135 U.S. 641, 659 (1890), the Supreme Court held that just compensation must be "reasonable, certain and adequate." The government must provide compensation "without imposing on the owner any bur[d]en of seeking or pursuing any remedy, or *leaving him exposed to any risk or expense in obtaining it.*" *Bonaparte v. Camden & AR Co*, 3 F. Cas. 821, 831 (Cir. Ct. D. N.J. 1830) (emphasis added). Those subjected to a taking must not be forced to pursue procedures that send them "knee-deep in technicalities." *Kruse v. Village of Chagrin Falls*, 74 F3d 694, 701 (6th Cir. 1996) (quoting Charles Dickens, *Bleak House 2* (Oxford

27

University Press ed. 1989) (London 1853)). Just compensation is required to be "reasonably prompt." *Joslin Mfg. Co. v. Providence*, 262 U.S. 668, 677 (1923).

The indemnity fund on its face fails to meet these requirements and the evidence about how the indemnity fund operates further confirms it is far from a *Nelson*-like opportunity to obtain just compensation. Fewer than one-tenth of those who lose their properties in the tax sale file a lawsuit, which as a practical matter requires hiring an attorney given the complexity of the legal issues involved. SOF ¶¶ 43, 45, 50-51. The Treasurer routinely demands "strict proof" that petitioners meet the burden of proving entitlement to relief and were without fault or negligence. SOF ¶¶ 50-51.[11] Cases routinely take 22 months or more to resolve, during which the Treasurer typically issues dozens of discovery requests demanding information about claimants' finances, relationships, and/or health, and also demands to take the petitioner's deposition. SOF ¶ 51. Then, at the end of each indemnity case there is still a ***seven-year*** backlog to receive payment. (Dkt. 133, at 6.) And the Treasurer's Chief Financial Officer projects that it will take 20-25 years to get the payment backlog to zero. SOF ¶ 46. Contrary to Defendants' description, a divested homeowner cannot win an indemnity fund case just by showing that the "property is worth more than the taxes due", which is all that had to be proved in *Nelson.* SOF ¶ 51.

Judge Ellis conducted an in-depth analysis of the indemnity fund and concluded that it is no "font of just compensation that satisfies the Fifth Amendment's clear compensation requirement*." Sharritt,* at *41. *See also*, *Woodbridge v. City of Greenfield*, 2024 U.S. Dist. LEXIS 96015 *15 (D. Mass. 2024) (Massachusetts scheme providing a separate court process not the equivalent of the automatic *Nelson* procedure).

---

[11] Indeed, Defendant Pappas defeated an indemnity claim because, among other reasons, the taxpayers were "articulate, bright individuals who have served in the military" and "raised families" and therefore should have paid their taxes. *Greater Pleasant Valley Church in Christ v. Pappas*, 2012 IL App. (1st) 111853, 975 N.E.2d 713, 721 (2012). How is that for a "reasonable, certain and adequate" procedure?

**C.**     <u>**Defendants' Eleventh Amendment Arguments Fail.**</u>

Defendant Pappas argues that she is entitled to immunity under the Eleventh Amendment on the Individual Plaintiffs' damages claims. Eleventh Amendment immunity from liability in a § 1983 damages suit typically applies to states and state agencies, not "counties and similar municipal" actors; it applies to local officials only where they are considered an "arm of the state" that is "carrying out non-discretionary duties subject to state policy control." *Cassell v. Snyders*, 990 F.3d 539, 551-52 (7th Cir. 2021). Defendants do not qualify for immunity in this case.

As demonstrated above, Defendants were not compelled by Illinois law to violate the Constitution. Their choices and conduct in fact violated state law that mandated the payment of just compensation and limited property tax collection recoveries to the amount of the tax debt. That puts them in a different position than officials in the cases Defendants cite: a police officer ordered to evict someone by a state court order, *Scott v. O'Grady*, 975 F.2d 366, 371 (7th Cir. 1992), and a county treasurer operating under a different state's laws that did not afford the discretion afforded by Illinois law. *Bowles v. Sabree*, No. 22-1912, 2024 WL 1550833, at *2 (6th Cir. Apr. 10, 2024). Here, the Treasurer is much closer in type to the Illinois sheriff in *Ruehman v. Sheahan*, 34 F.3d 525, 528-29 (7th Cir. 1994), who was held to lack Eleventh Amendment immunity where a state law instructed him to "arrest the right people but [said] nothing about how he should do it" using an electronic tracking system.

Treasurer Pappas is provided with a set of steps to follow *if* she chooses to collect unpaid property taxes through tax sale rather than individual lawsuits, but she has a choice of whether to use the tax sale and if she does, further discretion permitting steps to protect homeowners. *See also Richman v. Sheahan*, 270 F.3d 430, 440 (7th Cir. 2001) (no immunity where "no state policy" affirmatively "directing" a sheriff's "actions regarding the training and supervision of deputies" on a specific subject); *Sharritt*, 2024 U.S. Dist. LEXIS 189825, at *15 (no immunity in similar tax

sale case because claims not "for any act the [officials] performed that state law compelled them to do").

Defendants argue that the relief Plaintiffs request would "fundamentally alter the operation of indemnity funds throughout the state," (Dkt. 133 at 18), but that is not true. Plaintiffs request just compensation, whether for past or future deprivations, which *cannot* be provided through the indemnity fund due to its many deficiencies. Moreover, should Plaintiffs succeed on their claims, neither the state indemnity fund statute nor its implementation will necessarily change. Defendants will just need to start providing prompt and full just compensation.

**D.**     **Plaintiffs Are Entitled to Partial Summary Judgment on Liability for the Excessive Fines Claim.**

    **1.**     **The Elements of an Excessive Fines Claim**

An Eighth Amendment violation exists when the government (1) imposes a "fine" that (2) is grossly disproportionate to the offense. *United States v. Bajakajian,* 524 U.S. 321, 325 (1998). Defendants' decision to collect delinquent property taxes through the annual tax sales ensured each Plaintiff would lose all the remaining equity in their home, even after their tax debt and associated penalties had been satisfied. This additional punishment—forfeiture of the remaining equity—was grossly disproportionate to the non-criminal "offense" of failing to pay property taxes.

    **2.**     **The Confiscation of Plaintiffs' Equity is a Fine.**

If a confiscation is other than "purely remedial," it is a fine subject to Eighth Amendment scrutiny. *United States v. Bajakajian,* 524 U.S. 321, 325 (1998). The concurrence in *Tyler* summarized the law on this point:

> [T]he Excessive Fines Clause applies to *any* statutory scheme that "serv[es] *in part* to punish." It matters not whether the scheme has a remedial purpose, even a predominantly remedial purpose. So long as the law "cannot fairly be said *solely* to serve a remedial purpose," the Excessive Fines Clause applies. Nor, this Court has held, is it appropriate to label sanctions as "remedial" when (as here) they bear "'no correlation to any damages sustained by society or to the cost of enforcing the law,'"

and "any relationship between the Government's actual costs and the amount of the sanction is merely coincidental."

