**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MICHELLE KIDD and GOYCE H. RATES, individually and on behalf of all others similarly situated; SOUTHWEST ORGANIZING PROJECT and PALENQUE LSNA individually,** ) ) ) ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| **vs.** ) ) | **Case No. 22 C 7061** |
| **MARIA PAPPAS, in her capacity as Treasurer of Cook County, Illinois and Trustee of the Indemnity Fund, and COOK COUNTY, ILLINOIS,** ) ) ) ) ) | |
| **Defendants.** ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

This case currently has four plaintiffs—Michelle Kidd, Goyce H. Rates, Southwest Organizing Project, and Palenque LSNA—who filed suit against Cook County and its treasurer, Maria Pappas. The plaintiffs claim that the defendants violated their constitutional rights through the operation of Cook County's property tax sale system. Specifically, the plaintiffs claim that Cook County's tax sales violate the Fifth Amendment's prohibition against takings without just compensation, the Eighth Amendment's prohibition on excessive fines, and the due process guarantees of the Fourteenth Amendment.

Ms. Kidd and Ms. Rates have moved to certify a class action on these claims, or in the alternative, to certify issue classes related to these claims. In response, the

defendants moved to exclude plaintiffs' expert Dr. William G. Hamm.  The plaintiffs, in their reply, also moved to exclude defendants' expert Ron DeVries.  For the reasons stated below, the Court denies the defendants' motion to exclude Dr. Hamm, denies the plaintiffs' motion to exclude Mr. DeVries, and grants the plaintiffs' motion for class certification.

## Background

A.    **Cook County's property tax sale**

The following facts are undisputed unless otherwise noted.  Every year, Cook County conducts a property tax sale.  The procedures Cook County follows are outlined by the Illinois Property Tax Code, 35 ILCS 200, *et seq*.  Under the Property Tax Code, if a homeowner fails to timely pay property taxes, the property is considered delinquent. The County treasurer creates a list of all delinquent properties on an annual basis.  *Id.* 200/21-160.  If taxes on a delinquent property continue to go unpaid, the County treasurer applies for a judgment and order of sale for unpaid taxes on that property.  *Id.* 200/21-150.  The judgment grants the County a lien on the property "for the amount of taxes . . ., interest, penalties, and costs due thereon" and orders that the property, "or so much of each of them as shall be sufficient to satisfy the amount of taxes . . . due thereon, be sold as the law directs."  *Id.* 200/21-180.  Once a judgment and order of sale is rendered, the Property Tax Code states that the County "shall" "proceed to offer the property for sale pursuant to the judgment."  *Id.* 200/21-190.

Cook County offers its lien on delinquent property at its annual tax sale, which is supervised and administered by the Cook County Treasurer.  Tax buyers bid on this lien by offering to impose the lowest interest rate collected on any later payments made by

the property owners. *Id.* 200/21-215. In exchange for the lien and the right to collect unpaid taxes from the property owner plus interest, tax buyers pay Cook County the outstanding balance of unpaid taxes on the property at issue.

The Illinois Constitution provides property owners with a "right of redemption," allowing property owners to reacquire ownership lost via the tax sale system. *See* Ill. Const. art. IX, § 8. Generally, property owners have thirty months from the time of the tax sale to redeem their property by repaying the tax buyer. 35 ILCS 200/21-350. But if the property owner does not repay the tax buyer within the allotted time, the tax buyer may petition a court for ownership of the property. *Id.* 200/22-30. Upon granting the tax buyer's petition, the court orders the county clerk to issue and certify a tax deed transferring ownership of the property to the tax buyer. *Id.* 200/22-40.

The Property Tax Code further requires counties to maintain a fund to indemnify eligible property owners for losses or damages incurred due to the tax sale. 35 ILCS 200/21-295. To fund Cook County's Indemnity Fund, the Property Tax Code requires every tax buyer to pay "a nonrefundable fee of $80 for each [property] purchased plus an additional sum equal to 5% of the taxes, interest, and penalties paid" to purchase the property, as well as $80 for each subsequent year the tax buyer pays property taxes on the property. *Id.* A property owner seeking indemnity must "petition the Court which ordered the tax deed to issue" and "ask that judgment be entered against the County Treasurer, as trustee, in the amount of the indemnity sought." *Id.* 200/21-305. It is undisputed that the Indemnity Fund in Cook County is insufficiently funded, creating "a backlog of Indemnity Fund awards about six or seven years in arrears." Pls.' Resp. to Defs.' Stmt. of Facts ¶ 20.

3

**B.     The named plaintiffs**

Michelle Kidd purchased her home in Maywood, Illinois in 2011.  She fell behind on her property taxes around 2015.  Cook County Treasurer Maria Pappas obtained a judgment and order of sale against her property that year.  On April 4, 2017, Cook County sold the tax lien on Ms. Kidd's property to High 5 Group, LLC for the amount of unpaid taxes, interest, and costs—$2,340.44.  Ms. Kidd was unable to pay her outstanding tax debt before the redemption period expired on October 10, 2019.  On November 2, 2021, High 5 Group obtained a tax deed for Ms. Kidd's home.  High 5 Group obtained an order for possession of the property on January 23, 2022.  Rather than evict Ms. Kidd, High 5 Group allowed her and her family to remain in the property as long as she paid rent.  She did this for a few months before moving her family into a smaller rental unit in May 2022.

Goyce H. Rates inherited her home in Evanston, Illinois from her mother in 2014.  Ms. Rates did not pay property taxes for the two parcels of land on which the home sits.  Treasurer Pappas obtained a judgment and order of sale against both parcels.  On May 3, 2019, Cook County sold the tax liens on the respective parcels to separate tax buyers:  Newline Holdings, LLC and Corona Investments.  Collectively, the liens were purchased for the total unpaid taxes, interest, and costs relating to the two parcels— $9,025.45.  Ms. Rates was unable to redeem her property, and tax deeds for both parcels were issued to the tax buyers by June 2023.  Both buyers obtained eviction orders.  Ms. Rates and her family were evicted from the property on November 22, 2023.

At the time of the issuance of the tax deeds that transferred these properties to

4

tax buyers, Cook County's latest tax assessments indicated that Ms. Kidd's and Ms. Rates's homes had a fair market value of $166,220 and $389,060 respectively. The defendants, however, dispute the reliability of these assessments as indicators of fair market value. Neither Ms. Kidd nor Ms. Rates have petitioned for lost home equity from the Cook County's Indemnity Fund.

Ms. Kidd, Ms. Rates, Michael Bell, Dolly Janis, Southwest Organizing Project (SWOP), and Palenque LSNA (PLSNA) filed the present suit against Treasurer Pappas in her official capacity, Cook County Clerk Karen A. Yarbrough in her official capacity, and Cook County. Their complaint alleges the defendants violated the Fair Housing Act, the Illinois Civil Rights Act, and the United States Constitution through their operation of Cook County's property tax sale system. The property-owner plaintiffs sued on behalf of themselves and those similarly situated for damages, while the organizational plaintiffs sued solely on behalf of themselves for declaratory and injunctive relief.

On April 19, 2024, the Court dismissed the Fair Housing Act and Illinois Civil Rights Act claims against all defendants, dismissed all claims by Michael Bell, and dismissed all claims against County Clerk Yarbrough. The Court later granted Dolly Janis's motion to voluntarily dismiss her claims as well. The case thus now has four plaintiffs—Ms. Kidd, Ms. Rates, SWOP, and PLSNA—who allege that Cook County's tax sale system violates the Fifth Amendment's prohibition on taking property without just compensation, the Eighth Amendment's prohibition on excessive fines, and the Fourteenth Amendment's due process protections. These claims stem from the defendants' failure to pay homeowners just compensation for their property upon

5

transferring the property to tax buyers.

