**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHELLE KIDD and GOYCE H. RATES, individually and on behalf of all others similarly situated, and SOUTHWEST ORGANIZING PROJECT and PALENQUE LSNA, individually,<br><br>Plaintiffs,<br><br>v.<br><br>MARIA PAPPAS, in her capacity as Treasurer of Cook County, Illinois, and Trustee of the Indemnity Fund, and COOK COUNTY, ILLINOIS,<br><br>Defendants. | Case No. 1:22-cv-7061<br><br>Hon. Matthew F. Kennelly |

## JOINT MEMORANDUM ON SCOPE OF BENCH TRIAL

In advance of the status conference on February 18, 2026, the parties submit this joint statement containing their respective views on the scope of the bench trial set for April 7, 2026.

## PLAINTIFFS' STATEMENT

In its Memorandum Opinion and Order of December 8, 2025 ("December 8 Opinion"), the Court held that the Plaintiffs are entitled to summary judgment on their contention that the Defendants' tax sale procedures violate the Fifth Amendment Takings Clause and the Eighth Amendment Excessive Fines Clause. Dkt. 198 at 42, 48. The Defendants' procedures are unconstitutional because (1) the Treasurer failed to conduct the tax sales in such a manner as to ensure property owners who lost their property to a tax buyer were provided with just compensation "either from the purchaser of the tax lien or from the County itself" (*id.* at 30), and (2) the County failed "to compensate owners for their lost equity after the sale is completed." *Id.* at 34-35. As a result, the Court found "that the County and Treasurer Pappas, in her official capacity as Cook County's

Treasurer, may be held liable under *Monell* for the Plaintiffs' alleged constitutional violations." *Id.* at 35.

The Court stopped short of holding Defendants liable for these violations. The Court reasoned that (1) under *Monell,* liability based on inaction requires that the defendant be on notice of the harm being done, and (2) while a reasonable fact finder could conclude that the Defendants had notice of the harm—uncompensated equity loss—notice was "not sufficiently established on the present record to entitle the Plaintiffs to summary judgment in their favor" under the standard of Rule 56, Fed. R. Civ. P. *Id.* at 33-34. Before proceeding to trial on the notice issue, however, Plaintiffs believe two matters require the Court's attention.

First, based on conversations with the County's counsel, Plaintiffs believe the County intends to present testimony that it did not know, or have reason to know, that home rule authority allowed payment of just compensation, and that this precludes it from being held liable for failing to act. Plaintiffs believe this defense is foreclosed as a matter of law. The Court has already determined that Plaintiffs need to establish only that the County was aware of the harm, not that Defendants knew they had the authority through the exercise of home rule authority or otherwise to provide compensation for this harm.

The second issue concerns whether there is a need for a trial on the County's liability independent of its failure to compensate using its home rule power. Plaintiffs believe that the Court's Opinion establishes the liability of the County based on the conduct of its Treasurer, acting as the final policy maker for the County on the execution of the ta sale. That is, the Court found in the December 8 Opinion that the County acted through its official, the Treasurer, to execute the tax sale, and that the Treasurer was authorized and required under the Illinois Property Tax Code and the United States and Illinois Constitutions to execute the tax sale in a manner that would have prevented the uncompensated taking of equity. Dkt. 198 at 27-29; Dkt. 140 at 14-17. For purposes of

establishing liability under *Monell,* the Treasurer is a final policy maker for the County with respect to the tax sale. She had discretion to "adopt policies that would provide the property owner just compensation . . . because such policies would be reasonably necessary to execute a tax sale in accordance with law." Dkt. 198 at 30; *Phoenix Bond & Indemnity Co. v. Pappas,* 194 Ill. 2d 99,105; 741 N.E.2d 248, 251 (2000). Plaintiffs therefore believe the Court's December 8 Opinion establishes the County's liability based on the Treasurer's conduct as the County official with final policymaking authority for the tax sale. Accordingly, there is nothing left to decide on this issue at trial. If the Court disagrees, that issue will of course also need to be tried.

I.      **Unless the County Stipulates to Notice, the Trial Should Encompass Only the County's Knowledge of Equity Losses, and Not its Claim That it Was Not Aware of or Did Not Believe it Had the Power to Compensate.**

The Court stated that a "reasonable fact finder could find that if the tax sales did result in unconstitutional takings and fines, the risks of that in conducting tax sales was obvious to the County." Dkt. 198 at 32. The Court nevertheless concluded that the *summary judgment record* was "relatively sparse regarding the frequency of Takings Clause violations resulting from the Cook County tax sale." *Id.* at 34. That is, while Plaintiffs introduced enough evidence to support a finder of fact's conclusion that the County had notice, it did not present enough evidence to satisfy the standard for summary judgment that the County had notice that the tax sales presented a "known or obvious risk that constitutional violations will occur" (Dkt. at 32), or in other words, "that the tax sales often led to the properties being transferred despite property owners not being compensated for the excess equity in their properties." *Id.* at 33. The Court therefore set this notice issue for trial.[1]

