**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHELLE KIDD and GOYCE H. RATES, individually and on behalf of all others similarly situated; SOUTHWEST ORGANIZING PROJECT and PALENQUE LSNA individually,** | ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 22 C 7061** |
| **MARIA PAPPAS, in her capacity as Treasurer of Cook County, Illinois and Trustee of the Indemnity Fund, and COOK COUNTY, ILLINOIS,** | ) ) ) ) ) | |
| **Defendants.** | ) | |

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

MATTHEW F. KENNELLY, District Judge:

This case currently has four plaintiffs—Michelle Kidd, Goyce H. Rates, Southwest Organizing Project (SWOP), and Palenque LSNA (PLSNA)—who filed suit against Cook County and its treasurer, Maria Pappas. The plaintiffs claim that the defendants violated their constitutional rights through the operation of Cook County's property tax sale system. Specifically, the plaintiffs claim that Cook County's tax sales violate the Fifth Amendment's prohibition against takings without just compensation, the Eighth Amendment's prohibition on excessive fines, and the due process guarantees of the Fourteenth Amendment. Ms. Kidd and Ms. Rates assert claims for damages on behalf of a class of similarly situated persons. SWOP and PLSNA assert claims solely on their own behalf and request declaratory and injunctive relief.

The Court certified a class all persons or entities who meet the following criteria: (1) they owned or were the beneficial owners of residential real property in Cook County, Illinois in Residential Assessment Classes Major Class 2 and Class 3; (2) the properties were sold in the Cook County annual tax sale; (3) a tax deed was issued to the purchaser of such property at any time on or after December 15, 2020 and not withdrawn; and (4) the Cook County Assessor's Office's assessed Fair Cash Value as of the time of tax deed's issuance exceeded the total amount of taxes, fees, and interest owed at the end of the redemption period. *Kidd v. Pappas*, No. 22 C 7061, 2025 WL 1865983, at *20 (N.D. Ill. July 7, 2025). The Court later concluded that Cook County's tax sales violate the Fifth Amendment's prohibition against takings without just compensation and the Eighth Amendment's prohibition on excessive fines. *Kidd v. Pappas*, No. 22 C 7061, 2025 WL 3507374 (N.D. Ill. Dec. 8, 2025). In its summary judgment decision, the Court determined that the summary judgment record was not sufficient to decide the issue of the County's *Monell* liability. *Id.* at *16.

The Court conducted a bench trial regarding Cook County's *Monell* liability from April 7, 2026 through April 9, 2026. This decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(1).

## A. Facts

Every year, Cook County conducts a property tax sale. The procedures the County follows are outlined by the Illinois Property Tax Code, 35 ILCS 200/21-5–200/22-95. Under the Property Tax Code, if a homeowner fails to pay property taxes in a timely fashion, the property is considered delinquent. *Id.* 200/21-15. The county treasurer, acting as the county collector, annually creates a list of all delinquent

properties. *Id.* 200/21-160, 19-35. If taxes on a delinquent property continue to go unpaid, the county treasurer may apply for a judgment and order of sale for unpaid taxes on that property. *Id.* 200/21-150. The judgment grants the county a lien on the property "for the amount of taxes . . . , interest, penalties, and costs due thereon" and orders that the property, "or so much of each of [it] as shall be sufficient to satisfy the amount of taxes . . . due thereon, be sold as the law directs." *Id.* 200/21-180. Once a judgment and order of sale is rendered, the Property Tax Code states that the county "shall" "proceed to offer the property for sale pursuant to the judgment." *Id.* 200/21-190.

The County offers its liens on delinquent property at its annual tax sale, which is supervised and administered by the Cook County Treasurer. Tax buyers bid against each other on a lien via the penalty percentage they propose to collect on any later payments made by the property owners, with the buyer who bids the lowest winning the bid. *Id.* 200/21-215. In exchange for the lien and the right to collect unpaid taxes from the property owner plus the penalty percentage, tax buyers pay Cook County the outstanding balance of unpaid taxes on the property at issue.

The Illinois Constitution provides property owners with a "right of redemption," allowing them to reacquire ownership lost via a tax sale. *See* Ill. Const. art. IX, § 8. Generally, property owners have thirty months from the time of the tax sale to redeem their property by repaying the tax buyer. 35 ILCS 200/21-350. But if the property owner does not repay the tax buyer within the allotted time, the tax buyer may petition a court for ownership of the property. *Id.* 200/22-30. Upon granting the tax buyer's petition, the court orders the county clerk to issue and certify a tax deed transferring ownership of the property to the tax buyer. *Id.* 200/22-40.

