**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHELLE KIDD and GOYCE H. RATES, individually and on behalf of all others similarly situated; SOUTHWEST ORGANIZING PROJECT and PALENQUE LSNA individually,** | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | **Case No. 22 C 7061** |
| **MARIA PAPPAS, in her capacity as Treasurer of Cook County, Illinois and Trustee of the Indemnity Fund, and COOK COUNTY, ILLINOIS,** | ) | |
| **Defendants.** | ) | |

## **MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

This case currently has four plaintiffs—Michelle Kidd, Goyce H. Rates, Southwest Organizing Project (SWOP), and Palenque LSNA (PLSNA)—who filed suit against Cook County and its treasurer, Maria Pappas.[1] The plaintiffs claim that Cook County's tax sales violate the Fifth Amendment's prohibition against takings without just compensation, the Eighth Amendment's prohibition on excessive fines, and the due process guarantees of the Fourteenth Amendment. Ms. Kidd and Ms. Rates assert claims for damages on behalf of a class of similarly situated persons. SWOP and

[1] Treasurer Pappas was not a party to the bench trial and is not a party to the current motions because she has appealed the Court's Eleventh Amendment decision. *See Kidd II,* 2025 WL 3507374, at *8–16. That appeal is currently pending.

PLSNA assert claims solely on their own behalf and request declaratory and injunctive relief.

The Court certified a class of all persons or entities who meet the following criteria: (1) they owned or were the beneficial owners of residential real property in Cook County, Illinois in Residential Assessment Classes Major Class 2 and Class 3; (2) the properties were sold in the Cook County annual tax sale; (3) a tax deed was issued to the purchaser of such property at any time on or after December 15, 2020 and not withdrawn; and (4) the Cook County Assessor's Office's assessed Fair Cash Value as of the time of tax deed's issuance exceeded the total amount of taxes, fees, and interest owed at the end of the redemption period. *Kidd v. Pappas*, No. 22 C 7061, 2025 WL 1865983, at *20 (N.D. Ill. July 7, 2025) ("*Kidd I*"). The Court later concluded that Cook County's tax sales violate the Fifth Amendment's prohibition against takings without just compensation and the Eighth Amendment's prohibition on excessive fines. *Kidd v. Pappas*, No. 22 C 7061, 2025 WL 3507374 (N.D. Ill. Dec. 8, 2025) ("*Kidd II*"). In its summary judgment decision, the Court determined that the summary judgment record was insufficient to decide the issue of the County's liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). *Kidd II*, 2025 WL 35007374, at *16. After a bench trial on *Monell* liability, the Court concluded that the County was on notice that its tax sale process caused constitutional violations and was deliberately indifferent when it failed to take any action to provide just compensation to homeowners. *Kidd v. Pappas*, No. 22 C 7061, 2026 WL 1278273 (N.D. Ill. May 11, 2026) ("*Kidd III*").

The County has moved for reconsideration of the Court's summary judgment and

bench trial decisions based on the Supreme Court's recent decision in *Pung v. Isabella County*, 146 S. Ct. 1964, 1967 (2026). The plaintiffs have moved for entry of a final judgment that would award damages to the class based on a formula of fair market value minus taxes due, plus prejudgment interest.

## Background

### A. Cook County's property tax sales

Every year, Cook County conducts a property tax sale, which is supervised and administered by the County Treasurer acting as the County collector. The procedures the County follows are outlined by the Illinois Property Tax Code, 35 ILCS 200/21-5–200/22-95. If taxes on a delinquent property go unpaid, the County Treasurer may apply for a judgment and order of sale for unpaid taxes on the property. *Id.* 200/21-150. The judgment grants the County a lien on the property "for the amount of taxes . . ., interest, penalties, and costs due thereon" and orders that the property, "or so much of each of them as shall be sufficient to satisfy the amount of taxes . . . due thereon, be sold as the law directs." *Id.* 200/21-180. Once a judgment and order of sale is rendered, the Property Tax Code states that the County "shall" "proceed to offer the property for sale pursuant to the judgment." *Id.* 200/21-190.

Rather than auctioning a property based on its value, the County Treasurer sets the auction price based on the amount of taxes past due plus the penalty percentage the buyer is willing to collect on any later payments made by the property owners. 35 ILCS 200/21-215. The buyer who bids the lowest penalty percentage wins the sale. *Id.* In exchange for a lien on the property and the right to collect unpaid taxes from the property owner plus the penalty percentage, tax buyers pay Cook County the

outstanding balance of unpaid taxes on the property at issue. *Id.* In short, the sale price is based on the amount of taxes past due plus interest; it is not tied to the value of the property.

The Illinois Constitution provides property owners with a "right of redemption," allowing them to *reacquire* ownership lost via a tax sale. *See* Ill. Const. art. IX, § 8. Generally, property owners have thirty months from the time of the tax sale to redeem their property by repaying the tax buyer. 35 ILCS 200/21-350. But if the property owner does not repay the tax buyer within the allotted time, the tax buyer may petition a court for ownership of the property. *Id.* 200/22-30. Upon granting the tax buyer's petition, the court orders the County Clerk to issue and certify a tax deed transferring ownership of the property to the tax buyer. *Id.* 200/22-40.

The Property Tax Code also requires counties to maintain a fund to indemnify eligible property owners for losses or damages incurred due to the tax sale. 35 ILCS 200/21-295. To fund Cook County's Indemnity Fund, the Property Tax Code requires every tax buyer to pay "a nonrefundable fee of $80 for each [property] purchased plus an additional sum equal to 5% of the taxes, interest, and penalties paid" to purchase the property, as well as $80 for each subsequent year the tax buyer pays property taxes on the property. *Id.* A property owner seeking indemnity must "petition the Court which ordered the tax deed to issue" and "ask that judgment be entered against the County Treasurer, as trustee, in the amount of the indemnity sought." *Id.* 200/21-305. To obtain an award in excess of $99,000, a homeowner must prove that the loss of the property was not attributable to his or her own fault or negligence. *Id.*

Two witnesses testified during the bench trial: Justin Kirvan and James

Thompson. Kirvan is policy director for the Cook County Treasurer and has served in that role since December 2022. He previously served as a staff attorney and as the chief legal counsel in the Treasurer's office and as an attorney for the Cook County Assessor. Thompson is the Director of Assessment and Property Tax Policy for the President of the Cook County Board and has served in that role since December 2021.