598 U.S. at 648-49 (Gorsuch, J. concurring) (emphasis in original) (quoting *Austin v. United States*, 509 U.S. 602, 610 (1993)). Illinois courts have acknowledged that "the primary purpose of the tax sales provisions of the [Property Tax Code] is to coerce tax delinquent property owners to pay their taxes." *Excalibur Energy Co. v. Rochman*, 2014 IL App (5th) 130524, ¶ 17, 22 N.E.3d 322, 326 (2014), quoting *In re Application of the County Collector*, 295 Ill. App. 3d 703, 710, 692 N.E. 2d 1211 (1998). The County Clerk, in materials on her website describing the redemption process, admits that the County considers the taking of homes to be one of the "strict, large penalties for property owners who do not pay their real estate taxes on time." SOF ¶ 108. Coercing tax payment is the paradigm of a punitive function. *Bajakajian,* 524 U.S. at 326.

Defendants argue that there was no fine here because they did not retain possession of Plaintiffs' homes or keep for themselves any surplus value—the tax buyers did. (Dkt. 133, at 23.) As explained above, Defendants did take the Plaintiffs homes and equity in order to sell them to the tax buyers. And Defendants did receive a benefit through their receipt of unpaid taxes, fees, and interest later charged to Plaintiffs via the tax sale and used as the basis for obtaining the confiscatory tax deed. SOF ¶¶ 5, 17.

### 3. The Fine is in All Cases Excessive.

The County imposes these "strict, large penalties" on top of the taxes. Defendants then confiscated all of Plaintiffs' ownership rights in their homes and deprived them of any legal right to continue living there, with the resulting exposure to eviction and homelessness. SOF ¶¶ 7-8, 19-21, 29. Confiscating the remaining home equity on top of all the other punishments is excessive. As the court stated in *Balthazar v. Mari Limited*, 301 F. Supp. 103 (N.D. Ill. 1969), *aff'd without*

*opinion*, 396 U.S. 114 (1969): "total forfeiture seems extremely harsh when overdue taxes amount to only two or three percent of the property's value." 301 F. Supp. at 106.[12]

By the time Ms. Kidd and Ms. Rates were gratuitously penalized, the County had been fully paid all past due taxes and interest by the tax buyer. For Ms. Kidd, the satisfied debt was $17,583. In exchange for that payment, Defendants confiscated from Ms. Kidd and transferred to the tax buyer her family home, which was worth at least $130,000. SOF ¶ 7-11. The remaining equity therefore exceeded the debt by a factor of more than six. For Ms. Rates, two tax buyers paid a total of $32,847.44 to induce Defendants to transfer her home to them, which was worth at least $250,000. SOF ¶ 19-24. The remaining equity therefore exceeded her debt by a factor of more than seven.

As the Supreme Court explained in *Bajakajian*: "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." 524 U.S. at 334. There, the "offense" was Mr. Bajakajian's failure to report to Customs that he was transporting $357,000 out of the U.S. The government sought forfeiture of the entire $357,000. This offense was punishable by, at most, a $10,000 fine. The Court found that there was no sufficient relationship between the forfeiture and the gravity of the offense it was designed to punish, *id.* at 339, and the forfeiture would "bear[] no articulable correlation to any injury suffered by the Government." *Id.* at 344.

The same is true here. There is no relationship between the forfeiture and the gravity of the offense. Homeowners whose homes are worth little, or who have such high unpaid taxes that there

---

[12] To the extent *Balthazar* might be read as limiting Takings claims for surplus value, it was overturned by *Tyler. See Roberto*, 2025 N.J. LEXIS at *27 n.2. The court's dismay at the excessiveness of the taking of surplus home equity for unpaid property taxes remains applicable, however.

is no home equity left above the tax debt, pay nothing in forfeiture fines. But homeowners whose homes are valuable suffer an enormous penalty and lose all of their equity when they fall on hard times, even if their tax debt was small. The "worst offenders" pay the least, and homeowners who have committed a far less serious offense pay the most. The fine is proportional only to the value of the house and the taxes owed, not to the "offense." The arbitrary nature of this penalty alone demonstrates its excessiveness. *See Pimentel v. City of Los Angeles*, 115 F.4th 1062, 1074 (9th Cir. 2024) ("[O]ur Constitution protects against arbitrary governmental overreach, no matter how slight the government contends that its incursions are. …[O]ur Eighth Amendment jurisprudence does not allow imposing arbitrary sanctions.").

The amount of the remaining equity that is lost also bears no relation to any costs of collection or "loss" to the government—by the time the tax deed has been issued the taxes have long been paid, and it cost the government no more to put a valuable property into the tax sale than one with little value. The *additional* seizure of home equity, on top of other fines and interest, and with no rational basis for calculating the additional fine, is the sort of government piling-on forbidden by the Eighth Amendment. *See Sharritt*, 2024 U.S. Dist. LEXIS at *46 ("[T]he loss of all equity a landowner holds in their property is likely 'grossly disproportional to the gravity of' the offense."). In short, the punishment far exceeds the offense.

## E.    The Court Should Deny Defendants Request for Summary Judgment on Plaintiffs' Due Process Claim.

Defendants' motion for summary judgment on Plaintiffs' due process claim mischaracterizes the claim, which is pleaded in the alternative to their Takings and Excessive Fines claims. Dkt. 53, ¶ 130. Plaintiffs' claim is simple: if Plaintiffs are limited to the indemnity fund, Defendants' choices in implementing the indemnity fund violate Plaintiffs' rights to procedural due process. Dkt. 53, ¶¶ 141-48.

33

"The general test for determining what process is due and when "requires balancing the private interest at stake, the risk of erroneous deprivation and value of any additional safeguards, and the government's countervailing interest. *Simpson v. Brown Cty.* 860 F.3d 1001, 1006 (7th Cir. 2017). As Defendants argue, the right of procedural due process includes "notice of the intended deprivation and an opportunity to be heard[.]" *Lintzeris v. City of Chicago*, 276 F. Supp. 3d 845, 851 (N.D. Ill. 2017) (citing *Simpson*, 860 F.3d at 1006). A due process claims' fact-specific framework makes resolution inappropriate on summary judgment.