Discovery is complete. Ms. Kidd and Ms. Rates have moved for class certification under Federal Rules of Civil Procedure 23(a) and (b)(3) or, in the alternative, for issue class certification under Rule 23(c)(4). Both the plaintiffs and defendants move to exclude each sides' property valuation experts as well.

## Discussion

### A. Expert exclusion

As part of their class certification briefing, both sides have moved to exclude their opponents' experts. "Where an expert's report or testimony is critical to class certification," a district court "must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012).

Rule 702 of the Federal Rules of Evidence "governs the admissibility of expert testimony in federal court." *Artis v. Santos*, 95 F.4th 518, 525 (7th Cir. 2024). In evaluating expert testimony, a district court is tasked with the "gatekeeping responsibility" of ensuring expert testimony "is not only relevant, but reliable." *Id.* (quoting *Daubert v. Merrel Dow. Pharms., Inc.*, 509 U.S. 579, 598 (1993)). The proponent must demonstrate to the Court by a preponderance of the evidence that:

> (a) the expert's scientific, technical, or other specialized knowledge will be helpful to the jury; (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts.

*Id.* The Seventh Circuit has summarized these requirements into "a three-step analysis" that a district court should engage in "before admitting expert testimony."

*Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). "[T]he district court must evaluate: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Id.*

When analyzing an expert's qualifications, a court must determine whether the expert is "qualified to testify in the case in question." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). An expert in one subject may not be qualified to speak on another. The inquiry is "not whether an expert witness is qualified in general," but whether the expert's "qualifications provide a foundation . . . to answer a specific question" asked. *Id.* at 617 (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)).

For reliability, a district court must ensure that "the expert is providing testimony that is based on a correct application of a reliable methodology and that the expert considered sufficient data to employ the methodology." *Gopalratnam*, 877 F.3d at 780. "An expert may provide testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013). A district court "should permit the jury to weigh the strength of the expert's conclusions, provided such shortcomings are within the realm of a lay juror's understanding." *Id.* The "critical inquiry" is thus not whether a court agrees with an expert's conclusion, but whether "there is a connection between the data employed and the opinion offered." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) (cleaned up).

Finally, once a court has fulfilled its gatekeeping role, it must step aside. The adversarial process is the proper place to debate expert testimony deemed relevant and sufficiently reliable to be admissible. *Artis*, 95 F.4th at 527 (quoting *Daubert*, 509 U.S.

at 596) ("After the [gatekeeping] threshold, 'the familiar tools of vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof' will do.").

With these basic principles laid out, the Court proceeds to the parties' motions to exclude their opponents' property valuation experts.

### 1.     William G. Hamm

At the outset, the Court is not certain that the plaintiffs' expert—Dr. William G. Hamm—is truly "critical" to deciding the motion for class certification.  Dr. Hamm's analysis is focused on supporting the validity of Cook County's mass assessment system as a valid basis to determine the market value of properties.  As the plaintiffs argue, Illinois's Property Tax Code requires tax assessors to "actually view and determine as near as practicable the value of each property . . . and assess the property at 33 1/3% of its fair cash value, . . . or in accordance with a county ordinance adopted under Section 4 of Article IX of the Constitution of Illinois."  35 ILCS 200/9-155.  Cook County's tax code, in turn, requires residential property to be assessed at "ten percent" of "market value."  Cook Cnty. Mun. Code § 74-64.  Given this statutory predicate, it is likely that the plaintiffs could offer the assessments as admissible evidence of valuation irrespective of the admissibility of Dr. Hamm's opinions.

Still, the Seventh Circuit suggests that a court should make an express ruling on expert admissibility before ruling on a motion for class certification even if the court "has doubts about whether an expert's opinion may be critical for a class certification decision." *Messner*, 669 F.3d at 812.  "An erroneous . . . ruling excluding non-critical expert testimony would result, at worst, in the exclusion of expert testimony that did not

matter." *Id.* And, as will become evident below, the defendants' arguments for excluding Dr. Hamm's opinions involve, in significant part, the claimed inadmissibility of tax assessments. The Court thus considers the defendants' motion to exclude Dr. Hamm's expert opinions first, addressing the admissibility of Cook County's property assessments along the way.

### a. Qualifications

The defendants first contend that Dr. Hamm is not qualified to offer an opinion on the reliability of using Cook County's assessments as a method to establish a property's market value. Dr. Hamm is an economist with experience using quantitative models to predict market values in the mortgage lending market. According to his report, he previously served as a loan service manager at the World Savings and Loan Association, where he "developed and applied comprehensive business and financial models" used in the mutual fund business. Expert Rep. of William G. Hamm at 4–5. Dr. Hamm also previously served as the Chief Operating Officer of the Federal Home Loan Bank of San Francisco, where he was responsible for "determin[ing] the fair market value of . . . assets (primarily mortgage loans) that were pledged to the Bank as security." *Id.* at 5–6. As part of this process, he applied "complex financial models" to help determine "the fair market value of assets on the Bank's balance sheet such as . . . real estate." *Id.* at 6.

What is clear from these qualifications is that Dr. Hamm's expertise is not just in economics generally; he has firsthand experience in utilizing complex models to determine the fair market value of assets such as real estate. This qualifies him to testify regarding the reliability of Cook County's assessment system, which is a complex

model Cook County uses to determine the fair market value of property for tax purposes.

The defendants disagree. They argue that because Dr. Hamm lacks experience utilizing complex models in the appraisal context in particular, he is not qualified to testify on the reliability of Cook County's assessment system. Yet as the defendants acknowledge, "[t]he fact that an expert may not be a specialist in the field . . . typically goes to the weight to be placed on that opinion, not its admissibility." *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016). In this case, the defendants' concerns about Dr. Hamm's inexperience with the appraisal market impact only the weight to be accorded to his testimony concerning the reliability of Cook County's assessment system. They do not affect the admissibility of his opinions.

The defendants' citation to *Franconia Associates v. United States*, 61 Fed. Cl. 718 (Fed. Cl. 2004), only bolsters this conclusion. In *Franconia Associates*, Dr. Hamm's testimony was used by the defendant to criticize the appraisal techniques of the plaintiff's expert. *Id.* at 759. The court found his opinion unconvincing, noting that its persuasiveness was diminished because he was not "a certified appraiser nor particularly experienced in real estate valuation." *Id.* This lack of particularized experience in the appraisal market made his opinion "inadequate to overcome the probative value" of the plaintiff's expert. *Id.*

Notably, the Court of Federal Claims did not exclude Dr. Hamm's opinion as inadmissible. In fact, by weighing his testimony against that of the plaintiff's expert, the court expressly considered Dr. Hamm's testimony when making determinations on the merits. *Franconia Associates* thus supports this Court's conclusion that the fact that Dr.

Hamm is not a specialist in the appraisal market goes solely to the weight of his testimony, not the admissibility of his opinions.  The Court finds Dr. Hamm qualified to offer opinions on the reliability of Cook County's assessment system.