_____

[1] The notice issue for trial should not concern the entire class period but only the period prior to the filing of the Complaint. The County clearly had notice of the harm (equity loss) once Plaintiffs filed their complaint on December 15, 2022, because the Complaint alleges in detail the nature, origins and consequences of the uncompensated equity losses. Indeed, the County admitted in its Answer that "a homeowner may ultimately be divested of property and risk the loss of equity exceeding the delinquent taxes, including penalties, costs, and any other liens or encumbrances on the property" and that "a property tax sale can ultimately result in a

The notice issue the Defendant wants to try (*i.e*, whether it knew it had the home rule or other authority to ensure that homeowners who lost equity through the tax sale process could receive just compensation) is legally irrelevant and outside the scope of the notice issue the Court identified in its December 8 Opinion. The County is essentially planning to argue that their purported ignorance or mistaken understanding of their own capabilities under the law of Illinois shields them from liability for failing to act. This defense is unavailable as a matter of law. *Owen* v. *City of Independence*, 445 U.S. 622, 650 (1980) ("we can discern no 'tradition so well grounded in history and reason' that would warrant the conclusion that in enacting §1 of the Civil Rights Act, the 42d Congress *sub silentio* **extended to municipalities** a qualified immunity based on the good faith of their officers.") (Emphasis added).

The circumstances and procedural history in *Owen* are particularly significant because the Supreme Court, in holding that a municipality did not have immunity based on its good faith conduct, overturned the circuit court's holding in favor of precisely the same defense that the County appears to advance here. Owen, a terminated employee, brought a Section 1983 claim against the city that had employed him, alleging he was discharged without a hearing in violation of his constitutional right to due process. The district court entered judgment for the city. On appeal, the circuit court affirmed. It found that the city and its officials were not liable under 1983 because, even though it was the official policy of the city that caused the constitutional violation, the Supreme Court's opinion explaining the obligation to hold the hearing (cited at *id.* 634) was issued two months *after* the discharge had been effected without a hearing. The circuit court stated that

---

loss of property and its value." Dkt. 66 at 3. The County further admitted that, under the provisions of the indemnity fund legislation, even if a homeowner were to pursue an indemnity Fund petition, "some homeowners may not be eligible for recoupment of the equity in their homes", *id.* at 4, that "not every owner is entitled to receive the full value of their property from the indemnity fund," *id.* at 25, and that "a tax deed confers all ownership of the property including the entirety of its value." *Id.* at 23.

officials of the City of Independence could not have been aware of [petitioner's] right to a name-clearing hearing in connection with the discharge. The City of Independence should not be charged with predicting the future course of constitutional law. We extend the limited immunity the district court applied to the individual defendants to cover the City as well, **because its officials acted in good faith and without malice. We hold the City not liable for actions it could not reasonably have known violated [petitioner's] constitutional rights.**

*Id.* (Emphasis added.).

The Supreme Court reversed, refusing to shift the consequences for violating the Constitution from the municipality that committed the violation to the victim of the unlawful conduct. A municipality's good faith but erroneous belief that it was complying with the law, the Court stated, is not a defense to a Section 1983 claim.

[A] municipality has no discretion to violate the Federal Constitution; its dictates are absolute and imperative. And when a court passes judgment on the municipality's conduct in a § 1983 action, it does not seek to second-guess the 'reasonableness' of the city's decision nor to interfere with **the** local government's resolution of competing policy considerations. **Rather, it looks only to whether the municipality has conformed to the requirements of the Federal Constitution and statutes.**

*Id.* at 649 (emphasis added). Looking back at "hundreds of cases" from the era when Section 1983 was enacted, the Supreme Court noted that "the courts had rejected the proposition that a municipality should be privileged where it reasonably believed its actions to be lawful." *Id.* at 641.

The Court explained the simple fairness of its ruling: "even where some constitutional development could not have been foreseen by municipal officials, it is fairer to allocate any resulting financial loss to the inevitable costs of government borne by all the taxpayers than to allow its impact to be felt solely by those whose rights, albeit newly recognized, have been violated." *Id.* at 655. "The knowledge that a municipality will be liable for all of its injurious conduct, *whether committed in good faith or not*, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights." *Id.* at 651-52 (Emphasis added.)