3

The Property Tax Code also requires counties to maintain a fund to indemnify eligible property owners for losses or damages incurred due to the tax sale. 35 ILCS 200/21-295. To fund Cook County's Indemnity Fund, the Property Tax Code requires every tax buyer to pay "a nonrefundable fee of $80 for each [property] purchased plus an additional sum equal to 5% of the taxes, interest, and penalties paid" to purchase the property, as well as $80 for each subsequent year the tax buyer pays property taxes on the property. *Id.* A property owner seeking indemnity must "petition the Court which ordered the tax deed to issue" and "ask that judgment be entered against the County Treasurer, as trustee, in the amount of the indemnity sought." *Id.* 200/21-305. A homeowner who requests an award in excess of $99,000 must prove that the loss of his or her property was not attributable to his or her own fault or negligence before an award in excess of $99,000 will be granted. *Id.*

Two witnesses testified during the bench trial: Justin Kirvan and James Thompson. Kirvan is policy director for the Cook County Treasurer and has served in that role since December 2022. He previously served as a staff attorney and as the chief legal counsel in the Treasurer's office and as an attorney for the Cook County Assessor. Thompson is the Director of Assessment and Property Tax Policy for the President of the Cook County Board and has served in that role since December 2021.

Kirvan testified that one of the possible outcomes of the tax collection system is that a property owner can lose the equity in their property when a tax deed is issued. Kirvan also testified that, if "the system proceeded as the legislature intended, then [the property owner] should have gotten their equity back" from the Indemnity Fund  Tr. 23:3–4. Thompson testified that he believed the Cook County Commissioners, based

on his conversations with them, had a basic understanding that a homeowner who does not pay property taxes in Cook County may lose their home. Thompson also testified that he believed that the purpose of the Indemnity Fund is to address the equity loss expected from the tax sale.

Kirvan and Thompson both acknowledged that Cook County's Indemnity Fund has been severely underfunded. According to an analysis performed by the Treasurer's office in 2023, over the period from 2015 through 2022, the average number of tax deeds issued each year was 769. During that same period, an average of forty indemnity awards were issued to property owners each year. Based on this data, it appears that—on average—only five percent of property owners who had their property taken through the issuance of a deed to a tax buyer received compensation. Conversely, 95 percent of property owners who had their property taken received no compensation.

Illinois law requires county treasurers to transfer any funds in excess of $2 million from the Indemnity Fund to the county each year. Based on this requirement, the Cook County Treasurer's Chief Financial Officer sends the County's Chief Financial Officer a letter each year that lists the balance in the Indemnity Fund. Typically, no transfer occurs because the Indemnity Fund has a balance around or below $2 million. For example, the balance was $191,856.34 in 2020 and $2,217,747.04 in 2021. In December 2022, the letter included additional information because the balance for that year was approximately $3.9 million. The letter stated that the Indemnity Fund had over $22 million in outstanding judgments. Kirvan testified that the letter included the data about outstanding judgments to explain to the County why the Treasurer would not

5

transfer the funds in excess of $2 million.

At times, the property owner and tax buyer may enter into a "flip" agreement after the tax buyer has obtained a tax deed. Under a flip agreement, a tax buyer and the previous property owner agree that the divested property owner will assign any indemnity award to the tax buyer in exchange for regaining ownership of the property. But flip agreements only happen after the property owner has been divested of ownership without compensation.

Kirvan and Thompson also testified that, in their views, the Treasurer and County did not have the authority to independently compensate property owners for equity lost as the result of the property tax sale system. Kirvan testified that, in his view, there were limitations on the Treasurer's ability to promulgate rules and regulations relating to the annual tax sale. Specifically, Kirvan testified that he believed *Bridgman v. Korzen*, 54 Ill. 2d 74, 78, 295 N.E.2d 9, 11 (1972), prohibits the Treasurer or any County-related entity from undertaking "any action that would impact or implicate the collection and/or distribution of taxes." Tr. 135:1–7. Kirvan contended that providing a property owner payment for lost equity would create a disincentive for property owners to pay their taxes. Kirvan testified that, as a result of this assumed disincentive, the County's 99 percent tax collection rate would "presumably drop" and "directly implicate[] the amount of collections" the County would distribute to the taxing districts. Tr. 156:1–7. In short, Kirvan believed that providing lost equity to property owners would impact property tax collection and distribution in violation of *Bridgman*. Kirvan did not provide any data or analysis to support his contention. Still, Kirvan determined that the Treasurer and County lacked the legal authority to compensate property owners for lost equity.