Kirvan testified that one of the possible outcomes of the Cook County tax collection system is that a property owner can lose the equity in their property when a tax deed is issued. Kirvan also testified that, if "the system proceeded as the legislature intended, then [the property owner] should have gotten their equity back" via the Indemnity Fund. Tr. 23:3–4. Thompson testified that he believed the Cook County Commissioners, based on his conversations with them, had a basic understanding that a homeowner who does not pay property taxes in Cook County may lose their home. Thompson also testified that he believed that the purpose of the Indemnity Fund is to address the equity loss expected from the tax sale.

Kirvan and Thompson both acknowledged that Cook County's Indemnity Fund has been severely underfunded. According to an analysis performed by the Treasurer's office in 2023, over the period from 2015 through 2022, the average number of tax deeds issued each year was 769. During that same period, an average of forty indemnity awards were issued to property owners each year. Based on this data, it appears that—on average—only five percent of property owners who had their property taken through the issuance of a deed to a tax buyer received any compensation at all. Conversely, ninety-five percent of property owners who had their property taken received no compensation.

Illinois law requires the Treasurer to transfer to the County, each year, any funds in the Indemnity Fund in excess of $2 million. Based on this requirement, the Treasurer's Chief Financial Officer sends the County's Chief Financial Officer a letter each year that lists the balance in the Indemnity Fund. Typically, no transfer occurs because the Indemnity Fund has a balance around or below $2 million. For example, the balance was $191,856.34 in 2020 and $2,217,747.04 in 2021. In December 2022, the letter included additional information because the balance for that year was approximately $3.9 million. The letter stated that the Indemnity Fund had over $22 million in outstanding judgments. Kirvan testified that the letter included the detail about outstanding judgments to explain to the County why the Treasurer would not transfer the funds in excess of $2 million.

Kirvan and Thompson also testified that, in their views, the Treasurer and County did not have the authority to independently compensate property owners for equity lost as the result of the property tax sale system. Kirvan testified that, in his view, there were limitations on the Treasurer's ability to promulgate rules and regulations relating to the annual tax sale. Specifically, Kirvan testified that he believed *Bridgman v. Korzen*, 54 Ill. 2d 74, 78, 295 N.E.2d 9, 11 (1972), prohibits the Treasurer or any County-related entity from undertaking "any action that would impact or implicate the collection and/or distribution of taxes." Tr. 135:1–7. Kirvan contended that providing a property owner payment for lost equity would create a disincentive for property owners to pay their taxes. Kirvan testified that, as a result of this presumed disincentive, the County's ninety-nine percent tax collection rate would "presumably drop" and thus "directly implicate[] the amount of collections" the County would distribute to the taxing districts.

Tr. 156:1–7. In short, Kirvan believed that providing lost equity to property owners would impact property tax collection and distribution in violation of *Bridgman*. Kirvan did not provide any data or analysis to support his contention. Still, Kirvan determined that the Treasurer and County lacked the legal authority to compensate property owners for lost equity.

Thompson testified that he agreed with Kirvan's view that the County's funding of the difference between a homeowner's assessed value and the taxes owed would exceed the County's home rule authority because of the impact it would have on taxing districts. He further testified that he never briefed the County board with respect to the County's ability to compensate a property owner for lost equity because, in his view, the County has no authority to do that.

Kirvan and Thompson also testified that no County employees or officials, or other stakeholders, ever informed them that the County had the authority to compensate property owners for equity lost as the result of the tax sale. According to Kirvan, he did not consider whether the County could compensate property owners for lost equity because he viewed the lost equity as the outcome of "a harsh enforcement system in Illinois." Tr. 213:18–25. Kirvan and Thompson further testified that, to their knowledge, no one in the Treasurer's office or President's office considered whether the County could compensate property owners for lost equity.

Kirvan and Thompson testified that, after the Supreme Court's decision in *Tyler v. Hennepin County*, 598 U.S. 631 (2023), the Treasurer and the County advocated for the state legislature to reform the tax sales processes set forth in state law. These reforms would permit the Treasurer to auction a property after the redemption period, ensuring

that a property owner would not lose equity when a tax buyer received the deed to the property.

The plaintiffs also submitted excerpts of a report prepared by their expert, Dr. William Hamm, that detailed his analysis of the equity class members lost because of Cook County's property tax sale system. *See* PX 24. Dr. Hamm identified 1,773 parcels of land that are located in Cook County on which the County sold the tax lien on the owner's property to a third party and a tax deed was issued to the tax lien buyer on or after December 15, 2020. He eliminated forty-four parcels because: (1) a documented bankruptcy or other court action voided the tax deed, or (2) the property was identified as non-residential. Dr. Hamm then calculated the value of the equity lost for 205 of these parcels by subtracting the delinquent taxes from the Cook County Assessor's fair market value assessment of the property.

According to Dr. Hamm's analysis, the average lost equity was $69,167.72. This does not account for any amount owed on a mortgage on the property. Thompson testified that an estimated amount required for payment of property tax payments is typically included in what a property owner pays towards a mortgage payment every month and that mortgage lenders have an incentive to ensure the property taxes are paid.

Based on Dr. Hamm's calculation, all of the properties he reviewed suffered some amount of lost equity. Kirvan also testified that he thought that the average equity loss a property owner suffered from a tax sale was "several tens of thousands of dollars." Tr. 67:9–13. Kirvan and Thompson testified that the Treasurer or County could have requested information to conduct a similar analysis but never did so. Such

an analysis would have shown how many property owners lost equity as the result of property tax sales and provided an estimate of the amount of equity each property owner lost.