For example, Defendants claim property owners get "notice and an opportunity to be heard" related to the tax sale, Dkt. 133 at 22, but offer no evidence that owners get notice of even the existence of the indemnity fund, despite the high stakes for potential claimants, who may be entitled to six-figure payouts. SOF ¶¶ 7-11, 19-24. In fact, Defendants admit that they *choose* to provide no notice of the Fund to anyone, and provide no resources—in writing or online—to direct people to the Fund, explain it, or assist with the process. SOF ¶ 42. (This explains why less than one-tenth of those who lose properties even petition the Fund each year. SOF ¶ 43.) Defendant Pappas herself did not even mention the Fund's existence in a meeting about tax sale issues with Plaintiff Palenque, (SOF ¶ 94), consistent with Defendants' treatment of the Fund as a secret process available only to those lucky enough to discover it *and* hire a lawyer. Further, as explained above, the Fund process requires an elaborate legal argument and adversarial litigation that functionally requires hiring an attorney for a case that may not get resolved for years. SOF ¶¶ 45-51. Given the evidence of a total lack of notice, a functional lack of a right to be heard, and an unconscionably long delay in paying out claims, there is a legitimate factual question about whether all this amounts to the process that is "due." Summary judgment should not be granted on the due process claim.

**F.     Organizational Plaintiffs Are Entitled to Summary Judgment on Their Claims for Equitable Relief.**

      **1.     The Organizational Plaintiffs Have Standing.**

The Organizational Plaintiffs adopt the arguments made by the individual Plaintiffs on liability but seek declaratory and prospective injunctive relief. Defendants did not move to dismiss the Organizational Plaintiffs on standing grounds, nor have they challenged standing in their Motion for Summary Judgment. As an Article III issue, however, Plaintiffs demonstrate to the Court that the record supports their standing.

An organization has direct standing if it suffers an "injury in fact" caused by Defendants' challenged activity, and the injury is redressable by the court. An injury exists if the defendant's actions caused a concrete impact on the organization such as a "drain on the organization's resources," rather than merely "a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Access Living of Metro. Chicago v. Uber Techs., Inc.*, 958 F.3d 604, 609 (7th Cir. 2020); *see also Common Cause Ind. v. Lawson,* 937 F.3d 944, 954-955 (7th Cir. 2019) (organization has standing if defendant's actions cause it to perform work or expend resources consistent with its mission but outside of its core work). Only a "perceptible impairment" of activities involving some resources being diverted is necessary. *Havens*, 455 U.S. at 379.

Courts have found direct standing in situations comparable to the Organizational Plaintiffs' where they have been forced to take on work they otherwise would not do in order to address a defendant's ongoing violation. In *Havens Realty*, the Supreme Court found standing where a company's discriminatory practices hindered the nonprofit plaintiff's ability to realize its goal of equal access to housing. 455 U.S. at 379. In *Access Living*, the Seventh Circuit found that a

nonprofit had standing to challenge a rideshare company's conduct under the ADA which caused the nonprofit to expend extra resources on transportation. 958 F.3d at 609.

SWOP diverts substantial resources to address the harms caused by the Defendants' confiscation of home equity, impacting its ability to fulfill other aspects of its mission. SOF ¶¶ 55-81. SWOP allocates significant staff time and money to educate homeowners about the equity risks of tax sales, assist affected residents, and advocate for reform. SOF ¶¶ 61-75. These efforts have required a shift in focus and funding, requiring SWOP to prioritize tax sale issues over other programs to avoid the property loss—and often property vacancy—that follows. SOF ¶ 81.

SWOP's diversion of resources includes hundreds of hours spent organizing and conducting community forums to inform residents about tax sales and their equity-forfeiting consequences. SOF ¶¶ 70-79. Resources for at least one full-time staff person who could otherwise focus on broader housing stability initiatives have been reassigned to focus directly on this work, to avoid homeowners losing their properties and home equity. SOF ¶¶ 65-66. This work is labor-intensive given the complexity of the tax sale process and need to engage third-party organizational support. SOF ¶¶ 70-75. This reallocation has limited SWOP's capacity to deliver other services, such as its regular housing and family empowerment programs. SOF ¶ 81.

Palenque has similarly diverted its limited resources to combat the adverse effects that Defendants' equity-depriving choices have made on the communities Palenque serves, undermining Palenque's ability to address other pressing issues. SOF ¶¶ 83-87. The organization has redirected staff and volunteer hours to assist residents in navigating the tax sale process. SOF ¶¶ 89-101, 103-106. This reallocation has hindered Palenque's ability to carry out other initiatives. SOF ¶ 107. Funds intended for broader community initiatives have been reallocated to support Palenque's tax sale-related activities. SOF ¶ 107. This includes the production of educational materials and labor-intensive, direct support services for affected residents and attempts at outreach

36

to each property owner facing the tax sale. SOF ¶¶ 89-101, 103-106. Indeed, Palenque often cannot reach every household it wants to in the communities it serves due to budget constraints and limits tied to a grant that helps support this work. SOF ¶ 106. Even so, it maintains an Outreach Team that spends significant time on these issues each year. SOF ¶¶ 96-101, 103-105. It also will refer these residents to other third-party support services related to the tax sale. SOF ¶¶ 104. Palenque organizes workshops to inform residents about their rights and responsibilities under the tax sale system. SOF ¶ 92.

### 2. Declaratory Relief Is Appropriate.

The Organizational Plaintiffs' standing entitles them to declaratory relief to clarify that Defendants' policies result in: (1) unconstitutional takings by depriving property owners of remaining equity without just compensation, and (2) the imposition of excessive fines. A declaration will inform community members of their legal rights and permit the organizations to stop diverting resources to help community members avoid the worst consequences of the tax sale. Without such relief, the tax sale system's equity-confiscation harms will persist, as will the Organizational Plaintiffs' ongoing need to divert resources.

SWOP and Palenque have been forced to divert significant resources to help their communities avoid the harm caused by the Defendants' failure to provide just compensation to residents who lose their homes for failing to pay property taxes. SOF ¶¶ 81, 107. Granting declaratory relief is a practical way to address the systemic harms caused by the tax sale system's confiscation of remaining home equity without requiring SWOP and Palenque to continue spending resources to help each affected homeowner seek relief from future violations. Additionally, declaratory relief is equitable because it helps to prevent future harm to vulnerable communities disproportionately impacted by the tax sale system. SOF ¶¶ 56-57, 59-60, 70, 83, 85, 102.

Organizational Plaintiffs therefore request a declaration that Defendants' policy decisions to use the tax sale method to collect past due debts without providing just compensation for the confiscated remaining home equity results in an unconstitutional taking and excessive fine under the Fifth and Eighth Amendments to the U.S. Constitution.

### 3. Injunctive Relief Is Appropriate.

The Organizational Plaintiffs seek an injunction requiring Defendants to stop taking excess equity without providing just compensation. They do not seek to enjoin the tax sale or any method of tax collection or to set aside tax deeds or judgments allowing the properties to be sold. Defendants may continue to take homeowners' remaining equity but must end the practice of not paying for it. *See Vargo v. Casey*, No. 20-cv-1109, 2024 U.S. Dist. LEXIS 207319, at *23-24 (W.D. Wis. Nov. 14, 2024) (injunction ensuring a means of future compensation for a taking).