        **b.**    **Reliability**

Next, the defendants contend that Dr. Hamm's opinion is not the product of reliable methods.  Dr. Hamm used the following methodology to evaluate Cook County's assessment system.  First, Dr. Hamm considered the purpose and procedures of the assessment system.  He reviewed Illinois's Property Tax Code's description of the purpose of tax assessments, publicly available information on the Cook County Treasurer's website, and a description of the procedures by witness Raymond Gottner, a Director of Residential Assessment in the Cook County Assessor's Office.  Based on this information, he concluded that Cook County's assessment system aims at predicting the fair market value of each assessed property in order to calculate property taxes.

Second, Dr. Hamm considered the propriety of using a complex model like Cook County's assessment system to determine the fair market value of property.  He relied on Mr. Gottner's description of Cook County's system, his own experience working with complex models, and publicly available information on the Cook County Treasurer's website, including the publicly available modeling code and data that the Cook County Assessor's Office uses.  Based on these sources and his own evaluation, Dr. Hamm concluded that Cook County's system accurately determines the fair market value of properties.

Third, Dr. Hamm identified parcels that fit within the plaintiffs' class definition,

utilizing Cook County's assessment records. Although he presumed the data in these records to be accurate, he did notice that certain values were implausible, as indicated by a large difference between some assessments and later certified Board of Review assessments on the same properties. In these circumstances, Dr. Hamm would rely on assessments that were certified by the Board of Review. Using these assessments, Dr. Hamm identified 1,773 potential parcels that fit within the plaintiffs' class definition. Still, Dr. Hamm eliminated forty-four of them for one of two reasons: (1) a documented bankruptcy or other court action voided the tax deed, or (2) the property was identified as non-residential.

Fourth, Dr. Hamm used a randomly selected subset of the properties—205 of them—to demonstrate how the property owner's lost equity could be calculated. He used the publicly accessible tax deeds issued on these properties and matched them up with Cook County's assessed values. Recognizing that Cook County ordinances require residential property to be assessed at ten percent of its market value, Dr. Hamm multiplied the assessed value by ten to determine the market value of each property. *See* Cook Cnty. Mun. Code § 74-64. He then subtracted from that value the amount the property owner owed in delinquent property taxes, interest, fees, and tax payments made by the tax buyer, as indicated by Cook County's Judgment Book. This calculation yielded a collective excess of over $14,000,000, which Dr. Hamm concluded was the collective excess equity in property value lost by property owners in the sample.

Fifth, Dr. Hamm recognized that because Cook County assesses property only once every three years, there could be a substantial difference between the fair market value at the time of assessment and at the time of tax deed issuance (i.e., the date

12

when a property owner lost the property).  To address this, Dr. Hamm suggested

interpolating the data based on later assessments that reflect market changes.

Although he noted that the information required to interpolate Cook County's

assessments was readily available, he did not apply this interpolation method to the

sample.

Finally, to give an opinion on the excessive-fine aspect of this case, Dr. Hamm

converted the data used to calculate the lost equity in the sample properties to a ratio of

penalty (lost equity) to offense (taxes due plus fees and interest).  The ratio produced

was 5.19 to 1.  He then compared this ratio to other tax penalties imposed by

neighboring states, Illinois, and federal law, and found the fine produced by the tax sale

was well above other penalties for failure to pay taxes.  Dr. Hamm also concluded that

there was a dearth of evidence supporting the deterrent effect of conducting tax sales,

citing a study that found many states do not conduct tax sales but still have adequate

tax compliance.

The defendants' main gripe with Dr. Hamm's methodology is his use of Cook

County's assessments to determine the fair market value of property.  This, the

defendants contend, is problematic because "assessed value is not competent direct

evidence of value for purposes other than taxation."  Defs.' Mem. in Supp. of Mot. to

Exclude & in Opp'n to Pls.' Mot. for Class Cert. at 13 (citation omitted).  To support this

assertion, the defendants cite several out-of-circuit cases that state it is a "general rule"

that "the assessed valuation of property is not evidence" of market value.  *Tarrify*

*Props., LLC v. Cuyahoga County*, 37 F.4th 1101, 1108 (6th Cir. 2022).

The Court concludes that, in the Seventh Circuit, there is no general rule

13

prohibiting the use of tax assessments to determine the fair market value of property. At least one court in this district has referenced tax assessments as a possible indicator of a property's fair market value. *See, e.g.*, *Evenson ex rel. A.E. Evenson Fam. Living Tr. v. Evenson*, No. 14 C 4880, 2022 WL 17534367, at *8–9 (N.D. Ill. Dec. 8, 2022) (allowing the parties to consider "government tax assessor records" to help determine the "fair market value" of property). And the sole case the defendants cite from this district to support their argument, *Lardas v. Drcic*, No. 14 C 193, 2015 WL 444321 (N.D. Ill. Jan. 29, 2015), did not find assessments inadmissible. Rather, the court simply noted—in a footnote—that a county assessor's property valuation "for real estate purposes does not *necessarily* represent the market value of the property." *Id.* at *4 n.6 (emphasis added).

Evidence need not "necessarily" establish a fact to be admissible. The Federal Rules of Evidence set out a default rule for admissibility: "[r]elevant evidence is admissible." Fed. R. Evid. 402. And evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and that "fact is of consequence in determining the action." *Id.* R. 401. This "basic standard of relevance" is thus a "liberal one." *Daubert*, 509 U.S. at 587. Far from needing to conclusively establish market value, tax assessments need only have a "tendency" to indicate a property's market value is to be relevant.

Illinois's and Cook County's property tax codes themselves support the conclusion that tax assessments are relevant to determining a property's fair market value. Illinois law requires tax assessors to "determine as near as practicable the value of each property" and base their assessments off "fair cash value." 35 ILCS 200/9-155.

14

Cook County's municipal code requires the same—an assessor "shall assess . . . assessments on real estate" as a percentage of "market value."  Cook Cnty. Mun. Code § 74-64.  The Cook County Assessor's Office acknowledges on its website that "under Illinois law," assessments "should fairly reflect fair market values."  Pls.' Mem. in Supp. of Mot. for Class Cert. at 15–16 (quoting Cook Cnty. Assessor's Off., *Find Out More Information About Your Property* (last accessed July 7, 2025), https://www.cookcountyassessor.com/assessor-property-details).  It is inarguable that an assessment that is statutorily required to reflect fair market value is relevant to determining a property's fair market value, even if it may not be conclusive.  *Cf. Antolovich v. Brown Grp. Retail, Inc.*, 183 P.3d 582, 595 (Colo. App. 2007) (admitting tax assessments to show market value despite past cases holding otherwise due to new legal requirements that mandated assessments be based on market value).

With the relevance of Cook County's tax assessments established, the Court sees no basis to apply a so-called "general rule" against admitting them.  The main source cited for this general rule—C.C. Marvel, Annotation, *Valuation for Taxation Purposes as Admissible to Show Value for Other Purposes*, 39 A.L.R.2d 209, § 2—is somewhat outdated.  *Cf. Tarrify Props.*, 37 F.4th at 1108 (citing Marvel's "survey of the caselaw" as establishing that "assessed valuation does not create cognizable proof of valuation for purposes other than taxation") (cleaned up).  This article was originally published in 1955.  For reference, the Federal Rules of Evidence were first codified in 1975—twenty years later.  And although this article was republished in 2022, the republication merely added additional cases supporting its prior conclusions.  The latest Illinois case cited is from 1957.  There are no Seventh Circuit cases cited at all.