Under *Owen,* a claim by the municipality that a decision recognizing a constitutional obligation came as a surprise simply carries no weight. If the municipality violates the Constitution, and it is, as Plaintiffs believe it was here, *on notice of the harm that is occurring*, it is liable. Whether it was surprised because it had erroneously analyzed the law, or because it was unaware of the law, or because it never even thought about the law, is irrelevant. Once the municipality was on notice of the problem, it is not entitled to immunity from the consequences of a constitutional violation based on a claimed good faith misunderstanding of the law.

The County's defense seeks to introduce the defendant's state of mind as a relevant factor in a Section 1983 claim for compensation for a governmental taking. In effect, the County seeks to require Plaintiffs to prove either that the County intended to violate Plaintiffs' constitutional rights or that it was recklessly negligent in not knowing the law. As the Supreme Court stated in *Daniels v. Williams*, 474 U.S. 327, 329-30 (1986), "§ 1983, unlike its criminal counterpart, 18 U.S.C. § 242, contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right." The obligation to compensate under the Fifth or Eighth Amendments arose here *automatically* upon the occurrence of the takings, not from governmental "bad faith" or negligence. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315 (1987) ("government action that works a taking of property rights necessarily implicates the 'constitutional obligation to pay just compensation'"); *Knick v. Township of Scott,* 588 U.S. 180, 192 (2019) ("Because of 'the self-executing character' of the Takings Clause 'with respect to compensation,' a property owner has a constitutional claim for just compensation at the time of the taking").

This Court's recitation of the elements of a Takings Claim (Dkt. 198 at 36) is consistent with the foregoing: there is no state of mind requirement. Plaintiffs are aware of no case holding that

municipal liability for taking private property can be avoided through ignorance of the law or a mistaken belief that its action is not a taking.

Were ignorance or misunderstanding of the law with respect to a municipality's ability to provide compensation a defense to a taking claim, many deserving property owners would be denied compensation in contravention of the principle that "[t]he County has an independent obligation to comply with the Constitution's mandate of fair compensation for the taking of property," Dkt. 198 at 35, an obligation that is not conditioned on the property owner proving either government neglect or recklessness or its knowledge that it was violating the Constitution. *Daniels*, 474 U.S. at 329-30 (1986). Notably, the Supreme Court rejected each of the reasons Hennepin County offered in *Tyler v. Hennepin County* to justify why, relying on settled Minnesota state law, it did not believe it had to compensate Ms. Tyler. 598 U.S. 631 (2023). In the end, what Hennepin County believed or did not believe about the law was irrelevant. It took Ms. Tyler's property without providing just compensation, which constituted "a 'classic taking in which the government directly appropriates private property for its own use'" and all the good faith or ignorance in the world was no defense. *Id.* at 631; Dkt. 198 at 32-33.

Defendant promotes a defense that would, as the Court in *Owen* noted, encourage public officials to evade liability by keeping their heads buried in the sand, or by interpreting the law in a way that justifies inaction, or by failing to look for ways to comply with their obligations under the Constitution. That sort of defense was rejected by the Supreme Court. A "municipality's … decisionmaker would be derelict in his duties if, at some point, he did not consider whether his decision comports with constitutional mandates, and did not weigh the risk that a violation might result in an award of damages from the public treasury." *Owen,* 445 U.S. at 656.

In sum, the County's purported good faith or ignorance (or however they choose to characterize it) defense is not a defense at all. The only issue that should be tried – unless Defendant

will stipulate to it – is whether Defendant had notice of the harm, which is how this Court defined the notice issue in its December 8 Opinion.[2]

## II. The County is Also Liable Under *Monell* For the Actions of the Treasurer, Who Had Final Policymaking Authority Over the Tax Sale.

A Section 1983 Plaintiff may satisfy the "official policy" requirement for *Monell* claims and thus establish the liability of the County by proving that the constitutional deprivation was made "by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dept. of Soc. Serv.*, 436 U.S. 658, 694 (1978). *See also, e.g, Board of County Com'rs of Bryan County v. Brown*, 520 U.S. 397, 403-04 (1997); *Bradley v. Vill. of Univ. Park, Ill.*, 929 F.3d 875, 884 (7th Cir. 2019); *Glisson v. Ind. Dept of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017). "Responsibility for making law or setting policy' . . . is authority to adopt rules for the conduct of government." *AurLPliemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992). In other words, what is required is that the constitutional violation was authorized or directed "at the policymaking level of government" rather than by a random employee. *Vodak v. City of Chicago*, 639 F.3d 738, 747 (7th Cir. 2011).

"[T]he identification of policymaking officials is a question of state law" and "is not a question of fact in the usual sense." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988). Plaintiffs believe this Court already has found that, under the test set forth above, the Treasurer meets the requirements for being the final policymaker with respect to the tax sale.