6

Thompson testified that he agreed with Kirvan's view that the County's funding of homeowner's assessed value minus taxes owed would exceed the County's home rule authority because of the impact it would have on taxing districts.  He further testified that he never briefed the County board with respect to the County's ability to compensate a property owner for lost equity because, in his view, the County has no authority to do that.

Kirvan and Thompson also testified that no County employees or officials, or other stakeholders, ever informed them that the County had the authority to compensate property owners for equity lost as the result of the tax sale.  According to Kirvan, he did not consider whether the County could compensate property owners for lost equity because he viewed the lost equity as the outcome of "a harsh enforcement system in Illinois."  Tr. 213:18–25.  Kirvan and Thompson further testified that, to their knowledge, no one in the Treasurer's office or President's office considered whether the County could compensate property owners for lost equity.

Kirvan and Thompson testified that, after the Supreme Court's decision in *Tyler v. Hennepin County*, 598 U.S. 631 (2023)*,* the Treasurer and the County advocated for the state legislature to reform the tax sales processes set forth in state law.  These reforms would permit the Treasurer to auction a property after the redemption period, ensuring that a property owner would not lose equity when a tax buyer received the deed to the property.  No such legislation has been adopted, however.

The plaintiffs also submitted excerpts of a report prepared by their expert, Dr. William Hamm, that detailed his analysis of the equity class members lost because of Cook County's property tax sale system.  PX 24.  Dr. Hamm identified 1,773 parcels of

7

land that are located in Cook County on which the County sold the tax lien on the owner's property to a third party and a tax deed was issued to the tax lien buyer on or after December 15, 2020.  He eliminated 44 parcels because:  (1) a documented bankruptcy or other court action voided the tax deed, or (2) the property was identified as non-residential.  Dr. Hamm then calculated the value of the equity lost for 205 of these parcels by subtracting the delinquent taxes from the Cook County Assessor's fair market value assessment of the property.  According to Dr. Hamm's analysis, the average lost equity was $69,167.72.[1]  Kirvan and Thompson testified that the Treasurer or County could have requested information to conduct a similar analysis but never did so.  Such an analysis would have shown how many property owners lost equity as the result of property tax sales and provided an estimate of the amount of equity each property owner lost.

## B.    Discussion

Cook County contends that the plaintiffs have not established the requirements for municipal liability under 42 U.S.C. § 1983 because it did not have notice that the tax sale process caused constitutional violations and, even if it was aware, it was not deliberately indifferent to the risk of constitutional violations.  Section 1983 creates a private right of action for plaintiffs to bring suit against any "person" who violates their

---

[1] Based on this calculation, all the properties reviewed suffered some amount of lost equity.  This does not account for any amount owed on a mortgage on the property. Thompson testified that an estimated amount required for payment of property tax payments is typically included in what a property owner pays towards a mortgage payment every month and that mortgage lenders have an incentive to ensure the property taxes are paid.  Kirvan also testified that he thought that the average equity loss a property owner suffered from a tax sale was "several tens of thousands of dollars."  Tr. 67: 9–13.

federal rights while acting under color of state law.  42 U.S.C. § 1983.  "In order to bring constitutional claims against a municipality under Section 1983," the plaintiffs "must satisfy the requirements of *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978)."  *Castro v. Dart*, 483 F. Supp. 3d 564, 573 (N.D. Ill. 2020) (citation omitted).

To sustain a claim under *Monell*, the plaintiffs must show that they "suffered a deprivation of a constitutionally protected interest" that was caused by "an official policy, custom or usage of the municipality."  *Id.* (citation omitted).  This policy must also be "the 'moving force' behind the federal-rights violation."  *First Midwest Bank, Guardian of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)).  "To satisfy th[is] standard," the plaintiffs must establish "a 'direct causal link' between the challenged municipal action and the violation of [their] constitutional rights."  *Id.* (quoting *Brown*, 520 U.S. at 404).