**B. Individual plaintiffs**

Michelle Kidd purchased her home in Maywood, Illinois in 2011. She fell behind on her property taxes around 2015. Cook County Treasurer Maria Pappas obtained a judgment and order of sale against her property that year. On April 4, 2017, Cook County sold the tax lien on Ms. Kidd's property to High 5 Group, LLC for the amount of unpaid taxes, interest, and costs—$2,340.44. Ms. Kidd was unable to pay her outstanding tax debt before the redemption period expired on October 10, 2019. On November 2, 2021, High 5 Group obtained a tax deed for Ms. Kidd's home. High 5 Group further obtained an order for possession of the property on January 23, 2022. Rather than evict Ms. Kidd, High 5 Group allowed her and her family to remain in the property as long as she paid rent. She did this for a few months before moving her family into a smaller rental unit in May 2022.

Goyce H. Rates inherited her home in Evanston, Illinois from her mother in 2014. Ms. Rates did not pay property taxes for the two parcels of land on which the home sits. Treasurer Pappas obtained a judgment and order of sale against both parcels. On May 3, 2019, Cook County sold the tax liens on the respective parcels to separate tax buyers: Newline Holdings, LLC and Corona Investments. Collectively, the liens were purchased for the total amount unpaid taxes, interest, and costs relating to the two parcels, a total of $9,025.45. Ms. Rates was unable to redeem her property, and tax deeds for both parcels were issued to the tax buyers by June 2023. Both buyers

obtained eviction orders. Ms. Rates and her family were evicted from the property on November 22, 2023. At the time of the issuance of the tax deeds that transferred these properties to tax buyers, Cook County's latest tax assessments indicated that Ms. Kidd's and Ms. Rates's homes had fair market values of $166,220 and $389,060 respectively.

## Discussion

### A. Defendant's motion for reconsideration

The County argues that the Court should reconsider its conclusions that Cook County's taking of the plaintiffs' property without providing the plaintiffs with any compensation violated the Fifth and Eighth Amendments. The County also asks the Court to reconsider its conclusion that the County is liable for these violations under *Monell.* Finally, the County argues that principles of comity require the plaintiffs to bring their claims in state court.

#### 1. Comity

Because comity is a question of federal court abstention, the Court addresses it first. *City of Fishers v. DIRECTV*, 5 F.4th 750, 752 (7th Cir. 2021). The County contends that the principles of comity require dismissal of the plaintiffs' claims. The plaintiffs respond that the County waived any comity argument and, if not waived, comity concerns associated with local tax administration are not implicated by this case because the plaintiffs only seek just compensation for property the County has taken.

The plaintiffs first argue that the County has waived its comity argument by raising it for the first time in a motion to reconsider. Comity "is a prudential doctrine." *Levin v. Com. Energy, Inc.*, 560 U.S. 413, 432 (2010). The Seventh Circuit has held that the failure of a party to raise other abstention doctrines at any point in the

proceedings is "no impediment to our consideration of the applicability of those doctrines." *Int'l Coll. of Surgeons v. City of Chicago*, 153 F.3d 356, 360 (7th Cir. 1998). The purpose underlying those abstention doctrines related to "promoting a harmonious federal system by avoiding a collision between the federal courts and state (including local) legislatures." *Id.* The same is true of comity. The Court will therefore consider the merits of the County's comity argument.

The plaintiffs are correct that comity did not prevent the exercise of federal jurisdiction in *Tyler* or *Pung*. The plaintiffs argue that the lack of any comity discussion supports the contention that comity was not of any concern to those courts. The County responds that the failure of a court to mention potential jurisdictional issues has no precedential effect. In *Tyler*, the local government removed the case from state court to federal court and, in doing so, waived any argument that the principles of comity applied. *See Tyler v. Hennepin County*, 505 F. Supp. 3d 879, 888 (D. Minn. 2020). The district court did not address comity in *Pung*. *Pung v. County of Isabella*, 632 F. Supp. 3d 743, 751 (E.D. Mich. 2022). The Court agrees that the fact that *Tyler* and *Pung* were decided by federal courts by itself does not support the Court's exercise of jurisdiction. The Court therefore does not rely on those decisions for this purpose.

"[T]he comity doctrine applicable in state taxation cases restrains federal courts from entertaining claims for relief that risk disrupting state tax administration." *Levin*, 560 U.S. at 417. "Comity's constraint has particular force when lower federal courts are asked to pass on the constitutionality of state taxation of commercial activity." *Id.* Comity also requires abstention in suits for damages arising from state taxation collection and enforcement so long as a plain, adequate, and complete state remedy

exists. *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 115–16 (1981).

In *Levin*, the Supreme Court held that comity considerations warranted dismissal of a suit when the plaintiffs, independent marketers who competed with local distribution companies for retail sale of natural gas, sought an order invalidating certain state tax exemptions that local distribution companies received under the Ohio tax code. *Levin*, 560 U.S. at 417. As the Seventh Circuit has noted, the Supreme Court stated in *Levin* that several factors counseled in favor of abstention:

> First, 'respondents seek federal-court review of commercial matters over which [the state] enjoys wide regulatory latitude; their suit does not involve any fundamental right or classification that attracts heightened judicial scrutiny.'
>
> Second, 'while respondents portray themselves as third-party challengers to an allegedly unconstitutional tax scheme, they are in fact seeking federal-court aid in an endeavor to improve their competitive position.'
>
> Third, '[state] courts are better positioned than their federal counterparts to correct any violation because they are more familiar with state legislative preferences and because the [Tax Injunction Act] does not constrain their remedial options.'

*City of Fishers*, 5 F.4th at 756 (quoting *Levin*, 560 U.S. at 431–32).

The first factor noted in *Levin* weighs in favor of exercising jurisdiction in this case because the plaintiffs' claims involve fundamental constitutional rights, not commercial matters. The second factor also weighs in favor of exercising jurisdiction because the plaintiffs are not seeking to improve their competitive position through challenging the state's tax procedures. Instead, the plaintiffs are seeking compensation that they are due based on the County's Fifth and Eighth Amendment violations. The third factor further weighs in favor of exercising jurisdiction. The plaintiffs do not request, and the Court could not order, any modification to Cook County's tax collection

procedures. Instead, the plaintiffs seek damages based on the County's failure to provide just compensation after a taking has occurred.