To obtain a permanent injunction, a "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved[.]" *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

### a. Irreparable Injury and Inadequate Remedy at Law.

In addition to the drain on their resources, the Organizational Plaintiffs are damaged by the Defendants' constitutional violations because they strip wealth from the people and communities they serve, necessitating the provision of more services. Former homeowners are not only evicted but left without the remaining equity they could use to rent or buy housing, forcing the Organizations to divert resources to assist them. To cope with the destabilizing effects caused by Defendants' policies, the Organizational Plaintiffs must divert resources that could be used to support other initiatives. Even if the Individual Plaintiffs recover on their claims, the organizations

will still have the same drains on their resources if Defendants' unconstitutional policies do not change. Defendants have continued taking remaining equity in disregard of *Tyler* and have shown no signs of changing their ways. *See Preston v. Thompson*, 589 F.2d 300, 303 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm.").

### b.    Balance of Hardships.

An injunction that requires Defendants to comply with Constitution causes no harm. *Hope v. Comm'r of the Ind. Dep't of Corr.*, No. 1:16-cv-02865, 2017 U.S. Dist. LEXIS 52850, at *21-22 (S. D. Ind. Apr. 6, 2017), citing *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004) ("[T]here can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute").

### c.    Public Interest.

The public has a strong interest in the enforcement of constitutional protections. "The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest." *Preston*, 589 F.2d at 303 n.3. Organizational Plaintiffs' requested injunction would serve this interest.

## IV.    CONCLUSION

"A court must grant a summary judgment motion 'if the movant shows that there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(a)." *Miller v. O'Malley,* No. 20 C 2118, 2024 U.S. Dist. LEXIS 168746, *10-11 (N. D. Il. Sept. 19, 2024) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Fed. R. Civ. P. 56(a) expressly allows motions for partial summary judgment, stating that "a party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." *See also, e.g., Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund.*, 778 F.3d 593, 606 (7th Cir. 2015); *MacNeil Auto. Prods. v. Cannon Auto. Ltd.*,

No. 08 CV 0139 2014 U.S. Dist. LEXIS 94243, *13 (N. D. Ill. July 11, 2014) (granting partial summary judgment on liability and deferring the question of damages to trial.)

Plaintiffs have established that there is no genuine dispute about any material fact. Based on the undisputed facts, Defendants' policy choices caused Plaintiffs to lose the surplus equity in their homes and therefore violated the Fifth Amendment's prohibition against takings without just compensation and the Eighth Amendment's prohibition against excessive fines. Accordingly, Defendants are liable under the standard for municipal liability in *Monell v. Department of Social Services of City of New York,* 436 U.S. 658 (1978).

This Court should grant Plaintiffs' Motion for Partial Summary Judgment and deny Defendants' Motion for Summary Judgment.

Dated: March 3, 2025

By: _____/s/ Brian D. Roche_____
        An Attorney for Plaintiffs

John Bouman
Lawrence Wood
Daniel Schneider
LEGAL ACTION CHICAGO
120 South LaSalle Street, 10th Floor
Chicago, IL 60603
(312) 341-1070
jbouman@legalactionchicago.org
lwood@legalactionchicago.org
dschneider@legalactionchicago.org

Brian D. Roche
REED SMITH LLP
10 South Wacker Drive
40th Floor
Chicago, IL 60606
(312) 207-6400
broche@reedsmith.com

Charles R. Watkins
GUIN & EVANS, LLC
805 Lake Street, #226

40

Oak Park, IL 60301
(312) 878-8391
charlesw@guinevans.com

David J. Guin
GUIN & EVANS, LLC
P.O. Box 380723
Birmingham, AL 35238
205-527-1582
davidg@guinevans.com

## CERTIFICATE OF SERVICE

I, Daniel J. Schneider, an attorney, hereby certify that on March 3, 2025, I caused to be served the above and forgoing document by causing a true and accurate copy of the same to be served on counsel of record in the above-noted matter via the Court's electronic filing system.

/s/ Daniel J. Schneider

41

# EXHIBIT A



# The handbook from which this excerpt was taken was first published by IICLE®. This Real Estate Taxation 1997 Edition is posted or reprinted with permission.

The handbook and any forms referenced herein is an archived edition. It can be purchased as a PDF by calling 217-787-2080.

**REAL ESTATE TAXATION (Ill. Inst. for CLE, 1997):**

This 1997 edition replaces the 1991 edition of the same title and its 1993 supplement, as well as all prior editions of the same title.

We would be interested in your comments on this handbook. Please address any comments to Director of Publications, IICLE, 2395 West Jefferson Street, Springfield, IL 62702; call Cynthia Booher at 800/252-8062; fax comments to Ms. Booher at 217/787-5986; or fill out the reader suggestion card that you received with this handbook and drop it in the mail. Call IICLE Customer Representatives at the same number for information regarding other available and upcoming publications.

# REAL ESTATE TAXATION

## 1997

Chapter authors:

| | |
|---|---|
| Michael F. Baccash | Martin S. Katz |
| Lawrence B. Brodsky | Michael Kelly |
| James W. Chipman | Randye A. Kogan |
| Mark R. Davis | John McElroy |
| Robin Drayer | Thomas J. McNulty |
| Robert Herman | Robert M. Sarnoff |
| Douglas M. Karlen | Rodney C. Slutzky |

Nilda M. Soler

**This 1997 edition replaces the 1991 edition of the same title and
its 1993 supplement, as well as all prior editions of the same title.**

**ILLINOIS INSTITUTE FOR
CONTINUING LEGAL EDUCATION
2395 West Jefferson
Springfield, IL 62702**

Owner: _____

Copyright 1997 by Illinois Institute for Continuing Legal Education. All rights reserved. Except in the course of the professional practice of the purchaser, no part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photo-copying, recording, or otherwise, without the prior written permission of the publisher. IICLE en-courages the adaptation and use of forms, checklists, and other similar documents printed in its publications in the professional practice of its customers.

This handbook may be cited as REAL ESTATE TAXATION (Ill. Inst. for CLE, 1997).

For the Good of the Profession . . .

IICLE is an independent, not-for-profit Illinois corporation.

IICLE's mission is to serve the legal profession (and, thereby, the public) by assessing the Illinois lawyer's career-long educational needs and by being the profession's primary source for filling those needs through updates on changing state and federal law, "how-to" instruction practice techniques, and guidance in professional responsibility.

Illinois Institute for Continuing Legal Education's publications and programs are intended to provide current and accurate information about the subject matter covered and are designed to help attorneys maintain their professional competence. Publications are distributed and oral programs presented with the understanding that neither IICLE nor the authors render any legal, accounting, or other professional service. Attorneys using IICLE publications or orally conveyed information in dealing with a specific client's or their own legal matters should also research original and fully current sour ces of authority.

Printed in the United States of America.