15

A lot has changed since this general rule against admissibility was propagated. As the plaintiffs note, Cook County's assessment system was notoriously corrupt before the 1930s. J. Wayne Moore, *A History of Appraisal Theory and Practice*, 6 J. Prop. Tax Assessment & Admin. 23, 29 (2009) ("Cook County's corrupt assessment system had become an embarrassing mark of local distinction.") (citation omitted). This corruption caused "[v]alues [to] deviate[] almost randomly from the property's true resale value." *Id.* And at that point, even if assessors wanted to base their assessments on market value, they lacked the data to do so. Only by the 1960s did most states begin requiring "accurate disclosures and recording of sale prices as part of the property transfer," allowing states to incorporate actual market sales into their assessments and facilitating statistical analyses based on those sales. *Id.* at 34. Although it may have made sense to exclude tax assessments when they were corruptly calculated and based on a dearth of market data, that is not the case today.

The Court concludes that Cook County's tax assessments are admissible for the purpose of establishing the fair market value of property. Still, for Dr. Hamm to rely on these assessments in his calculations, the assessments must "not only [be] relevant, but reliable." *See Artis*, 95 F.4th at 525 (quoting *Daubert*, 509 U.S. at 598). The Court therefore considers Cook County's assessment system in particular to determine whether it produces a reliable measure of a property's fair market value.

Cook County uses a Computer Assisted Mass Appraisal system to assess residential property. As the Cook County Assessor's Office notes, this system uses "multiple regression" "[t]o determine the property value of a single-family home" by creating "a type of sales comparison average, a mathematical relationship between the

value of [a] house and those of [its] neighbors."  Pls.' Mem. in Supp. of Mot. for Class Cert. at 16 (quoting Cook Cnty. Assessor's Off., *The Cook County Property Tax System* (last accessed July 7, 2025), https://www.cookcountyassessor.com/cook-county-property-tax-system).  The system "produces hundreds of different models, each using different methods to calculate how combinations of characteristics are associated with changes in sale values."  Expert Rep. of William G. Hamm at 15 (quoting Cook Cnty. Assessor's Off., *How Residential Property Is Valued* (last accessed July 7, 2025), https://rpie.cookcountyassessor.com/how-residential-property-valued-0).

Each model is tested "by comparing the model's estimate of a home's value (based on its characteristics) to its actual sales price."  *Id.* (quoting Cook Cnty. Assessor's Off., *How Residential Property Is Valued*, *supra*).  Roughly seventy property characteristics are considered, including:  neighborhood characteristics (e.g., age, education, household size, income, etc.), home characteristics (e.g., square feet, year built, air conditioning, bedrooms, etc.), location characteristics (e.g., distance to schools, hospitals, roads, etc.), and prior sales.  *See* Pls.' Mem. in Supp. of Mot. for Class Cert., Ex. O at 6–11.  Cook County's system ultimately selects "the best-performing statistical model" for each "geographic area" being assessed.  Expert Rep. of William G. Hamm at 15 (quoting Cook Cnty. Assessor's Off., *How Residential Property Is Valued*, *supra*).

Lastly, once an estimate is selected, analysts in the Cook County Assessor's Office "review these estimates, neighborhood by neighborhood, and correct individual properties' assessments as needed."  *Id.* (quoting Cook Cnty. Assessor's Off., *How Residential Property Is Valued*, *supra*).  The Office then "mails an assessment notice to the property's owner, containing the home's characteristics and initial value estimated."

Cook Cnty. Assessor's Off., *How Residential Property Is Valued*, *supra.* If a property owner believes this assessment is incorrect, the owner may appeal the alleged over-valuation to the Cook County Board of Review. Expert Rep. of William G. Hamm at 17 (quoting Cook Cnty. Bd. of Rev., *Welcome to the Board of Review* (last accessed July 7, 2025), https://www.cookcountyboardofreview.com/welcome-board-review). The Board's latest available annual report notes that in 2021, it adjudicated over 248,899 appeals. *Id.* at 18 (citing Cook Cnty. Bd. of Rev., Annual Report (2022)).

The above discussion illustrates that Cook County utilizes a sophisticated, multifactor system to assess properties at their fair market value. Not only does the system utilize a complex algorithm incorporating dozens of property characteristics to produce initial assessments, but those assessments are checked by analysts and may be appealed by the property owner to a review board.

Still, the defendants argue that these assessments are too faulty to be reliable. They emphasize that Cook County has acknowledged its system has several shortcomings, including: an inability to accurately model all of the property characteristics considered, missing features commonly used in property valuation, outdated or incorrect data due to errors, and a lack of data for property sales that are below $50,000 or above $2.5 million.

The proposition that Cook County's assessment system has shortcomings is unremarkable. Every method of property valuation has faults. The only close-to-perfect way to determine the market value of property is by way of a sale of that property on the market. But because Cook County's tax sales did not actually "sell" the properties but rather transferred them in exchange for payment of outstanding tax debt, there is no

contemporaneous sale to consider. It is axiomatic that defendants cannot complain about imprecise damages calculations when their allegedly wrongful actions have made precise damages calculations impossible. *Traebert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477, 484 (7th Cir. 1980) (citing *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927)) ("[A] defendant whose wrongful conduct has rendered difficult the ascertainment of precise damages suffered by the plaintiff is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible.").

The defendants, relying on their own appraisal expert Ron DeVries, emphasize that a retrospective appraisal of properties would be more reliable. Yet retrospective appraisals have their own issues. Because the property is no longer owned by the plaintiff, a retrospective appraisal must rely mostly on exterior inspections. And the data a retrospective appraiser considers when determining the interior's value, such as historic interior data and past sales, is the same type of data Cook County's assessment system relies on. These issues are compounded by the fact that a retrospective appraiser has to determine not what the value of the property is today, but what its market value would have been at the time the property was transferred. The Court is unable to conclude that a retrospective appraisal is so superior to Cook County's assessment system in this context to make assessments unreliable.

Nor does the defendants' assertion that Dr. Hamm "relies uncritically on the assessed values" have merit. *See* Defs.' Mem. in Supp. of Mot. to Exclude & in Opp'n to Pls.' Mot. for Class Cert. at 13. Dr. Hamm expressly recognized that there would be cases where the data would not "represent the real world perfectly." Expert Rep. of

William G. Hamm at 28. When confronted with clear anomalies in the assessment data—such as when the market value assessed by Cook County did not match a Board of Review assessment—he acted to ensure the most reliable data was considered by using the more conservative Board of Review certified assessment. He also suggested that the data could be made more accurate by interpolating the assessments. This is not a mere acceptance of Cook County's assessments, but a conscious effort to ensure the assessments reliably reflect market value.

Finally, the defendants argue that Dr. Hamm's methods are unreliable because his final calculations are deficient. The defendants quibble with the date he used to calculate the tax debt. Because Cook County's Judgment Book only lists subsequent taxes paid by the tax buyer "not less than 30 days before the redemption period expired," Dr. Hamm's reliance on the Judgment Book to determine total tax debt led to the omission of taxes accrued at the time of or after the expiration of the redemption period. *See id.* at 25 n.65.

Dr. Hamm should not be faulted for working with the data that was available to him. The fact that Cook County's Judgment Book fails to list property taxes beyond a certain date does not invalidate Dr. Hamm's method for calculating excess equity lost. Nothing in his calculation, which involves subtracting the total tax debt owed from a property's market value, relies on him using incomplete tax data. It is thus clear that if Dr. Hamm *had* access to further tax information, he would have incorporated that data into his calculations. If the defendants truly believe Dr. Hamm's lack of full tax data makes his calculation unreliable, they are free to provide the plaintiffs with a more complete account of the outstanding taxes owed.