As the County official responsible by statute for the annual tax sale, *see* 35 ILCS 200/21-190, 21-205, 21-260, Treasurer Pappas determined whether tax buyers should or should not be required to pay just compensation for the taking of homeowners' surplus equity. Dkt. 198 at 27-30. As this Court reasoned in its December 8 Opinion, the Treasurer had the authority and the obligation under settled

---

[2] Plaintiffs believe and will seek to prove if necessary at trial that even if the County had this defense, it would not be able to sustain it as a factual matter, but it should not be tried at all because it is legally invalid.

Illinois law, *e.g., Phoenix Bond*, 194 Ill. 2d 99, 741 N.E.2d 248 (2000), to require such measures because they were necessary to provide just compensation to homeowners who lost equity as a result of the tax sale that she administered. Dkt. 198 at 27, 29. The Treasurer could do this by "accepting a bid only if the buyer agrees to pay the excess equity on the purchased property and providing property owners 'prompt and fair just compensation,'" Dkt. 198 at 27, just as the Treasurer of Rock Island County has done in Rock Island County. Lynda Segneri, *Illinois Deed Sale Case Shows Lack of State-Level Tax Clarity*, Bloomberg Tax (Jan. 27, 2026), https://news.bloombergtax.com/tax-insights-and-commentary/illinois-deed-sale-case-shows-lack-of-state-level-tax-clarity (last accessed Feb. 13, 2026).[3]

Not only is the Treasurer empowered by *Phoenix Bond*, as the court held, but the Treasurer took an oath, *required by the PTC itself*, to implement the PTC consistent with the Illinois Constitution. PTC, 35 ILCS 200/19-4. As this Court stated:

> Any condition [*e.g.,* exercise of *Phoenix Bond* powers] ensuring that the property owner receives this just compensation is thus reasonably necessary to execute a tax sale that complies with the Illinois Property Tax Code and the United States and Illinois Constitutions.

*Id.* at 29.

Treasurer Pappas implemented the tax sale in a manner that had none of the safeguards necessary to ensure that homeowners who lost homes worth more than their tax debts would receive just compensation. She did this as the final policymaker for the County with respect to the administration of the tax sale, so her actions and failures are imputed to the County as a matter of law. *City of St. Louis v. Praprotnik*, 485 U.S. at 123 (plurality) ("[M]unicipal officials who have 'final policymaking authority' may by their actions subject the government to §1983 liability.") (quoting

---

[3] The Rock Island Treasurer's "Participation and Indemnity Agreement" requiring tax buyers to pay any surplus equity to the former owners can be found at https://aboutblaw.com/bkIC (last accessed Feb. 13, 2026).

*Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986)). "[T]he conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Bd. of the County Commissioners,* 520 U.S. at 405 (1997)); *Bradley.*, 929 F.3d at 885 (action of the mayor by virtue of his position as final policy maker in terminating employee without due process is by virtue of the defendant's authority as policymaker, "automatically considered actions of the municipality itself under § 1983"); *Valentino v. South Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) ("It is well-established that when a particular course of action is directed by those who set municipal policy, the municipality is responsible under section 1983, even if the action in question is undertaken only once.").[4]

The undisputed facts the Court identified, together with its legal conclusions in the December 8 Opinion concerning the Treasurer's control of the tax sale, establish that the Treasurer's actions were those *of the County itself*, thereby subjecting the County to liability under *Monell*. If and at such time as it appears that disputed issues of fact arise in connection with the Treasurer's status as final policymaker, Plaintiffs will supplement the record at trial to confirm the County's liability on this basis. Plaintiffs do not know whether the defendant contends that there are disputed facts on this issue that need to be addressed at the upcoming trial.

*       *       *

---

[4] Each tax sale resulted in hundreds of uncompensated equity deprivations and excessive fines and the tax sale itself was conducted year after year. Plaintiffs' Statement of Material Facts in Support of Motion for Partial Summary Judgment, Dkt. 142 at ¶1 (list of 1,700 homeowners in Cook County who had tax deeds issued on their property from 12/15/2020 through 2/1/2024, including Dr. Hamm's sample of 200 properties therefrom showing amount of confiscated equity based on County records recording assessed value and tax debt, Dkt. 142-1 at ¶ 91).

## DEFENDANT COOK COUNTY'S STATEMENT

## ON THE SCOPE OF THE APRIL 7 TRIAL

In its December 8, 2025 Order ("Order"), this Court concluded that the failure to compensate property owners for equity lost through the Illinois tax sale process constitutes a constitutional violation. ECF No. 198 at 30-31.[5] However, the Court expressly declined to grant summary judgment to either party on the question of municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). To hold Cook County (the "County") liable under *Monell*, Plaintiffs must demonstrate that the constitutional violation "was caused by 'an official policy, custom or usage of the municipality.'" *Id*. at 18 (citation omitted). Plaintiffs "contend that the County's failure to pay for homeowners' lost equity amounts to a policy of 'inaction.'" *Id*. at 31. The April 7, 2026 bench trial will determine whether Plaintiffs can satisfy the stringent requirements for *Monell* liability predicated on municipal inaction.