The Seventh Circuit has "cautioned" that "the path to *Monell* liability based on inaction is steeper because, unlike in a case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous."  *Orozco v. Dart*, 64 F.4th 806, 824 (7th Cir. 2023) (citation omitted).  A failure to act "amounts to municipal action for *Monell* purposes *only if* the municipality has notice that its program will cause constitutional violations."  *Id.* at 824–25 (cleaned up).  "Demonstrating that notice is essential to an ultimate finding [of liability] and requires a 'known or obvious' risk that constitutional violations will occur."  *Id.* at 825.  The plaintiffs must also show that the local government was "deliberately

9

indifferent to the need" for a particular policy. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

### 1. Notice

The plaintiffs "can demonstrate the requisite notice" in "two ways." *Orozco*, 64 F.4th at 824. First, the plaintiffs can show "a pattern of past constitutional violations such that the County was put on notice of the constitutional harm." *Id.* Second, the plaintiffs can show "that the risk of a constitutional violation . . . was so high as to be obvious." *Id.*

The evidence presented at trial establishes that the risk of constitutional violations in conducting tax sales was obvious to the County. Kirvan and Thompson stated that it was common knowledge that tax sales often led to the issuance of tax deeds without compensation to homeowners. The County knew that the Fifth Amendment prohibited the taking of property without just compensation and that the tax sales often led to properties being transferred despite property owners not being compensated for the lost equity in their properties.

Additionally, the County could have determined how many property owners lost or were at risk of losing excess equity. Dr. Hamm—plaintiffs' expert—identified 1,729 Cook County properties on which the County sold the tax lien to a third party and a tax deed was issued to the tax lien buyer on or after December 15, 2020. Based on his calculation of equity lost for 205 of these properties, the average lost equity was $69,167.72. Kirvan and Thompson acknowledged that the County could have conducted this analysis at any time but did not. The County therefore had, in its possession, or in the possession of another County official's office, every piece of

10

information needed to know that its failure to compensate property owners caused constitutional violations.

It was also common knowledge that the Indemnity Fund was severely underfunded and backlogged. In addition to general knowledge of the Indemnity Fund's inadequacy, in 2023, the Treasurer's office determined that only five percent of Cook County property owners who had their property taken through the issuance of a deed to a tax buyer received an indemnity award. The County could have conducted this analysis at any time to determine the actual scope of the constitutional violations occurring as the result of the property tax sale system. And the County always knew that any property owner who lost more than $99,000 in equity had to show that they were not at fault or negligent as a prerequisite to receive full just compensation via the Indemnity Fund.

The County argues that it did not have notice of the Indemnity Fund's inadequacy until December 29, 2022, when the Treasurer's CFO reported the Indemnity Fund's insolvency to the County's CFO. The plaintiffs respond that notice to the Treasurer constitutes notice to the County because the Treasurer is the County when running the tax sale. The County argues that the Treasurer is a separately elected official with separate responsibilities and is the trustee of the Indemnity Fund.

The Court concludes that the Treasurer is acting as the County when undertaking any process related to property tax sales. The Property Tax Code provides that "[t]he treasurers of all counties shall be ex-officio county collectors of their counties." 35 ILCS 200/19–35. As county collector, the Treasurer "is responsible for collecting all property taxes for and distributing tax revenue to the hundreds of local

11

taxing districts located within Cook County." *Village of Arlington Heights v. Pappas*, 2016 IL App (1st) 151802, ¶ 3, 67 N.E.3d 513, 514. Thus, for purposes of the tax sale and related activities, the Treasurer is acting as the County, and notice to the Treasurer may constitute notice to the County.

The County attempts to distance itself from the Indemnity Fund's inadequacy by arguing that "the Indemnity Fund's flaws are the State's flaws." Tr. 363:5–6. The County further argues that there was no evidence of any effort from the County to backstop the Indemnity Fund "because no one thought it was possible." Tr. 364:1–2. This argument amounts to a post-hoc rationalization of the County's failure to compensate property owners who lost their property through the tax sale system. At one point, the County contends that it never thought about providing compensation to property owners who lost their property through tax deeds because it did not view the process as unconstitutional. Then, the County argues that it did not provide such compensation because its home rule authority was limited. These arguments are inconsistent. Based on the evidence presented, the County failed to undertake any contemporaneous analysis of whether Cook County could use its home rule authority to compensate property owners who lost their property through the tax sale process. As the Court previously held, the County has an independent obligation to comply with the Constitution's mandate of fair compensation when it takes property. *Kidd,* 2025 WL 3507374, at *16. Nothing in the Property Tax Code prohibits or even hinders the County from doing so. *Id.* The County's failure to analyze this issue does not negate the obviousness of the risk of constitutional violations.