The plaintiffs rely on *Freed v. Thomas*, 976 F.3d 729 (6th Cir. 2020). In *Freed*, the plaintiff sued Gratiot County, Michigan and the Country Treasurer claiming they took his property without just compensation in violation of the Fifth Amendment's takings clause and imposed an excessive fine against him in violation of the Eighth Amendment. *Id.* at 732. The Sixth Circuit held that comity did not require federal court abstention because the plaintiffs did not challenge the state's tax collection procedures but instead challenged the processes and procedures after tax collection. *Id.* at 735. The court went on to explain that the excess sale proceeds at issue in the lawsuit arose from a tax-foreclosure sale but were not tax proceeds. *Id.* Thus no tax proceeds would be removed from the state's coffers if the plaintiff succeeded in recovering the excess sale proceeds as a result of the lawsuit. *Id.* at 736.

The County points to *Turner v. Jordan*, 117 F.4th 1289, 1304 (11th Cir. 2024).[2] In *Turner*, the plaintiff claimed that the County sold his property for an impermissibly low amount based on incorrect interpretations of Flordia's tax code. *Id.* at 1294. The Eleventh Circuit held that comity supported the federal court's abstention because the plaintiff's claims required the court "to rule on the propriety of the homestead exemption removal, the sufficiency of the notice of the tax sale, and the failure of County Tax

---

[2] The County briefly asserts in its reply that "the Seventh Circuit has already held that comity bars requests for damages resulting from tax lien sales." Def.'s Reply at 10 (citing *Wright v. Pappas*, 256 F.3d 635, 637 (7th Cir. 2001)). But, in *Wright*, the plaintiff challenged the mode of collection and sought, "in effect, a refund of state taxes." *Wright*, 256 F.3d at 637. *Wright* thus does not support the County's assertion that the Seventh Circuit has already decided this issue.

Collector employees to consider the homestead status of his property." *Id.* at 1300. The court explained that "to rule on those issues would require the district court to rule on the constitutionality of the local government's tax procedures." *Id.* Because the plaintiff challenged the local government's interpretation of state statutes that governed the sale of property to collect delinquent taxes, the court reasoned that the state courts were in a better position to address these claims. *Id.* at 1302–04.

The County argues that, because it receives no surplus proceeds, comity bars plaintiffs' claims. According to the County, such claims directly challenge state tax collection and enforcement procedures because the County receives no surplus funds to return to a property owner. But the County ignores that the plaintiff in *Turner* challenged the local county's process for conducting the sale of his property based on its interpretation of Florida law. The Eleventh Circuit distinguished *Freed* on this basis because his challenge was more than a challenge to "post-collection constitutional violations." *Turner*, 117 F.4th at 1304. The court also noted that, if the sale of the plaintiff's property resulted in a surplus, he would have received it under Florida law. *Id.* Contrary to the County's argument, *Turner* does not support abstention in a case like this one where the local government does not receive surplus proceeds from a tax sale.

As in *Freed*, the plaintiffs in this case do not challenge the constitutionality of the County's tax collection process but instead challenge the County's failure to provide just compensation after the County took their property. These challenges do not impact the collection or enforcement of taxes. As the Court explained in two previous decisions in this case, "the state-imposed process for conducting a tax sale does not cause the deprivation of equity." *Kidd III*, 2026 WL 1278273, at *18; *see also Kidd II*, 2025 WL

3507374, at *16. "What actually results in property owners losing their property—in this case, being deprived of their equity" is "the refusal of the seller—the County—to compensate owners for their lost equity after the sale is completed." *Kidd II*, 2025 WL 3507374, at *16. The fact that the County does not retain any surplus property proceeds does not change this conclusion.

For these reasons, the Court concludes that the principles of comity do not require dismissal of the plaintiffs' claims.

**2. Merits**

**a. Fifth Amendment**

The County contends that—after *Pung*—it cannot be liable for a Takings Clause violation because it does not retain any surplus proceeds related to the plaintiffs' property. The plaintiffs respond that the County "misconstrues *Pung* to mean there is no taking unless the government actually receives and retains surplus proceeds from the sale of the property." Pls.' Resp. to Mot. for Recons. at 4. The plaintiffs point out that in Cook County there is no "tax sale" of property (real estate) akin to the type of sale the Supreme Court contemplated in *Pung*. *Id.* at 5. Instead, what is sold in Cook County is a tax *lien* whose value is capped at the amount of taxes past due. The only bidding that occurs involves the interest rate on that amount. *Id.*

"[A] property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it." *Knick v. Township of Scott*, 588 U.S. 180, 189 (2019). "Whether the government does nothing," or provides a statutory or other remedy, "the owner's claim for compensation rests upon the Fifth Amendment." *Id.* at 190–91 (internal citation omitted). "Compensation under the

Takings Clause is a remedy for the constitutional violation that the landowner has *already* suffered at the time of the uncompensated taking." *Id.* at 193. "A later payment of compensation may remedy the constitutional violation that occurred at the time of the taking, but that does not mean the violation never took place." *Id.*

Two recent Supreme Court decisions are relevant to the County's motion. In *Tyler*, the plaintiff owed roughly $15,000 in unpaid property taxes, interest, and penalties. *Tyler*, 598 U.S. at 635. Hennepin County, utilizing Minnesota's tax forfeiture laws, seized the plaintiff's property. *Id.* The county then sold the property for $40,000, extinguishing the $15,000 debt. *Id.* The county retained the $25,000 surplus for its own use. *Id.* The plaintiff sued Hennepin County and its officials, arguing that "the County had unconstitutionally retained the excess value of her home above her tax debt" in violation of the Fifth Amendment's Takings Clause. *Id.* at 635–36. The Supreme Court unanimously concluded that the plaintiff had plausibly alleged a Takings Clause claim. *Id.* at 647–48. The Court recognized that the county "had the power to sell [the plaintiff]'s home to recover the unpaid property taxes." *Id.* at 639. "But it could not use the toehold of the tax debt to confiscate more property than was due." *Id.* In doing so, Hennepin County "effected a classic taking in which the government directly appropriates property for its own use." *Id.* (cleaned up).