# Table of Contents

**Rules of Attorney Practice and Discipline** ......................................................... xi

**Proposed Standards for Professional Conduct Within
the Seventh Judicial Circuit** ............................................................................. xxviii

1. **Taxable and Exempt Property** .................................................................... 1 — 1
   Mark R. Davis
   Randye A. Kogan

2. **Assessment of Taxable Property** ............................................................... 2 — 1
   Robert M. Sarnoff
   Michael F. Baccash

3. **Appraisals** ................................................................................................. 3 — 1
   Michael Kelly
   Robert Herman
   John McElroy

4. **Levy, Extension, and Collection of Property Taxes** .................................... 4 — 1
   Nilda M. Soler
   Robin Drayer

5. **Tax Collection and Methods of Enforcement** ............................................. 5 — 1
   Douglas M. Karlen
   Rodney C. Slutzky

6. **Taxpayers' Remedies** .................................................................................. 6 — 1
   Martin S. Katz

7. **Practice and Procedure Before the Property
   Tax Appeal Board** ....................................................................................... 7 — 1
   James W. Chipman

8. **Tax Objection Complaints** ......................................................................... 8 — 1
   Lawrence B. Brodsky

9. **Tax Rate Objections** ................................................................................... 9 — 1
   Thomas J. McNulty

**Index** ......................................................................................................... a — 1

# About the Authors

**MICHAEL F. BACCASH** (Chapter 2) is vice president of the Chicago-based firm of Sarnoff & Baccash, which limits its practice to the area of real estate property taxation. Mr. Baccash received his A.B. (cum laude) from Princeton University and his J.D. from the University of Chicago. He has spoken before the Illinois State Bar Association (as part of the Law Ed Series), IICLE, the International Association of Assessing Officers, and the Institute of Property Taxation, as well as other professional organizations, and has served as coeditor of the Legal Reporter of the International Association of Assessing Officers. He is a member of the American, Illinois State, and Chicago Bar Associations, the Appellate Lawyers Association, the Institute of Property Taxation, the International Association of Assessing Officers, and the Building Owners and Managers Association of Chicago.

**LAWRENCE B. BRODSKY** (Chapter 8) is an attorney with the Chicago-based law firm of Holleb & Coff and concentrates his practice in real estate tax law. He has extensive experience in representing commercial business in real estate tax matters. Mr. Brodsky served in the Real Estate Tax Department of the State's Attorney's Office for fifteen years, where he was involved in numerous trials and helped shape much of Illinois' real estate tax law. He frequently writes and lectures on real estate taxation issues.  Mr. Brodsky is a member of the American, Illinois State, and Chicago Bar Associations. He received his J.D. and his undergraduate degree from DePaul University.

**JAMES W. CHIPMAN** (Chapter 7) is Executive Director of the State of Illinois Property Tax Appeal Board. He received his A.B. (magna cum laude) from Illinois College and his J.D. from Southern Illinois University School of Law.  Mr. Chipman has spoken for the Illinois State Bar Association and ICLE and is the author of the article *Illinois' Open Space Statute: An Administrative Review of the "Country Club Tax Relief Act,"* which appeared in the Journal of Property Tax Management.

**MARK R. DAVIS** (Chapter 1) is a partner in the Chicago law firm of O'Keefe Ashenden Lyons & Ward, where he concentrates his practice in real estate tax issues and related litigation. From 1984 to 1989, he was the Supervisor of the Tax Division in the Office of the State's Attorney of Cook County. Mr. Davis has written and spoken frequently in seminars on real estate taxation sponsored by the International Association of Assessing Officers, the Illinois State Bar Association, the Chicago Bar Association, the Chicago Tax Club, and IICLE. He was one of the principal drafters of the reformed judicial appeal process of the Illinois Property Tax Code and has also worked as one of the principal drafters of local court rules implemented after these provisions. He is a member of the ISBA and Chairman of its State and Local Taxation Section Council, the ABA and CBA, the Institute of Property Taxation, and the International Association of Assessing Officers. He has been designated as a Certified Illinois Assessing Officer by the Illinois Property Assessment Institute. Mr. Davis received his B.A. from the University of New Mexico, where he was elected to Phi Beta Kappa, and his J.D. from DePaul University College of Law.

**ROBIN DRAYER** (Chapter 4) is Assistant Corporation Counsel for the City of Chicago Law Department, where she concentrates in the areas of municipal and housing law. She received her B.A. in urban and regional planning from the University of Illinois and her J.D. from Antioch School of Law.

**ROBERT HERMAN** (Chapter 3) is Executive Director of Real Estate Analysis Corporation in Chicago. He received his Bachelor of Business Administration degree from the School of Business, University of Wisconsin at Madison, with a major in Finance-Real Estate. He is a member of the Appraisal Institute (MAI).

**DOUGLAS M. KARLEN** (Chapter 5) is an associate regional counsel for Chicago Title Insurance Company in Chicago. He is engaged in general underwriting for the Chicago Metro Region with special emphasis on real estate tax problems. He has written and lectured for IICLE, the Chicago Bar Association, and the Illinois State Bar Association on the subjects of real estate taxation and title insurance and has made numerous presentations to practitioners on real estate taxation, new legislation, and title insurance issues. A graduate of the University of Illinois, where he received both his B.A. and his J.D. degrees, Mr. Karlen is a member of the CBA Real Property Law Committee and Real Estate Taxatation Committee (past chairman) and a past member of the ISBA State and Local Taxation Section Council. Prior to joining Chicago Title in 1977, Mr. Karlen taught at the University of Toledo College of Law.

**MARTIN S. KATZ** (Chapter 6) is President of Fisk Kart and Katz, Ltd., a law firm that has concentrated its practice on property tax and assessment law in Illinois for 55 years. Prior to joining Fisk and Kart in 1979, Mr. Katz was an Assistant State's Attorney for Cook County in the Real Estate Tax Trial Division. He is a past chairman of the Chicago Bar Association State and Municipal Taxation Committee and was appointed to the Joint Illinois/Chicago Bar Associations Commission on the Unauthorized Practice of Law in Real Estate Assessment Appeals. He has written and spoken for professional organizations including the International Association of Assessing Officers, the Institute of Property Taxation, and the American Bar Association. Mr. Katz received his B.S. from the University of Illinois and his J.D. from DePaul University College of Law.

**MICHAEL KELLY** (Chapter 3) is President of Real Estate Analysis Corporation, a firm that specializes in appraising commercial and industrial property. He received his bachelor's degree in Business Finance from Western Illinois University and his M.B.A. from the University of Chicago. He is a member of the Appraisal Institute (MAI), the International Association of Assessing Officers, and the Institute of Property Taxation.

**RANDYE A. KOGAN** (Chapter 1) is an Associate Judge of the Circuit Court of Cook County, currently serving in the Law Division, Jury Section. From 1988 to 1996, she served in the Law Division, Tax and Special Remedies Section. In that position, her assignments included administrative review of tax decisions, both state and local, constitutional challenges of tax statutes, class action tax litigation, and tax exemption litigation. A graduate of DePaul University College of Law, Judge Kogan served as an Assistant Cook County State's Attorney in that office's civil division (including the State and Local Taxation Section) and was appointed to the bench after practicing law as a partner in the Chicago law firm of Keck, Mahin & Cate, where she concentrated in the areas of taxes and real estate development. She is a frequent lecturer in seminars on taxation and exemptions.