The defendants raise no further arguments for excluding Dr. Hamm's opinions. Because the Court has found that Dr. Hamm is qualified to give his opinions on the reliability of Cook County's assessment system and that the methods he used to reach his conclusions were in themselves reliable, the Court denies the defendants' motion to exclude his expert testimony.

### 2. Ron DeVries

#### a. Qualifications

The plaintiffs first argue that the defendants' appraisal expert, Ron DeVries, is not qualified to state an opinion on the reliability of Cook County's assessment system. It is undisputed that Mr. DeVries is an Illinois certified real estate appraiser. Still, the plaintiffs contend that he is unqualified to analyze the reliability of Cook County's assessment system because he lacks specific experience with mass appraisal tools. According to the plaintiffs, the mass appraisal industry is a distinct industry from individual appraisals that requires distinct, specialized knowledge.

The Court disagrees. Mr. DeVries, as a licensed real estate appraiser, is qualified to render an opinion on whether Cook County's assessment system accurately describes the market value of properties. Of course, Mr. DeVries is not qualified to testify on all aspects of Cook County's assessment system. The technical mathematics behind the algorithm used by Cook County, for example, are beyond his expertise—Mr. DeVries is not a mathematician.

But as an experienced appraiser, Mr. DeVries is qualified to testify on the accuracy of Cook County's assessment system in the appraisal context. He thus may opine on the reliability of Cook County's assessment system's appraisal of fair market

values by comparing the information it incorporates with his own experience appraising properties. The conclusions he reached in his report do just that. He concludes that Cook County's assessment system is flawed because, in his opinion, its assessments are infrequent, impersonal, and detached from any particular property being appraised. These conclusions, which are based on his own experience as a traditional appraiser, are well within his expertise.

### b. Reliability

The plaintiffs next contend that Mr. Devries did not use reliable data or methods when reaching his conclusions, as he did not extensively review documents or materials relating to Cook County's assessment system in particular. Mr. DeVries's report is undeniably sparse on citations. Yet the lack of cited sources simply reflects the nature of his expert opinions.

None of Mr. DeVries's opinions require an in-depth delve into the intricate workings of Cook County's assessment system. Rather, in comparing faults in Cook County's assessment system to his own experience as an individual appraiser, he is able to rely mostly on his own appraisal experience when reaching his conclusions. For example, Mr. DeVries concludes that Cook County's assessment system is flawed because it only assesses properties once every three years, while a traditional appraiser puts emphasis on the specific day of appraisal and date of expected sale. It is unclear what further information about Cook County's assessment system Mr. DeVries would need to support such a conclusion, beyond his own experience as a licensed appraiser.

The plaintiffs complain that in failing to review more documents concerning Cook

22

County's assessment system, Mr. DeVries was unable to fully appreciate its benefits. But as the Seventh Circuit has made clear, arguments as to whether an expert "selected the best data set to use . . . is a question for the jury, not the judge." *Manpower*, 732 F.3d at 809. The plaintiffs' arguments that Mr. DeVries failed to adequately consider the benefits of Cook County's assessment system go to the weight to be given to his testimony, not its admissibility.

The plaintiffs raise no further arguments for excluding Mr. DeVries's opinions. Because the Court has found that Mr. DeVries is qualified to give his opinion on the reliability of Cook County's assessment system in comparison to an individual appraisal and that the methods he used to make such comparisons were reliable, the Court denies the plaintiffs' motion to exclude his expert testimony.

With both sides' motions to exclude their opponents' experts resolved, the Court considers the plaintiffs' motion for class certification.

**B.     Class certification**

Federal Rule of Civil Procedure 23(a) requires all class actions to meet four requirements:

> (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy of representation).

*Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 434 (7th Cir. 2015) (quoting Fed. R. Civ. P. 23(a)).

"In addition to meeting these requirements of Rule 23, a class action must meet the requirements of one of the four categories in Rule 23(b)." *Id.* Because the plaintiffs

23

seek damages, they move to have their class certified under Rule 23(b)(3), which further requires: "(1) the questions of law or fact common to the members of the proposed class predominate over questions affecting only individual members; and (2) that a class action is superior to other available methods of resolving the controversy." *Messner*, 669 F.3d at 811.

Finally, the Seventh Circuit has "recognized an implicit requirement under Rule 23" of "ascertainability." *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 657 (7th Cir. 2015). The "class must be defined clearly" and membership must be "defined by objective criteria." *Id.*

The plaintiffs "bear the burden of showing that a proposed class satisfies the Rule 23 requirements" by a "preponderance of the evidence." *Messner*, 669 F.3d at 811.

### 1.     Ascertainability

The Court begins with ascertainability, as whether the plaintiffs' proposed class is sufficiently defined will impact whether it can meet the remaining Rule 23 requirements. Although not an express requirement of Rule 23, the Seventh Circuit requires plaintiffs to demonstrate that their proposed class definition is ascertainable—i.e., it defines an existing "class" of people. *See Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981) ("It is axiomatic that for a class action to be certified a 'class' must exist."). As discussed above, a class is only ascertainable if it is "clearly defined" by "objective criteria." *Mullins*, 795 F.3d at 657. "Class definitions have failed this requirement when they were too vague or subjective, or when class membership was defined in terms of success on the merits (so-called 'fail safe' classes)." *Id.*

24

The plaintiffs proposed class is defined as "[a]ll persons or entities who meet the following criteria":

> (1) they owned or were the beneficial owners of residential real property in Cook County, Illinois in Residential Assessment Classes Major Class 2 and Class 3; (2) the properties were sold in the Cook County annual tax sale; (3) a tax deed was issued to the purchaser of such property at any time on or after December 15, 2020 and not withdrawn; and (4) the Cook County Assessor's Office's assessed Fair Cash Value as of the time of tax deed's issuance exceeded the total amount of taxes, fees, and interest owed at the end of the redemption period.

Pls.' Mem. in Supp. of Mot. for Class Cert. at 7.

The defendants, citing only out-of-circuit caselaw, first argue that this class definition is not ascertainable because it is not "administratively feasible for the court to determine whether a particular individual is a member of the proposed class." Defs.' Mem. in Supp. of Mot. to Exclude & in Opp'n to Pls.' Mot. for Class Cert. at 26 (quoting *Tarrify Props.*, 37 F.4th at 1106). The proposed class lacks administrative feasibility, the defendants argue, because the Court will need to conduct an individualized analysis regarding each plaintiff's property to determine if a plaintiff lost equity as a result of the tax sale.

The Seventh Circuit, however, has expressly rejected any heightened ascertainability requirement that demands plaintiffs show the class is administratively feasible. There is no requirement in this circuit to show, for ascertainability, that there is a "reliable and administratively feasible way to identify all who fall within the class definition." *Mullins*, 795 F.3d at 657–58; *see also Freund v. McDonough*, 114 F.4th 1371, 1378 & nn. 5–6 (Fed. Cir. 2024) (recognizing that the Sixth Circuit in *Tarrify Properties* adopted a heightened ascertainability standard at odds with the Seventh Circuit's approach in *Mullins*). The ascertainability requirement solely concerns "the

adequacy of the class definition itself," not "the potential difficulty of identifying particular members of the class and evaluating the validity of claims they might eventually submit." *Mullins*, 795 F.3d at 657–58.