## I.     Plaintiffs Must Satisfy a Heightened Evidentiary Burden

### A.     *Monell* Claims Based on Inaction are Subject to Stringent Requirements

A *Monell* claim predicated on municipal inaction "entails unique concerns and stringent requirements." *Orozco v. Dart*, 64 F.4th 806, 824 (7th Cir. 2023). The Seventh Circuit has repeatedly "cautioned" that "the path to *Monell* liability based on inaction is steeper because, unlike in the case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous." *Id.* (citation omitted). This heightened standard exists because claims of inaction address "situations in which a municipality has knowingly acquiesced in an unconstitutional result of what its express policies have left unsaid." *Taylor v. Hughes*, 26 F.4th 419, 435 (7th Cir. 2022). To prevail, Plaintiffs "must show that the County [1] had

---

[5]     The County reserves all rights and grounds for appeal of any aspect of the Order.

notice that its gap in policy would cause constitutional violations and [2] was deliberately indifferent to that risk." *Orozco*, 64 F.4th at 825. The Seventh Circuit has recognized that "[d]emonstrating that notice is essential to an ultimate finding [of liability] and requires a 'known or obvious' risk that constitutional violations will occur." *Id.*

> **B.     Plaintiffs Bear the Heightened Evidentiary Burden of Establishing Notice**

Plaintiffs must establish the requisite notice through one of two methods. First, Plaintiffs may meet the "heightened evidentiary burden" of demonstrating "a prior pattern of similar constitutional violations" resulting from municipal inaction. *Taylor*, 26 F.4th at 435. Second, Plaintiffs may invoke the "narrow exception" applicable in the "rare" case where "'the unconstitutional consequences' of municipal inaction are 'so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.'" *Id.* at 435-36 (quoting *Connick v. Thompson*, 563 U.S. 51, 64 (2011)). A constitutional violation "must be a 'blatantly obvious' consequence of inaction;" it is not sufficient "to show that a policy could conceivably or potentially lead to a constitutional violation." *Orozco*, 64 F.4th at 826. The violation must be "a highly predictable consequence" of municipal inaction. *Taylor*, 26 F.4th at 435-36 (citing *Bd. of the Cnty. Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 409 (1997)).

**II.     Plaintiffs Must Establish the County Had Sufficient Notice of Constitutional Violations**

> **A.     Evidence Relevant to Establishing (or Negating) a Prior Pattern of Violations**

Under *Taylor*, the County should be entitled to present evidence demonstrating the absence of a "widespread practice" of constitutional violations. In *Taylor*, the Seventh Circuit affirmed summary judgment for the municipality because the plaintiff failed to adduce evidence that "internal documents, citizen complaints or calls for an investigation, or perhaps some form of inquiry by an inspector general" demonstrated a pattern of constitutional violations. *Taylor*, 26 F.4th at 437. There, the plaintiff alleged municipal inaction for failing to purge stale investigative alerts from the computer

system used by the police department. *Id.* at 425. The Seventh Circuit found that the plaintiff's Fourth Amendment rights were violated, and he "undoubtedly suffered a constitutional injury." *Id.* at 435. Nonetheless, the Seventh Circuit found that plaintiff did not meet the "heightened evidentiary burden" to show a widespread practice of false arrests stemming from stale alerts. *Id.*

Here, the County should be entitled to present similar relevant evidence showing lack of notice of a "pattern" of constitutional violations caused by "inaction" that it had the power and obligation to fix.[6] As to awareness of a pattern of constitutional violations, this inquiry requires more than simply counting annual tax sales or tax deeds issued during the relevant period, because not all tax liens purchased in annual tax sales resulted in the issuance of tax deeds, and not all tax deeds resulted in lost equity. The County should be entitled to present evidence showing that in many instances homeowners—including Plaintiff Kidd—assigned their claims to Indemnity Fund proceeds to third parties in exchange for retaining their property free and clear of all liens. In such scenarios, no property was "taken," and thus no constitutional violation occurred. Similarly, where the value of liens exceeded the property's value, the divested owner was not entitled to compensation because nothing of value was taken. Evidence regarding these distinctions is directly relevant to whether a "pattern" of violations existed sufficient to put the County on notice.

As to awareness of whether constitutional violations were caused by alleged "inaction," such evidence may include testimony or documents showing internal County tax reform efforts, lobbying efforts by the County and others focused on statewide legislative reform, and the proposed legislation. The County should be permitted to show that it and other stakeholders did not perceive a pattern of violations that the County was able or required to address but rather understood Property Tax Code reforms to be a state-level concern requiring a state-level solution.