The County also contends that it was not on notice of any constitutional violations

12

because a series of contingencies occur between a property owner's failure to pay property taxes and the loss of equity. According to the County, these include: whether the homeowner timely pays the property taxes or a tax buyer purchases the lien at the annual sale, whether the homeowner pays the required taxes during the several years-long redemption period, whether the tax buyer petitions for a tax deed, whether the tax buyer obtains the tax deed, whether the homeowner seeks relief from the Indemnity Fund, whether the tax buyer seeks a sale-in-error, and whether the homeowner enters into a flip agreement with a tax buyer and ultimately regains ownership of the property. These contingencies are immaterial to the questions before the Court: whether there was a pattern of constitutional violations and whether the risk of constitutional violation was so high that it should have been obvious. The evidence at trial established that it was common knowledge that tax sales often led to the issuance of tax deeds without compensation to homeowners and that the County had at its fingertips the data needed to determine the actual scope of the constitutional violations. The additional contingencies involved in the tax sale process do not have any impact on the obviousness of the risk of constitutional violations.

The County also argues that it did not have notice because not every tax deed resulted in a constitutional violation. The County conceded, however, that "the expected outcome" of the property tax sale system is that "Cook County homeowners may lose their home through the State's property tax foreclosure system." Tr. 361:13–15. The fact that only a small percentage of the total number of Cook County property owners suffer constitutional violations does not mean that the County can avoid liability for those violations. The number was not so low as to fall off the radar screen. On the

13

contrary, the evidence showed that the existence of constitutional violations was a matter of common knowledge.

The County also contends that it could not have known that the tax sale process was unconstitutional before the Supreme Court's decision in *Tyler v. Hennepin County*, 598 U.S. 631 (2023)—which formally concluded that a county's retention of excess equity violated the Fifth Amendment's Takings Clause. Yet the Supreme Court was not imposing any new obligation onto governmental entities in *Tyler*. Instead, the Court was interpreting the preexisting obligation governmental entities have to pay just compensation for taken property under the Takings Clause, which has applied to local governments for over one hundred twenty-five years. *See Chi., B. & Q. R. Co. v. City of Chicago*, 166 U.S. 226, 241 (1897) (incorporating the Fifth Amendment's Taking Clause vis-à-vis states and local governments through the Fourteenth Amendment). And the Court in *Tyler* held—unanimously—that counties' "use [of] the toehold of the tax debt to confiscate more property than was due" was a "*classic* taking." *Tyler*, 598 U.S. at 639 (emphasis added).

The County further argues that whether the County's tax sale process was unconstitutional, even after *Tyler*, "remained unsettled" until this Court's summary judgment decision, because the County does not retain the taken property. Tr. 11:12–15. This argument does not square with the testimony by Kirvan and Thompson that the County lobbied the state legislature to reform the tax sale system to comply with *Tyler*. Kirvan testified that the Treasurer's position as of October 2022 was that—in response to *Tyler*—legislation was needed to "fully restore equity to property owners that have lost their property to a tax deed." Tr. 143:4–5. Kirvan also prepared

14

testimony that he intended to present to the state legislature that recognized the $99,000 cap on payouts from the Indemnity Fund "likely won't be permissible after <u>Tyler v. Hennepin</u>[.]"  PX 80, p. 3.  This evidence clearly establishes that the County did not need a decision from this Court to understand that it had a problem with constitutionality.

Finally, the County contends that it was not on notice of constitutional violations because the County had never "received a complaint, a demand, a communication framing the loss of surplus equity . . . in constitutional terms before the *Tyler* era."  Tr. 363:17–20.  Given the evidence presented at trial and discussed above regarding notice to the County, the proposition that it did not get sued or threatened with suit "in constitutional terms" is of no consequence.  It is also worth observing that every claim for lost equity made against the essentially tapped-out Indemnity Fund amounts to a complaint or demand that any reasonable person in the relevant County officials' positions would understand as a claim involving a violation of constitutional rights.  That aside, the County did not need to receive an engraved notice to understand that its actions—taking private property without providing just compensation—constituted a "classic" violation of the Fifth Amendment's Takings Clause.