In *Pung*, the question presented was "whether 'just compensation' following a tax sale is measured by the price that the property fetched at auction or its hypothetical fair market value." *Pung*, 146 S. Ct. at 1967. The Supreme Court concluded "that the proper baseline [for just compensation] under the Takings Clause is the price obtained in a tax sale, at least when the sale is fairly conducted in light of our country's history of

tax sales." *Id.* In sum, the Court concluded that "just compensation in the tax-sale context need not be based on a property's fair market value." *Id.* at 1971.

But in *Pung*, the Court did not address whether Isabella County's tax sale procedures were fair. *Id.* The Court noted that "the parties appear[ed] to agree that a jurisdiction might violate the Constitution if it employs blatantly unfair procedures, such as conducting a sham sale or needlessly delaying a tax sale while real estate prices crashed." *Id.* at 1972. The Court remanded to the Sixth Circuit the question of whether the procedures Isabella County followed in seizing and selling Pung's property were unfair and thus violated the Takings Clause. *Id.*

In a concurrence, Justice Thomas, joined by Justice Gorsuch, addressed the historical contours of tax foreclosure sales. *Id.* at 1979. Justice Thomas noted that tax foreclosure sales were historically subject to strict limits that, among other things, "protected the property rights of the homeowner and helped to avoid a conflict between tax foreclosures and the Takings Clause." *Id.* He pointed to two limits that are "most relevant when the government takes an entire home to pay for a small tax debt, as it did to the Pungs." *Id.* "First, the government had to try to sell the taxpayer's personal property before it moved on his real property." *Id.* "Second, before foreclosing on a delinquent taxpayer's entire property, the government had to pursue only part of the property first." *Id.* "If the government did not attempt to sell either part of the property or personal property first, then the taxpayer could reclaim his property or compensation for the taking." *Id.* at 1979–80. Justice Thomas noted that Isabella County's actions "seem to have departed from" history and tradition of fair tax sales in the United States. *Id.* at 1980. Thus, in his view, Isabella County's tax sale procedures were likely

unconstitutional. *Id.* at 1981.

In its summary judgment briefing in this case, the County attempted to distinguish *Tyler* in two ways. First, the County emphasized that it does not take title to any property and does not receive any surplus equity. Second, the County contended that its tax sales could not result in any taking because the homeowners may petition the Indemnity Fund for lost excess equity. The Court concluded that the government is responsible for a Takings Clause violation when it authorizes the occupation of private property by third parties. *Kidd II*, 2025 WL 3507374, at *18. The Court also concluded that the Indemnity Fund did not provide a meaningful opportunity to recoup lost equity. *Id.*

*Pung* does not change the Court's conclusion. The Minnesota law at issue in *Tyler* provided that, if the property owner did not timely pay property taxes or redeem the property during the redemption period, "absolute title vests in the State, and the tax debt is extinguished." *Tyler*, 598 U.S. at 635. The Supreme Court held that Minnesota's scheme was a "classic taking" because "[u]nlike in *Nelson*, Minnesota's scheme provides no opportunity for the taxpayer to recover the excess value." *Id.* at 644. The same is true in Illinois, and more specifically in Cook County. Because the plaintiffs in this case had no meaningful opportunity to recover *any* compensation after the County took their homes, the County's actions violated the Takings Clause.

The County relies heavily on the Court's statement in *Pung* that, when the government seizes and sells property to collect a tax debt, a property owner is entitled to "the surplus sale proceeds—nothing less, and nothing more." *Id.* at 1969-70. But the County ignores the next line of the Court's opinion: "The baseline for measuring just

compensation in the tax-sale context is therefore the sale price, not the property's hypothetical fair market value, *at least when the sale is fairly conducted in light of our country's history of tax sales*." *Id.* at 1970 (emphasis added).

In *Pung*, the Court did not answer whether Isabella County's tax sale process was fair; it remanded that question to the Sixth Circuit. *Id.* at 1967 (remanding the question of whether "the *procedure* the County followed in seizing and selling [Pung's] property was unfair in several respects" to the Sixth Circuit for consideration in the first instance (emphasis in original)). Instead, the Court held that a tax sale process based on an auction of property where the surplus is returned to the owner *could* be fairly conducted such that it would satisfy the Fifth Amendment's just compensation requirement. *Id.* ("To sum up, just compensation in the tax-sale context need not be based on a property's fair market value.").

Although "just compensation" in the tax sale context does not require alignment with the hypothetical fair market value of a property, *Pung* does not disturb the proposition that a Fifth Amendment violation occurs when a local government takes private property and provides *no* compensation. In Cook County, a property owner's only hope to recoup compensation for property the County seizes and transfers to a third party for past due taxes is from the Indemnity Fund. As discussed at length in the Court's previous decisions, at the relevant time it was well known that a homeowner could receive compensation from the Indemnity Fund only after meeting certain conditions and that the Fund was chronically underfunded. *Kidd II,* 2025 WL 3507374, at *18; *Kidd III*, 2026 WL 1278273, at *5. The Indemnity Fund therefore did not provide any meaningful remedy for property owners.

The County contends that any argument that the Court's holding in *Pung* was contingent on the tax sale being fairly conducted fails for two reasons. First, the County says, the plaintiffs "cannot possibly reconcile this argument with the fact that what happened here was *exactly what the* Pung *petitioner offered up as fair*: placing a lien on his property." Def.'s Resp. to Mot. for J. at 7 (internal citation omitted). Second, the County contends, its tax sale process was fairly conducted because "given the lien was created by Illinois law, and was executed upon in strict compliance with the requirements of Illinois law, such a challenge to the fairness of the statutory lien process cannot possibly be reconciled with the federal comity doctrine . . . ." *Id.* These arguments are not persuasive.