**JOHN McELROY** (Chapter 3) is Vice President — Review & Training at Real Estate Analysis Corporation. He received his M.M. degree from Kellogg School of Management at Northwestern University and his B.A. from the University of Illinois at Chicago. He is a member of the Appraisal Institute (MAI), the American Society of Appraisers (ASA), the Illinois Association of Certified Real Estate Appraisers, and Ely Chapter of Lambda Alpha International.

**THOMAS J. MCNULTY** (Chapter 9) is a partner in the Chicago-based law firm of Keck, Mahin & Cate and is the partner in charge of that firm's property tax assessment practice. He is a 1973 graduate of the University of Notre Dame and a graduate of Rutgers Law School in 1976. From 1980 to 1984, Mr. McNulty was an Assistant State's Attorney for Cook County and was the Supervisor of the Tax Unit during his tenure in that office. He is a member of the Institute of Property Taxation and a subscribing member to the International Association of Assessing Officers and has written and lectured on various property tax issues. He is also a former member of the Illinois State Bar Association State and Local Taxation Section Council and was the ISBA representative on the Joint CBA/ISBA Committee that studied the issue of the unauthorized practice of law in the real estate tax assessment area.

**ROBERT M. SARNOFF** (Chapter 2) is President of the Chicago-based firm of Sarnoff & Baccash, which limits its practice to the area of real estate property taxation. Mr. Sarnoff received his B.S. from the University of Illinois and his J.D. from Chicago-Kent College of Law. Mr. Sarnoff is a member of the Executive Council of the American Bar Association Section of Real Property's Property Tax Committee and is the author of the Illinois chapter in the ABA PROPERTY TAX DESKBOOK. He is also a past chairman of the Illinois State Bar Association State and Local Taxation Section Council and the Chicago Bar Association Committee on State and Municipal Taxation. He has served as coeditor of the Legal Reporter of the International Association of Assessing Officers and has spoken for a variety of professional organizations. Additionally, he was the recipient of the 1981 Institute of Property Taxation Literary Award, the first such award granted by the IPT. Mr. Sarnoff is a member of the American, Illinois State, and Chicago Bar Associations and the Building Owners and Managers Association of Chicago and a member and Designated Certified Member of the Institute (CMI) of the Institute of Property Taxation.

**RODNEY C. SLUTZKY** (Chapter 5) is a sole practitioner in Chicago, concentrating his practice in real estate taxation, tax sales, tax deed procedures, and Indemnity Fund proceedings. He received his B.A. from Michigan State University and his J.D. from the University of Illinois. He served as a member of the Illinois Department of Revenue's Advisory Committee on the recodification of the Property Tax Code and as a member of the Cook County Clerk's Tax Redemption Advisory Committee. He is a former chairman of the Chicago Bar Associaton Real Estate Taxation Committee and of that Committee's Tax Sale/Tax Deed Subcommittee and is a member of the Illinois State Bar Association State and Local Taxation Committee. He has spoken for IICLE, ISBA, and the CBA.

**NILDA M. SOLER** (Chapter 4) is Chief Assistant Corporation Counsel for the Law Department of the City of Chicago. Concentrating her practice in building code enforcement and foreclosure matters, she supervises a staff of 22 lawyers and 27 support personnel that has successfully implemented a housing court fine collection system, the Chicago Abandoned Property Program, and a receivership program in Housing Court. Ms. Soler received her B.A. from Newcomb College of Tulane University, her Masters in Urban Planning from the University of Illinois, her J.D. from DePaul University College of Law, and her LL.M. in Taxation from The John Marshall Law School. She was a founding member of the Hispanic Alliance for Career Enhancement and served on its board until 1991 and also was appointed to the Illinois State Board of Education in 1981, serving until 1988. Ms. Soler has been a board member of the Latino Institute since 1980 and has occupied various leadership positions within that organization.

no express provision for the constitutionally required period of redemption, nor is a statutory rate of penalty provided, nor is there any provision for consummation of the sale. In short, this section of the Property Tax Code contains so many inadequacies that few county officials, if any, have been known ever to attempt its use.

### G.   [5.48]   In Personam Liability — The Suit To Recover Unpaid Taxes

In addition to the above methods of tax enforcement through in rem tax sale proceedings, the Property Tax Code establishes personal liability for the payment of real estate taxes. Section 9-175 of the Property Tax Code declares that the "owner of property on January 1 in any year shall be liable for the taxes of that year." When a tax parcel has more than one owner on January 1, any owner may, as discussed above, make a partial payment under §20-210 of the Code as to the specified legal description or as to an undivided interest in the property. For any remaining delinquency, however, each owner who has not made any such payment under §20-210 is liable jointly and severally in any action brought to enforce personal liability for unpaid taxes. The liability may be enforced by means of a money judgment obtained in a civil action brought under §21-440 of the Code.

Section 21-440 provides that a county board, in its discretion, "may, at any time after final judgment and order of sale," direct the state's attorney to institute an in personam "civil action in the name of the People of the State of Illinois in the circuit court for the whole amount" of unpaid taxes and against the person or persons who owned the land on the date the delinquent tax lien arose. The state's attorney may seek to recover delinquent taxes for one year or for several years. Since this proceeding is the same as any other in personam action, the state's attorney must file a complaint that states a cause of action (*Carney v. People,* 210 Ill. 434, 71 N.E. 365 (1904)) and the defendant is entitled to personal service of process (*Griffin v. Cook County,* 369 Ill. 380, 16 N.E.2d 906 (1938)). If the state's attorney cannot determine who is the owner, §21-440 establishes a presumption of ownership if the real estate is assessed to a person, firm, or corporation. If the state's attorney obtains a judgment for the unpaid taxes, it is a money judgment similar to any other judgment, and it does not enjoy the special lien priority accorded to the lien of real estate taxes. If the state's attorney records a memorandum of the judgment, it becomes a lien on all real estate owned by the judgment debtor, and it may be enforced by execution, levy, and sale. Any taxing body may bid at a judicial sale conducted under this procedure. The entire process may be repeated for every subsequent year of delinquent taxes, probably until the person liable for the taxes no longer has any assets.

If county officials decline to bring a civil action for the whole amount of unpaid taxes, any county, city, town, school district, or other municipal corporation that levies taxes on the tax-delinquent property may, at any time after entry of the judgment and order of sale, institute a civil action in its own name in the circuit court for the tax amount owing to it and against the person or persons liable for the unpaid taxes. While the authors of this chapter are not aware of any actions filed under this provision, it is presumed that a final judgment in such a case will be enforceable in the same manner as the county's judgment for the whole amount of unpaid taxes described above.