Administrative difficulties are instead only considered when deciding whether a class action is manageable under Rule 23(b)(3)'s "superiority" requirement. *Id.* at 658. This is a key distinction. When a court considers "the likely difficulties in managing a class action" in the superiority context, "it must balance countervailing interests to decide whether a class action 'is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3)). In other words, courts "must recognize both the costs *and benefits* of the class device" when deciding whether a class action is administratively feasible when analyzing superiority. *Id.* at 663. Considering administrative feasibility when determining whether a class is ascertainable, on the other hand, "upsets this balance" by giving "one factor in the balance absolute priority." *Id.* at 658.

The defendants' contention that it is not administratively feasible to determine who is in the class thus does not concern ascertainability. This argument instead implicates the Court's ability to manage a class action, not the adequacy of the class definition itself. The Court therefore will consider administrative feasibility only when determining whether a class action is superior to alternative methods of adjudication, and not as part of its ascertainability analysis.

Next, the plaintiffs contend that the class is unascertainable because the terms "owner" and "beneficial owner" are vague and subjectively defined. According to the defendants, Illinois defines "owner" broadly, meaning a titleholder or taxpayer of record

26

is not always the actual owner of a property.

Yet classes are commonly defined in terms of ownership. This is true even when ownership is defined by Illinois law. *Cf. Goldberg v. Frerichs*, 912 F.3d 1009, 1010–12 (7th Cir. 2019) (vacating and remanding a district court's refusal to certify a class of "owners of property" who had their property "taken into custody by Illinois"). The defendants do not cite any cases, and the Court is unaware of any, where a court refused to certify a class because the terms "owners" or "beneficial owners" in a class definition were overly vague.

Moreover, the defendants have produced no evidence of any class members with disputed ownership. Even if it could be theoretically possible that an "owner" of property might be, in certain scenarios, difficult to determine, the defendants have given the Court no reason to believe that is the case here. This concern is thus speculative at best.

Finally, the defendants contend that the proposed class is unascertainable because it sweeps in too many people who could not have been injured. Because the proposed class does not exclude those who applied for or received compensation through Illinois's Indemnity Fund, the defendants argue, the class definition includes owners who were not actually injured by the transfer of their property.

This is an argument on the merits, not against class certification. Although "a district court's analysis of the Rule 23 requirements will often 'entail some overlap with the merits of the plaintiff[s'] underlying claim[s]," "the court may only consider the merits of a claim to the extent 'they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Eddlemon v. Bradley Univ.*, 65 F.4th

335, 341 (7th Cir. 2023) (first quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011); then quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).  The plaintiffs' ultimate likelihood of success on the merits is not a relevant question for class certification.  *See Simpson v. Dart*, 23 F.4th 706, 712 (7th Cir. 2022) (cautioning against considering factors that "go not to commonality but instead to whether" a class "can ultimately succeed on the merits"); *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010) (noting that class certification can be appropriate even if "the class will lose on the merits").  It is thus permissible for a class to include some uninjured, nonmeritorious parties.  "[A] class will often include persons who have not been injured by the defendant[s'] conduct; indeed this is almost inevitable given that a class can be certified yet fail to prove its case on the merits."  *Lacy v. Cook County*, 897 F.3d 847, 864 (7th Cir. 2018).

In arguing that the proposed class is unascertainable because certain class members may be eligible for the Indemnity Fund, the defendants are actually arguing that the Indemnity Fund prevents or remedies the class plaintiffs' claims.  This is an argument that the plaintiffs will not prevail on the merits.  In fact, the defendants make this exact argument in their summary judgment briefing for why the plaintiffs' claims fail, further indicating this is a merits issue.  *See, e.g.*, Defs.' Mem. in Supp. of Mot for Summ. J. at 21, 23 (arguing that "there is no Fifth Amendment unlawful taking because divested property owners can file petitions for relief from the Indemnity Fund").

It is true that a class definition can, on its face, so broadly encompass obviously uninjured members that the class becomes unascertainable.  This occurs when the class "sweeps within it persons who could not have been injured by the defendant's

28

conduct or if it is apparent that it contains a great many persons who have suffered no injury." *Lacy*, 897 F.3d at 864 (cleaned up).  The proposed class is not defined so broadly.  Every member of the proposed class, by having their property transferred by Cook County via tax deed, could have been harmed by the defendants' tax sale procedures.  Nor is it apparent that the class includes many people that have suffered no injury.  Despite the proposed class definition encompassing roughly 1,700 class members, the defendants do not provide a single example of an uninjured class member.

The Court therefore finds that the plaintiffs have proposed an ascertainable class by a preponderance of the evidence.

### 2.      Numerosity

"The key numerosity inquiry under Rule 23(a)(1) is not the number of class members alone but the practicability of joinder." *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021).  The plaintiffs must show that "it is extremely difficult or inconvenient to join all the members of the class." *Id.* (citation omitted).  Though there is no magic number for establishing numerosity, the Seventh Circuit has "recognized that a forty-member class is often regarded as sufficient to meet the numerosity requirement." *Id.* (cleaned up).

The defendants argue that the plaintiffs have not provided sufficient evidence that there are enough members of the proposed class to satisfy numerosity.  The plaintiffs, using Cook County's Judgment Book, have identified roughly 1,700 people whose homes had an assessed market value that exceeded the documented tax debt. It would be extremely difficult to join over 1,700 plaintiffs in a single lawsuit.  Because,

as discussed above, the assessments are admissible to show market value, the plaintiffs have shown a sufficient number of class members by a preponderance of the evidence.

### 3.    Typicality

Rule 23(a)(3)'s typicality requirement "directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Scott v. Dart*, 99 F.4th 1076, 1091–92 (7th Cir. 2024) (cleaned up).  The plaintiffs' claims are "typical" of the class when they "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and [are] based on the same legal theory." *Lacy*, 897 F.3d at 866 (cleaned up).

The named plaintiffs are Michelle Kidd and Goyce H. Rates.  They both owned homes in Cook County, did not pay their property taxes, and lost their homes through the tax sale process.  Comparing Cook County's assessed values of their homes to the taxes due, as indicated by Cook County's Judgment Book, their properties were worth more than the tax debt they owed.  Retrospective appraisals on their properties further confirmed that their properties were worth more than the accrued tax debt.

This is the same process every class member must have gone through to be a member of the class.  Every class member must have owned a residential property in Cook County, failed to pay their property taxes, lost their property through the tax sale process, and had property with an assessed value above the tax debt owed to be a part of the class. The claims the named plaintiffs make—that this process violated the Fifth Amendment's Takings Clause, the Eighth Amendment's prohibition on excessive fines,

and the Fourteenth Amendment's Due Process Clause—are also the same for each class member.

Still, the defendants contend that the plaintiffs have not shown typicality. They emphasize that only the named plaintiffs acquired a retrospective appraisal confirming a loss of excess equity. Because Cook County's assessment data does not "sufficient[ly] prove the actual fair market value" of any class member's property, the defendants argue, it is uncertain whether other class members actually lost excess equity like the named plaintiffs. Defs.' Mem. in Supp. of Mot. to Exclude & in Opp'n to Pls.' Mot. for Class Cert. at 31.