---

[6] The relevant inquiry is of what the County, not the independently-elected Treasurer or Clerk, had notice.

**B.** **Evidence Relevant to Determining Whether a Constitutional Violation Was "Blatantly Obvious"**

The County also should be entitled to present evidence demonstrating that any constitutional harm was not "blatantly obvious" or "a highly predictable consequence" of inaction. For decades, the legal landscape provided no indication that the Illinois property tax system was unconstitutional. To the contrary, in *Balthazar v. Mari Ltd.*, a court in this district upheld the constitutionality of the Illinois Property Tax Code system that allowed tax purchasers to obtain property "for a fraction of its market value, thus gaining as a windfall all 'surplus value' which exceeds the land's tax and interest liabilities." 301 F. Supp. 103, 104-05 (N.D. Ill. 1969) (three judge panel convened pursuant to 28 U.S.C. § 2284), *aff'd* 396 U.S. 114 (1969). The *Balthazar* court expressly rejected the argument that owners "were deprived of 'just compensation' for their property," reasoning that "Illinois is here collecting taxes which are admittedly overdue." *Id.* at 105 n.6. *See also Catoor v. Blair*, 358 F. Supp. 815, 816 and n.1 (N.D. Ill. 1973) (characterizing *Balthazar* as "well-reasoned" and upholding the Property Tax Code "especially in light of the statutory revisions enacted subsequent to the *Balthazar* ruling," including "the creation of an indemnity fund to reimburse non-negligent landowners whose property is forfeited."), *aff'd* 414 U.S. 990 (1974). The Illinois Supreme Court, citing *Balthazar*, likewise treated the constitutionality of Illinois' tax-deed system as resolved. *Rosewell v. Chicago Title & Tr. Co.*, 459 N.E.2d 966, 968 (Ill. 1984) ("The end result of such proceedings strikes many as harsh because the tax buyer can gain title to the real estate for a fraction of its value. However, this process has been upheld in light of the State's compelling interest in collecting taxes.").

This was the controlling legal framework in Illinois until, at the earliest, the May 25, 2023 decision in *Tyler v. Hennepin County*, 598 U.S. 631 (2023). Moreover, the Supreme Court's decision in *Tyler* overturned the Eighth Circuit's contrary ruling. The nationwide uncertainty about whether

retention of surplus equity constituted a taking is directly relevant to whether such a result was "patently obvious" to the County.

Even after *Tyler*, it remained unsettled whether a local government like the County—that neither possessed the property nor received any excess equity, which was instead obtained by third-party tax purchasers—would be deemed liable for any constitutional violation. Evidence that the allegedly unconstitutional windfall inured entirely to private tax buyers, not to the County, is relevant to whether County inaction caused the constitutional harm. Relatedly, the County should be entitled to present evidence that until this Court's Order, no one—not the County, not the state, and not the lobbying groups representing various stakeholders—thought the problems of the Property Tax Code were within the County's authority or responsibility to fix using its home rule powers. The County should be entitled to demonstrate its inability to control the operation of the Illinois Property Tax Code or the statutory Indemnity Fund, the lack of any evidence that constitutional harm was "a highly predictable consequence" of the County's inaction, and the dearth of any evidence showing the County understood that the problem was within its authority and responsibility to rectify, all of which are relevant to the Court's determination of whether it was "blatantly obvious" that a constitutional harm resulted from the County's inaction.

## III. Plaintiffs Must Establish the County Acted With Deliberate Indifference

### A. Deliberate Indifference Requires Proof of a Conscious Choice Not to Act

A *Monell* policy must be "a course of action *consciously chosen* from among various alternatives." *City of Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985) (emphasis added). To establish deliberate indifference in failing to create a supplemental mechanism for just compensation, Plaintiffs must demonstrate that the County made a conscious choice not to act even though it should have realized its failure to do so resulted in constitutional harm.

15

The Supreme Court has instructed that "unless evidence be adduced which proves that the inadequacies resulted from *conscious choice*—that is, proof that the policymakers *deliberately chose* a ... program which would prove inadequate," there can be no *Monell* liability. *Id.* at 823 (emphasis added). Applying this standard, the Seventh Circuit has cautioned that "[t]he absence of a policy might thus mean only that the government sees no need to address the point at all, or that it believes that case-by-case decisions are best, or that it wants to accumulate some experience before selecting a regular course of action." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). "At times, the absence of a policy might reflect a decision to act unconstitutionally, but the Supreme Court has repeatedly told us to be cautious about drawing that inference." *Id.*