For the same reasons, the County had actual or constructive notice that its property tax sale system violated the Eighth Amendment's Excessive Fines Clause. The Court previously concluded that this loss of equity was an excessive fine in all residential property cases.  *Kidd,* 2025 WL 3507374, at *21.  As discussed, the County knew that property owners lost equity because of the tax sale process and that the Indemnity Fund did not provide an adequate remedy for this lost equity.  Based on this

15

knowledge, the risk of Eighth Amendment violations was obvious.

### 2. Deliberate indifference

The Court next addresses the appropriate standard for deliberate indifference required to establish *Monell* liability for a local government's inaction. The County suggests that deliberate indifference is comparable to criminal recklessness and thus requires subjective intent. This is the correct standard for a court considering deliberate indifference for purposes of violations of the Eighth Amendment's Cruel and Unusual Punishments Clause. *See Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994). It is not the correct standard for addressing *Monell* claims. *Id.*

The Supreme Court has expressly adopted an objective standard for deliberate indifference under *Monell*. *Farmer*, 511 U.S. at 841 ("It would be hard to describe the *Canton* understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective."); *see also Short v. Hartman*, 87 F.4th 593, 608 (4th Cir. 2023); *Doe v. Fort Zumwalt R-II Sch. Dist.*, 920 F.3d 1184, 1189 (8th Cir. 2019); *Castro v. County of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016). The Court noted that "the Courts of Appeals have routinely equated deliberate indifference with recklessness." *Farmer*, 511 U.S. at 836. Civil recklessness is objective, encompassing action or failure to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* Thus a local government may be liable under *Monell* "when it disregards 'obvious' needs." *Id.* at 841.

The County contends that the plaintiffs focus on the type of legislation the County chose to advance in the state legislature as the County's deliberately indifferent

16

conduct. This is an overly narrow characterization of the plaintiffs' argument. Instead, the plaintiffs argue that the County was deliberately indifferent by failing to act to provide compensation to property owners who lost their property when a tax deed was issued.

The County does not dispute that some property owners lose equity after a tax deed is issued under the property tax sale system. It also does not dispute that it took no action to compensate the property owners who lose equity. With this knowledge, the County continued to conduct tax sales knowing the absence of, and without providing, an adequate means for a property owner to obtain compensation for lost excess equity. This created an obvious risk that property owners who had their property taken without just compensation would suffer a violation of their constitutional rights. By failing to address this issue and consider any possible solution, the County disregarded an obvious need. The Court concludes that the evidence shows the County was deliberately indifferent to the obvious risk of constitutional violations when it failed to act to address property owners' loss of equity when a tax deed was issued.

Perhaps recognizing that the property tax sales process resulted in constitutional violations and being unable to point to any response to that obvious risk, the County largely repeats the arguments from its opposition to the plaintiffs' motion for summary judgment. These arguments remain unpersuasive.

Based on its characterization of the plaintiffs' argument, the County argues that it was "far from indifferent" because, after *Tyler*, it urged the state legislature to adopt a two-auction property tax collection and enforcement system. Tr. 357:20–21. The Court previously explained that the state-imposed process for conducting a tax sale does not cause the deprivation of equity. *Kidd*, 2025 WL 3507374, at *16. "What actually results

17

in property owners losing their property—in this case, being deprived of their equity—is not the state-imposed processes for conducting a tax sale, but the refusal of the seller—the County—to compensate owners for their lost equity after the sale is completed." *Id.* Efforts to reform the state-imposed processes for conducting the tax sale do not satisfy, or excuse, the County's obligation to compensate property owners for their lost equity.

Furthermore, the County argues that it was not deliberately indifferent because it did not have the authority to compensate property owners who lost excess equity as the result of the issuance of a tax deed. This argument is based on its position that *Bridgman*, 54 Ill. 2d at 78, 295 N.E.2d at 11, prohibits the County from undertaking "any action that would impact or implicate the collection and/or distribution of taxes." Tr. 135:1–7. As discussed above, this appears to be a post-hoc rationalization of the County's actions; it offered no evidence of any contemporaneous analysis on this point. By failing to consider and analyze this issue, the County disregarded an objectively obvious need—*i.e.*, providing compensation to property owners who lost equity as the result of property tax sales.