Again, in *Pung*, the Court did not find that placing a lien on the homeowner's property was a fair tax sale procedure. It remanded the question of fairness to the Sixth Circuit. *Pung*, 146 S. Ct. at 1967. And Justice Thomas stated in his concurrence that Isabella County's tax sale procedures were likely unconstitutional. *Id*. at 1979. As for comity, the plaintiffs' claims are based on the County's taking of their property without providing any compensation. Although the fairness of the County's tax sale procedures is relevant to this question, the claims do not challenge the County's interpretation of the statutes governing the tax sale itself or seek any modification of that process. Instead, the plaintiffs seek the compensation they are due under the Fifth Amendment.

The County's tax sale procedures were blatantly unfair. The County did not conduct any true auction of the plaintiffs' property. Instead, the County's auction price was based on the amount of past-due taxes plus interest. The failure to conduct any sale of the property itself that may result in surplus proceeds is far more egregious than

the sham sale or needless delay of a tax sale when real estate prices crashed that the parties in *Pung* agreed may violate the Takings Clause.

At oral argument, the County argued that Cook County never takes possession of the property and thus essentially is a bystander in the process established in the Property Tax Code that occurs between a property owner and a tax buyer. Accepting this argument would lead to absurd results.

Under the County's reading of *Pung*, a local government would avoid liability for a Takings Clause violation if it took property from one person, gave it to another, and retained no equity in the property. But a tax buyer cannot take private property from a delinquent taxpayer without the County's involvement. Indeed, the County—through the Treasurer—applies for a judgment and order of sale for unpaid taxes on a delinquent property. 35 ILCS 200/21-150. The judgment grants the County a lien on the property "for the amount of taxes . . ., interest, penalties, and costs due thereon" and orders that the property, "or so much of each of [it] as shall be sufficient to satisfy the amount of taxes . . . due thereon, be sold as the law directs." *Id.* 200/21-180. Once a judgment and order of sale is rendered, the County "shall" "proceed to offer the property for sale pursuant to the judgment." *Id.* 200/21-190.

The County's attempt to portray this process as simply collecting money to pay off its lien via a new lien that then arises in favor of the tax buyer, rather than the County's sale of its lien to the tax buyer, does nothing to help its cause. The County Treasurer, on behalf of the County, conducts an auction during which tax buyers bid on the right to receive a lien on delinquent properties in exchange for paying the amount of past due taxes. This is the beginning of the process that allows the tax buyer to

ultimately obtain a deed to the property. In sum, the fact that the County auctioned the rights to the plaintiffs' properties for the price of the taxes past due, rather than for the value of the property, does not immunize it from a Takings Clause violation; the County's initial application for a lien on the plaintiffs' properties ultimately caused the taking to occur.

The County also argues that *Pung* requires reconsideration of the Court's conclusion that "the fact that a tax buyer might also have violated the Takings Clause does not immunize the defendants' facilitation of the transfer of property without just compensation." *Kidd II*, 2025 WL 3507374, at *18. According to the County, to reach this conclusion, the Court relied on "eminent-domain cases that do not govern the measure of just compensation in this context." Def.'s Mem. ISO Mot. for Recons. at 10. The Court did not cite eminent domain cases for the proposition that the plaintiffs were due a certain amount of compensation. Instead, these cases supported the Court's point that the government "is responsible for a Takings Clause violation when it authorizes the occupation of private property by third parties." *Kidd II*, 2025 WL 3507374, at *18. This reliance is not impacted by *Pung*.

For these reasons, the Court concludes that *Pung* does not require reconsideration of its previous decision that the County's failure to provide just compensation after taking the plaintiffs' property violated the Fifth Amendment's Takings Clause.

**b. Eighth Amendment**

The County also contends that *Pung* requires reconsideration of the Court's conclusion that Cook County tax sales imposed an excessive fine in violation of the

Eighth Amendment. The County points to *Pung*'s discussion that the Supreme Court, in that case, found no evidence "suggesting that a tax sale which is fairly conducted in light of our Nation's history would violate the Eighth Amendment[.]" Def.'s Mem. ISO Mot. for Recons. at 11 (quoting *Pung*, 146 S. Ct. at 1973). According to the County, "[s]o long as the government returns any surplus that it actually receives, it has not imposed a fine for purposes of the Eighth Amendment." *Id.* at 12 (citing *Pung*, 146 S. Ct. at 1973). The plaintiffs respond that *Pung* does not affect the Court's Eighth Amendment analysis because that case addressed a tax sale system that generated proceeds that were remitted to the homeowner, whereas the County's tax lien sale system does not.

The County continues to rely on *Pung* without addressing the key point that is fatal to its arguments. *Pung*'s holding relied on the underlying tax sale having been fairly conducted in light of the history of tax sales in the United States. *Pung*, 146 S. Ct. at 1967 ("We conclude that the proper baseline under the Takings Clause is the price obtained in a tax sale, at least when the sale is fairly conducted in light of our country's history of tax sales."). For the reasons previously discussed, the County's tax sale procedure, which auctions tax liens and not the homeowner's property, and which provides no avenue for a homeowner to recoup *any* compensation for lost equity, is not a sale that is fairly conducted in light of the history of tax sales in the United States.

**3. *Monell* liability**

The County also argues that the Court must reconsider its conclusion that the County is liable for the violations of the plaintiffs' constitutional rights under *Monell.* The County contends that "[a]fter *Pung*, a local government cannot be deliberately indifferent

for failing to adopt a policy that would require it to operate its tax-sale system at a net loss." Def.'s Mem. ISO Mot. for Recons. at 12. The plaintiffs respond that the County's argument fails because *Pung* does not apply to this case. The plaintiffs also argue that the Court's decision finding *Monell* liability was fully supported because the evidence established that it was common knowledge that tax sales often led to the issuance of tax deeds without compensation and the County had access to the data needed to determine the scope of the constitutional violations.