In recent years, the Cook County State's Attorney has sought to recover unpaid taxes through actions under §21-440 more often than in the past. The resulting litigation has raised several interesting problems.

First, what defenses are available? The courts have held that defenses are few and difficult to maintain. The defendant may argue that there are no delinquent taxes, but the

state's attorney can defeat this defense by producing the warrant book, the judgment and order of sale, and the judgment and sale record. The defendant may not argue that the delinquent tax was based on an overvalued or irregular assessment inasmuch as the courts have consistently held that a taxpayer must seek his remedies prior to the entry of judgment and order of sale except when the tax is unauthorized by law or when it is imposed on exempt property. *See People v. Kimmel,* 323 Ill. 261, 154 N.E. 97 (1926); *People v. Hibernian Banking Association,* 245 Ill. 522, 92 N.E. 305 (1910); *Sanderson v. Town of LaSalle,* 117 Ill. 171, 7 N.E. 114 (1886). It appears that if the taxes are delinquent, the defendant may argue only that he was not the owner of the property on January 1 of the year in question. *See generally People v. Hagerty,* 104 Ill.App.3d 240, 432 N.E.2d 908, 60 Ill.Dec. 9 (1st Dist. 1982), sustaining a §21-440 proceeding against a variety of constitutional and procedural attacks.

Even though overvaluation is not a formal defense in an action against the property owner for unpaid taxes, defendants have informally discussed overvaluation with the state's attorney in order to reach compromise or settlement agreements. If the court accepts the compromise, the defendant should pay the agreed amount of taxes to the county collector and insist that the tax records, in addition to the court file, reflect satisfaction of all tax liability. The collector must post the payment on the warrant books and mark any remaining balance as satisfied per court order. In addition, the county clerk must void any forfeiture on the judgment and sale record. In this way, the in rem liability of the land will be shown on the tax records as satisfied, and the in personam liability of the property owner will be shown on the court file as satisfied. At present, however, overvaluation arguments can be used to achieve full satisfaction of both in personam and in rem liabilities only when the state's attorney is willing to compromise. If the state's attorney is not willing to cooperate, a property owner has no defenses in the personal action. In recent years, proposals have been submitted to the legislature to amend §21-440 to allow defendants to argue overvaluation as a formal defense. To date, however, this section has not been amended in this fashion.

The courts have also disposed of the defense raised by a defendant who had sold the tax-delinquent property prior to the filing of the action. The liability for unpaid taxes, once it attaches on January 1, remains irrespective of what the owner subsequently does with the property. *In re Chicago Rys.,* 177 F.2d 860 (7th Cir. 1949).

Second, if personal liability for unpaid taxes may be imposed only on the owner, who is the owner? In *People v. Chicago Title & Trust Co.,* 75 Ill.2d 479, 389 N.E.2d 540, 27 Ill.Dec. 476 (1979), the Cook County State's Attorney instituted in personam actions to recover forfeited taxes against several corporate land trustees in their capacities as trustees, the beneficiaries of the trusts, and the land trustees in their individual corporate capacities. The trial court rendered judgments against the trustees solely in their individual corporate capacities but dismissed the suits against the trustees in their capacities as trustees. The trial court also dismissed the suits against the beneficiaries. The trustees and the state's attorney both appealed. The Supreme Court of Illinois reversed, holding that, for purposes of tax collection, and enforcement law, the beneficiary of an llnois land trust should be considered the "owner" of the property. The court ruled that trustees were not liable in personam in any of their capacities for unpaid taxes, not even to the extent of the corpus of the trust, and that the trust beneficiary was liable in personam. The court reasoned:

> **It is a generally accepted principle that taxes are imposed for benefits received. Thus, where the trust beneficiary is the recipient of all the benefits of the property and controls the management of the property, he is the party most benefited by the ends of taxation, regardless of who holds**

**the title. Revenue collection is not concerned with the "refinements of title"; it is concerned with the realities of ownership.** 389 N.E.2d at 544.

The court also stated that "[w]hen all of the benefits of ownership flow to a particular person, that person is the owner for tax purposes." 389 N.E.2d at 545.

While this result may seem reasonable when limited to land trust beneficiaries, this same line of reasoning may be used by the courts to find other "owners" liable for unpaid taxes. *See Christian Action Ministry v. Department of Local Government Affairs,* 74 Ill.2d 51, 383 N.E.2d 958, 23 Ill.Dec. 87 (1978) (contract purchaser in possession deemed to be owner for purposes of obtaining exemption from real estate taxes); *Cole Hospital, Inc. v. Champaign County Board of Review,* 113 Ill.App.3d 96, 446 N.E.2d 562, 68 Ill.Dec. 656 (4th Dist. 1983) (lessee in possession under sale-and-leaseback arrangement deemed to be owner for purposes of obtaining exemption from real estate taxes). *But see Gamble v. People,* 117 Ill.App.3d 784, 454 N.E.2d 26, 73 Ill.Dec. 282 (1st Dist. 1983) (estate of deceased beneficiary or successor in interest to deceased beneficiary apparently not liable for unpaid taxes unless state's attorney files claim against decedent's estate during probate claims period). The reasoning in *People v. Chicago Title & Trust Co., supra,* may eventually be expanded to apply to the stockholders of a title-holding corporation or to the principal of a title-holding nominee or agent. These extensions of the above decision may well be accomplished in future litigation.

Third, what is the relationship between the in rem lien and the in personam action? Suit to recover unpaid taxes may be filed as early as the day after the entry of the judgment and order of sale. Thus, while an in personam action is pending, the delinquent taxes may be sold at the annual tax sale or, even later, at a forfeiture sale, a scavenger sale, or at a forfeiture foreclosure sale. Would a subsequent tax sale, in any of the above forms, eliminate personal liability for unpaid taxes? With respect to the scavenger sale, in which the county may receive less than the full amount of taxes due, the answer is clear. Personal liability remains, despite the tax sale. On several occasions, property owners who owned parcels eligible for the scavenger sale and who were also defendants in personal actions for the same unpaid taxes attempted to convince the courts that the in rem and in personam actions could not proceed at the same time and that, under the Scavenger Act, the in rem action should take precedence. *In re Application of Cook County Treasurer,* 103 Ill.App.3d 756, 431 N.E.2d 1186, 59 Ill.Dec. 429 (1st Dist. 1981); *Rosewell v. Levin,* 101 Ill.App.3d 498, 428 N.E.2d 755, 57 Ill.Dec. 205 (1st Dist. 1981), *rev'd sub nom. In re Application of Rosewell,* 97 Ill.2d 434 (1983); *In re Application of Rosewell,* 93 Ill.App.3d 1106, 418 N.E.2d 53, 49 Ill.Dec. 409 (1st Dist. 1981); *People ex rel. Larson v. Rosewell,* 88 Ill.App.3d 272, 410 N.E.2d 404, 43 Ill.Dec. 404 (1st Dist. 1980). The Illinois Supreme Court rejected this argument, however, and held that the county could choose which tax collection device to employ. *In re Application of Rosewell,* 97 Ill.2d 434, 454 N.E.2d 997, 73 Ill.Dec. 748 (1983). The county's choice of remedies would be based on the likelihood and the amount of recovery possible under each device. After the 1982 amendments to the Scavenger Act, however, the county need not choose between recovery methods. The Act now clearly states that an in rem proceeding and an in personam proceeding may go forward on the same tax liens at the same time. Section 21-260 of the Property Tax Code now reads in part:

**Confirmation of the sale shall in no event affect the owner's personal liability to pay the taxes, interest and penalties as provided in this Code or prevent institution of a proceeding under Section 21-440 to collect any amount that may remain due after the sale.**

Thus, a scavenger sale held subsequent to the filing of an in personam action will have no effect on the pending proceeding other than to establish a credit in the defendant's favor for any taxes realized by the county at the scavenger sale. Though not statutorily mandated, the result should be identical in the event of a forfeiture foreclosure sale held subsequent to the filing of an in personam action because, like the scavenger sale, the county may recover less than the full amount of delinquent taxes from the forfeiture foreclosure sale. With respect to the annual tax sale or an "over-the-counter" forfeiture sale, the result must be different. In these two forms of tax sale, the county must receive the full amount of taxes due. Any recovery through an in personam action would therefore seem to be precluded because it would be a double collection of the same taxes. It is suggested, therefore, that the state's attorney advise the county collector of all parcels on which the state's attorney is seeking to obtain in personam judgments for unpaid taxes. Otherwise, significant problems may develop if an in rem tax deed proceeding and an in personam money judgment proceeding are going forward at the same time. It appears that the interests of tax purchasers may prevail over the interests of public officials in such situations. For example, if the defendant loses the property to a tax deed prior to the entry of an in personam judgment, then the tax-delinquent parcel will not be available for a levy and execution by the state's attorney. Even if an in personam judgment becomes a lien on the tax-delinquent land prior to the issuance of a tax deed, the judgment lien enjoys no special priority and may be eliminated by a tax deed. Thus, for various reasons, a judgment may be worthless unless the defendant owns more property in the county than that which was the subject of the unpaid taxes.

Fourth, assuming that a subsequent tax sale does not occur, is an in personam judgment tantamount to an accord and satisfaction of the tax lien? Or does a successful action amount to a merger of the tax lien into the judgment? The former would appear to maintain the priority of the tax lien over other liens while the latter would appear to extinguish the county's otherwise first-in-priority tax lien. There are no reported decisions on this point. If, however, a proceeding under §21-440 is treated as being analogous to the debt and lien created by a mortgage against property, it is possible that when the judgment is entered, the tax lien is extinguished by a merger into the judgment. In *Harper v. Sallee,* 305 Ill.App. 85, 26 N.E.2d 987 (3d Dist. 1940), for example, the court held that when a decree of foreclosure is entered, the mortgage and all its covenants are merged in the decree. The instrument can be enforced only through the decree and only according to the terms of the decree. The mortgage cannot be the basis of a new, independent suit. *Wayman v. Cochrane,* 35 Ill. 152 (1864); *Lightcap v. Bradley,* 186 Ill. 510, 58 N.E. 221 (1900); *Schaeppi v. Bartholomae,* 217 Ill. 105, 75 N.E. 447 (1905). In practice, the above analogy will stand uncontested, especially if county officials mark the tax records as paid in full whenever any satisfaction of an in personam judgment for taxes is obtained even if it is for less than the full amount of taxes due. This practice will allow for compromise settlement agreements between the state's attorney and the property owner, approved by the court, establishing the amount of taxes that the property owner will actually pay.

Finally, strict application and vigorous prosecution of the in personam liability provisions of §21-440 may play havoc with real estate closings as they are currently conducted. The tax bill for the entire year is chargeable to the party who was the owner of the property on January 1 of the year involved. In an ordinary closing, the seller of the property is required to give tax prorations for both the current year and for the prior year since tax bills are issued 18 months after the lien date. If the purchaser does not later pay the tax bills for which he was given prorations, the seller who gave the prorations might be subjected to an in personam action to recover the unpaid taxes even though the seller gave credits for current and prior taxes and did not own the property for a portion of the current

year. Depending on the enforcement policies of the county board and the state's attorney in each county, it may well be that the only prudent way to close a real estate transaction is to use a form of reverse proration, escrowing all the tax funds until the taxes can be paid. This procedure may, however, stifle some real estate sales.

Recently a proposal was submitted to the legislature that would eliminate the seller's dilemma. The proposal would amend §9-175 of the Property Tax Code to provide that personal liability for unpaid taxes be shifted from the person who owns the property on January 1 of each year to the person who owns the property on the delinquency date of the unpaid installment. Under this proposal, a seller who gave credits for his time of ownership would be absolved from liability if the buyer failed to pay the taxes when billed. Thus, only a current owner would face the consequences, both in personam and in rem, of the failure to pay a tax bill. To date, however, the section has not been amended in this fashion.

## V.   [5.49]   THE REDEMPTION PERIOD

A tax sale certificate of purchase represents a lien that may, in the absence of a redemption, ripen into a tax deed. Since a tax deed necessarily involves the owner's loss of the property and the ouster of other interested parties, the tax deed procedure must satisfy the right of redemption contained in the Illinois Constitution as well as the Illinois and federal constitutional guarantees of notice and opportunity to be heard. Within this framework, the Property Tax Code establishes time limits and procedures for owners and interested parties exercising the right of redemption and notice-serving requirements for certificate holders attempting to obtain tax deeds. All parties are bound by the strict time limits contained in the Property Tax Code. It is necessary, therefore, to understand the law concerning redemption periods before describing the rights of the various parties and detailing the tax deed proceeding.

Article IX, §8 of the Illinois Constitution, as amended at the general election of November 6, 1990, and effective November 6, 1990, reads in part:

**(b)  The right of redemption from all sales of real estate for the nonpayment of taxes or special assessments, except as provided in sub-sections (c) and (d), shall exist in favor of owners and persons interested in such real estate for not less than 2 years following such sales.**

**(c)  The right of redemption from the sale for nonpayment of taxes or special assessments of a parcel of real estate which: (1) is vacant non-farm real estate or (2) contains an improvement consisting of a structure or structures each of which contains 7 or more residential units or (3) is commercial or industrial property; shall exist in favor of owners and persons interested in such real estate for not less than one year following such sales.**

**(d)  The right of redemption from the sale for nonpayment of taxes or special assessments [of] a parcel of real estate which: (1) is vacant non-farm real estate or (2) contains an improvement consisting of a structure or structures each of which contains 7 or more residential units or (3) is commercial or industrial property; and upon which all or part of the general taxes for each of 2 or more years are delinquent shall exist in favor of owners and persons interested in such real estate for not less than 6 months following such sales.**