Yet the plaintiffs are not required to prove every class member's claims with certainty at this stage of review. Rather, the plaintiffs just need to show they satisfy each Rule 23 requirement by a preponderance of the evidence. *Messner*, 669 F.3d at 811. Despite the defendants' repeated complaints about the validity of tax assessments, they offer no conflicting evidence indicating that any proposed class member's property was worth equal to or less than the taxes owed at the time of property transfer. Absent contrary evidence, the plaintiffs, through their use of tax assessments, have shown by a preponderance of the evidence that the class members owned property worth more than the unpaid taxes due, thus making the named plaintiffs typical of the class.

### 4. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). "This adequate representation inquiry consists of two parts: (1) the

adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Id.*

The defendants do not challenge the adequacy of the proposed class counsel. Class counsel are lawyers with substantial experience with class actions and constitutional law. In fact, two of the lawyers requesting to be appointed class counsel—Charles Watkins and David Guin—were counsel for the petitioner in *Tyler v. Hennepin County*, 598 U.S. 631 (2023), the landmark Supreme Court case that is the basis of the plaintiffs' Fifth and Eighth Amendment claims. The Court therefore finds the plaintiffs have shown that their proposed counsel is adequate by a preponderance of the evidence.

The defendants do, however, challenge the adequacy of one of the named plaintiffs—Ms. Kidd. The defendants argue that defenses specific to Ms. Kidd make her an inadequate representative of the class. According to the defendants, Cook County Assessor's Office's recent records of Ms. Kidd's property describe it as a one-story home. These records are contradicted by a historical listing database from 2011 that describes her home as having a finished partial second floor. The defendants contend this discrepancy creates a unique "uncertainty regarding the conditions of [Ms.] Kidd's property at the time of transfer," making her an inadequate class representative. Defs.' Mem. in Supp. of Mot. to Exclude & in Opp'n to Pls.' Mot. for Class Cert. at 31–32.

The Seventh Circuit has held that a unique defense against a named plaintiff can destroy adequacy, as the named plaintiff may become so "distracted by the presence of a possible defense applicable only" to it that the plaintiff's "representation of the rest of

the class will suffer." *J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980). Yet the Court is not convinced this apparent discrepancy is so unique to Ms. Kidd to unduly distract her from adequately representing the class. Frankly, it is unclear if this is a unique defense at all. The defendants emphasize that they plan to challenge the veracity of every property valuation that relies on Cook County's assessments, as they believe "*every* property valuation will require a complex, fact specific inquiry." Defs.' Mem. in Supp. of Mot. to Exclude & in Opp'n to Pls.' Mot. for Class Cert. at 32. If the defendants plan to scrutinize every assessment, it is expected that the class will need to defend the accuracy of Cook County's assessments. The proposition that Ms. Kidd has a glaring discrepancy between a recent assessment and a prior listing thus makes her a more adequate class representative in some respects, as it gives her an increased incentive to bolster the validity of Cook County's assessment system in the face of such discrepancy.

The Court therefore finds the named plaintiffs—Michelle Kidd and Goyce H. Rates—have shown they are adequate representatives of the class by a preponderance of the evidence.

### 5. Predominance

The defendants do not challenge the commonality requirement of Rule 23(a). The plaintiffs have shown by a preponderance of the evidence that there is at least one overarching question common to the class—whether the defendants' tax sale procedures constitute a taking under the Fifth Amendment and/or an excessive fine under the Eighth Amendment due to the loss of excess equity. The plaintiffs also identify several subsidiary questions—all common to the class—that would need to be

resolved when addressing this overarching question, including: (a) "Did class members have a constitutionally protected property interest in the equity in their property?" (b) Did the defendants "cause class members to be deprived of that equity," or was the tax buyer the direct cause? (c) "Were these actions a policy choice that constituted the moving force for the constitutional violation," which is required for a county to be liable under *Monell v. Department of Social Services of City of N.Y.*, 436 U.S. 658 (1978)? (d) Does the defendants' "failure to promptly and fully provide for the compensation . . . of the remaining equity in [the plaintiffs'] . . . homes constitute an uncompensated Taking of private property?" (e) Does the availability of the Indemnity Fund prevent or remedy these constitutional violations? And (f) is the "taking of [any] surplus equity" always an excessive "fine" in violation of the Eighth Amendment? *See* Pls.' Mem. in Supp. of Mot. for Class Cert. at 9. Any of these questions would satisfy the commonality element, as each is "capable of class-wide resolution" and the "determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims." *See Wal-Mart Stores*, 564 U.S. at 350.

The defendants instead argue that these common questions fail to "predominate" over individual issues. For a class to be certified under Rule 23(b)(3), common questions must "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The guiding principle behind predominance is whether the proposed class's claims arise from a common nucleus of operative facts and issues." *Scott*, 99 F.4th at 1092. Common questions predominate when they "represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Ross v. Gossett*, 33 F.4th 433, 439 (7th Cir. 2022) (citation omitted).

34

As the text of Rule 23(b)(3) indicates, "[i]ndividual questions need not be absent" for common questions to predominate over them. *Messner*, 669 F.3d at 815. Rather, "[e]fficiency is the animating principle" of predominance. *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 607 (7th Cir. 2021). Individual issues can unduly undermine the efficiency gained from a class action even if common questions exist. "To gauge whether a class action would be more efficient than individual suits, 'the predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation defeating, individual issues.'" *Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)) (cleaned up).

The Court concludes that common questions predominate in this case. The significant, overarching common question of whether the defendants' tax sale procedures violate the Fifth Amendment's Takings Clause and the Eighth Amendment's prohibition on excess fines, and the subsidiary questions that must be answered to make those determinations, are practically identical for every class member. Each class member was subject to the same tax sale procedures implemented by the defendants, meaning they lost their homes through the exact same process. Immense efficiencies will be gained by resolving the common questions concerning those procedures for each class member in a single lawsuit.

Of course, whether a plaintiff actually lost excess equity in a home is an individualized question that impacts both the defendants' liability and the damages owed to each class member. But considering the several common questions that must be resolved before a calculation of lost equity is necessary—whether the defendants are the direct cause of the loss of any excess equity (as opposed to the tax buyer), whether

the defendants had a policy that was a significant moving force under *Monell*, whether the Indemnity Fund prevents any taking or excessive fine, etc.,—the Court concludes that substantial efficiencies will be gained by litigating these issues as a class action even if individual follow-on proceedings concerning property valuations are later required.

This conclusion is in accord with both Supreme Court and Seventh Circuit precedent finding that individualized damages questions do not destroy predominance when several material common questions exist. *See, e.g.*, *Tyson Foods*, 577 U.S. at 454 ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."); *Scott*, 99 F.4th at 1092–93 (concluding the "need to proceed in individualized trials to prove causation and to seek damages" did not destroy predominance or superiority); *Messner*, 669 F.3d at 815 ("It is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)."); *Arreola v. Godinez*, 546 F.3d 788, 800 (7th Cir. 2008) (noting that even "fact-bound" damages calculations do not destroy predominance when "many of the issues involved . . . would be common among all potential class members").

The Court therefore finds the plaintiffs have shown the predominance of common questions by a preponderance of the evidence.

### 6. Superiority

Rule 23(b)(3) also requires a class action to be "superior to other available

methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

When assessing superiority, a court should consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.*

The purpose of the superiority inquiry is to ensure that class actions "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (cleaned up).  A class action is often superior to individual adjudications when "many common issues of law and fact" exist.  *Messner*, 669 F.3d at 814 n.5.  This is because "where a common issue exists such that its resolution is unlikely to be enhanced by repeated proceedings, . . . it makes good sense, especially when the class is . . . large, to resolve that issue in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings."  *Scott*, 99 F.4th at 1092 (cleaned up).