Further, the failure to implement a policy may not constitute deliberate indifference when the proposed policy would have been exceedingly impractical to implement. *See, e.g.*, *Ayon v. Austin Indep. Sch. Dist.*, 1:21-CV-209-RP, 2024 WL 1572408, at *3 (W.D. Tex. Feb. 5, 2024), *aff'd,* 24-50267, 2025 WL 560228 (5th Cir. Feb. 20, 2025) (agreeing that municipal actor's failure to implement an "impractical" policy that could have prevented the harm at issue did not amount to deliberate indifference). *See also Simmons v. City of Philadelphia,* 947 F.2d 1042, 1075 (3d Cir. 1991) (affirming judgment against municipality that "introduced no evidence, such as testimony that this training would have proved unworkable, ineffective, or too costly, from which a countervailing and legitimate governmental reason for electing not to provide the training could have been inferred.").

## B.  The County Should Be Entitled to Present Evidence That Any Failure to Act Was Inadvertent

The County should be entitled to present evidence demonstrating that any failure to establish a local compensation mechanism was inadvertent—not a deliberate choice among known alternatives. The County should be able to present evidence that creating a supplemental "lost equity" remedy was simply never contemplated by any stakeholder. This Court should consider evidence demonstrating

not that the County evaluated alternatives and chose not to act, but rather did not believe that action under County home rule powers was possible, appropriate, or required. *See Bridgman v. Korzen*, 295 N.E.2d 9, 11 (Ill. 1972) ("the collection of property taxes is not" among home rule powers); *Chicago Bar Ass'n v. Cook Cnty.*, 467 N.E.2d 580, 581 (Ill. 1984) (assessment of property taxes not among home rule powers). The County's evidence will also show the impracticality of establishing a local compensation mechanism, which would require the County to incur liability for equity payments vastly in excess of delinquent taxes collected through a tax sale. As the Seventh Circuit recognized in *Calhoun*, the absence of a policy may "mean only that the government sees no need to address the point at all." 408 F.3d at 380. The Court should hear evidence relevant to Plaintiff's burden of demonstrating deliberate indifference.

Likewise, the Court should consider evidence that the County lacked notice of its home rule authority to create a supplemental system for just compensation. To meet the deliberate indifference standard, a municipality must have "actual or constructive notice that its inaction results in harm." *Connick*, 563 U.S. at 61. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 62. The County should be entitled to present evidence that it lacked notice both that constitutional violations were occurring when private tax buyers acquired any lost equity, and that the County possessed the authority and responsibility to remedy them.

Moreover, the Illinois Constitution requires a jury to determine the amount of just compensation after a taking and vests in the Illinois General Assembly the exclusive power to establish the procedures for fulfilling the just compensation requirement. Ill. Const. 1970, art. I, § 15; *Ill. State Toll Highway Auth. v. Am. Nat'l Bank & Trust Co. of Chicago*, 642 N.E.2d 1249, 1254 (Ill. 1994). Evidence that the County reasonably believed it lacked unilateral authority under its home rule powers to establish a mechanism for adjudicating and paying compensation is relevant to Plaintiffs'

17

burden of establishing that the County's inaction was deliberate. *Ampersand, Inc. v. Finley*, 338 N.E.2d 15, 18 (Ill. 1975) (holding that the administration of justice is a matter of statewide concern and does not pertain to Cook County's government or affairs for home-rule purposes).

Finally, the County should be able to establish that the County did not bury its head in the sand. Rather, the County should be able to present evidence showing that it made regular and sustained efforts to reform the Property Tax Code through the only avenue it and other stakeholders believed was available: legislative reform in Springfield. Relevant evidence will demonstrate that the County was not indifferent to deficiencies in the tax sale system and pursued reform through what it understood to be the only available channel.

### C. The County Had No Control Over the Relevant Variables

In defending a claim for "inaction," the County should be able to present evidence regarding the numerous factors outside its control, which bear directly on whether "inaction" can be characterized as deliberate indifference. Plaintiffs must establish the County should have known it had the authority and responsibility to compensate for any lost equity despite having no control over numerous salient factors leading to the loss of equity, including whether: County residents pay their property taxes; the annual tax sale occurs for properties with delinquent taxes; a tax buyer purchases the tax liens; homeowners redeem their properties during the redemption period; the tax purchaser petitions for and obtains a tax deed; the homeowner seeks relief from the Indemnity Fund, obtains that relief, and that relief is subject to the statutory cap; and, perhaps most critically, the homeowner and tax purchaser reach a private agreement—like Plaintiff Kidd did—allowing the homeowner to retain possession of the property.

Plaintiffs want to present a superficially simple case of the County's general awareness of problems with the Property Tax Code that led the state to create the Indemnity Fund over 70 years ago. The County should be entitled to present opposing evidence demonstrating the attenuated

18

connection between any County "inaction" and the alleged constitutional harm—precisely the concern animating the Seventh Circuit's heightened standard for inaction-based *Monell* claims.