That aside, the County misreads *Bridgman*. The Illinois Supreme Court held that assessing and collecting taxes are not within Cook County's home rule powers because "the county acts both for itself and the other taxing bodies authorized to levy taxes on property within the county," meaning these functions do "not pertain to its government and affairs to any greater extent than to the government and affairs of the other taxing bodies for whose benefit it acts." *Bridgman*, 54 Ill. 2d at 78, 295 N.E.2d at 11; *see also Chi. Bar Ass'n v. Cook County*, 102 Ill. 2d 438, 441, 467 N.E.2d 580, 581 (1984) (applying *Bridgman*'s reasoning to tax assessments). But *Bridgman* does not support

the contention that the County cannot use its home rule authority to take *any* action related to property taxes. Indeed, the County must have recognized that the holding in *Bridgman* was not as broad as it now argues, because it created a Homeowner Relief Fund to provide funds to homeowners suffering financial hardship from property taxes.

The County argues that the Homeowner Relief Fund is a "red herring" because it was "no-strings-attached money." Tr. 373:10, 12. The County argues that this funding is distinct from providing just compensation because the latter "would have a devastating effect on the . . . collection and distribution of [property] taxes." Tr. 369:23–24. But no evidence presented at trial supports this contention; on the record before the Court, it amounts to pure speculation. Furthermore, it defies logic that property owners would choose not to pay property taxes despite knowing they would lose their home because they would, at some later date, get compensated for lost equity—which is one, but just one, of the severe hardships that loss of one's home would entail. In addition, the County's argument ignores that providing just compensation to property owners who lose excess equity is fundamentally distinct from the County's obligation to collect and distribute property taxes.

The County also argues that its failure to act was not deliberately indifferent because it did not retain the property owners' property. The Court previously rejected this argument, concluding that the Treasurer and County authorized the taking of homeowners' property and thus are responsible for the Takings Clause violation. *Kidd*, 2025 WL 3507374, *18. The County has provided no reason to depart from the Court's previous decision.

In a final effort to avoid liability, the County argues that "[c]reating a local

19

mechanism to adjudicate and pay just compensation would not only have been dubious but exceedingly impractical, requiring the County to incur equity payments vastly in excess of the mere 4.4 percent of all property taxes that go to the County." Tr. 368:6–10. But nothing in the Constitution or the law under 42 U.S.C. § 1983 requires a local government to have financially benefitted from a constitutional violation before it may be held liable.

Additionally, the County argues that requiring it to compensate property owners is impractical because the "hundreds of millions of dollars" that it would be required to pay would "ruin one of the largest counties in the country." Tr. 368:13–15. On the record before the Court, this seems to be a wild overstatement. The evidence at trial showed that an average of 220 homeowners out of the one million homes in Cook County whose owners pay property taxes—two one-hundredths of one percent—lose their home due to the tax sale process each year. If each of these homeowners lost equity and were paid just compensation, using the estimated average compensation of $70,000, the County would be required to pay approximately $15.4 million each year. This is a far cry from "hundreds of millions of dollars" that would potentially "ruin" the County. In fact, the County appropriated $15 million for the Homeowner Relief Fund in 2025. Rather than providing full compensation for property it took, the County decided that the Homeowner Relief Fund would provide a one-time payment of $1,000 to Cook County residents who are experiencing financial hardship based on property taxes and meet eligibility criteria. This action, at a minimum, shows that the County could allocate $15 million in a particular year to address property tax relief without facing financial ruin. It failed to do so.

20

In sum, the evidence establishes that the County's inaction was deliberately indifferent to the need to address the Fifth and Eighth Amendment violations that occurred from property tax sales.

**Conclusion**

For the reasons stated above, the Court concludes that the County is liable under *Monell* for the violations of the Fifth Amendment's Takings Clause and the Eighth Amendment's Excessive Fines Clause suffered by the plaintiffs and class members. The parties are directed to promptly meet and confer and are to file by May 18, 2026 a joint status report with a proposal for whatever further proceedings are needed to bring the case to a conclusion (or separate proposals if they cannot agree). The case is set for an in-person status hearing on May 20, 2026 at 9:45 a.m.

Date: May 11, 2026

_____
MATTHEW F. KENNELLY
United States District Judge

21