The County's argument rests on reading *Pung* to hold, as relevant here, that "the relevant question is not whether a property's assessed value exceeds the tax debt but rather whether the government received surplus proceeds and failed to return them." Def.'s Mem. ISO Mot. for Recons. at 13. This reading is incorrect. As discussed, *Pung* held that the surplus proceeds a government received after auctioning a property through tax sale procedures *may* satisfy the "just compensation" requirement of the Fifth Amendment. *Id.* This is only true, however, when the tax sale procedures are fairly conducted in light of the history of tax sales in the United States. *Id.* As noted earlier, the Court did not answer whether Isabella County's procedures were fair and instead remanded this question to the Sixth Circuit. *Id.* at 1972–73.

*Pung* does not impact the Court's determination that the County ignored the obvious risk that property owners who had their property taken without any compensation would suffer a violation of their constitutional rights. The only avenue for a property owner to receive compensation for his or her property is through the Indemnity Fund. 35 ILCS 200/21-305. It was undisputed that the Indemnity Fund is insufficiently funded, "creating a backlog of Indemnity Fund awards about six or seven

years in arrears." *Kidd II*, 2025 WL 3507374, at *2. As a practical matter, this means that most property owners receive no compensation when the County takes a property to satisfy delinquent taxes. *Kidd III*, 2026 WL 1278273, at *5–6; Tr. 91:9 – 92:13; Pls.' Ex. 80. Kirvan, the Treasurer's policy director, also recognized that, to comply with *Tyler*, Illinois needed to implement a process to auction property based on its value rather than the amount of past due taxes. *See* Tr. 196:3–11 (Kirvan testifying that after reviewing the *Tyler* decision, it was his opinion that Illinois could implement an auction of property and, "if the results weren't too egregious," it would be a constitutionally permissible way of determining the value of the property within the foreclosure context.). In short, the County was on notice that homeowners had no meaningful opportunity to receive any compensation after a property was taken for a tax sale.

The fact that the County may not have known the exact amount of just compensation that was due to each property owner does not alter this result. As the Court explained in its previous decision, the County had every piece of information it needed to know that property owners lost excess equity. *Kidd III*, 2026 WL 1278273, at *5. The County also knew that property owners did not receive any compensation at all, aside from the hypothetical possibility of an award from the Indemnity Fund. *Id.* As discussed, any potential award from the Indemnity Fund does not satisfy the constitutional requirement of just compensation, because such awards are subject to various limitations and the Fund is chronically underfunded, making recovery unlikely at best.

The County also focuses on the discussion in *Pung* that a rule requiring governments to pay a property owner the difference between the auction price and the

hypothetical fair value of a property, resulting in a net loss to the government, would "render tax sales infeasible as a debt-collection mechanism." Def.'s Mem. ISO Mot. for Recons. at 14 (quoting *Pung*, 146 S. Ct. at 1971–72). Based on this discussion, the County contends that *Pung* "confirm[ed] that the Constitution does not require" the County to pay compensation that it never received. *Id*. at 14.

In *Pung*, the Court explained that the plaintiff's fair-market-value theory would require local governments "to do what homeowners typically do when they want to sell their homes: either shoulder the burden of selling the property themselves or employ a real estate agent." *Pung*, 146 S. Ct. at 1972. The Court stated that these would be "unprecedented burdens" on the local government. *Id.* As an example, the Court used a hypothetical property with a fair market value of $100,000 where the property owner owed $20,000 to the local tax authority. *Id.* In the Court's hypothetical, the government seized the property and sold it at a public auction for $60,000. *Id.* The government kept $20,000 to satisfy the tax debt and returned $40,000 to the prior owner. *Id.* at 1972. The Court explained that a rule requiring the government to instead pay the owner $80,000—the difference between the hypothetical fair market value and the tax debt—"would render tax sales infeasible as a debt-collection mechanism." *Id.*

The hypothetical set forth in *Pung* stands in stark contrast to the facts of this case. Ms. Kidd purchased her home in Maywood, Illinois in 2011. She fell behind on her property taxes around 2015. The County sold her property for the amount of unpaid taxes, interests, and costs—$2,340.44. Ms. Rates inherited her home in Evanston, Illinois from her mother in 2014. She did not pay property taxes for the two parcels of land on which the home sits. Cook County sold the respective parcels to two tax buyers

for the total unpaid taxes, interest, and costs relating to the two parcels—$9,025.45. The sale price in both of these "tax sales" was based on the amount of taxes due, not the value the property itself could generate at auction. Thus the County did not simply provide Ms. Kidd and Ms. Rates a lower amount of compensation than the hypothetical fair market value, as occurred in *Pung*. Instead, it provided no compensation at all even though their homes were valued at $166,220 and $389,060 respectively.

In reply, the County argues that it "did not know it was constitutionally required to adopt a policy under which it would collect only unpaid taxes, interest, and costs, only to give that money back many times over by paying fair-market-value or assessed-value compensation it never received." Def.'s Reply ISO Mot. for Recons. at 3. The County goes on to argue that *Pung* "rejected a rule requiring governments to pay more than they receive in the tax-sale process because such a rule would create a 'perverse result' and render tax sales 'infeasible as a debt-collection mechanism.'" *Id.* at 4 (quoting *Pung*, 146 S. Ct. at 1972). Thus, according to the County, "even if Cook County knew that some properties had assessed values exceeding the tax debt, that did not put Cook County on notice that it had to incur massive debt to delinquent taxpayers merely to collect the amounts undisputedly owed." *Id.*

The County's argument again misses the critical distinction between this case and the language it relies on from *Pung*: a fairly conducted tax sale. The County was on notice that the property owners had no meaningful opportunity to receive any compensation when it took their property to collect delinquent property tax payments. The failure to provide any compensation when taking a property is a classic Takings Clause violation.

The County also contends that "[t]he fact that the State ultimately enacted a new statutory framework reinforces that the issue was one for the State legislature, not the County." Def.'s Reply ISO Mot. for Recons. at 5. As discussed in the Court's summary judgment decision, the County had authority to implement policies related to the execution of tax sales that would provide just compensation. *Kidd II*, 2025 WL 3507374, at *12–14. The State's recent decision to change the underlying tax sale procedures to comply with constitutional requirements does not excuse the County's taking of private property without just compensation.