The defendants volley most of their attacks at the last Rule 23(b)(3) superiority factor—manageability.  According to the defendants, a class action would be unmanageable due to three individualized issues that apply to each class member: property valuation, ownership of property, and other separate proceedings relating to each class member's property that might affect this Court's adjudication.  As an initial note, the Court is not persuaded that the mere prospect of other concurrent proceedings will make a class action unmanageable.  The examples given by the defendants of

possible concurrent proceedings are eviction proceedings and petitions to the Indemnity Fund.  The defendants do not explain how an eviction proceeding would complicate—or even affect—this Court's analysis of common questions relating to Cook County's tax sale procedures.  And a petition to the Indemnity Fund would impact these proceedings only if the Indemnity Fund actually prevented or remedied the alleged constitutional violations, which is itself a common question in this dispute.

The Court does recognize that challenges to property valuations and ownership will be individual issues that may have to be resolved in follow-on proceedings.  But possible manageability issues are just one factor the Court considers when determining whether a class action is superior.  *See Mullins*, 795 F.3d at 663 (noting that there is a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns").  As discussed above, there are several common questions concerning Cook County's tax sale procedures that can be resolved before the Court even reaches individualized issues like ownership or specific property valuations.  And again, most of the material facts concerning each class member are identical—every proposed class member lost their residential property as a result of Cook County's tax sale procedures.  There are thus common issues of law and fact concerning Cook County's tax sale procedures that can be resolved "in one fell swoop" that will not "be enhanced by repeated proceedings" regarding those same procedures. *See Scott*, 99 F.4th at 1092.  The alternative, potentially over 1,700 separate lawsuits all challenging Cook County's tax sale procedures, is wasteful in comparison.

Finally, the defendants contend that even if a class action is desirable, it would not be fair to the individual class members.  They emphasize that the usual purpose of

class actions is to "overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."  Defs.' Mem. in Supp. of their Mot. to Exclude & in Opp'n to Pls.' Mot. for Class Cert. at 42 (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 759 (7th Cir. 2014)).  Because a class member's lost equity in their home may be quite large, the defendants argue that each plaintiff has an incentive to litigate their claims individually.

The proposition that small recoveries disincentivize individual suits does not mean the prospect of more substantial recoveries always encourages them.  The class members in this dispute are not sophisticated parties who can afford to embroil themselves in individual lawsuits.  Rather, they are homeowners who lost their homes due to their inability to pay property taxes.  The time and resources necessary to conduct such individual suits are likely not within many of the class members' reach, especially when success on the merits is not guaranteed.

The Court therefore finds that the plaintiffs have shown by a preponderance of the evidence a class action is superior.  And because the plaintiffs have shown the class satisfies all the requirements to certify a class under Rule 23(a) and (b)(3), the Court grants their motion for class certification.

## C.    Issue class certification

In the alternative, the plaintiffs request that the Court certify issue classes regarding issues common to all class members.  Rule 23(c)(4) allows a class action to be "brought or maintained . . . with respect to particular issues."  Fed. R. Civ. P. 23(c)(4).  For Rule 23(b)(3) classes certified as an issue class, the Seventh Circuit has emphasized that plaintiffs need not "show common issues predominate in the resolution

of the entire claim" as they would for a usual, non-issue class action.  *Jacks v. DirectSat USA, LLC*, 118 F.4th 888, 896–98 (7th Cir. 2024).  Still, the predominance requirement does not disappear for Rule 23(b)(3) issue classes.  "[A] party seeking certification of an issue under Rule 23(c)(4) must show that common questions predominate in the resolution of the specific issue or issues that are the subject of the certification motion . . . ."  *Id.* at 897.

The superiority requirement also remains.  "[I]n addition to demonstrating that common questions predominate as to each issue to be certified, a party seeking certification under Rule 23(c)(4) must show that certifying the proposed issues would be the most practical and efficient way to resolve the litigation."  *Id.* at 898.

In other words, although plaintiffs may use issue classes to litigate common questions that do not predominate over the entire case, issue classes cannot be used to resolve "minor or insignificant common questions."  *Id.* (quoting *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018)).  Rather, they must "materially advance" the plaintiffs' claims.  *Id.* at 899.

The Court concludes in the alternative that, even if common questions did not predominate over individual questions in the entire case, issue class certification on the common questions presented would be appropriate.  Specifically, the Court would certify issue classes regarding the following issues:  (1) whether the loss of a residential property owner's excess equity as a result of Cook County's tax sale procedures is a "taking" by Cook County under the Fifth Amendment, and (2) whether the loss of remaining equity as a result of Cook County's tax sale procedures is a "fine" by Cook County subject to Eighth Amendment scrutiny.

These questions would materially advance the litigation. A finding that Cook County's tax sale procedures did not lead to a "taking" or "fine" would immediately resolve the plaintiffs' Fifth and Eighth Amendment claims in favor of the defendants. It is true the opposite conclusion, that the tax sale procedures did lead to a taking or fine by Cook County, would not resolve the litigation completely. Issues concerning liability and damages would still need to be addressed by follow-on proceedings focused on the market value of property at the time of the taking or fine.

But, as the Seventh Circuit has emphasized, an issue class does not have to "resolve *all liability* in one fell swoop." *Id.* at 898–99. It simply needs to materially advance the plaintiffs' claims. *Id.* A finding that Cook County's tax sale procedures, which it used for every member of the proposed class, resulted in a Fifth Amendment taking and Eighth Amendment fine by Cook County would do just that. The Court, to resolve these issues, would further have to resolve common preliminary questions concerning the defendants' liability, such as whether Cook County can be held liable under *Monell* or if Cook County's treasurer is protected by sovereign immunity when implementing tax sale procedures claimed to be dictated by Illinois statutes. Resolving these issues and sub-issues on a class wide basis, as opposed to doing so in hundreds of individual cases, would create immense efficiencies that are not outweighed by the possibility of conducting later follow-on proceedings regarding liability and damages.

The Court therefore, in the alternative, finds that the plaintiffs have shown by a preponderance of the evidence that issue classes should be certified concerning: (1) whether the loss of a residential property owner's excess equity as a result of Cook County's tax sale procedures is a "taking" by Cook County under the Fifth Amendment,

and (2) whether the loss of remaining equity as a result of Cook County's tax sale procedures is a "fine" by Cook County subject to Eighth Amendment scrutiny.

## Conclusion

For the reasons stated above, the Court grants the plaintiffs' motion for class certification, denies the defendants' motion to exclude Dr. William G. Hamm, and denies the plaintiffs' motion to exclude Ron DeVries. The class is defined as all persons or entities who meet the following criteria: (1) they owned or were the beneficial owners of residential real property in Cook County, Illinois in Residential Assessment Classes Major Class 2 and Class 3; (2) the properties were sold in the Cook County annual tax sale; (3) a tax deed was issued to the purchaser of such property at any time on or after December 15, 2020 and not withdrawn; and (4) the Cook County Assessor's Office's assessed Fair Cash Value as of the time of tax deed's issuance exceeded the total amount of taxes, fees, and interest owed at the end of the redemption period. Michelle Kidd and Goyce H. Rates are appointed as representatives for the class, and John Bouman, Brian D. Roche, Charles R. Watkins, and David J. Guin are appointed as class counsel.

Date: July 7, 2025

_____
MATTHEW F. KENNELLY
United States District Judge

42