## IV.     Evidence Relevant to Knowledge and Deliberate Indifference

Plaintiffs dismiss the County's beliefs about the limitations of its home rule powers or the constitutionality of the Illinois Property Tax Code as irrelevant because municipalities are not entitled to qualified immunity based on "good faith." *See Owen v. City of Indep., Mo.*, 445 U.S. 622 (1980). But the County's evidence will not be offered to determine whether it acted in good faith. Rather, the County's evidence will demonstrate that it is not liable for inaction because Plaintiffs cannot prove the requisite level of knowledge or deliberate indifference. While these inquiries are informed by the state of the law and the consensus understanding in Illinois and elsewhere regarding what constituted a taking and what home rule powers permitted, this issue is distinct from a qualified immunity defense.

The Seventh Circuit's decision in *Taylor* illustrates this critical distinction. There, the appellate court affirmed judgment for individuals who "acted in good faith on the facially valid search warrant," even though executing the warrant led to a constitutional violation. *Taylor*, 26 F.4th at 434. As to the municipality's liability, however, the inquiry was different—the Seventh Circuit examined whether evidence of "internal documents, citizen complaints or calls for an investigation, or perhaps some form of inquiry by an inspector general" demonstrated that the municipality had sufficient knowledge of constitutional violations. 26 F.4th at 437. The absence of such evidence demonstrated the lack of a "widespread practice" that could be imputed to the municipality. The County intends to present evidence that comports with the analysis in *Taylor*.

## V.     Conclusion

The April 7, 2026 bench trial presents a single, focused issue: whether Plaintiffs can satisfy the "stringent requirements" for *Monell* liability predicated on inaction. To prevail, Plaintiffs must

demonstrate that the County had actual or constructive notice that its failure to use its home rule authority to establish a local compensation mechanism for any lost equity would be the cause of constitutional violations, and that the County was deliberately indifferent to that risk.

The County should be entitled to rebut both elements of this inquiry by presenting evidence demonstrating the absence of any prior pattern of violations, the settled state of the law before *Tyler*, the universal understanding among stakeholders that reform required state-level action, the County's active pursuit of state-level legislative solutions, and the lack of any conscious choice on the County's part not to act.

As this Court recognized, the evidentiary record on these issues remains undeveloped. The County respectfully submits that the scope of trial should encompass all evidence relevant to these inquiries. The Court should permit development of the record the County contends is necessary to adjudicate *Monell* liability for failure to use home rule authority to create a parallel local mechanism to cure deficiencies in state law that may lead to constitutional violations, particularly because the County does not anticipate any impact on the anticipated trial length of three to four days or any confusion to the Court when evaluating the record at the conclusion of the bench trial.

*       *       *

Respectfully submitted,

Dated: February 13, 2026

By: /s/ Brian D. Roche
An Attorney for Plaintiffs

John Bouman
Lawrence Wood
Daniel Schneider
LEGAL ACTION CHICAGO
120 South LaSalle Street, 10th Floor
Chicago, IL 60603
(312) 341-1070
jbouman@legalactionchicago.org

20

lwood@legalactionchicago.org
dschneider@legalactionchicago.org

Brian D. Roche
REED SMITH LLP
10 South Wacker Drive
40th Floor
Chicago, IL 60606
(312) 207-6400
broche@reedsmith.com

Charles R. Watkins
GUIN & EVANS, LLC
805 Lake Street, #226
Oak Park, IL 60301
(312) 878-8391
charlesw@guinevans.com

David J. Guin
GUIN & EVANS, LLC
P.O. Box 380723
Birmingham, AL 35238
205-527-1582
davidg@guinevans.com


EILEEN O'NEILL BURKE
Cook County State's Attorney


By        /s/ *David E. Morrison*
          Special Assistant State's Attorney

Kenneth S. Ulrich
David E. Morrison
Rachel C. Steiner
Kerry D. Nelson
Kyle W. Walther
Special Assistant State's Attorneys
GOLDBERG KOHN LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois  60603
(312) 201-4000
kenneth.ulrich@goldbergkohn.com
david.morrison@goldbergkohn.com
rachel.steiner@goldbergkohn.com

kerry.nelson@goldbergkohn.com
kyle.walther@goldbergkohn.com

-and-

Megan Honingford
Anthony O'Brien
Prathima Yeddanapudi
Assistant State's Attorneys
COOK COUNTY STATE'S
  ATTORNEY'S OFFICE
500 Richard J. Daley Center
Chicago, Illinois  60602
(312) 603-3116
megan.honingford@cookcountysao.org
anthony.obrien@cookcountysao.org
prathima.yeddanapudi@cookcountysao.org

22