In sum, the County knew that property owners had no meaningful opportunity to receive *any* compensation when it seized their property and transferred it to a tax buyer through the tax sale process. This put the County on notice that its tax sale process resulted in constitutional violations. The County's inaction in the face of this knowledge constituted deliberate indifference.

For these reasons, the Court concludes that *Pung* does not require reconsideration of its previous decision that the County is liable under *Monell* for violations of the Fifth Amendment's Takings Clause and the Eighth Amendment's Excessive Fines Clause suffered by the plaintiffs and class members.

## B. Plaintiffs' motion for judgment

### 1. Damages

The plaintiffs argue that the Court should enter final judgment awarding class-wide damages based on the following formula: the County Assessor's fair market value, minus taxes owed, plus prejudgment interest. The County responds that *Pung* forecloses plaintiffs' fair market value formula because the decision turned on three

factors: "(1) historical evidence demonstrated a long tradition of requiring only return of a 'surplus' in the tax context; (2) provision of fair market value could not be considered 'just' when the taxpayer had ample opportunity to save either his property or his equity via refinancing, loans, or sale; and (3) it would be 'perverse' to require a government attempting to collect a delinquent tax to incur a 'net loss' to the delinquent taxpayer, at the expense of innocent taxpayers, and would likely render tax sales 'infeasible as a debt-collection mechanism.'" Def.'s Resp. to Mot. for J. at 4 (quoting *Pung*, 146 S. Ct. at 1968, 1971–72). The County contends that these factors apply in this case as well.

As the Court has noted several times in this opinion, the County's argument relies on an incorrect reading of *Pung*. Each of the "factors" that the County argues the Court relied on in its holding apply only where the underlying tax sale process is fairly conducted. As discussed, the County did not conduct *any* sale of homeowners' property or otherwise offer a meaningful opportunity for them to receive compensation for the property the County was taking. In addition, the Supreme Court has expressly rejected the County's argument that "ample opportunity to save either his property or his equity" eliminates a constitutional violation. In *Tyler*, the Court addressed Hennepin County's argument that "the delinquent taxpayer could sell her house to pay her tax debt before the County itself seizes and sells the house." *Tyler*, 598 U.S. at 644–45. The Court rejected this argument: "But requiring a taxpayer to sell her house to avoid a taking is not the same as providing her an opportunity to recover the excess value of her house once the State has sold it." *Id.* at 645. And *Pung* does not support the proposition that a government can avoid its constitutional obligations if it transfers property to a third party without conducting a fair sale even if this may lead to a "net

loss" for the government.

The County also contends that any argument that the holding in *Pung* was contingent on the tax system being fairly conducted fails. As discussed, this argument is not persuasive. In *Pung*, the Court did not decide whether the tax sale process was fair, and principles of comity do not require this Court to abstain from addressing the plaintiffs' constitutional claims.

*Pung* does, however, support the County's argument that fair market value is not the *required* metric for assessing damages. The County argues that the fair market valuations are mass appraisals that do not accurately value individual properties, that the valuations do not reflect the distressed nature of the properties at the time of the taking, and that the valuations do not reflect market conditions at the time of the taking. These are fair points, and they illustrate the inappropriateness of imposing plaintiffs' formula as, in effect, a matter of law.

As an alternative to the plaintiffs' proposed formula, the County suggests that the Court conduct a damages trial for Ms. Kidd and Ms. Rates before deciding whether any class-wide damages methodology is appropriate. According to the County, this would "allow the Court and the parties to develop the issues that matter to retrospective valuation: the condition of each property at the time of the tax deed, deferred maintenance, vacancy, code issues, comparable sales, market conditions, the effect of tax delinquency, and the discount associated with a forced or distressed sale." Def.'s Resp. to Mot. for J. at 14.

A trial would address the County's contentions that the fair market value estimates, alone, are unreliable. A trial likewise would address the plaintiffs' concerns

that the County's objections to the fair market value estimates are based on unsupported factual assertions. The Court therefore concludes that conducting a trial (or trials) regarding damages is the appropriate course to follow.

**2. Declaratory judgment**

The plaintiffs also seek a declaratory judgment that: "Cook County’s policy and practice of causing Plaintiffs and Class Members who failed to pay property taxes to be deprived of the surplus equity value held in their homes and private property via issuance of tax deeds, without payment of just compensation, violates both the Takings Clause of the Fifth Amendment to the United States Constitution and the Eighth Amendment’s prohibition against excessive fines." Pls.' Mot. for J., Ex. A, at ¶ 2. The County argues that plaintiffs do not explain why a declaratory judgment is needed and that spurring the County to reform the tax sale system is the only reason the plaintiffs have previously provided. The plaintiffs argue that the declaratory judgment would "settle the rights of the parties—memorializing what the Court did in its rulings last December and last May." Pls.' Reply ISO Mot. for J. at 9.

The declaratory judgment that the plaintiffs seek would be duplicative of the Court's decisions on the merits. *Sarkis' Cafe, Inc. v. Sarks in the Park, LLC*, 55 F. Supp. 3d 1034, 1038 (N.D. Ill. 2014) ("Where the substantive suit would resolve the issues raised by the declaratory judgment action, the declaratory judgment action serves no useful purpose because the controversy has ripened and the uncertainty and anticipation of litigation are alleviated." (internal citations omitted)). The Court thus overrules, without prejudice, the plaintiffs' motion for a declaratory judgment.

## Conclusion

For the reasons stated above, the Court denies the County's motion for reconsideration [dkt. no. 248] and denies the plaintiffs' motion to enter final judgment [dkt. no. 238]. The parties have already weighed in on how they believe the damages phase of this case should be conducted. The Court continues to consider the issue, particularly in light of the points made by counsel at the hearing held on August 14, 2026. The parties are directed to (again) meet and confer to attempt to agree upon an approach for determining damages and are to file by August 28, 2026, a joint status report with a proposal (or separate proposals if they cannot agree). The case is set for an in-person status hearing on September 2, 2026 at 9:30 a.m.

Date: August 21, 2026

MATTHEW F. KENNELLY
United States District Judge